**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Civil Action No.:

STUDENT LOAN SERVICING ALLIANCE,

     Plaintiff,

v.

STEPHEN C. TAYLOR;
CHARLES A. BURT; and
DISTRICT OF COLUMBIA.

     Defendants.

---

## COMPLAINT

---

     Plaintiff Student Loan Servicing Alliance, ("SLSA" or "Plaintiff"), through undersigned counsel, hereby submits its Complaint against Defendants Stephen C. Taylor, Commissioner, Department of Securities, Insurance and Banking; Charles A. Burt, Student Loan and Foreclosure Ombudsman; and the District of Columbia (collectively "Defendants") as follows:

### <u>INTRODUCTION</u>

     1.    This lawsuit concerns the federal student loan programs and the vitality of a critical piece of their administration: student loan servicers.

     2.    Student loan servicers are selected by the federal government to administer and service federal student loans.  As part of this activity, servicers provide unique assistance to student loan borrowers, including helping those borrowers understand the repayment and deferment options available to them so that their loans do not become delinquent or fall into default.

3.      Almost half of the financial assets of the United States Government—more than a trillion dollars—are promissory notes related to unpaid loans made to America's students for their higher education:



4.      Naturally, the federal government has a comprehensive set of laws, regulations and rules pertaining to the administration, collection and repayment of these loans, including borrower protections.  Because many of the 34 million Americans who owe federal student loans move around the country, these federal laws, regulations and rules must apply uniformly throughout the country.  Furthermore, because over 92 percent of all student loans in America are made, owned, or guaranteed by the federal government, these federal laws and regulations drive the rules and practices nationwide for everyone involved in the administration and collection of student loans, including student loan servicers.

5.      Until recently, there had been no significant effort by any state to regulate the collection of these monies owed to the federal government.  In response to a few such recent efforts: (1) a U.S. District Court in Illinois held that federal control over this subject preempts

state regulations, (2) the United States submitted a formal Statement of Interest in a case in Massachusetts state court explaining the need for consistent federal control over the rules for collection of its most significant financial asset, and (3) the U.S. Department of Education issued a Notice of its position that federal law preempts state regulation of student loan servicers.

6. This lawsuit asks the Court move swiftly to prevent the District of Columbia from imposing its own directly conflicting, burdensome and expensive laws and regulations in this federally preempted area. The District of Columbia's law and regulations would cause significant harm to the federal student loan program, its borrowers, and the student loan servicers that manage the program on behalf of the federal government.

7. This lawsuit challenges District of Columbia Law 21-214 ("D.C. Law 21-214") and emergency rules ostensibly promulgated pursuant to it that purport to regulate student loan servicers by imposing additional requirements and fees beyond what is prescribed by federal law on the grounds that (1) federal law preempts D.C. Law 21-214 and the emergency rules, and (2) the emergency rules contravene D.C. law.

8. Specifically, this lawsuit seeks a declaratory judgment that the D.C. laws, including the emergency rules' fees, (1) constitute an insurmountable obstacle to the federal government's ability to administer the federal student loan programs, (2) are preempted by the Congress' occupation of the field of student loan regulation, and (3) are in many respects expressly preempted pursuant to 20 U.S.C. § 1098g, and are therefore invalid.

## PARTIES

9. Plaintiff SLSA is a non-profit, membership trade organization with an office located at 1100 Connecticut Avenue NW, Suite 1200, Washington D.C. 20036.   SLSA's

membership consists of 20 student loan servicers and 9 affiliate members, who collectively service over 95 percent of the outstanding Federal Direct Loan Program ("FDLP") and Federal Family Education Loan Program ("FFELP") student loans.[1]   To aid its members, SLSA primarily focuses on the operational and technical issues that impact customer service and program administration.  SLSA develops industry positions and promotes best practices, which help its members provide a high level of quality customer service.  It also works with other organizations to support the continuing enhancement and streamlining of the student loan programs.  As part of this focus, SLSA identifies obstacles and opportunities within the operation of the loan programs that can benefit from its expertise and leadership, and it formulates solutions that achieve simplification and standardization.  SLSA's efforts directly benefit student loan borrowers by supporting servicers' efforts to comply with federal regulations and best help student borrowers avoid delinquency and default.

10.     Defendant Stephen C. Taylor is the Commissioner of the District of Columbia, Department of Insurance, Securities and Banking (the "Commissioner").

11.     Defendant Charles A. Burt is the District of Columbia Student Loan and Foreclosure Ombudsman (the "Ombudsman").   He is empowered to establish licensing requirements for student loan servicers in the District of Columbia.[2]

12.     Defendant the District of Columbia is the official local government for the district.

---

[1] SLSA's members also service privately-issued student loans.  Such loans account for less than 8 percent of the outstanding student loan debt nationally.  *Measure One Q3 Private Student Loan Report*, *available at* https://www.measureone.com/psl.php.

[2] Both the Commissioner and the Ombudsman are sued in their official capacities.

## STANDING

13.     SLSA has standing to bring this action because (1) its members have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested may require the participation of individual members in the lawsuit. *See, e.g.*, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

14.     First, SLSA's members have standing to sue on their own because they are harmed by the imposition of D.C. Law 21-214 and the emergency rules, including their required fees, and have a cognizable theory that the emergency rules are in excess of the District's or Commissioner's authority; the government of the District of Columbia, through the Commissioner, caused the passage of the emergency rules and therefore the injury; and this Court has the power to redress the injury by invalidating D.C. Law 21-214 and/or the emergency rules.

15.     Second, D.C. Law 21-214 and the emergency rules directly affect the ability of SLSA's members to provide customer service (by cutting off funds necessary to do that) and administer FFELP and FDLP, both of which are goals of SLSA.

16.     Third, none of SLSA's members are required to participate in this lawsuit because this lawsuit merely seeks declaratory judgments to invalidate District of Columbia law and rules.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper over SLSA's first, second, third and fifth claims for relief pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.  This Court has supplemental jurisdiction over SLSA's fourth claim for relief pursuant to 28 U.S.C. § 1367 because it is substantially related to the other claims for relief.

18.     Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391 because the defendants reside in this judicial district and the acts described in this Complaint occurred in this judicial district.

## GENERAL ALLEGATIONS

### *Federal Student Loans*

19.     In total, there are $1.49 trillion in outstanding student loans, of which $1.4 trillion, or over 92 percent, are federal student loans.  *See* Federal Student Aid Portfolio Summary for the fourth quarter of FY 2017, U.S. Department of Education, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio; Federal Reserve, Statistical Release: Consumer Credit – G.19 (Mar. 7, 2018), *available at* https://www.federalreserve.gov/releases/g19/current/g19.pdf (showing $1.49 trillion in outstanding student loans as of December 2017).

20.     The data regarding total outstanding student loans in the United States are summarized in the following chart and described below:



21.     The federal student loan industry is unique among loan industries in the United States.

22.     Federal student loans are government programs designed to provide greater access to higher education.  The Higher Education Act of 1965 (the "HEA") created the federal student loan programs, which are regulated by the Department of Education.

23.     Congress passed the HEA in 1965 to "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Higher Education Act, Pub L. No. 89-329, 79 Stat. 1219 (1965).

24.     Specifically, the HEA, which is codified at 20 U.S.C. §§ 1001–1155, was passed with the goal of "keep[ing] the college door open to all students of ability, regardless of

socioeconomic background." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009) (internal quotation marks omitted).

25.     To effectuate these goals, Congress has established two main federal education loan programs: FDLP, 20 U.S.C. § 1087a, *et seq*., and FFELP, 20 U.S.C. § 1071, *et seq*.   Title IV of the HEA governs these federally funded student financial aid programs for college and post-secondary vocational training.  20 U.S.C. § 1070, *et seq*.

26.     FFELP loans, which are loans that were made by banks and other private lenders and then guaranteed by the federal government, constitute $212 billion or approximately 16 percent of federal student loans.  *See* Federal Student Aid Portfolio Summary for the third quarter of FY 2017, U.S. Department of Education, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.   FFELP loans are no longer available to student loan borrowers; FFELP was ended, and no new FFELP loans have been made since June 30, 2010.  Health Care and Education Reconciliation Act, Pub. L. 111-152, § 2201, *et seq.* (Mar. 30, 2010); *see also* 20 U.S.C. § 1071(d).  As a result, over 90 percent of new student loans today are made through FDLP.     *Trends in Student Aid 2017*, College Board, *available at* https://trends.collegeboard.org/sites/default/files/2017-trends-student-aid_0.pdf.

27.     FDLP loans, which are made by and are owned by the federal government, constitute over $1 trillion or approximately 77 percent of federal student loans.[3]  In addition, the federal government owns $94 billion in FFELP loans, which private lenders sold to the Department of Education between 2008 and 2010 under the Ensuring Continued Access to

---

[3] Perkins Loans, which are loans made by some institutions to their neediest students using federal funds, constitute $7.6 billion or less than 1 percent of federal student loans.

Student Loans Act of 2008 ("ECASLA").[4]  In total, the federal government owns and manages 84 percent of all outstanding federal student loans.  *See* Federal Student Aid Portfolio Summary for the fourth quarter of FY 2017, U.S. Department of Education, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

28.     As a result of its commanding share of the market and its regulatory oversight, the federal government has a unique and essentially unilateral ability to determine who services student loans, how those loans are serviced, and what student loan servicers are paid.

29.     There is no credit check or test for ability to repay for students who want to participate in federal student loan programs.  The only criterion to take out a federal student loan is attendance at an institution of higher education that meets Department of Education standards for participation.  *See* 20 U.S.C. § 1091 (detailing student eligibility).

30.     Because of their importance in providing access to higher education, federal student loans provide federal taxpayer-funded benefits to borrowers that are not found in other consumer loans.  These benefits include below-market interest rates, payment deferment periods where the federal government pays interest on the loan, generous forgiveness and discharge provisions, and income-based repayment and forgiveness.  *See* 20 U.S.C. §§ 1071 to 1087vv (stating the benefits of the federal loan programs).

31.     Approximately 59 percent of the undergraduate class of 2016 in public four-year schools and 62 percent of the undergraduate class in private four-year schools graduated with student loan debt.  In the 2015-2016 academic year, only 39 percent of all undergraduates used

---

[4] ECASLA (Pub. Law 110-227) was adopted by Congress in response to the disruptions in financial markets in 2008.  As extended in 2009, it gave the Department of Education authority to purchase FFELP loans until the end of the 2009-2010 academic year.

student loans of any type.   U.S. Department of Education, National Center for Education Statistics, National Postsecondary Student Aid Study 2016 (NPSAS:16).  This is down from the 42 percent of all undergraduates who used student loans in the 2011-2012 academic year.  U.S. Department of Education, National Center for Education Statistics, National Postsecondary Student Aid Study 2012 (NPSAS:12).

32.     Despite the recent decrease in the percentage of students using student loans, outstanding federal student loans have more than doubled from less than $600 billion in 2008 to over $1.4 trillion today.  *See* Federal Student Aid Portfolio Summary for the third quarter of FY 2017, U.S. Department of Education, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.  This is largely attributable to the increase of undergraduate borrowing limits included in ECASLA in response to the recession, the substantial increase in graduate borrowing after the enactment of the Grad PLUS program in 2006, which allows graduate and professional students to borrow up to the total cost of attendance, and the increase in the number of students pursuing postsecondary education during the recession.

33.     As of September 30, 2017, the average student loan borrower in the District of Columbia had approximately $50,000.00 in outstanding federal student debt.  Federal Student Aid, Federal Student Loan Portfolio by Borrower Location, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.  Given that the current borrowing limit for dependent undergraduates is $31,000.00, this average likely reflects a high number of District residents who have used student loans for graduate studies.  *See Trends in Student Aid 2017*, College Board, *available at* https://trends.collegeboard.org/sites/default/files/2017-trends-student-aid_0.pdf (showing that average annual borrowing for undergraduate studies is

approximately $6,590 per student while average annual borrowing for graduate studies is $18,720 per student).

34.     Borrowers with higher outstanding loan balances are actually significantly less likely to default on their loans.  While almost two-thirds of defaults came from borrowers with less than $10,000 in outstanding student loan debt, only 4 percent of defaults came from borrowers with over $40,000 in outstanding student loan debt. *Investing in Higher Education: Benefits, Challenges and the State of Student Debt*, The White House Council of Economic Advisors, July 2016, *available at:*

https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160718_cea_student_debt.pdf

### *The Federal Government Highly Regulates Federal Student Loans and Servicers*

35.     Both FDLP and FFELP are highly regulated.

36.     Congress "instruct[ed]" the Department of Education to "[e]stablish a set of rules that will apply across the board," *Chae v. SLM Corp.*, 593 F.3d 936, 945 (9th Cir. 2010), and granted the Secretary of Education and the Department of Education broad authority to: (1) prescribe regulations, including regulations pertaining to servicers; (2) audit financial transactions of, impose civil penalties against, and limit, suspend, or terminate the participation of lenders and guaranty agencies; and (3) promulgate standardized forms and procedures covering "all aspects of the loan process," including common application forms, promissory notes, and master promissory notes, 20 U.S.C. § 1082(a), (f), (g), (h), (l), and (m).

37.     The Department of Education specifically has broad and exclusive authority to create servicer requirements.  *See* 20 U.S.C. § 1082(a)(1); see also U.S.C. §§ 1087a, 1087e.

38.     The Department of Education has since adopted numerous regulations governing all aspects of federal student loans under FDLP and FFELP, including charges to borrowers, 34 C.F.R. § 682.202, § 685.202; repayment plans, 34 C.F.R. § 682.208, § 685.209; deferment and forbearance, 34 C.F.R. §§ 682.210–211 (forbearance in FFELP), §§ 685.204–205 (forbearance in FDLP); and due diligence in servicing a loan, 34 C.F.R. § 682.208.

39.     The Department of Education also has promulgated rules establishing the forms of promissory notes, borrower disclosures, and other forms that neither the student loan borrower nor the servicer may alter.  *See* 20 U.S.C. §§ 1082(m)(1)-(4).  "The purpose of the common forms is to standardize the terms and formatting to help applicants understand their loan obligations."  *Chae*, 593 F.3d at 940 (citing 20 U.S.C. § 1082(m)(1)(B)).

40.     These regulations are all-encompassing and include specific regulations governing servicing transfers.  *See* 34 C.F.R. § 682.208(e).

41.     For example, the regulations specify that if federal student loan servicers violate any statutory provision, regulation, or agreement, they face reduced ability to service additional loans and termination of their existing contracts.  34 C.F.R. §§ 682.700a, 682.706.

42.     Overall, Congress intended for both FDLP and FFELP to operate uniformly across the United States and that their "participants be held to clear, uniform standards."  *Chae*, 593 F.3d at 944–47 (noting that "Congress created a policy of inter-program uniformity by requiring that 'loans made to borrowers [under the Direct Loan Program] shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFELP].'" (quoting 20 U.S.C. § 1087e(a)(1))); *see also Brannan v. United*

*Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996) (holding that FFELP "requires uniformly administered . . . standards in order to remain viable").

43.    "In other words, Congress's instructions to [the Department of Education] on how to implement the student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board." *Id.* at 945.

<u>Challenges Student Loan Borrowers Face</u>

44.    As with many large government programs, federal student loan programs are complex.

45.    Congress and the Department of Education have made numerous changes to the programs over the years.

46.    Demonstrating both the programs' complexity and Congress' changes, the programs contain a myriad of options designed to help borrowers afford their student loan debt payments.   Specifically, the programs now include 16 possible repayment plans, including 6 different income-driven repayment plans; 21 types of deferments; 13 types of forbearance; and 8 different loan forgiveness/discharge options. Due to this complexity and its constantly changing nature, many borrowers are overwhelmed and need help navigating their choices.

47.    Despite the many offerings designed to protect federal student loan borrowers from delinquency, default, and impaired credit ratings, borrowers may not be fully aware of the unique assistance that is available to them or may feel too embarrassed about their situation to reach out on their own.  This can occur when a borrower leaves the institution of higher education without achieving their degree, often avoiding the institution's exit counseling that is required by the Higher Education Act.  As a result, borrowers' loans may become delinquent or in default.

48.     Nevertheless, because the programs offer a plethora of options that can meet differing needs, if student loan servicers can reach the borrowers and explain the options, no student borrower should ever have to default on his or her federal student loans.

49.     However, overlaying state laws and regulations on top of the HEA requirements would simply add to the complexity federal student loan borrowers face, increasing the cascade and complexity of information borrowers must sort through to figure out what they owe, when they owe it, and how to get relief when they are struggling with payments.

50.     Any additional burden state law or regulations place on servicers, such as fees or conflicting notification obligations, could impede servicers' ability to perform the necessary outreach to properly inform borrowers of their options.

<u>*Student Loan Servicers' Role in the Federal Student Loan Industry*</u>

51.     Student loan servicers play an important role in the federal student loan process; they are a valuable partner of the loan programs themselves in making educational opportunities possible for millions of Americans and their families.

52.     To help student borrowers navigate the myriad options available in the federal student loan program and to lower the frequency of delinquency and default, the Secretary of Education is authorized to prescribe regulations necessary to carry out the HEA's purposes, including regulations applicable to loan servicers.[5]  *See, e.g.*, 20 U.S.C. § 1082(a)(1).

53.     The Secretary of Education also is authorized to contract with servicers for the servicing and pre-default collection of loans it owns.  *Id.* § 1087f(a)(1).

---

[5] For example, the HEA's sections on FFELP define a "third party servicer" as a person or entity that enters into a contract with an institution of higher education, guaranty agency, or eligible lender to administer the loan.  20 U.S.C. § 1088(c).

54.   Student loan servicers' place in the industry thus is as follows:

   a.   At the top, institutions of higher education set their tuition and fees.  Families then select an institution and may borrow money to pay for the cost of attendance.

   b.   In order to help families pay the costs, Congress sets the interest rate formula, loan limits, and repayment terms for federal student loans.

   c.   When a family decides to take out a federal student loan, the Department of Education issues the loan at the congressionally set rates and terms, distributes the proceeds to the institution on behalf of the student, and assigns the loan to a student loan servicer under a contract.

   d.   The student loan servicer then works on behalf of the federal government with the borrower to help the borrower assess multiple repayment options and successfully repay the loan.

   e.   With the servicer's aid, the loan is repaid.

55.   In conjunction with their role in the student lending process, student loan servicers are responsible for a range of loan services, including processing Income-Driven Repayment ("IDR") applications and reenrollment applications, maintaining account records, sending statements and other account notices, processing payments, processing paperwork associated with a myriad of payment statuses, operating incoming and outgoing call centers to help inform and educate borrowers about their loans and select the best repayment plan within their budget, and even facilitating temporary cessation of payments, all in an effort to avoid the consequences of delinquency and default and to more efficiently and effectively collect before default these federal obligations.  All of these activities are highly regulated by the Department of Education.

56.     For example, to help protect borrowers, the Department of Education regulations require student loan servicers to inform borrowers of the special programs available to them for short- and long-term economic hardship, ranging from temporarily postponing payments to sustainable income-based repayment plans that adjust to the borrowers' earnings. *See* 34 C.F.R. §§ 682.416, 682.208.

57.     Servicers are thus representatives of the government to student borrowers; federal regulations and contracts require that they are available to help prevent the adverse consequences that can accompany a borrower's delinquency or default on a federal student loan. Servicers are thus a valuable resource to borrowers, providing a link to government repayment options that range from temporarily postponing payments to sustainable income-based repayment plans that connect monthly loan obligations to the borrower's earnings.

58.     The federal government specifically recognizes servicers' importance. According to the Executive Branch, "[h]igh-quality, borrower-focused servicing helps more borrowers successfully repay their federal student loans." *White House Fact Sheet, Presidential Memorandum, Student Aid Bill of Rights* (March 10, 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/03/10/fact-sheet-student-aid-bill-rights-taking-action-ensurestrong-consumer-. The needs of borrowers are best met by "find[ing] the most innovative and effective ways to communicate with borrowers, leverag[ing] the latest research identifying key factors that influence borrower repayment, and keep[ing] actual borrower behavior in mind so they stay in repayment and avoid default." *Id.* These steps help borrowers because they aid in setting and adjusting a borrower's repayment plan at an affordable rate, and ensure that "[e]very borrower has the right to an affordable repayment plan." *Id.*

*Federal Government Compensation to Student Loan Servicers*

59.     Servicers are compensated at a set amount per borrower (1) pursuant to contracts with the federal government for student loans in the FDLP, the current federal student loan program, and (2) pursuant to contracts with private lenders making student loans guaranteed[6] by the federal government in the FFELP, the predecessor federal student loan program.

60.     Federal contracts in the FDLP program pay servicers on a per student loan borrower basis, based on the borrower's repayment status.  Most borrowers have multiple student loans.  Servicers get paid less if a borrower becomes delinquent or the loan is placed in forbearance—that is, servicers see their compensation reduced if they do not keep the borrowers on track toward repayment of their loans. Finally, servicers are paid nothing if a loan defaults and enters debt collection.

61.     Under these contracts, the <u>most</u> a student loan servicer can receive from a single student loan borrower, who may have multiple loans of different types, is $34.20 per year.   *See* Exhibit A, Great Lakes Educational Loan Services Contract at September 2014 Amendment page 4 (showing that the maximum per month a servicer may be paid is $2.85 per borrower, allowing a potential annual compensation of $34.20).

---

[6] FFELP loans are reinsured by the federal government pursuant to 20 U.S.C. §§ 1071(a)(1)(D), 1078(c) and 32 C.F.R. § 682.404. Any reinsurance claims are paid by the federal government directly out of federal reserve funds. 34 C.F.R. §§ 682.404(a), 682.410(b)(6). Unlike a typical reinsurance arrangement, the federal reinsurance obligation may not ordinarily be cancelled, making it a guarantee in substance.  Indeed, the FFELP program was formerly named the "Guaranteed Student Loan Program," before being renamed in 1992.  Higher Education Amendments of 1992, Pub.L. No. 102-325, § 411(a)(1), 106 Stat. 448, 510 (1992).  Any reinsurance claims are paid by the federal government directly out of federal reserve funds. 34 C.F.R. §§ 682.404(a), 682.410(b)(6).

62.     In contrast, in the mortgage servicing industry, the annual cost of servicing a performing loan in 2016 was $163.00 and the annual cost of servicing a non-performing loan was $2,113.00.   MBA Chart of the Week: Servicing Costs Per Loan (Single-Family)--Performing v. Non-Performing,  *MBA Newslink*,  *available at*  https://www.mba.org/servicing-newslink/2017/july/servicing-newslink-tuesday-7-25-17/news-and-trends/mba-chart-of-the-week-servicing-costs-per-loan-(single-family)-performing-v-non-performing.   If state-imposed fees, requirements, and other burdens were to become widely enacted, and if the federal government were forced to pay student loan servicers at such levels, it would cost federal taxpayers millions of dollars per year.

63.     The HEA specifically requires that the Secretary of Education award contracts to servicers that have "extensive and relevant experience," "demonstrated effectiveness," and "a history of high quality performance."  20 U.S.C. § 1078f.

64.     The Department of Education distributes new federal student loans to servicers based on performance metrics that incentivize servicers to keep the borrowers they service current and satisfied.  *Explanation of Allocation and Performance Measure Methodology*, Federal Student Aid Office, U.S. Department of Education,  *available at*  https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/06302017/ExplanationQuarterEnd063017.pdf.  Metrics are weighted as follows:

    a.  Percent of borrowers current: 30 percent

    b.  Percent of borrowers 91 to 270 days delinquent: 15 percent

    c.  Percent of borrowers 271 to 360 days delinquent: 15 percent

    d.  Borrower satisfaction survey: 35 percent

e.   The Department of Education's Federal Student Aid Staff : 5 percent

65.     Therefore, the federal government's compensation scheme for student loan servicers is designed to incentivize servicers to perform their jobs: keeping as many student loans as possible out of delinquency and default.

*The District of Columbia's Initial Emergency Rules*

66.     On December 7, 2016, the Council of the District of Columbia enacted the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016 (the "Act"), D.C. Law 21-214, to amend the Department of Insurance and Securities Regulation Establishment Act of 1996.  The Act is attached as Exhibit B.

67.     Section 7b of the Act requires "a person or entity seeking to operate as a student loan servicer" in the District of Columbia to apply for an "SLS license."   D.C. Code § 31-106.02(a).

68.     Along with an application, a prospective student loan servicer must submit "[a]pplication fees and other fees as prescribed by the Commissioner [of the Department of Insurance, Securities and Banking ("DISB")]."  D.C. Code § 31-106.02(c)(1)(B).

69.     Ostensibly pursuant to the Act, the Commissioner adopted emergency rules on September 8, 2017, regarding student loan servicers, which constitute Chapter 30, Student Loan Servicers, of Title 26-C DCMR, Banking and Financial Institutions (the "Initial Emergency Rules").  The Initial Emergency Rules are attached as Exhibit C.  These rules also were proposed as permanent rules.

70.     The Initial Emergency Rules, which became effective on the date of their adoption, require student loan servicers to apply for a license, § 3002; file a surety bond, § 3004;

provide annual reports and reporting, § 3014; keep records for at least three years after a final payment is made on a loan, § 3018; be subject to examinations and investigations, § 3021; and face penalties of up to $25,000 for each violation, § 3023.

71.     The Initial Emergency Rules also prescribe additional fees.   Section 3002.2 requires that the application for an SLS license shall include, at minimum, "[p]ayment of applicable fees as described in Appendix A of these rules and any outstanding fees due to the Department or to the District, including compliance with the Clean Hands Before Receiving a License or Permit Act of 1996, effective May 11, 1996 (D.C. Law 11-118; D.C. Official Code § 47-2861 *et seq.*)."

72.     Section 3015 of the Initial Emergency Rules includes the following annual assessments, which are due on or before November 1 of each calendar year:

    a.   Subsection (1) states that "[e]ach licensed student loan servicer who held a license during the prior licensing period shall be subject to an annual assessment fee as prescribed in Appendix A."

    b.   Subsection (2) provides that "[t]he annual assessment fee shall be determined to be the sum of a fixed amount plus a variable amount based on the number of loans serviced in the previous license period as prescribed in Appendix A."

    c.   Subsection (3) clarifies that "[a] licensee who has been charged and pays an annual assessment fee shall not be subject to an examination fee in the same year unless the following occurs: (a) The Commissioner determines that an out-of-the-District examination is necessary; or (b) The Commissioner determines that an unscheduled examination is necessary."

73.     Appendix A to the Initial Emergency Rules lists the following student loan servicer license fees:

    a.  DISB Initial Application Fee – $1,200 + Nationwide Multistate Licensing System ("NMLS") Fee

    b.  DISB Renewal Application Fee – $1,000 + NMLS Fee

    c.  DISB Amendment Fee – $100

    d.  DISB Reinstatement Fee – $1,000

    e.  DISB Annual Assessment Fee – $800 + $6.60 per loan

    f.  DISB Examination Fee – $400 per examiner day

*The Initial Emergency Rules Would Impede Servicers Ability to Aid Borrowers*

74.     Although the Commissioner passed the Initial Emergency Rules "in an effort to ensure the long-term financial safety and security of District residents with student educational loans," the rules have an adverse consequence that directly affects borrowers in the District of Columbia.

75.     The Initial Emergency Rules threatened to drive SLSA's members out of business because the per-loan-serviced fee ($800 plus $6.60 per loan serviced) essentially would render it impossible for SLSA members to retain any revenue under their FDLP contracts to provide services required under those contracts to borrowers in the District of Columbia.

76.     Given the federal government's unilateral ability to determine who services student loans, how those loans are serviced, and what student loan servicers are paid, SLSA members would have been caught in the middle of what would have essentially been a dispute between their federal and state regulators.

21

77.     Such a position would have been especially untenable given that student loan servicers cannot choose the States in which they service loans—they are assigned loans by the federal government without regard to the residency of the borrowers.  *See* Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg.  10619, 10621 (published Mar. 12, 2018) ("The Department's contracts require servicers to operate throughout the United States because loan borrowers are in all States. A servicer does not have the choice to refrain from operating in a particular State to avoid licensing fees and other costs imposed by the State.").

78.     The Initial Emergency Rules also would unlawfully cripple the ability of SLSA's members, and federal student loan servicers in general, to help the federal government administer the federal student loan programs and provide necessary services to borrowers.

79.     Without servicers, there would be a vacuum in the federal student loan industry to the detriment of the District of Columbia borrowers.

### *SLSA's Efforts to Confer with the District of Columbia Government*

80.     Within a week of the adoption of the Initial Emergency Rules, Winfield Crigler, who serves as SLSA's Executive Director, contacted the Commissioner and requested a meeting to discuss the rules.  In her September 15, 2017 e-mail requesting the meeting, Ms. Crigler specifically noted that the Commissioner had "proposed an annual administrative assessment that in most instances is more than the entire amount the servicer is paid by the [the Department of Education] to service the loans."  The e-mail is attached as Exhibit D.

81.     After receiving no response for over two weeks, Ms. Crigler sent a letter to the Commissioner on October 3, 2017, detailing SLSA's concerns and again requesting a meeting. This letter requested a response by October 10, 2017.  The letter is attached as Exhibit E.

82.     On October 11, 2017, the Ombudsman e-mailed in response to Ms. Crigler's first message asking for a meeting.

83.     Ms. Crigler met with the Commissioner, the Ombudsman, and DISB staff on October 19, 2017, and expressed SLSA's and its members' concerns regarding the Initial Emergency Rules, including that federal law preempts them.

84.     At the meeting, the Commissioner and DISB conveyed that it read the Initial Emergency Rules to impose the annual assessments, including the per-loan-serviced fee (set at $6.60 per loan serviced), beginning, at earliest, on November 1, 2018, pursuant to Section 3015.1 of the Initial Emergency Rules.  Under this interpretation, a servicer that applies to be licensed between November 1 and December 31, 2017, would not incur the fee until November 1, 2018.

85.     The Commissioner and DISB also stated at the meeting that they believe that the Initial Emergency Rules became effective on September 8, 2017, and continue to be in effect as emergency rules.  They maintained this belief even though Ms. Crigler explained at the meeting that D.C. Code § 2-505(c) requires that emergency rules be "forthwith" published and filed in accordance with the Code, and SLSA has been unable to locate the Initial Emergency Rules in the D.C. Register under Emergency Rulemaking.

86.     The Commissioner, the Ombudsman, and DISB staff did not comment at the meeting on the enforceability of the Initial Emergency Rules or whether federal law preempts them.

87.     Ms. Crigler sent a follow-up letter to the Commissioner on October 23, 2017, asking him to confirm as soon as possible the Commissioner and DISB's representations about the imposition of the annual assessments and the effectiveness of the Initial Emergency Rules. The letter is attached as Exhibit F.  Because the per-loan-serviced fee would have a significant impact on servicers' ability to service federal student loans for D.C. borrowers, Ms. Crigler reiterated that SLSA's members must be able to rely upon the representation as to when the annual assessment will first be due.

88.     Ms. Crigler also restated in the letter SLSA's position that federal law preempts the Initial Emergency Rules and requested that the rules should be withdrawn to allow the rulemaking process to go forward in the ordinary course.  She expressed that, at a minimum, the rules should be amended to provide for an interim period during which servicers would not be required to be licensed for the remainder of 2017 and some portion of early 2018 to allow SLSA and its members to provide input on the rules during the regular rulemaking process.  Without this minimum step, other regulators or jurisdictions may view servicers' failure to possess a license as noncompliance with D.C. law, which could prevent servicers from having their federal contracts renewed or licenses issued in other jurisdictions.

*The District of Columbia Publishes the Initial Emergency Rules, Receives Comments,
and Adopts Revised Emergency Rules*

89.     The Initial Emergency Rules were later published on October 27, 2017 in the D.C. Register at 64 D.C.R. 11287.

90.     Before the comment period ended on November 27, 2017, DISB received comments on the Initial Emergency Rules from the student loan servicer industry, including

comments and suggested modifications regarding preemption and the per-loan-serviced fee.  A copy of SLSA's comments on the Initial Emergency Rules is attached as Exhibit G.

91.     "[I]n order to ensure continuous regulatory coverage as [DISB] considers the comments and suggested modifications put forward by the student loan servicing community," DIBS promulgated new emergency rules (the "Revised Emergency Rules"), which were adopted on December 26, 2017, and became effective on that date.  The Revised Emergency Rules are attached as Exhibit H.  The Revised Emergency Rules supersede the Initial Emergency Rules.

92.     The Revised Emergency Rules changed the assessment fee from $6.60 per loan to $0.50 per borrower "based upon stakeholder concerns."  The assessment fee is not due until the license is renewed and thus will not take effect until November 1, 2018.

93.     The $0.50 per borrower service fee, like the $6.60 per loan fee, would come from the money the federal government pays student loan servicers under FDLP contracts.  DISB would ostensibly use the money from the assessment fee to fund its imposition of additional regulations on student loan servicers.

94.     The Revised Emergency Rules were published in the D.C. Register on January 25, 2018.  SLSA submitted comments on the Revised Emergency Rules on February 26, 2018.  A copy of these comments is attached as Exhibit I.

95.     Given that the Revised Emergency Rules have been published in the D.C. Register for over thirty days, the Commissioner may take final rulemaking action to adopt these proposed rules as a permanent measure in a Notice of Final Rulemaking at any time.

96.     The Revised Emergency Rules will expire on April 25, 2018, unless superseded by publication of a Notice of Final Rulemaking in the D.C. Register.

<u>*The United States District Court for the Southern District of Illinois's Decision in*</u>
<u>*Nelson v. Great Lakes Educational Loan Services, Inc.*</u>

97.     On December 19, 2017, the United States District Court for the Southern District

of Illinois issued a Memorandum and Order dismissing a putative class action lawsuit captioned

*Nelson v. Great Lakes Educational Loan Services, Inc., et al.* (Case No. 3:17-CV-00183-NJR-

SCW).  The Memorandum and Order is attached as Exhibit J.

98.     This lawsuit was brought by a student loan borrower against her federal student

loan servicer and several unidentified defendants.  *Id.*

99.     The federal servicer—a SLSA member—moved to dismiss the suit on the ground

that it sought to impose additional state disclosure requirements over and above those imposed by

the HEA was therefore preempted by federal law.

100.     In the Memorandum and Order—and citing *Chae*—the court agreed with the

servicer, finding that the borrower's claims (for violation of the Illinois Consumer Fraud and

Deceptive Practices Act, constructive fraud, and negligent misrepresentation) were all predicated

on the imposition of additional state law disclosure requirements over and above those imposed

by federal law at 20 U.S.C. § 1098g and its implementing regulations at 34 C.F.R. § 682.205.

Exhibit J, at 10-12.[7]

---

[7] Plaintiff in *Nelson* filed a notice of appeal to the United States Court of Appeals for the Seventh Circuit on March 7, 2018.

*The Department of Education's Memorandum on Records and Data*

101.    The Department of Education, through Patrick A. Bradfield, the Director of Federal Student Aid Acquisitions, drafted a memorandum on December 27, 2017, regarding ownership of and access to Department of Education records and data (the "Department of Education Memorandum").    The Department of Education Memorandum is attached as Exhibit K.

102.    In the memorandum, the Department of Education explains that its office of Federal Student Aid ("FSA") "maintains individually identifying information regarding the application for, distribution of, and repayment and collection of federal student loans and grants authorized pursuant to Title IV of [the HEA]."   *Id.* at 1. This information is protected by the Privacy Act of 1974, 5 U.S.C. § 552a, which provides for criminal and civil penalties for its unlawful release.   *Id.*

103.    The Department of Education also explains that all federal student loan servicers must comply with the Privacy Act and that all records the Department of Education maintains or that are maintained for the Department of Education by the servicers are the records of the Department of Education and not of the servicers.    Therefore, any third-party request for these records must be made directly to the Department of Education.   *Id.*

*The United States' Statement of Interest in a Case Involving State Regulation of Servicers*

104.    In *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*, Case No. 1784CV02682, the Massachusetts Superior Court has been presented with allegations similar to those in *Nelson* but made by the Commonwealth of Massachusetts itself. This lawsuit against a student loan servicer alleges violations of state consumer protection laws ostensibly regulating servicers.

105.    Specifically, the Commonwealth alleges that the servicer, a SLSA member: (1) wrongfully failed to count forbearance periods for borrowers to satisfy the requirement of certain loan forgiveness programs; (2) wrongfully converted the grants of participants who had not filed the correct documentation for loans as required by the Teacher Education Assistance for College and High Education ("TEACH") Grant Program; and (3) wrongfully allocated overpayments to interest and fees.

106.    The United States filed a Statement of Interest in the case on January 8, 2018, pursuant to 28 U.S.C. § 517, which states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."   The Statement of Interest is attached as Exhibit L.

107.    The United States rarely files statements of interest.  *See* Victor Zapana, Note, *The Statement of Interest as a Tool in Federal Civil Rights Enforcement*, 52 HARV. C.R.-C.L L REV. 227, 229 (2017) (explaining that based on the author's search, the United States filed a statement of interest but did not intervene as a party in only 614 federal and state court cases since 1925).

108.    In the Statement of Interest, the United States explains that the HEA and federal
regulations require and authorize the student loan servicer's treatment of forbearance periods,
deadlines for TEACH certification, and allocation of overpayments.  Exhibit L, at 10–14.
Federal law therefore preempts Massachusetts' claims because the claims conflict with the HEA
and federal regulations and, in some cases, render it physically impossible for the servicer to
comply with both federal and state regulations.  *Id.*

109.    The United States also explains that the Commonwealth's claims are preempted to
the extent that they conflict with the purposes of the HEA because "[s]tate law is preempted
when it 'stands as an obstacle to the accomplishment and execution of the full purposes and
objectives of Congress.'" *Id.* at 14 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287
(1995)).

110.    The United States describes that in creating FDLP, "Congress intended to '(1)
simplify the delivery of student loans to borrowers and eliminate borrower confusion; (2) provide
borrowers with a variety of repayment plans . . . .; (3) replace, through an orderly transition, the
Federal Family Education Loan program with the Federal Direct Student Loan Program; (4)
avoid the unnecessary cost to taxpayers and borrowers and the administrative complexity
associated with the Federal Family Education Loan program through the use of a direct student
loan program; and (5) create a more streamlined student loan program that can be managed more
effectively at the Federal level.'" *Id.* at 15 (quoting 139 Cong. Rec. S5628 (daily ed. May 6,
1993)).

111.    The United States also describes that Congress had similar objectives in passing
FFELP and intended "'to encourage States and nonprofit private institutions and organizations to

establish adequate loan insurance programs for students in eligible institutions,' 'to provide a

Federal program of student loan insurance,' and 'to guarantee a portion of each loan insured.'"

*Id.* (quoting 20 U.S.C. § 1071(a)(1)(A), (B), (D)).

112.    The United States then expounds that the Commonwealth's state-law claims are

contrary to these goals because they "potentially would lead to different rules for loan

forgiveness for borrowers in every state, resulting in borrowers being treated differently

depending on the state in which they live, to the detriment of the uniformity and ease of

administration sought by [FDLP] and FFELP."  *Id.* at 17.

113.    Moreover, the United States elucidates that the Commonwealth's claims also are

preempted to the extent that they conflict with the Department of Education's contract with the

student loan servicer because "[c]onflict preemption may also arise from conflicts between state

law and the provisions of contracts between the Federal Government and contractors."  *Id.* at 19

(citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (holding that federal preemption

may apply even "in the absence of either a clear statutory prescription, or a direct conflict

between federal and state law" (internal citations omitted))).  This type of preemption applies "to

(1) areas of 'uniquely federal interests' with (2) "significant conflict . . . between an identifiable

federal policy or interest and the [operation] of state law, or the application of state law would

frustrate specific objectives of federal legislation,'" and "both requirements are met."  *Id.*

(quoting *Boyle*, 487 U.S. at 507).

114.    In its explanation, the United States unequivocally states that "[f]ederal student

loans are an area of uniquely federal interests."  *Id.*

115.    As a result, the United States concluded its Statement of Interest by urging the court to find that the Commonwealth's claims are preempted because they conflict with federal law. *Id.* at 21.

116.    Despite the United States' Statement of Interest, the Massachusetts Superior Court entered an order on March 1, 2018, allowing the Commonwealth's lawsuit to proceed.

### *The Department of Education's Notice Regarding Federal Preemption and State Regulation of Student Loan Servicers*

117.    On March 9, 2018, the Department of Education filed for public inspection a notice entitled "Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers" (the "Preemption Notice"). 83 Fed. Reg. 10619 (published Mar. 9, 2018). The Preemption Notice is attached as Exhibit M.

118.    The Preemption Notice references the United States' Statement of Interest in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*. 83 Fed. Reg. at 10619.

119.    In the Preemption Notice, the Department of Education explains that the recent state requirements on servicers, including state regulations requiring licensure of servicers in order to perform work for the federal government, conflict with the federal government's power to select contractors and to determine whether contractors are responsible under federal law. *Id.* at 10620 ("A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional

conditions not contemplated by Congress.'' (quoting *Sperry v. Florida*, 373 U.S. 379, 385 (1963) (quoting *Leslie Miller Inc. v. Arkansas*, 352 U.S. 187, 190 (1956)))).

120.    Such requirements undermine the "clear command for uniformity" in the HEA with respect to FFELP and FDLP.  *Id.* at 10621.  ''[W]here the Federal interest requires a uniform rule, the entire body of State law applicable to the area conflicts and is replaced by Federal rules.''  *Id.* (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500, 508 (1988)).

121.    These state laws also may undercut Congress' goal of saving taxpayer dollars in administering FDLP by utilizing "servicers' compliance with federal law and contracts to extract payments that benefit the state at the expense of the federal taxpayer." *Id.* at 10620–21.

122.    The Preemption Notice thus concludes that federal law preempts state regulation of loan servicers that conflict with statutes, regulations, federal contracts, and congressional objectives.  *Id.* at 10621.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment that Federal Law Preempts the Revised Emergency Rules under Conflict Preemption)

123.    SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    The Supremacy Clause of the U.S. Constitution states that "the Laws of the United States . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.

125.    "[S]tate laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (citation omitted).  "Pre-emption may result not only from action taken by Congress itself; a federal

agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986).

126.    Although consumer protection is traditionally part of a state's police power, regulating the federal student loan industry is strictly a federal area of national concern and thus no presumption against preemption applies. *See California v. ARC America Corp.*, 490 U.S. 93, 101 (1989) (noting that the presumption against preemption only applies "in areas traditionally regulated by the States").

127.    When a state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" that state law is preempted under the doctrine of conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("'[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case.").

128.    An obstacle occurs when a state law would directly conflict with federal law or would "undermine [its] goals and policies." *See Volt Info. Sciences v. Stanford Univ.*, 489 U.S. 468, 477–78 (1989).

129.    In deciding whether conflict preemption applies, the Court must consider both the statute's text and its purpose and objectives. *See Crosby*, 530 U.S. at 373 ("For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed."); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("In determining whether state law stands as an obstacle to the full implementation of a federal law it is not

enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." (internal quotation marks and citations omitted)).

130. Additionally, in determining whether a conflict exists, the Court must give weight to an agency's determination of the objectives. *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996) ("Because Congress has delegated to the Secretary its authority to implement the provisions of the HEA, the Secretary 'is uniquely qualified to determine whether a particular form of state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, . . . and therefore, whether it should be preempted'" (quoting *Medtronic*, 518 U.S. at 496)).

131. Here, in establishing FDLP and FFELP, Congress sought uniformity and ease of administration. The United States confirmed these objectives in its Statement of Interest in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency* and in the Department of Education's Preemption Notice.

132. Specifically, in its Preemption Notice, the Department of Education provided a non-exhaustive list of examples of state laws and regulations covering FDLP that conflict with the HEA:

    a. State registration and licensure of FDLP servicers that require as a condition to licensure that servicers: (i) demonstrate that they have adopted certain business standards set by the state; (ii) meet certain financial responsibility requirements such as liquidity, financial solvency, capitalization, and surety bond requirements;

and (iii) submit to investigations, audits, and background checks by state authorities;

b. State regulatory requirements that provide: (i) deadlines on servicers for responding to borrower inquiries; (ii) specific procedures to resolve borrower disputes; (iii) deadlines for completing transfers of loans from one servicer to another; and (iv) specific protocols for applying overpayments on loans;

c. State laws that undermine Congress's goal of saving taxpayer dollars in administering FDLP, including those that include: (i) licensing fees; (ii) assessments; (iii) minimum net worth requirements; (iv) surety bonds; (v) data; (vi) disclosure requirements; and (vii) annual reporting requirements;

d. State law restricting the actions a servicer may take to collect on a loan;

e. State-level regulation that subjects borrowers to different loan servicing deadlines and processes depending on where the borrower happens to live, and at what point in time; and

f. State laws and regulations imposing liability on servicers.

83 Fed. Reg. at 10620–21.

133.   In addition, the Department of Education also presented a non-exhaustive list of examples of state laws and regulations covering FFELP that conflict with the HEA:

a. State laws that require FFELP servicers to respond to a borrower's inquiry or dispute within a certain period of time conflict with 34 CFR 682.208(c)), which allows servicers 30 days after receipt to respond to any inquiry from a borrower;

    b.   Deadlines for notifying borrowers of loan transfers between servicers conflict with 20 U.S.C. 1078(b)(2)(F) and 34 CFR 682.208(e)(1), which allow 45 days for notification; and

    c.   The imposition of required dispute resolution procedures under state law conflict with 34 CFR 682.208(c)(3)(i) and (ii), which govern the resolution of disputes raised by borrowers.

83 Fed. Reg. at 10621–22.

134.    Like the state laws at issue in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*, by prescribing additional requirements on federal student loan servicers, D.C. Law 21-214 and the Revised Emergency Rules issued pursuant to it create obstacles to the accomplishment and execution of the federal student loan program.

135.    In so doing, D.C. Law 21-214 and the Revised Emergency Rules create significant differences between the servicing of borrowers in the District of Columbia and borrowers in states where only the federal laws apply.  *See Chae*, 593 F.3d at 945 (in holding that that conflict preemption prohibited borrowers' claims against a student loan servicer for violation of California state law, the Ninth Circuit noted that "permitting varying state law challenges across the country, with state law standards that may differ and impede uniformity, will almost certainly be harmful to the FFELP").

136.    For example, Section 3018.2 of the Revised Emergency Rules requires servicers to make records available to the Commissioner within seven days after the Commissioner's official request, which creates an obstacle to compliance with the requirement described in the Department of Education Memorandum that third-party requests for student loan records must be

made directly to the Department of Education.  This memorandum itself merely reinforces the application of the Federal Privacy Act, 5 U.S.C. § 522a, to the servicing of FFELP and/or FDLP student loans.

137.    Similarly, Section 3004.2(c) of the Revised Emergency Rules requires each servicer to post a surety bond conditioned on the servicer: (1) complying with all D.C. and federal laws regulating the activities of servicers; and (2) performing all written agreements with student loan borrowers.  This section of the Revised Emergency Rules implements section 7b(c)(1)(D) of D.C. Law 21-214, which expressly requires a surety bond and explains its purpose is to "be used for the recovery of damages incurred by a student loan borrower as the result of a licensee's noncompliance with the requirements of this act or the recovery of fees or expenses levied against a licensee pursuant to this act."

138.    Because servicers cannot provide student loan records directly to the Commissioner pursuant to Section 3018.2 since all third-party requests must be made directly to the Department of Education, servicers must violate federal law to satisfy the surety bond conditions.  This creates a physical impossibility that results in conflict preemption.  *See Myrick*, 514 U.S. at 287 (explaining that under conflict preemption, "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law" when it is "impossible for a private party to comply with both state and federal requirements").

139.    Moreover, Section 3018.1 of the Revised Emergency Rules imposes record keeping requirements applicable to servicing loan transfers that conflict with federal rules governing servicing transfers.  *See* 34 C.F.R. § 682.208(e).

140.    Even as revised, the per-borrower fee in Appendix A to the Revised Emergency Rules cut into SLSA members' revenue source, leaving servicers with less revenue from the federal contracts to service borrowers in the District of Columbia and adhere to federal regulations.

141.    Additional conflicts with the HEA in the Revised Emergency Rules include the licensure requirements in Section 3002.2, such as the required evidence of a servicer's financial responsibility; the requirement in Section 3003 that servicers provide financial statements and demonstrate a $250,000 net worth; the annual reporting requirements in Section 3014; the annual assessments in Section 3015; the requirement to submit to examinations and investigations in Section 3021; and the civil penalties for servicers in Section 3023.[8]

142.    Therefore, if every state were to adopt laws similar to D.C. Law 21-214 and the Revised Emergency Rules, it could severely impair SLSA's members' ability to provide customer service under the terms of their servicing contracts, and would, at a minimum, be an obstacle to Congress' and the Department of Education's discernable objectives in establishing the federal student loan programs because of the important role servicers play in administering

---

[8] This Complaint does not list every conflict between D.C. Law 21-214 and the Revised Emergency Rules, on the one hand, and federal law, on the other hand.

the programs.[9]  *See* 83 Fed. Reg. at 10621 ("A requirement that Federal student loan servicers comply with 50 different State-level regulatory regimes would significantly undermine the purpose of [FDLP] to establish a uniform, streamlined, and simplified lending program managed at the Federal level.").

143.    D.C. Law 21-214's and the Revised Emergency Rules' conflicts with the federal government's the contracts with student loan servicers are amplified because they seek to regulate in an area of unique federal interest and clash with that interest.  *See Boyle*, 487 U.S. 500; 83 Fed. Reg. at 10621 ("These conflicts with statutes, regulations, Federal contracts, and congressional objectives suggest that State regulation of loan servicers would be preempted by Federal law. That result is even more evident where, as in [FDLP], State regulation implicates uniquely Federal interests.").

144.    D.C. Law 21-214 and the Revised Emergency Rules thus are preempted under conflict preemption.

145.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of D.C. Law 21-214 and the Revised Emergency Rules.

---

[9] Four States and the District of Columbia have enacted laws requiring licensure of student loan servicers and imposing numerous and varying regulatory requirements on servicers: California (AB 2251, Chapter 824, Statutes of 2016, effective July 1, 2018), Connecticut (Public Act 15-62, effective July 1, 2016, as amended by Public Acts 16-65 and 17-233), Illinois (Public Act 100-0540, effective December 31, 2018), Washington (SB 6029, effective the earlier of January 1, 2019 or the adoption of implementing regulations), and the District of Columbia (DC Law 21-214, effective February 18, 2017). The Connecticut statute has been amended twice already and both California (AB 38) and Illinois (HB 4397) are currently considering additional legislation to modify their statutes. In addition, twelve other states are currently considering legislation requiring servicer licensing and regulation: Arizona (HB 2226), Maine (LD1507 and SP532), Maryland (SB 1012 and HB 1642, plus SB 1068 and HB 1634), Massachusetts (SB 129 and HB 2173), Minnesota (HF 21 and SF 2955), Missouri (HB 1274), New Jersey (A455 and S1149), New Mexico (SB 85), New York (A08862, A09508, S07508), Ohio (HB 432), Rhode Island (H7881), and Virginia (SB 362).

146.     A declaration as to the legality and enforceability of D.C. Law 21-214 and the Revised Emergency Rules would terminate the uncertainty giving rise to this proceeding.

147.     Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201 et seq., and F.R.C.P. 57 that federal law preempts D.C. Law 21-214 and the Revised Emergency Rules, and the Commissioner, the Ombudsman, and the District of Columbia have no power to enforce D.C. Law 21-214 and the Revised Emergency Rules because they are preempted under conflict preemption.

**SECOND CLAIM FOR RELIEF**
(Declaratory Judgment that Federal Law Preempts the Revised Emergency Rules under Field Preemption)

148.     SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 147 of this Complaint as if fully set forth herein.

149.     Field preemption occurs where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or if the goals sought to be obtained and the obligations imposed reveal a purpose to preclude state authority." *Wisc. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991).

150.     Here, the federal government has fully occupied the field by extensively regulating the federal student loan servicing industry.  Such occupation makes sense; as alleged in this Complaint, outstanding federal student loans constitute almost 50 percent of the financial assets of the federal government.  The United States, through the Department of Education, thus has an interest in the servicing of loans as both a lender and a guarantor in addition to its interest as a regulator.

151.    As demonstrated in the United States' Statement of Interest in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency* and in the Department of Education's Preemption Notice, federal student loans are in an area of uniquely federal interests.

152.    Both the Department of Education and the Consumer Financial Protection Bureau ("CFPB") supervise and regulate federal student loan servicers.   For example, servicers must comply with all statutory, regulatory, and contractual requirements, including compliance with the Federal Information Security Management Act ("FISMA"), and must have highly-specialized systems for handling the unique requirements for servicing federal student loans.

153.    State regulation of servicers impedes Congress' goals of uniformity and ease of administration for FDLP and FFELP.  *See Chae*, 593 F.3d at 945 ("[E]xposure to lawsuits under fifty separate sets of laws and court systems could make lenders reluctant to make new federally-guaranteed student loans." (quoting Brannan v. United States Aid Funds, Inc., 94 E3d 1260, 1264 (9th Cir.1996))); 83 Fed. Reg. at 10621 (explaining that state regulatory regimes conflict with the congressional objective of uniformity for FDLP and FFELP).

154.    State regulation also clashes with other federal policies, such as the Department of Education's recordkeeping policies to comply with the Privacy Act of 1975, as set forth in the the Department of Education Memorandum.

155.    Moreover, state regulation cannot conflict with the contracts between the Department of Education and the servicers.  *See Boyle*, 487 U.S. 500; 83 Fed. Reg. at 10621 ("[T]he the loan servicers are acting pursuant to a contract with the Federal government, and the servicers stand in the shoes of the Federal government in performing required actions under [FDLP].").

156.    Federal interests thus dominate the area of federal student loan servicing, and there is no room for the states, including the District of Columbia, to supplement federal law.

157.    After considering these issues, the Department of Education issued the Preemption Notice "to clarify its view that State regulation of the servicing of [FDLP] Loans impedes uniquely Federal interests, and that State regulation of the servicing of [FFELP] is preempted to the extent that it undermines uniform administration of the program."  83 Fed. Reg. at 10620.

158.    Specifically, "[t]he Department believes that the statutory and regulatory provisions and contracts governing [FDLP] preclude State regulation, either of borrowers or servicers" and that federal law "preempt State servicing laws that conflict with, or impede the uniform administration of, [FFELP]."  *Id.* at 10621.

159.    "Accordingly, the servicing of [FDLP] Loans is an area 'involving uniquely Federal interests' that must be 'governed exclusively by Federal law.'"  *Id.* at 10619 (quoting *Boyle*, 487 U.S. at 504).

160.    D.C. Law 21-214 and the Revised Emergency Rules thus are preempted under field preemption.

161.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of D.C. Law 21-214 and the Revised Emergency Rules.

162.    A declaration as to the legality and enforceability of D.C. Law 21-214 and the Revised Emergency Rules would terminate the uncertainty giving rise to this proceeding.

163.    Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201 et seq., and F.R.C.P. 57 that federal law preempts D.C. Law 21-214 and the Revised

Emergency Rules, and the Commissioner, the Ombudsman, and the District of Columbia have no power to enforce D.C. Law 21-214 and the Revised Emergency Rules because they are preempted under field preemption.

## THIRD CLAIM FOR RELIEF
(Declaratory Judgment that Federal Law Preempts the Revised Emergency Rules under Express Preemption)

164.    SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 163 of this Complaint as if fully set forth herein.

165.    Express preemption occurs where Congress indicates its intent to displace state law through express language in a provision.  *Chae*, 593 F.3d at 942.

166.    In determining the proper scope of an express preemption provision, courts examine the text of the provision, the provision's surrounding statutory framework, and Congress's stated purposes in enacting the statute.  *Id.*

167.    The HEA includes an express preemption provision in 20 U.S.C. § 1098g, which states that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act . . . shall not be subject to any disclosure requirements of any State law."

168.    20 U.S.C. § 1083 titled "student loan information by eligible lenders" and 34 C.F.R. § 682.205, titled "Disclosure requirements for lenders," regulate the specific disclosures that FFELP lenders must make at specific times.  20 U.S.C. § 1087e provides that FDLP loans are subject to "the same terms, conditions, and benefits" as FFELP loans.

169.    FDLP and FFELP fall within Title IV of the HEA and thus are subject to the express preemption provision in 20 U.S.C. § 1098g.  *See Chae*, 593 F.3d at 942.

170.    In interpreting the scope of the express preemption provision in 20 U.S.C. §
1098g, courts have determined that misrepresentation claims related to billing practices are in
essence improper-disclosure claims such that "[a] properly-disclosed FFELP practice cannot
simultaneously be misleading under state law, for state disclosure law is preempted by the federal
statutory and regulatory scheme." *Id.* at 943 (holding that 20 U.S.C. § 1098g expressly preempts
state disclosure requirements under California's Unfair Competition Law and Consumer
Remedies Act"); *see also Linsley v. FMS Inv. Corp.*, No. 3:11cv961, 2012 WL 1309840, *4 (D.
Conn. Apr. 17, 2012) (holding that where a state law claim is "rooted in a failure to disclose
information required by the HEA," such claim would likely be expressly preempted); *Brooks v.
Sallie Mae, Inc.*, No. FSTCV096002530S, 2011 WL 6989888, at *6 (Conn. Super. Ct. Dec. 20,
2011) (holding that the plaintiff's claims for misrepresenting documentation required to
determine eligibility for economic deferment and misrepresenting that payment of late fees were
required to enter economic deferment were, in fact, disguised improper disclosure claims that
HEA preempts).

171.    For example, "[a] state-law prohibition on misrepresenting a business practice 'is
merely the converse' of a state-law requirement that alternate disclosures be made." *Chae*, 593
F.3d at 942–43 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 527 (1992)).

172.    Therefore, "Congress intended § 1098g to preempt any state law requiring lenders
to reveal facts or information not required by federal law." *Nelson v. Great Lakes Educational
Loan Services, Inc.*, et al., No. 3:17-CV-00183-NJR-SCW, at *10 (S.D. Ill. Dec. 19, 2017)
(Order and Memorandum attached as Exhibit J).

173.    This is consistent with the Department of Education's interpretation that "'disclosure requirements' under section 1098g of the HEA [] encompass informal or non-written communications to borrowers as well as reporting to third parties such as credit reporting bureaus." 83 Fed. Reg. at 10621.

174.    The Act (D.C. Law 21-214) and the Revised Emergency Rules contain the very disclosure requirements and obligations under their licensing scheme that are preempted by 20 U.S.C. § 1098g. *See* 83 Fed. Reg. at 10621 ("To the extent that State servicing laws attempt to impose new prohibitions on misrepresentation or the omission of material information, those laws would also run afoul of the express preemption provision in 20 U.S.C. 1098g.").

175.    Section 7b of the Act requires that all student loan servicers must apply for and obtain a license. D.C. Code § 31-106.02(a).

176.    This Commissioner, however, may revoke or suspend a servicer's license under sections (h) and (i) of the Act for "violating any provision of this act or of any implementing regulation," which includes the Revised Emergency Rules.

177.    The Revised Emergency Rules therefore create duties and requirements for servicers that must be followed to service student loans in the District of Columbia.

178.    Specifically, the Revised Emergency Rules require servicers to communicate or provide disclosure in at least the following ways that are not mandated under the HEA:

> a.   Section 3014 requires servicers to submit an annual report continuing the number of loans sold, assigned, or transferred during the previous calendar year, and other information the Commissioner requires;

b. Section 3016 requires servicers to notify the Commissioner of certain events, including settlement and resolution of any civil action or proceeding involving fraud, misrepresentation, or wrongful taking of property;

c. Section 3018 requires servicers to maintain records for at least three years after final payment is made on a student loan and make such records available to the Commissioner upon request; and

d. Section 3021 permits the Commissioner, based on a borrower complaint or the Commissioner's own initiative, to examine and investigate servicers, including investigating the transactions, business, and records of any licensee or person who the Commissioner has reason to believe is engaging in any business subject to the Act.

179. These requirements also create a scheme whereby the Commissioner may require information from servicers based on borrower complaints.

180. The contents of the Student Loan Borrower's Bill of Rights, created pursuant to the Act, demonstrate the intent behind and breadth of these disclosure requirements. The Student Loan Borrower's Bill of Rights is attached as Exhibit N.

181. Although functionally an aspirational document, the Student Loan Borrower's Bill of Rights, which were issued without public comment beyond the input of a few stakeholders, nevertheless states that borrowers have a panoply of purported rights, among other things, to:

a. have the borrower's inquiry or complaint to a servicer regarding the borrower's loan addressed and resolved;

46

b.   have his or her payments applied to outstanding loan balance(s) timely, appropriately, and fairly;

c.   receive a monthly billing statement, which indicates the outstanding balance of the loan(s) and the current amount of the payment due for the loan(s);

d.   receive, no less than quarterly, a periodic statement that identifies: the servicer and current loan holder; for each loan, the outstanding balance, monthly payment, current term and interest rate, date of origination, and any interest and fees charged; and payments received since the last statement;

e.   receive timely and accurate annual statements concerning student loan interest paid for tax reporting purposes;

f.   receive payoff information upon request;

g.   have the servicer's current schedule of fees that could be charged to the borrower, and the schedule shall disclose each event that would trigger a fee to the borrower, and disclose the applicable fee to be charged;

h.   receive timely information of organizational changes that could affect loan repayment or borrower interactions with the servicer, including changes to the servicer's physical address or contact information, or the transfer of the borrower's account to another servicer;

i.   timely and accurate reporting to credit bureaus of the borrower's loan payment information;

j.  have access to default diversion services from the servicer that notifies the borrower when they are at risk of default, and the servicer shall assist the borrower with avoiding a default;

k.  receive financing that complies with certain principles; and

l.  receive evidence that a loan is paid in full within 30 days of the borrower paying off a student loan.

182.    The Student Loan Borrower's Bill of Rights also specifies that servicers shall develop and implement procedures to ensure that these rights are upheld.

183.    The Student Loan Borrower's Bill of Rights further states that borrowers have the right to file a complaint with the Ombudsman and are encouraged to do so.

184.    These purported rights, which require information or communication from servicers, are in essence disclosure requirements that could trigger additional disclosures.  *See* 83 Fed. Reg. at 10620–22 (identifying many of these disclosure requirements as conflicting with federal law and undermining Congress's goal of saving taxpayer dollars in administering the student loan programs).

185.    Indeed, the purported rights are combined with enforcement powers.  Section 7a(c)(1) of D.C. Law 21-214 provides that the Student Loan Ombudsman's duties include assisting the Commissioner "in the enforcement of the licensing provisions of section 7b, including the referral of actions to the Office of the Attorney General for the District of Columbia for the enforcement of an order of the Commissioner pursuant to section 7b or other authority of the Commissioner related to a licensee or a person required to have a license under the act."

186.     Section 7a(c)(5) of D.C. Law 21-214 requires that the Student Loan Ombudsman, in consultation with the Commissioner, "[m]onitor the actions that student loan servicers take to ensure that student loan borrowers are informed of their rights and responsibilities under the terms of the student loan borrower's student education loan in a transparent, accessible, and timely manner."

187.     Section 7b(h)(1) of D.C. Law provides that a servicer's license may be revoked upon the Commissioner's determination that, among other things, the servicer has "engaged in any dishonest activities or made any misrepresentation in any business transaction."

188.     A borrower could file a complaint with the Ombudsman against a servicer for, for example, lack of payoff information based on the Student Loan Borrower's Bill of Rights, which could trigger an investigation by the Commissioner, cause the servicer to provide additional information to the Commissioner, and result in a servicer's license being revoked.

189.     Therefore, the licensing scheme is built around the servicers providing disclosures to borrowers and the District of Columbia government that are not included in the HEA and its implementing regulations.

190.     As a result, 20 U.S.C. § 1098g of the HEA expressly preempts the disclosure obligations in the Act and the Revised Emergency Rules.

191.     An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of D.C. Law 21-214 and the Revised Emergency Rules.

192.     A declaration as to the legality and enforceability of D.C. Law 21-214 and the Revised Emergency Rules would terminate the uncertainty giving rise to this proceeding.

193.    Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201 et seq., and F.R.C.P. 57 that federal law preempts D.C. Law 21-214 and the Revised Emergency Rules, and the Commissioner, the Ombudsman, and the District of Columbia have no power to enforce D.C. Law 21-214 and the Revised Emergency Rules because they are preempted under express preemption.

## FOURTH CLAIM FOR RELIEF
(Declaratory Judgment that the Emergency Rules Are Invalid under D.C. Law 21-214)

194.    SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 193 of this Complaint as if fully set forth herein.

195.    The Revised Emergency Rules also are not in compliance with the Act, D.C. Law 21-214.

196.    Section 2(b) of the Act provides that that the "[Student Loan] Ombudsman, in consultation with the Commissioner [of the Department of Insurance, Securities and Banking], shall. . . (12) Charge each student loan servicer an examination fee, assessed in an amount set by the Mayor."  D.C. Code § 31-106.01(c)(12).

197.    The Revised Emergency Rules, as adopted and proposed, violate Section 2(b)'s requirement in at least two respects.

198.    First, Appendix A of the Revised Emergency Rules imposes an "examination fee" of "$400 per examiner day."

199.    This amount was not set by the Mayor of the District of Columbia as required by Section 2(b).

200.     Although the Revised Emergency Rules reference Mayor's Office Order 2017-206, attached as Exhibit O, this Order not only does not set the examination fee, it does not even discuss this fee at all. At best, it purports to delegate any mayoral authority to the Commissioner for the purpose of making emergency rules.

201.     Therefore, this purported delegation is in direct conflict with Section 2(b)'s requirement that the Mayor herself set the fee amount.

202.     Second, Section 3015.3 of the Revised Emergency Rules subsumes the required examination fee within other fees assessed under the Commissioner's presumed authority to prescribe "other fees" as part of the licensing application process.  *See* D.C. Code § 31-106.01(c).

203.     The Revised Emergency Rules provide that any servicer who pays the annual assessment fee (set in Appendix A at $0.50 per borrower) shall not be charged an examination fee unless you determine that an "out of district examination" or "unscheduled examination" is necessary.

204.     The relationship of the assessment fee to the examination fee is reflected in Section 3021.5 of the Rules, which (after prior sections appearing to require an examination fee to defray costs for all servicers subject to examination) provides that any servicer charged an examination fee shall not be subject to an annual assessment fee in the same year.

205.     Therefore, all of these fees—and at the very least the annual assessment fee—are improper under D.C. Law 21-214.  By making these other fees into substitutes for the examination fee that D.C. Law 21-214 requires to be set by the Mayor, the Commissioner has illegally assumed mayoral authority to set that fee and the Ombudsman's obligation to charge it.

206.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of the Revised Emergency Rules.

207.    A declaration as to the legality and enforceability of the Revised Emergency Rules would terminate the uncertainty giving rise to this proceeding.

208.    Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201, *et seq*., and F.R.C.P. 57 that the Revised Emergency Rules are invalid because they are not in compliance with D.C. Law 21-214.

## FIFTH CLAIM FOR RELIEF
(Injunctive Relief)

209.    SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 208 of this Complaint as if fully set forth herein.

210.    As stated above, federal law preempts D.C. Law 21-214 and the Revised Emergency Rules, and the Revised Emergency Rules are invalid and unenforceable.

211.    SLSA and student loan servicers have demanded that Defendants withdraw D.C. Law 21-214 and the Revised Emergency Rules and refrain from enforcing them, but Defendants have not done so.

212.    Therefore, an injunction is necessary to prevent Defendants from enforcing them against student loan servicers.

## PRAYER FOR RELIEF

WHEREFORE, SLSA respectfully requests that the Court issue:

a. a declaratory judgment that federal law preempts D.C. Law 21-214 and the Revised Emergency Rules, and the Commissioner, the Student Loan and Foreclosure Ombudsman, and the District of Columbia have no power to enforce the Revised Emergency Rules;

b. a declaratory judgment that the Revised Emergency Rules are invalid because they are not in compliance with D.C. Law 21-214;

c. an order permanently enjoining Defendants from enforcing D.C. Law 21-214 and the Revised Emergency Rules against student loan servicers;

d. an order providing for expedited discovery and trial of this case before the assessment fees and other aspects of the Revised Emergency Rules go into effect on November 1, 2018, and to avoid the need for a separate preliminary injunction proceeding; and

e. such other and further relief as may be provided by law or as the Court may deem equitable.

Respectfully submitted this 20th day of March 2018.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:     *s/ Christopher O. Murray*
_____
         Richard B. Benenson
         Christopher O. Murray
         410 17th Street, Suite 2200
         Denver, CO 80202
         Telephone:  303.223.1100
         Fax:  303.223.1111
         Email:  rbenenson@bhfs.com
                   cmurray@bhfs.com


         *Attorneys for Plaintiff Student Loan Servicing Alliance*

<u>Plaintiff Address:</u>
1100 Connecticut Avenue NW
Suite 1200
Washington D.C. 20036