**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Civil Action No.: 1:18-cv-640 (PLF)

STUDENT LOAN SERVICING ALLIANCE,

      Plaintiff,

v.

STEPHEN C. TAYLOR;
CHARLES A. BURT; and
DISTRICT OF COLUMBIA.

      Defendants.

---

## AMENDED COMPLAINT

---

Plaintiff Student Loan Servicing Alliance, ("SLSA" or "Plaintiff"), through undersigned counsel, hereby submits its Complaint against Defendants Stephen C. Taylor, Commissioner, Department of Securities, Insurance and Banking; Charles A. Burt, Student Loan and Foreclosure Ombudsman; and the District of Columbia (collectively "Defendants") as follows:

## <u>INTRODUCTION</u>

1.    This lawsuit concerns the federal student loan programs and the vitality of a critical piece of their administration: student loan servicers.

2.    The federal government selects student loan servicers to administer and service federal student loans. As part of this activity, servicers provide unique assistance to student loan borrowers, including helping those borrowers understand the repayment and deferment options available to them so that their loans do not become delinquent or fall into default.

3.     Nearly half of the financial assets of the United States Government—over a trillion dollars—are promissory notes related to unpaid loans made to America's students for their higher education:[1]



4.     Naturally, the federal government has a comprehensive set of laws, regulations and rules pertaining to the administration, collection and repayment of these loans, including borrower protections.  Because many of the 34 million Americans who owe federal student loans move around the country, these federal laws, regulations, and rules must apply uniformly throughout the country.  Furthermore, because approximately 92 percent of all student loans in America are made, owned, or guaranteed by the federal government, these federal laws and

---

[1] The chart is included as part of the following article: Jill Mislinksi, *The Fed's Financial Accounts: What Is Uncle Sam's Largest Asset?*, Advisor Perspectives, Inc, (June 22, 2018), https://www.advisorperspectives.com/dshort/commentaries/2018/06/22/the-fed-s-financial-accounts-what-is-uncle-sam-s-largest-asset.

regulations drive the rules and practices nationwide for everyone involved in the administration and collection of student loans, including student loan servicers.

5.      Until recently, there had been no significant effort by any state to regulate the collection of these monies owed to the federal government.  In response to a few such recent efforts: (1) a U.S. District Court in Illinois held that federal control over this subject preempts state regulations, (2) the United States submitted a formal Statement of Interest in a case in Massachusetts state court explaining the need for consistent federal control over the rules for collection of its most significant financial asset, and (3) the U.S. Department of Education issued a Notice of its position that federal law preempts state regulation of student loan servicers.

6.      This lawsuit asks the Court move swiftly to prevent the District of Columbia from imposing its own directly conflicting, burdensome, and expensive laws and regulations in this federally preempted area.   The District of Columbia's law and regulations would cause significant harm to the federal student loan program, its borrowers, and the student loan servicers that manage the program on behalf of the federal government.

7.      This lawsuit challenges District of Columbia Law 21-214 ("D.C. Law 21-214") and final rules promulgated pursuant to it that purport to regulate student loan servicers by imposing additional requirements and fees beyond what is prescribed by federal law on the grounds that federal law preempts D.C. Law 21-214 and the final rules.

8.      Specifically, this lawsuit seeks a declaratory judgment that the D.C. law and the final rules (1) constitute an insurmountable obstacle to the federal government's ability to administer the federal student loan programs, (2) are preempted by the Congress' occupation of

the field of regulating the servicing of student loans, and (3) are in many respects expressly preempted pursuant to 20 U.S.C. § 1098g, and are therefore invalid.

## PARTIES

9.      Plaintiff SLSA is a non-profit, membership trade organization with an office located at 1100 Connecticut Avenue NW, Suite 1200, Washington D.C. 20036.  SLSA's membership consists of 24 student loan servicers (who service either federal or private loans, or both) and 14 affiliate members, who collectively service over 95 percent of the outstanding William D. Ford Federal Direct Loan Program ("FDLP") and Federal Family Education Loan Program ("FFELP") student loans.[2]  To aid its members, SLSA primarily focuses on the operational and technical issues that impact customer service and program administration.  SLSA develops industry positions and promotes best practices, which help its members provide a high level of quality customer service.  It also works with other organizations to support the continuing enhancement and streamlining of the student loan programs.  As part of this focus, SLSA identifies obstacles and opportunities within the operation of the loan programs that can benefit from its expertise and leadership, and it formulates solutions that achieve simplification and standardization.  SLSA's efforts directly benefit student loan borrowers by supporting servicers' efforts to comply with federal regulations and best help student borrowers avoid delinquency and default.

10.      Defendant Stephen C. Taylor is the Commissioner of the District of Columbia, Department of Insurance, Securities and Banking (the "Commissioner").

---

[2] SLSA's members also service privately-issued student loans.  Such loans account for less than 8 percent of the outstanding student loan debt nationally.  *Measure One Q1 2018 Private Student Loan Report*, *available at* https://www.measureone.com/psl.php.

11.     Defendant Charles A. Burt is the District of Columbia Student Loan and Foreclosure Ombudsman (the "Ombudsman").   He is empowered to establish licensing requirements for student loan servicers in the District of Columbia.[3]

12.     Defendant the District of Columbia is the official local government for the district.

## STANDING

13.     SLSA has standing to bring this action because (1) its members have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested may require the participation of individual members in the lawsuit.  *See, e.g.*, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

14.     First, SLSA's members have standing to sue on their own because they already have been harmed and will be imminently harmed by the imposition of D.C. Law 21-214 and the final rules, including their required fees; the government of the District of Columbia, through the Commissioner, caused the passage of the final rules and therefore the injury; and this Court has the power to redress the injury by invalidating D.C. Law 21-214 and/or the final rules.

15.     Second, D.C. Law 21-214 and the final rules directly affect the ability of SLSA's members to provide customer service (by cutting off funds necessary to do that) and administer FFELP and FDLP, both of which are goals of SLSA.

16.     Third, none of SLSA's members are required to participate in this lawsuit because this lawsuit merely seeks declaratory judgments to invalidate District of Columbia law and rules.

---

[3] Both the Commissioner and the Ombudsman are sued in their official capacities.

**JURISDICTION AND VENUE**

17.     Jurisdiction is proper over SLSA's claims for relief pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

18.     Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391 because the defendants reside in this judicial district and the acts described in this Complaint occurred in this judicial district.

**GENERAL ALLEGATIONS**

*Federal Student Loans*

19.     In total, there are $1.524 trillion in outstanding student loans, of which over $1.4 trillion, or approximately 92 percent, are federal student loans.  *See* Federal Student Aid Portfolio Summary for the second quarter of FY 2018, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio; Federal Reserve, Statistical Release:   Consumer   Credit   –   G.19   (July   9,   2018),   *available   at* https://www.federalreserve.gov/releases/g19/current/g19.pdf (showing approximately $1.53 trillion in outstanding student loans as of June 2018).

20.     The data regarding total outstanding student loans in the United States are summarized in the following chart and described below:



21.     The federal student loan industry is unique among loan industries in the United States.

22.     Federal student loans are government programs designed to provide greater access to higher education.  The Higher Education Act of 1965 (the "HEA") created the federal student loan programs, which are regulated by the U.S. Department of Education.

23.     Congress passed the HEA in 1965 to "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Higher Education Act, Pub L. No. 89-329, 79 Stat. 1219 (1965).

24.     Specifically, the HEA, which is codified at 20 U.S.C. §§ 1001–1155, was passed with the goal of "keep[ing] the college door open to all students of ability, regardless of

socioeconomic background." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009) (internal quotation marks omitted).

25.     To effectuate these goals, Congress has established two main federal student loan programs: FFELP, 20 U.S.C. § 1071, *et seq*. and FDLP, 20 U.S.C. § 1087a, *et seq*.   Title IV of the HEA governs these federally funded student financial aid programs for college and post-secondary vocational training.  20 U.S.C. § 1070, *et seq*.  Congress established both programs as entitlement programs.

26.     Congress authorized FFELP, which was originally known as the Guaranteed Student Loan program, as part of the HEA in 1965.  FFELP loans are loans that were made by banks and other private lenders, insured by guaranty agencies, and then reinsured by the federal government.  As a result, entitlements under FFELP accrue to lenders and guaranty agencies, as well as to individual borrowers.

27.     Congress first authorized FDLP as a pilot program as part of the Higher Education Amendments of 1992.  Congress then fully authorized FDLP through the Student Loan Reform Act of 1993, as part of the Omnibus Reconciliation Act of 1993.  In contrast to FFELP loans, FDLP loans are made by and owned by the federal government.  As a result, entitlements under FDLP accrue to individual borrowers.

28.     The federal loan programs have grown exponentially since their inceptions. FFELP loans constitute $295.5 billion or approximately 21 percent of federal student loans.  *See* Federal Student Aid Portfolio Summary for the second quarter of FY 2018, U.S. Dep't of Educ., *available        at        https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/*

PortfolioSummary.xls.   FDLP loans constitute approximately $1.1 trillion or over 78 percent of federal student loans.[4] *Id.*

29.     In addition, under the Ensuring Continued Access to Student Loans Act of 2008 ("ECASLA"), the Department of Education purchased from private lenders approximately 3.91 million FFELP Loans with an outstanding balance of over $92 billion.   In total, the federal government owns and manages 85 percent of all outstanding federal student loans.  *See* Federal Student Aid Portfolio Summary for the second quarter of FY 2018, U.S. Dep't of Educ., *available       at*       https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/ PortfolioSummary.xls (showing the total volume for Direct Loans, FFEL Loans, Perkins Loans, and all federal student loans); Location of Federal Family Education Loan (FFEL) Program Loans,        U.S.        Dep't        of        Educ.,        *available        at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/LocationofFFELPLoans.xl s (breaking down the FFEL Program portfolio).  *See also* Federal Student Aid Posts New Reports to    FSA    Data    Center,    U.S.    Dep't    of    Educ.    (Apr.    6,    2018),    *available    at* https://ifap.ed.gov/eannouncements/040618FederalStudentAidPostsNewReportstoFSADataCent er.html (noting that as of December 31, 2017, the federally managed portfolio of student loans is $1.16 trillion or 84 percent of the outstanding federal student loan portfolio of $1.38 trillion).

30.     As a result of its commanding share of the market and its regulatory oversight, the federal government has a unique and essentially unilateral ability to determine who services student loans, how those loans are serviced, and what student loan servicers are paid.

---

[4] The remaining percentages of federal student loans come from Perkins Loans, which are loans made by some institutions to their neediest students using federal funds.

31.     There is no credit check or test for ability to repay for students who want to participate in federal student loan programs.  The only criterion to take out a federal student loan is attendance at an institution of higher education that meets U.S. Department of Education standards for participation.  *See* 20 U.S.C. § 1091 (detailing student eligibility).

32.     Because of their importance in providing access to higher education, federal student loans provide federal taxpayer-funded benefits to borrowers that are not found in other consumer loans.  These benefits include below-market interest rates, payment deferment periods where the federal government pays interest on the loan, generous forgiveness and discharge provisions, and income-based repayment and forgiveness.  *See* 20 U.S.C. §§ 1071 to 1087vv (stating the benefits of the federal loan programs).

33.     Approximately 59 percent of the undergraduate class of 2016 in public four-year schools and 62 percent of the undergraduate class in private four-year schools graduated with student loan debt.  In the 2015-2016 academic year, only 39 percent of all undergraduates used student loans of any type.  U.S. Dep't of Educ., National Center for Education Statistics, National Postsecondary Student Aid Study 2016 (NPSAS:16).  This is down from the 42 percent of all undergraduates who used student loans in the 2011-2012 academic year.  U.S. Dep't of Educ., National Center for Education Statistics, National Postsecondary Student Aid Study 2012 (NPSAS:12).

34.     Despite the recent decrease in the percentage of students using student loans, outstanding federal student loans have more than doubled from less than $600 billion in 2008 to over $1.4 trillion today.  *See* Federal Student Aid Portfolio Summary for the second quarter of FY        2018,        U.S.        Dep't        of        Educ.,        *available        at*

https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls.

This is largely attributable to the increase of undergraduate borrowing limits included in ECASLA in response to the recession, the substantial increase in graduate borrowing after the enactment of the Grad PLUS program in 2006, which allows graduate and professional students to borrow up to the total cost of attendance, and the increase in the number of students pursuing postsecondary education during the recession.

35.     As of March 31, 2018, the average student loan borrower in the District of Columbia had approximately $51,192.00 in outstanding federal student debt.  Federal Student Aid, Federal Student Loan Portfolio by Borrower Location, *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/Portfolio-by-Location.xls.  Given that the current borrowing limit for dependent undergraduates is $31,000.00, this average likely reflects a high number of District residents who have used student loans for graduate studies.  *See Trends in Student Aid 2017*, College Board, *available at* https://trends.collegeboard.org/sites/default/files/2017-trends-student-aid_0.pdf   (showing   that average annual borrowing for undergraduate studies is approximately $6,590 per student while average annual borrowing for graduate studies is $18,720 per student).

36.     Borrowers with higher outstanding loan balances are actually significantly less likely to default on their loans.  While almost two-thirds of defaults came from borrowers with less than $10,000 in outstanding student loan debt, only 4 percent of defaults came from borrowers with over $40,000 in outstanding student loan debt. *Investing in Higher Education: Benefits, Challenges and the State of Student Debt*, The White House Council of Economic

Advisors, July 2016, *available at:* https://obamawhitehouse.archives.gov/sites/
default/files/page/files/20160718_cea_student_debt.pdf.

*The Federal Government Highly Regulates Federal Student Loans and Servicers*

37.    Both FDLP and FFELP are highly regulated.

38.    Congress "instruct[ed]" the U.S. Department of Education to "[e]stablish a set of
rules that will apply across the board," *Chae v. SLM Corp.*, 593 F.3d 936, 945 (9th Cir. 2010),
and granted the Secretary of Education and the U.S. Department of Education broad authority to:
(1) prescribe regulations, including regulations pertaining to servicers; (2) audit financial
transactions of, impose civil penalties against, and limit, suspend, or terminate the participation
of lenders and guaranty agencies; and (3) promulgate standardized forms and procedures
covering "all aspects of the loan process," including common application forms, promissory
notes, and master promissory notes, 20 U.S.C. § 1082(a), (f), (g), (h), (l), and (m).

39.    The U.S. Department of Education specifically has broad and exclusive authority
to create servicer requirements.  *See* 20 U.S.C. § 1082(a)(1); see also U.S.C. §§ 1087a, 1087e.

40.    The U.S. Department of Education has since adopted numerous regulations
governing all aspects of federal student loans under FDLP and FFELP, including charges to
borrowers, 34 C.F.R. § 682.202, § 685.202; repayment plans, 34 C.F.R. § 682.208, § 685.209;
deferment and forbearance, 34 C.F.R. §§ 682.210–211 (forbearance in FFELP), §§ 685.204–205
(forbearance in FDLP); and due diligence in servicing a loan, 34 C.F.R. § 682.208.

41.    The U.S. Department of Education also has promulgated rules establishing the
forms of promissory notes, borrower disclosures, and other forms that neither the student loan
borrower nor the servicer may alter.  *See* 20 U.S.C. §§ 1082(m)(1)-(4).  "The purpose of the

common forms is to standardize the terms and formatting to help applicants understand their loan obligations." *Chae*, 593 F.3d at 940 (citing 20 U.S.C. § 1082(m)(1)(B)).

42.     These regulations are all-encompassing and include specific regulations governing servicing transfers. *See* 34 C.F.R. § 682.208(e).

43.     For example, the regulations specify that if federal student loan servicers violate any statutory provision, regulation, or agreement, they face reduced ability to service additional loans and termination of their existing contracts.  34 C.F.R. §§ 682.700a, 682.706.

44.     Overall, Congress intended for both FDLP and FFELP to operate uniformly across the United States and that their "participants be held to clear, uniform standards." *Chae*, 593 F.3d at 944–47 (noting that "Congress created a policy of inter-program uniformity by requiring that 'loans made to borrowers [under the Direct Loan Program] shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFELP].'" (quoting 20 U.S.C. § 1087e(a)(1))); *see also Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996) (holding that FFELP "requires uniformly administered . . . standards in order to remain viable").

45.     "In other words, Congress's instructions to [the U.S. Department of Education] on how to implement the student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board." *Id.* at 945.

46.     Nothing in the HEA, including its provisions regarding FFELP or FDLP, authorizes the States or the District of Columbia to exercise authority over the U.S. Department of Education as to regulating the servicing of loans.

*Challenges Student Loan Borrowers Face*

47.     As with many large government programs, federal student loan programs are complex.

48.     Congress and the U.S. Department of Education have made numerous changes to the programs over the years.

49.     Demonstrating both the programs' complexity and Congress' changes, the programs contain a myriad of options designed to help borrowers afford their student loan debt payments.   Specifically, the programs now include 16 possible repayment plans, including 6 different income-driven repayment plans; 21 types of deferments; 13 types of forbearance; and 8 different loan forgiveness/discharge options. Due to this complexity and its constantly changing nature, many borrowers are overwhelmed and need help navigating their choices.

50.     Despite the many offerings designed to protect federal student loan borrowers from delinquency, default, and impaired credit ratings, borrowers may not be fully aware of the unique assistance that is available to them or may feel too embarrassed about their situation to reach out on their own.  This can occur when a borrower leaves the institution of higher education without achieving their degree, often avoiding the institution's exit counseling that is required by the Higher Education Act.  As a result, borrowers' loans may become delinquent or in default.

51.     Nevertheless, because the programs offer a plethora of options that can meet differing needs, if student loan servicers can reach the borrowers and explain the options, no student borrower should ever have to default on his or her federal student loans.

52.     However, overlaying state laws and regulations on top of the HEA requirements would simply add to the complexity federal student loan borrowers face, increasing the cascade

and complexity of information borrowers must sort through to figure out what they owe, when they owe it, and how to get relief when they are struggling with payments.

53.     Any additional burden state law or regulations place on servicers, such as fees or conflicting notification obligations, could impede servicers' ability to perform the necessary outreach to properly inform borrowers of their options.

### *Student Loan Servicers' Role in the Federal Student Loan Industry*

54.     Student loan servicers play an important role in the federal student loan process; they are a valuable partner of the loan programs themselves in making educational opportunities possible for millions of Americans and their families.

55.     To help student borrowers navigate the myriad options available in the federal student loan program and to lower the frequency of delinquency and default, the Secretary of Education is authorized to prescribe regulations necessary to carry out the HEA's purposes, including regulations applicable to loan servicers.[5] *See, e.g.*, 20 U.S.C. § 1082(a)(1).

56.     The Secretary of Education also is authorized to contract with servicers for the servicing and pre-default collection of loans it owns. *Id.* § 1087f(a)(1).

57.     Student loan servicers' place in the industry thus is as follows:

    a.   At the top, institutions of higher education set their tuition and fees. Families then select an institution and may borrow money to pay for the cost of attendance.

    b.   In order to help families pay the costs, Congress sets the interest rate formula, loan limits, and repayment terms for federal student loans.

---

[5] For example, the HEA's sections on FFELP define a "third party servicer" as a person or entity that enters into a contract with an institution of higher education, guaranty agency, or eligible lender to administer the loan. 20 U.S.C. § 1088(c).

    c.   When a family decides to take out a federal student loan, the U.S. Department of Education issues the loan at the congressionally set rates and terms, distributes the proceeds to the institution on behalf of the student, and assigns the loan to a student loan servicer under a contract.

    d.   The student loan servicer then works on behalf of the federal government with the borrower to help the borrower assess multiple repayment options and successfully repay the loan.

    e.   With the servicer's aid, the loan is repaid.

58.    In conjunction with their role in the student lending process, student loan servicers are responsible for a range of loan services, including processing Income-Driven Repayment ("IDR") applications and reenrollment applications, maintaining account records, sending statements and other account notices, processing payments, processing paperwork associated with a myriad of payment statuses, operating incoming and outgoing call centers to help inform and educate borrowers about their loans and select the best repayment plan within their budget, and even facilitating temporary cessation of payments, all in an effort to avoid the consequences of delinquency and default and to more efficiently and effectively collect before default these federal obligations.   All of these activities are highly regulated by the U.S. Department of Education.

59.    For example, to help protect borrowers, the U.S. Department of Education regulations require student loan servicers to inform borrowers of the special programs available to them for short- and long-term economic hardship, ranging from temporarily postponing

payments to sustainable income-based repayment plans that adjust to the borrowers' earnings. *See* 34 C.F.R. §§ 682.416, 682.208.

60.     Servicers are thus representatives of the government to student borrowers; federal regulations and contracts require that they are available to help prevent the adverse consequences that can accompany a borrower's delinquency or default on a federal student loan.  Servicers are thus a valuable resource to borrowers, providing a link to government repayment options that range from temporarily postponing payments to sustainable income-based repayment plans that connect monthly loan obligations to the borrower's earnings.

61.     The federal government specifically recognizes servicers' importance.  According to the Executive Branch, "[h]igh-quality, borrower-focused servicing helps more borrowers successfully repay their federal student loans." *White House Fact Sheet, Presidential Memorandum, Student Aid Bill of Rights* (March 10, 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/03/10/fact-sheet-student-aid-bill-rights-taking-action-ensurestrong-consumer-.  The needs of borrowers are best met by "find[ing] the most innovative and effective ways to communicate with borrowers, leverag[ing] the latest research identifying key factors that influence borrower repayment, and keep[ing] actual borrower behavior in mind so they stay in repayment and avoid default." *Id.*  These steps help borrowers because they aid in setting and adjusting a borrower's repayment plan at an affordable rate, and ensure that "[e]very borrower has the right to an affordable repayment plan." *Id.*

### *Federal Government Compensation to Student Loan Servicers*

62.     Servicers are compensated at a set amount per borrower (1) pursuant to contracts with the federal government for student loans in the FDLP, the current federal student loan

program, and (2) pursuant to contracts with private lenders making student loans guaranteed[6] by the federal government in the FFELP, the predecessor federal student loan program.

63.     Federal contracts in the FDLP program pay servicers on a per student loan borrower basis, based on the borrower's repayment status.  Most borrowers have multiple student loans.  Servicers get paid less if a borrower becomes delinquent or the loan is placed in forbearance—that is, servicers see their compensation reduced if they do not keep the borrowers on track toward repayment of their loans. Finally, servicers are paid nothing if a loan defaults and enters debt collection.

64.     Under these contracts, the <u>most</u> a student loan servicer can receive from a single student loan borrower, who may have multiple loans of different types, is $34.20 per year.  *See* <u>Exhibit A</u>, Great Lakes Educational Loan Services Contract at September 2014 Amendment page 4 (showing that the maximum per month a servicer may be paid is $2.85 per borrower, allowing a potential annual compensation of $34.20).

65.     In contrast, in the mortgage servicing industry, the annual cost of servicing a performing loan in 2016 was $163.00 and the annual cost of servicing a non-performing loan was $2,113.00.  MBA Chart of the Week: Servicing Costs Per Loan (Single-Family)--Performing v. Non-Performing, *MBA Newslink*, *available at* <u>https://www.mba.org/servicing-</u>

---

[6] FFELP loans are reinsured by the federal government pursuant to 20 U.S.C. §§ 1071(a)(1)(D), 1078(c) and 32 C.F.R. § 682.404.  Any reinsurance claims are paid by the federal government directly out of federal reserve funds.  34 C.F.R. §§ 682.404(a), 682.410(b)(6). Unlike a typical reinsurance arrangement, the federal reinsurance obligation may not ordinarily be cancelled, making it a guarantee in substance.  Indeed, the FFELP program was formerly named the Guaranteed Student Loan program, before being renamed in 1992.  Higher Education Amendments of 1992, Pub.L. No. 102-325, § 411(a)(1), 106 Stat. 448, 510 (1992).  Any reinsurance claims are paid by the federal government directly out of federal reserve funds.  34 C.F.R. §§ 682.404(a), 682.410(b)(6).

newslink/2017/july/servicing-newslink-tuesday-7-25-17/news-and-trends/mba-chart-of-the-week-servicing-costs-per-loan-(single-family)-performing-v-non-performing.    If state-imposed fees, requirements, and other burdens were to become widely enacted, and if the federal government were forced to pay student loan servicers at such levels, it would cost federal taxpayers millions of dollars per year.

66.    The HEA specifically requires that the Secretary of Education award contracts to servicers that have "extensive and relevant experience," "demonstrated effectiveness," and "a history of high quality performance."  20 U.S.C. § 1078f.

67.    The U.S. Department of Education distributes new federal student loans to servicers based on performance metrics that incentivize servicers to keep the borrowers they service current and satisfied.  *Explanation of Allocation and Performance Measure Methodology*, Federal Student Aid Office, U.S. Department of Education, *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/06302017/ExplanationQuarterEnd063017.pdf.  Metrics are weighted as follows:

    a.  Percent of borrowers current: 30 percent

    b.  Percent of borrowers 91 to 270 days delinquent: 15 percent

    c.  Percent of borrowers 271 to 360 days delinquent: 15 percent

    d.  Borrower satisfaction survey: 35 percent

    e.  The U.S. Department of Education's Federal Student Aid Staff : 5 percent

68.    Therefore, the federal government's compensation scheme for student loan servicers is designed to incentivize servicers to perform their jobs: keeping as many student loans as possible out of delinquency and default.

*The Federal Government Assumes Greater Control over the Student Loan Industry*

69.     Beginning with FDLP's inception in 1992, FFELP and FDLP operated as parallel programs.

70.     However, starting in 2008, the federal government began asserting more control over the student loan industry.

71.     First, Congress adopted ECASLA (Pub. Law 110-227) in response to the disruptions in financial markets in 2008.  As extended in 2009, it gave the U.S. Department of Education authority to purchase FFELP loans until the end of the 2009-2010 academic year.

72.     Second, Congress passed the Health Care and Education Reconciliation Act in 2010.  The Act ended FFELP for future federal student loans, specifically requiring that no new FFELP loans could be made after June 30, 2010.  FFELP loans therefore are no longer available to student loan borrowers.  Health Care and Education Reconciliation Act, Pub. L. 111-152, § 2201, *et seq*. (Mar. 30, 2010); *see also* 20 U.S.C. § 1071(d).

73.     As a result, over 90 percent of new student loans today are made through FDLP. *Trends    in    Student    Aid    2017*,    College    Board,    *available    at* *https://trends.collegeboard.org/sites/default/files/2017-trends-student-aid_0.pdf*.    The federal government selects student loan servicers and contracts with them to service these loans.

*The District of Columbia Enacts an Act to Regulate Student Loan Servicers*

74.     On December 7, 2016, the Council of the District of Columbia enacted the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016 (the "Act"), D.C. Law 21-214, to amend the Department of Insurance and Securities Regulation Establishment Act of 1996.  The Act is attached as Exhibit B.

75.     On page 3 of the Act's Committee Report, the Council of the District of Columbia states that the basis for passing the Act is that "[w]hile servicers must generally comply with applicable federal and state consumer financial laws and regulations, there is currently no comprehensive federal statutory or regulatory framework providing consistent, market-wide standards for servicing student loans."   The Committee Report also notes that "because [this country] lack[s] robust federal standards for student loan servicers, many of which generally have discretion to determine policies related to their servicing operations, [the district's] students are at risk of receiving subpar and/or inconsistent services and some are even being targeted by predatory debt relief companies."   The Committee Report is attached as Exhibit C.

76.     Section 7b of the Act requires "a person or entity seeking to operate as a student loan servicer" in the District of Columbia to apply for an "SLS license."   D.C. Code § 31-106.02(a).

77.     To obtain a license, prospective student loan servicers must submit "[a] completed application, in a form and manner prescribed by the Commissioner [of the Department of Insurance, Securities and Banking ("DISB")], that is signed under penalty of perjury."   D.C. Code § 31-106.02(c)(1)(C).

78.     Along with an application, servicers must submit "[a]pplication fees and other fees as prescribed by the Commissioner [of the Department of Insurance, Securities and Banking ("DISB")]."   D.C. Code § 31-106.02(c)(1)(B).

79.     The Act also requires that servicers submit a surety bond "for the recovery of damages incurred by a student loan borrower as the result of a licensee's noncompliance with the requirements of this [A]ct or the recovery of fees or expenses levied against a licensee pursuant

to this [A]ct" and "[a]ny other information the Commissioner considers necessary and appropriate."  D.C. Code § 31-106.02(c)(1)(D)-(E).

80.     The Commissioner has broad power to issue licenses, deny applications for renewal of licenses, and revoke licenses.  D.C. Code § 31-106.02(d)-(h).

### *The District of Columbia Issues Emergency Rules*

81.     Ostensibly pursuant to the Act, the Commissioner adopted emergency rules on September 8, 2017, regarding student loan servicers, which constitute Chapter 30, Student Loan Servicers, of Title 26-C DCMR, Banking and Financial Institutions (the "First Emergency Rules").  The First Emergency Rules are attached as Exhibit D.  These rules also were proposed as permanent rules.

82.     The First Emergency Rules, which became effective on the date of their adoption, require student loan servicers to apply for a license, § 3002; file a surety bond, § 3004; provide annual reports and reporting, § 3014; keep records for at least three years after a final payment is made on a loan, § 3018; be subject to examinations and investigations, § 3021; and face penalties of up to $25,000 for each violation, § 3023.

83.     The First Emergency Rules also prescribe additional fees.  Section 3002.2 requires that the application for an SLS license shall include, at minimum, "[p]ayment of applicable fees as described in Appendix A of these rules and any outstanding fees due to the Department or to the District, including compliance with the Clean Hands Before Receiving a License or Permit Act of 1996, effective May 11, 1996 (D.C. Law 11-118; D.C. Official Code § 47-2861 *et seq.*)."

84. Section 3015 of the First Emergency Rules includes the following annual assessments, which are due on or before November 1 of each calendar year:

    a. Subsection (1) states that "[e]ach licensed student loan servicer who held a license during the prior licensing period shall be subject to an annual assessment fee as prescribed in Appendix A."

    b. Subsection (2) provides that "[t]he annual assessment fee shall be determined to be the sum of a fixed amount plus a variable amount based on the number of loans serviced in the previous license period as prescribed in Appendix A."

    c. Subsection (3) clarifies that "[a] licensee who has been charged and pays an annual assessment fee shall not be subject to an examination fee in the same year unless the following occurs: (a) The Commissioner determines that an out-of-the-District examination is necessary; or (b) The Commissioner determines that an unscheduled examination is necessary."

85. Appendix A to the First Emergency Rules lists the following student loan servicer license fees:

    a. DISB Initial Application Fee – $1,200 + Nationwide Multistate Licensing System ("NMLS") Fee

    b. DISB Renewal Application Fee – $1,000 + NMLS Fee

    c. DISB Amendment Fee – $100

    d. DISB Reinstatement Fee – $1,000

    e. DISB Annual Assessment Fee – $800 + $6.60 per loan

    f. DISB Examination Fee – $400 per examiner day

*The Act and the First Emergency Rules Would Impede Servicers Ability to Aid Borrowers*

86.     Although the Commissioner passed the First Emergency Rules "in an effort to ensure the long-term financial safety and security of District residents with student educational loans," the rules have an adverse consequence that directly affects borrowers in the District of Columbia.

87.     The First Emergency Rules threatened to drive SLSA's members out of business because the per-loan-serviced fee ($800 plus $6.60 per loan serviced) essentially would render it impossible for SLSA members to retain any revenue under their FDLP contracts to provide services required under those contracts to borrowers in the District of Columbia.

88.     Given the federal government's unilateral ability to determine who services student loans, how those loans are serviced, and what student loan servicers are paid, SLSA members would have been caught in the middle of what would have essentially been a dispute between their federal and state regulators.

89.     Such a position would have been especially untenable given that student loan servicers cannot choose the States in which they service loans—they are assigned loans by the federal government without regard to the residency of the borrowers.  *See* Federal Preemption and State Regulation of the U.S. Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg.  10619, 10621 (published Mar. 12, 2018) ("The Department's contracts require servicers to operate throughout the United States because loan borrowers are in all States. A servicer does not have the choice to refrain from operating in a particular State to avoid licensing fees and other costs imposed by the State.").

90.     The First Emergency Rules also would unlawfully cripple the ability of SLSA's members, and student loan servicers in general, to help the federal government administer the federal student loan programs and provide necessary services to borrowers.

91.     Without servicers, there would be a vacuum in the student loan industry to the detriment of the District of Columbia borrowers.

### *SLSA's Efforts to Confer with the District of Columbia Government*

92.     Within a week of the adoption of the First Emergency Rules, Winfield Crigler, who serves as SLSA's Executive Director, contacted the Commissioner and requested a meeting to discuss the rules.  In her September 15, 2017 e-mail requesting the meeting, Ms. Crigler specifically noted that the Commissioner had "proposed an annual administrative assessment that in most instances is more than the entire amount the servicer is paid by the [the U.S. Department of Education] to service the loans."  The e-mail is attached as Exhibit E.

93.     After receiving no response for over two weeks, Ms. Crigler sent a letter to the Commissioner on October 3, 2017, detailing SLSA's concerns and again requesting a meeting. This letter requested a response by October 10, 2017.  The letter is attached as Exhibit F.

94.     On October 11, 2017, the Ombudsman e-mailed in response to Ms. Crigler's first message asking for a meeting.

95.     Ms. Crigler met with the Commissioner, the Ombudsman, and DISB staff on October 19, 2017, and expressed SLSA's and its members' concerns regarding the First Emergency Rules, including that federal law preempts them.

96.     At the meeting, the Commissioner and DISB conveyed that it read the First Emergency Rules to impose the annual assessments, including the per-loan-serviced fee (set at

$6.60 per loan serviced), beginning, at earliest, on November 1, 2018, pursuant to Section 3015.1 of the First Emergency Rules.  Under this interpretation, a servicer that applies to be licensed between November 1 and December 31, 2017, would not incur the fee until November 1, 2018.

97.     The Commissioner and DISB also stated at the meeting that they believe that the First Emergency Rules became effective on September 8, 2017, and continue to be in effect as emergency rules.  They maintained this belief even though Ms. Crigler explained at the meeting that D.C. Code § 2-505(c) requires that emergency rules be "forthwith" published and filed in accordance with the Code, and SLSA has been unable to locate the First Emergency Rules in the D.C. Register under Emergency Rulemaking.

98.     The Commissioner, the Ombudsman, and DISB staff did not comment at the meeting on the enforceability of the First Emergency Rules or whether federal law preempts them.

99.     Ms. Crigler sent a follow-up letter to the Commissioner on October 23, 2017, asking him to confirm as soon as possible the Commissioner and DISB's representations about the imposition of the annual assessments and the effectiveness of the First Emergency Rules. The letter is attached as Exhibit G.  Because the per-loan-serviced fee would have a significant impact on servicers' ability to service student loans for D.C. borrowers, Ms. Crigler reiterated that SLSA's members must be able to rely upon the representation as to when the annual assessment will first be due.

100.     Ms. Crigler also restated in the letter SLSA's position that federal law preempts the First Emergency Rules and requested that the rules should be withdrawn to allow the rulemaking process to go forward in the ordinary course.  She expressed that, at a minimum, the

rules should be amended to provide for an interim period during which servicers would not be required to be licensed for the remainder of 2017 and some portion of early 2018 to allow SLSA and its members to provide input on the rules during the regular rulemaking process. Without this minimum step, other regulators or jurisdictions may view servicers' failure to possess a license as noncompliance with D.C. law, which could prevent servicers from having their federal contracts renewed or licenses issued in other jurisdictions.

*The District of Columbia Publishes the First Emergency Rules, Receives Comments, and Adopts a Second Set of Emergency Rules*

101.    The First Emergency Rules were later published on October 27, 2017 in the D.C. Register at 64 D.C.R. 11287.

102.    Before the comment period ended on November 27, 2017, DISB received comments on the First Emergency Rules from the student loan servicer industry, including comments and suggested modifications regarding preemption and the per-loan-serviced fee. A copy of SLSA's comments on the First Emergency Rules is attached as <u>Exhibit H</u>.

103.    "[I]n order to ensure continuous regulatory coverage as [DISB] considers the comments and suggested modifications put forward by the student loan servicing community," DISB promulgated new emergency rules (the "Second Emergency Rules"), which were adopted on December 26, 2017, and became effective on that date. The Second Emergency Rules are attached as <u>Exhibit I</u>. The Second Emergency Rules supersede the First Emergency Rules.

104.    The Second Emergency Rules changed the assessment fee from $6.60 per loan to $0.50 per borrower "based upon stakeholder concerns." A redline showing changes made from the First Emergency Rules to the Second Emergency Rules is attached as <u>Exhibit J</u>.

105.    The $0.50 per borrower service fee, like the $6.60 per loan fee, would come from the money the federal government pays student loan servicers under FDLP contracts.   DISB would ostensibly use the money from the assessment fee to fund its imposition of additional regulations on student loan servicers.

106.    The Second Emergency Rules were published in the D.C. Register on January 25, 2018.  SLSA submitted comments on the Second Emergency Rules on February 26, 2018.  A copy of these comments is attached as Exhibit K.

### The District of Columbia Adopts a Third Set of Emergency Rules

107.    DISB again promulgated new emergency rules (the "Third Emergency Rules") on April 20, 2018, which also is the rules' effective date.  They were set to expire on August 15, 2018, unless superseded by publication of a Notice of Final Rulemaking in the D.C. Register.  The Third Emergency Rules are attached as Exhibit L.

108.    SLSA submitted the only comments on the Second Emergency Rules before the issuance of the Third Emergency Rules.  *See* Ex. L, at 2.

109.    The provisions of the Third Emergency Rules are substantially similar to those in the Second Emergency Rules, although the Third Emergency Rules make a few changes.  A redline showing changes made from the Second Emergency Rules to the Third Emergency Rules is attached as Exhibit M.

110.    For example, the Third Emergency Rules keep $0.50 per borrower service fee, but extend the deadline for all annual assessment fees from November 1 to November 15, and reduce the maximum late penalty for filing an annual report from $1,000 per day to $50 per day.  *See id.* at 10, 12, 17.  The Third Emergency Rules clarify in Section 3015 that the annual assessment

fees are due on November 15 of the calendar year following the year in which the servicer became licensed.

111.    The Third Emergency Rules also include a savings clause that makes its record keeping requirements on student loan servicers applicable only to the extent allowed by federal law and provides the Commissioner discretion to waive or reduce these record keeping requirements if compliance would require the servicer to violate federal law.  *See id.* at 13.

112.    The Third Emergency Rules were published in the D.C. Register on June 22, 2018.  SLSA submitted comments on the Third Emergency Rules on July 23, 2018.  A copy of these comments is attached as <u>Exhibit N</u>.

113.    The emergency rules provide that after they have been published in the D.C. Register for over thirty days, the Commissioner may take final rulemaking action at any time to adopt them as a permanent measure in a Notice of Final Rulemaking.

114.    Each of these emergency rules was enforceable upon promulgation until superseded.

*<u>The District of Columbia Adopts Final Rules</u>*

115.    DISB adopted the Third Emergency Rules as final on July 25, 2018 (the "Final Rules") and published them in the D.C. Register on August 10, 2018.  The Final Rules are attached as <u>Exhibit O</u>.

116.    SLSA submitted the only comments on the Third Emergency Rules before the issuance of the Final Rules.  *See* Ex. O, at 1.

117.    No substantive changes were made between the Third Emergency Rules and the Final Rules.

118.    The Final Rules are currently enforceable.  To operate in D.C., the Final Rules require that all servicers must submit an application, pay the application fees and other proscribed fees, and become licensed.

119.    Specifically, the annual assessment fees are due on November 15th of the calendar year following the licensing period.  *See id.* § 3015.  Therefore, servicers that registered in 2017 will have annual assessment fees dues on November 15, 2018, while servicers that register in 2018 will have these fees due on November 15, 2019.

120.    In addition, servicers must as part of registering pay an initial application fee of $1,100.00 and are subject to other fees, including renewal fees and examination fees.  *See id.* § 3023.1.  They also must file a surety bond pursuant to Section 3004 of the Final Rules.

*The Emergency Rules and Final Rules Have and Continue to Cause SLSA's Members Immediate and Significant Hardship*

121.    Because D.C. Law 21-214 and the Final Rules promulgated pursuant to it impose significant regulations on student loan servicers, they have and continue to cause SLSA's members immediate and significant harm.

122.    SLSA's members have and continue to expend time and money in preparation to comply with the regulations.

123.    Three of SLSA's members have already obtained their license under the rules and thus paid the required licensing fees and other proscribed fees in Section 3023.1 of the Final Rules.  One of these servicers applied in 2017 and will be required to pay the annual assessment fees on November 15, 2018.

124.    Although the annual assessment fees for a license are not due until November 15, 2019 for servicers that register in 2018, a number of SLSA's members have begun the licensing process and gathered information requested on the licensure application.

125.    One SLSA member has dedicated over 65 hours to monitoring and comparing the rules to current processes.

126.    Another SLSA member has devoted at least 100 staff hours to internal discussions, 5 staff hours to work group meetings, 15 staff hours to reviewing the emergency rules, 2 staff hours to obtain the surety bond (in addition to the cost of $500.00 annually to obtain the bond), and 2 staff hours to obtain an application for certificate of authority.  This adds up to over 124 hours spent as a result of the rules.  Other SLSA members have used similar staff time to understand and assess the rules and their impacts.

127.    A smaller servicer and SLSA member is planning to transfer the servicing of its borrowers in the District of Columbia to another servicer because the cost of servicing borrowers in the District is not conducive or financially viable to its servicing future.

128.    This hardship is in addition to the imminent injury SLSA's members will suffer once annual assessment fees become due, and the interference the regulations will have on SLSA's members' ability to administer FFELP and FDLP student loans.

*The United States District Court for the Southern District of Illinois's Decision in*
*Nelson v. Great Lakes Educational Loan Services, Inc.*

129.    On December 19, 2017, the United States District Court for the Southern District of Illinois issued a Memorandum and Order dismissing a putative class action lawsuit captioned *Nelson v. Great Lakes Educational Loan Services, Inc., et al.* (Case No. 3:17-CV-00183-NJR-SCW).  The Memorandum and Order is attached as Exhibit P.

130.    This lawsuit was brought by a student loan borrower against her federal student loan servicer and several unidentified defendants.  *Id.*

131.    The federal servicer—a SLSA member—moved to dismiss the suit on the ground that it sought to impose additional state disclosure requirements over and above those imposed by the HEA was therefore preempted by federal law.

132.    In the Memorandum and Order—and citing *Chae*—the court agreed with the servicer, finding that the borrower's claims (for violation of the Illinois Consumer Fraud and Deceptive Practices Act, constructive fraud, and negligent misrepresentation) were all predicated on the imposition of additional state law disclosure requirements over and above those imposed by federal law at 20 U.S.C. § 1098g and its implementing regulations at 34 C.F.R. § 682.205. Ex. P, at 10-12.[7]

### *The U.S. Department of Education's Memorandum on Records and Data*

133.    The U.S. Department of Education, through Patrick A. Bradfield, the Director of Federal Student Aid Acquisitions, drafted a memorandum on December 27, 2017, regarding ownership of and access to U.S. Department of Education records and data (the "Department of Education Memorandum").  The Department of Education Memorandum is attached as <u>Exhibit Q</u>.

134.    In the memorandum, the U.S. Department of Education explains that its office of Federal Student Aid ("FSA") "maintains individually identifying information regarding the application for, distribution of, and repayment and collection of federal student loans and grants

---

[7] Plaintiff in *Nelson* filed a notice of appeal to the United States Court of Appeals for the Seventh Circuit on March 7, 2018, and submitted her Opening Brief on June 25, 2018.  Great Lakes Educational Loan Services, Inc. submitted its Response Brief on August 1, 2018.  The briefing concluded with Plaintiff's filing of her Reply Brief on August 15, 2018.

authorized pursuant to Title IV of [the HEA]."  Ex. Q, at 1. This information is protected by the Privacy Act of 1974, 5 U.S.C. § 552a, which provides for criminal and civil penalties for its unlawful release.  *Id.*

135.    The U.S. Department of Education also explains that all federal student loan servicers must comply with the Privacy Act and that all records the U.S. Department of Education maintains or that are maintained for the U.S. Department of Education by the servicers are the records of the U.S. Department of Education and not of the servicers.  Therefore, any third-party request for these records must be made directly to the U.S. Department of Education. *Id.*

### *The United States' Statement of Interest in a Case Involving State Regulation of Servicers*

136.    In *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*, Case No. 1784CV02682, the Massachusetts Superior Court has been presented with allegations similar to those in *Nelson* but made by the Commonwealth of Massachusetts itself. This lawsuit against a student loan servicer alleges violations of state consumer protection laws ostensibly regulating servicers.

137.    Specifically, the Commonwealth alleges that the servicer, a SLSA member: (1) wrongfully failed to count forbearance periods for borrowers to satisfy the requirement of certain loan forgiveness programs; (2) wrongfully converted the grants of participants who had not filed the correct documentation for loans as required by the Teacher Education Assistance for College and High Education ("TEACH") Grant Program; and (3) wrongfully allocated overpayments to interest and fees.

138.   The United States filed a Statement of Interest in the case on January 8, 2018, pursuant to 28 U.S.C. § 517, which states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."   The Statement of Interest is attached as <u>Exhibit R</u>.

139.   The United States rarely files statements of interest.   *See* Victor Zapana, Note, *The Statement of Interest as a Tool in Federal Civil Rights Enforcement*, 52 HARV. C.R.-C.L L REV. 227, 229 (2017) (explaining that based on the author's search, the United States filed a statement of interest but did not intervene as a party in only 614 federal and state court cases since 1925).

140.   In the Statement of Interest, the United States explains that the HEA and federal regulations require and authorize the student loan servicer's treatment of forbearance periods, deadlines for TEACH certification, and allocation of overpayments. Ex. R, at 10–14.   Federal law therefore preempts Massachusetts' claims because the claims conflict with the HEA and federal regulations and, in some cases, render it physically impossible for the servicer to comply with both federal and state regulations.   *Id.*

141.   The United States also explains that the Commonwealth's claims are preempted to the extent that they conflict with the purposes of the HEA because "[s]tate law is preempted when it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 14 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

142.     The United States describes that in creating FDLP, "Congress intended to '(1) simplify the delivery of student loans to borrowers and eliminate borrower confusion; (2) provide borrowers with a variety of repayment plans . . . .; (3) replace, through an orderly transition, the Federal Family Education Loan program with the Federal Direct Student Loan Program; (4) avoid the unnecessary cost to taxpayers and borrowers and the administrative complexity associated with the Federal Family Education Loan program through the use of a direct student loan program; and (5) create a more streamlined student loan program that can be managed more effectively at the Federal level.'" *Id.* at 15 (quoting 139 Cong. Rec. S5628 (daily ed. May 6, 1993)).

143.     The United States also describes that Congress had similar objectives in passing FFELP and intended "'to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions,' 'to provide a Federal program of student loan insurance,' and 'to guarantee a portion of each loan insured.'" *Id.* (quoting 20 U.S.C. § 1071(a)(1)(A), (B), (D)).

144.     The United States then expounds that the Commonwealth's state-law claims are contrary to these goals because they "potentially would lead to different rules for loan forgiveness for borrowers in every state, resulting in borrowers being treated differently depending on the state in which they live, to the detriment of the uniformity and ease of administration sought by [FDLP] and FFELP." *Id.* at 17.

145.     Moreover, the United States elucidates that the Commonwealth's claims also are preempted to the extent that they conflict with the U.S. Department of Education's contract with the student loan servicer because "[c]onflict preemption may also arise from conflicts between

state law and the provisions of contracts between the Federal Government and contractors." *Id.* at 19 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (holding that federal preemption may apply even "in the absence of either a clear statutory prescription, or a direct conflict between federal and state law" (internal citations omitted))).  This type of preemption applies "to (1) areas of 'uniquely federal interests' with (2) "significant conflict . . . between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation,'" and "both requirements are met." *Id.* (quoting *Boyle*, 487 U.S. at 507).

146.    In its explanation, the United States unequivocally states that "[f]ederal student loans are an area of uniquely federal interests." *Id.*

147.    As a result, the United States concluded its Statement of Interest by urging the court to find that the Commonwealth's claims are preempted because they conflict with federal law. *Id.* at 21.

148.    Despite the United States' Statement of Interest, the Massachusetts Superior Court entered an order on March 1, 2018, allowing the Commonwealth's lawsuit to proceed.

*The U.S. Department of Education's Notice Regarding Federal Preemption and State Regulation of Student Loan Servicers*

149.    On March 9, 2018, the U.S. Department of Education filed for public inspection a notice entitled "Federal Preemption and State Regulation of the U.S. Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers" (the "Preemption Notice"). 83 Fed. Reg. 10619 (published Mar. 9, 2018).  The Preemption Notice is attached as <u>Exhibit S</u>.

150.    The Preemption Notice references the United States' Statement of Interest in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*. 83 Fed. Reg. at 10619.

151.    In the Preemption Notice, the U.S. Department of Education explains that the recent state requirements on servicers, including state regulations requiring licensure of servicers in order to perform work for the federal government, conflict with the federal government's power to select contractors and to determine whether contractors are responsible under federal law.  *Id.* at 10620 ("A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress.'' (quoting *Sperry v. Florida*, 373 U.S. 379, 385 (1963) (quoting *Leslie Miller Inc. v. Arkansas*, 352 U.S. 187, 190 (1956)))).

152.    Such requirements undermine the "clear command for uniformity" in the HEA with respect to FFELP and FDLP.  *Id.* at 10621.  ''[W]here the Federal interest requires a uniform rule, the entire body of State law applicable to the area conflicts and is replaced by Federal rules.''  *Id.* (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500, 508 (1988)).

153.    These state laws also may undercut Congress' goal of saving taxpayer dollars in administering FDLP by utilizing "servicers' compliance with federal law and contracts to extract payments that benefit the state at the expense of the federal taxpayer."  *Id.* at 10620–21.

154.   The Preemption Notice thus concludes that federal law preempts state regulation of loan servicers that conflict with statutes, regulations, federal contracts, and congressional objectives. *Id.* at 10621.

155.   Courts are to give interpretational deference to a federal agency's interpretation regarding preemption.  *See Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (reasoning that agencies have unique understanding of statutes that they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to accomplishment and execution of Congress' purposes and objectives); *Chae*, 593 F.3d at 949–50 (giving the U.S. Department of Education's interpretation deference regarding preemption in the student loan context because "[the agency's] position about the FFELP's purpose of uniformity is in harmony with the evidence of congressional intent").  *See also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (stating that when an agency has authoritatively interpreted its own rule, courts have generally deferred to those interpretations unless "plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted).

*The United States District Court for the Northern District of Florida's Request for Supplemental Briefing in Lawson-Ross v. Great Lakes Higher Education Corp.*

156.   In another case with allegations similar to those in *Nelson*, the U.S. District Court for the Northern District of Florida in *Lawson-Ross v. Great Lakes Higher Education Corp.*, Case No. 1:17-CV-253-MW/GRJ, recently requested supplemental briefing from the parties in light of the Preemption Notice.

157.   Specifically, the court asked the parties to "address (1) the deference due to the Department of Education's interpretive ruling and (2) the substance of the Department of Education's interpretive ruling, including, but not limited to, the interpretation that the

Department gives to 'disclosure requirements.'"   The Order in *Lawson-Ross* is attached as

Exhibit T.

158.   The parties submitted briefs on June 15, 2018.

## FIRST CLAIM FOR RELIEF

(Declaratory Judgment that Federal Law Preempts the Final Rules under Conflict Preemption)

159.   SLSA incorporates and re-alleges the allegations contained in paragraphs 1

through 158 of this Complaint as if fully set forth herein.

160.   The Supremacy Clause of the U.S. Constitution states that "the Laws of the

United States . . . shall be the supreme Law of the Land."   U.S. Const. art. VI, cl. 2.

161.   "[S]tate laws that conflict with federal law are 'without effect.'"   *Altria Group,*

*Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).

162.   "[S]tate laws can be pre-empted by federal regulations as well as by federal

statutes." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (citation

omitted).   "Pre-emption may result not only from action taken by Congress itself; a federal

agency acting within the scope of its congressionally delegated authority may pre-empt state

regulation." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986).

163.   Although consumer protection is traditionally part of a state's police power,

states have only recently begun regulating the servicing of loans and, in particular, student loan

servicers.

164.   Therefore, the regulation of the servicing of student loans is strictly a federal area

of national concern and thus no presumption against preemption applies.   *See California v. ARC*

*America Corp.*, 490 U.S. 93, 101 (1989) (noting that the presumption against preemption only applies "in areas traditionally regulated by the States").

165.    "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Group*, 555 U.S. at 76.

166.    There are three types of federal preemption: conflict, field, and express. *Chae*, 593 F.3d at 941.

167.    When a state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" that state law is preempted under the doctrine of conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("'[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case.").

168.    An obstacle occurs when a state law would directly conflict with federal law or would "undermine [its] goals and policies." *See Volt Info. Sciences v. Stanford Univ.*, 489 U.S. 468, 477–78 (1989).

169.    In deciding whether conflict preemption applies, the Court must consider both the statute's text and its purpose and objectives. *See Crosby*, 530 U.S. at 373 ("For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed."); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("In determining whether state law stands as an obstacle to the full implementation of a federal law it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is

pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." (internal quotation marks and citations omitted)).

170.     Additionally, in determining whether a conflict exists, the Court must give weight to an agency's determination of the objectives.  *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996) ("Because Congress has delegated to the Secretary its authority to implement the provisions of the HEA, the Secretary 'is uniquely qualified to determine whether a particular form of state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, . . . and therefore, whether it should be preempted'" (quoting *Medtronic*, 518 U.S. at 496)).

171.     Here, in establishing FDLP and FFELP, Congress sought uniformity and ease of administration.  The United States confirmed these objectives in its Statement of Interest in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency* and in the U.S. Department of Education's Preemption Notice.

172.     In its Preemption Notice, the U.S. Department of Education provided a non-exhaustive list of examples of state laws and regulations covering FDLP that conflict with the HEA.  83 Fed. Reg. at 10620–21.

173.     Specifically, state registration and licensure of FDLP servicers that require as a condition to licensure that servicers: (i) demonstrate that they have adopted certain business standards set by the state; (ii) meet certain financial responsibility requirements such as liquidity, financial solvency, capitalization, and surety bond requirements; and (iii) submit to investigations, audits, and background checks by state authorities interfere with the federal government's power to select and contract with student loan servicers.  *See id.* at 10620.

174.    In addition, state servicing laws that impose: (i) deadlines on servicers for responding to borrower inquiries; (ii) specific procedures to resolve borrower disputes; (iii) deadlines for completing transfers of loans from one servicer to another; and (iv) specific protocols for applying overpayments on loans conflict with FDLP because they are matters specified in the laws and regulations governing that federal student loan program. *See id.*

175.    Furthermore, state laws that include: (i) licensing fees; (ii) assessments; (iii) minimum net worth requirements; (iv) surety bonds; (v) data; (vi) disclosure requirements; and (vii) annual reporting requirements undermine Congress's goal of saving taxpayer dollars in administering FDLP by increasing the costs of student loan servicing. *See id.*

176.    Finally, state laws restricting the actions a servicer may take to collect on a loan; state-level regulations that subjects borrowers to different loan servicing deadlines and processes depending on where the borrower happens to live, and at what point in time; and state laws and regulations imposing liability on servicers venture beyond the federal requirements in restricting how a servicer may collect on a loan and impede the U.S. Department of Education's ability to protect taxpayers by ensuring the repayment of federal student loans. *See id.* at 10621.

177.    All of these state laws would threaten Congress' goal of uniformity of servicing within the federal student loan programs. *Id.*

178.    In addition, the U.S. Department of Education also presented a non-exhaustive list of examples of state laws and regulations covering FFELP that conflict with the HEA by impeding the uniform administration of the program:

a.  State laws that require FFELP servicers to respond to a borrower's inquiry or dispute within a certain period of time conflict with 34 CFR 682.208(c)), which allows servicers 30 days after receipt to respond to any inquiry from a borrower;

b.  Deadlines for notifying borrowers of loan transfers between servicers conflict with 20 U.S.C. 1078(b)(2)(F) and 34 CFR 682.208(e)(1), which allow 45 days for notification; and

c.  The imposition of required dispute resolution procedures under state law conflict with 34 CFR 682.208(c)(3)(i) and (ii), which govern the resolution of disputes raised by borrowers.

83 Fed. Reg. at 10621–22.

179.  Like the state laws at issue in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*, by prescribing additional requirements on federal student loan servicers, D.C. Law 21-214 and the Final Rules issued pursuant to it create obstacles to the accomplishment and execution of the federal student loan program.

180.  The following chart lists provisions in D.C. Law 21-214 and the Final Rules and the obstacle they create as to FDLP and FFELP:

| **D.C. Law or Regulation** | **Type** | **Obstacle** |
| --- | --- | --- |
| Section 7b of D.C. Law 21-214 and Sections 3002, 3011, and 3019 of the Final Rules requires that student loan servicers be licensed and permits the Commissioner to deny applications and suspend and revoke licenses. | Licensure requirement in general | Interferes with the federal government's power to select and contract with student loan servicers under FDLP. |

| | | |
|---|---|---|
| Section 3002.2 of the Final Rules specifies that an application for a license must include various items, such as a "general plan and description of the applicant's business, including policies and procedures for receiving and processing consumer inquiries, complaints, and grievances promptly and fairly." This section of the Final Rules implements section 7b(c)(1)(A) and (E) of D.C. Law 21-214. | Condition of licensure that servicers demonstrate that they have adopted certain business standards | Interferes with the federal government's power to select and contract with student loan servicers under FDLP. |
| Section 3002.2(c) of the Final Rules specifies that an application for a license must provide evidence of the servicer's financial responsibility. This section of the Final Rules implements section 7b(c)(1)(A) and (E) of D.C. Law 21-214. | Condition of licensure that servicers meet financial responsibility requirements | Interferes with the federal government's power to select and contract with student loan servicers under FDLP. |
| Section 3021 of the Final Rules provides that the Commissioner may examine and investigate student loan servicers for a variety of reasons. Section 7a(c)(11) of D.C. Law 21-214 and Section 3021.1 of the Final Rules permit the Ombudsman to "[c]onduct an examination of the activities of each student loan servicer at least once every 3 years, and as the Commissioner considers necessary. | Condition of licensure that servicers submit to investigations, audits, and background checks | Interferes with the federal government's power to select and contract with student loan servicers under FDLP. |
| Section 7a(c)(2) of D.C. Law 21-214 requires the Ombudsman to "[r]eceive, review, and attempt to resolve any complaints from a student loan borrower, including attempts to resolve such complaints in collaboration with student loan servicers, and any other participants in student-loan lending, including those entities engaging student loan borrowers about existing student debt." | Specific procedures to resolve borrower disputes | Conflicts with FDLP because they are matters specified in the laws and regulations governing that federal student loan program.<br><br>Conflicts with 34 CFR 682.208(c)(3)(i) and (ii) (governing the resolution of disputes raised by borrowers). |

| | | |
|---|---|---|
| Sections 3015 and 3023.1 of the Final Rules prescribe licensing fees, examination fees, and assessments. This section of the Final Rules implements sections 7a(c)(12) and 7b(c)(1)(B) of D.C. Law 21-214. | Licensing fees, examination fees, and assessments | Interferes with the federal government's power to select and contract with student loan servicers under FDLP.<br><br>Undermines Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing. |
| Section 3003 requires that a student loan servicer shall demonstrate and maintain a net worth of at least $250,000.00.  This section of the Final Rules mirrors section 7b(c)(1)(C) of D.C. Law 21-214.  In addition, Section 3003 of the Final Rules and Section 7b(c)(1)(C) of D.C. Law 21-214 require that servicers provide three years of audit financial statements to demonstrate this net worth. | Minimum net worth requirements | Interferes with the federal government's power to select and contract with student loan servicers under FDLP.<br><br>Undermines Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing. |
| Section 3004 of the Final Rules requires each servicer to post a surety bond conditioned on the servicer: (1) complying with all D.C. and federal laws regulating the activities of servicers; and (2) performing all written agreements with student loan borrowers.  This section of the Final Rules implements section 7b(c)(1)(D) of D.C. Law 21-214, which expressly requires a surety bond and explains its purpose is to "be used for the recovery of damages incurred by a student loan borrower as the result of a licensee's noncompliance with the requirements of this act or the recovery of fees or expenses levied against a licensee pursuant to this act." | Surety bonds | Undermines Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing. |

| | | |
|---|---|---|
| Section 3002.2(l) of the Final Rules requires that the student loan servicer provide in its application "[o]ther data, financial statements, and information as the Commissioner may require with respect to the applicant, its partners, members, officers, directors, trustees, or agents." | Data | Undermines Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing. |
| *See* the allegations in the Second Claim for Relief in this Complaint for a discussion of the disclosure requirements imposed by D.C. Law 21-214 and the Final Rules. | Disclosure requirements | Undermines Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing.<br><br>Undermines Congress's goal of establishing uniform regulations for the servicing of federal student loans, including what information must be provided to borrowers and third parties. |
| Section 3014 of the Final Rules requires student loan servicers to submit an annual report containing the number of loans sold, assigned, or transferred during the calendar year, and any other relevant information.  It also assesses a late penalty of up to $50.00 per day. This section of the Final Rules implements section 7b(j) of D.C. Law 21-214, which includes the same annual reporting requirement. Section 3017 of the Final Rules also permits the Commissioner to require servicers to submit a report of a condition. | Annual reporting requirements | Undermines Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing. |

| D.C. Law 21-214 and the Final Rules create a scheme that includes different servicing deadlines and processes for servicers that operate in the District of Columbia than in the HEA and in the servicer's contracts with the federal government. | Different loan servicing deadlines and processes depending on where the borrower lives | Ventures beyond federal requirements to impede the U.S. Department of Education's ability to protect taxpayers by ensuring the repayment of federal student loans. |
| --- | --- | --- |
| Section 7b(h) of D.C. Law 21-214 and Sections 3019 and 3020 of the Final Rules permits the Commissioner to suspend or revoke a servicer's license based on violations of the rules and other conditions.  Section 3014 of the Final Rules assesses a late penalty of up to $50.00 per day. | Liability on servicers | Ventures beyond federal requirements to impede the U.S. Department of Education's ability to protect taxpayers by ensuring the repayment of federal student loans. |
| Section 3018.1 of the Final Rules imposes record keeping requirements applicable to servicing loan transfers. | Deadlines for notifying borrowers of loan transfers between servicers | Conflicts with 20 U.S.C. 1078(b)(2)(F) and 34 CFR 682.208(e)(1) (allowing 45 days for notification). |

181.    In addition, Section 3018 of the Final Rules requires servicers to make records available to the Commissioner within seven days after the Commissioner's official request, which creates a potential obstacle to compliance with the requirement described in the Department of Education Memorandum that third-party requests for student loan records must be made directly to the U.S. Department of Education.  This memorandum itself merely reinforces the application of the Federal Privacy Act, 5 U.S.C. § 522a, to the servicing of FFELP and/or FDLP student loans.

182.    Because servicers cannot provide student loan records directly to the Commissioner pursuant to Section 3018 since all third-party requests must be made directly to the U.S. Department of Education, servicers may have to violate federal law to satisfy the conditions in the rules, including the surety bond requirement, unless the Commissioner utilizes

his discretion to waive or reduce the requirements on record keeping.  If the Commissioner does

not waive or reduce these requirements, there is a physical impossibility that results in conflict

preemption.  *See Myrick*, 514 U.S. at 287 (explaining that under conflict preemption, "a federal

statute implicitly overrides state law . . . when state law is in actual conflict with federal law"

when it is "impossible for a private party to comply with both state and federal requirements").

At minimum, the Commissioner's discretion undermines Congress' goal of "ensuring uniformity

and stability within the [federal student loan programs]."  *Chae*, 593 F.3d at 949; *see also* Mary

J. Davis, *Unmasking the Presumption in Favor of Preemption*, 53 S.C. L. Rev. 963, 1016–1021

(2002) (explaining that "[t]he Court has found obstacle preemption in a wide variety of cases

over the years and relies for this conclusion on its fear of inhibiting the regulatory scheme that

Congress has devised to achieve national uniformity," and that "[t]he Court favors the value of

certainty and predictability that results from a uniform federal rule," which benefits "entities

subject to federal regulation," administrators, and other).

183.    Even as revised, the per-borrower fee in Appendix A to the Final Rules cut into

SLSA members' revenue source, leaving servicers with less revenue from the federal contracts to

service borrowers in the District of Columbia and adhere to federal regulations.

184.    Therefore, the described provisions in D.C. Law 21-214 and the Final Rules

create significant differences between the servicing of borrowers in the District of Columbia and

borrowers in states where only the federal laws apply.  *See Chae*, 593 F.3d at 945 (in holding that

that conflict preemption prohibited borrowers' claims against a student loan servicer for violation

of California state law, the Ninth Circuit noted that "permitting varying state law challenges

across the country, with state law standards that may differ and impede uniformity, will almost certainly be harmful to the FFELP").

185.    If every state were to adopt laws similar to D.C. Law 21-214 and the Final Rules, it could severely impair SLSA's members' ability to provide customer service under the terms of their servicing contracts, and would, at a minimum, be an obstacle to Congress' and the U.S. Department of Education's discernable objectives in establishing the federal student loan programs because of the important role servicers play in administering the programs.[8]  *See* 83 Fed. Reg. at 10621 ("A requirement that Federal student loan servicers comply with 50 different State-level regulatory regimes would significantly undermine the purpose of [FDLP] to establish a uniform, streamlined, and simplified lending program managed at the Federal level.").

186.    D.C. Law 21-214's and the Final Rules' conflicts with the federal government's contracts with student loan servicers are amplified because they seek to regulate in an area of unique federal interest and clash with that interest.  *See Boyle*, 487 U.S. 500; 83 Fed. Reg. at 10621 ("These conflicts with statutes, regulations, Federal contracts, and congressional objectives suggest that State regulation of loan servicers would be preempted by Federal law.

---

[8] Four States and the District of Columbia have enacted laws requiring licensure of student loan servicers and imposing numerous and varying regulatory requirements on servicers: California (AB 2251, Chapter 824, Statutes of 2016, effective July 1, 2016), Connecticut (Public Act 15-62, effective July 1, 2016, as amended by Public Acts 16-65 and 17-233), Illinois (Public Act 100-0540, effective December 31, 2018), Washington (SB 6029, effective the earlier of January 1, 2019 or the adoption of implementing regulations), and the District of Columbia (DC Law 21-214, effective February 18, 2017). The Connecticut statute has been amended twice already and both California (AB 38) and Illinois (HB 4397) are currently considering additional legislation to modify their statutes. In addition, twelve other states this year considered legislation requiring servicer licensing and regulation: Arizona (HB 2226), Maine (LD1507 and SP532), Maryland (SB 1012 and HB 1642, plus SB 1068 and HB 1634), Massachusetts (SB 129 and HB 2173), Minnesota (HF 21 and SF 2955), Missouri (HB 1274), New Jersey (A455 and S1149), New Mexico (SB 85), New York (A08862, A09508, S07508), Ohio (HB 432), Rhode Island (H7881), and Virginia (SB 362).

That result is even more evident where, as in [FDLP], State regulation implicates uniquely Federal interests.").

187.    The described provisions in D.C. Law 21-214 and the Final Rules thus are preempted under conflict preemption.

188.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of D.C. Law 21-214 and the Final Rules.

189.    A declaration as to the legality and enforceability of D.C. Law 21-214 and the Final Rules would terminate the uncertainty giving rise to this proceeding.

190.    Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201 et seq., and F.R.C.P. 57 that federal law preempts D.C. Law 21-214 and the Final Rules, and the Commissioner, the Ombudsman, and the District of Columbia have no power to enforce the described provisions in D.C. Law 21-214 and the Final Rules because they are preempted under conflict preemption.

## SECOND CLAIM FOR RELIEF
(Declaratory Judgment that Federal Law Preempts the Final Rules under Field Preemption)

191.    SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 190 of this Complaint as if fully set forth herein.

192.    Field preemption occurs where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or if the goals sought to be obtained and the obligations imposed reveal a purpose to preclude state authority." *Wisc. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991).

193.    Here, D.C. Law 21-214 and the Final Rules are aimed at regulating student loan servicers.  Through these laws, Defendants, like other states across the country, have engaged in the field of regulating the servicing of student loans.

194.    The federal government has fully occupied this field by extensively regulating the servicing of student loans.  Such occupation makes sense; as alleged in this Complaint, outstanding federal student loans constitute almost 50 percent of the financial assets of the federal government.  The United States, through the U.S. Department of Education, thus has a strong interest in the servicing of loans as both a lender and a guarantor in addition to its interest as a regulator.

195.    As articulated in the United States' Statement of Interest in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency* and in the U.S. Department of Education's Preemption Notice, the servicing of student loans is an area implicating uniquely federal interests.

196.    These federal interests include obligations to and rights of the United States under its contracts with student loan servicers and the protection of the funds of the United States under both FFELP and FDLP, *see* 83 Fed. Reg. at 10619–21; Ex. R, at 19–20 , as well as administering and streamlining the federal student loan programs to be cost-effective and uniform, Ex. R, at 2.

197.    The federal interests in occupying the field of regulating the servicing of student loans are dominant and only growing.  Through ECASLA, the U.S. Department of Education purchased $94 billion FFELP loans from private lenders between 2008 and 2010.  In addition, by eliminating FFELP for new federal student loans in 2010, all new federal student loans are serviced by student loan servicers pursuant to federal contracts after being selected by the federal

government. Over 90 percent of new student loans today are made through FDLP, and FDLP loans constitute approximately 78 percent of all federal student loans.

198. To protect these federal interests, the federal scheme regulating student loan servicers is all-encompassing. Both the U.S. Department of Education and the Consumer Financial Protection Bureau ("CFPB") supervise and regulate federal student loan servicers. For example, servicers must comply with all statutory, regulatory, and contractual requirements, including compliance with the Federal Information Security Management Act ("FISMA"), and must have highly-specialized systems for handling the unique requirements for servicing federal student loans.

199. Federal interests thus dominate the area of student loan servicing, and there is no room for the states, including the District of Columbia, to supplement federal law.

200. Despite the fact that the federal government extensively regulates the servicing of loans it makes or guarantees and has done so since FFELP's and FDLP's inception, in recent years a number of states have passed or considered passing laws extensively regulating student loan servicers.

201. These laws have originated during a time where Congress, through ECASLA and the passage of the Health Care and Education Reconciliation Act in 2010, have only increased the federal government's interests in regulating student loans.

202. Such state regulation of servicers at minimum impedes Congress' goals of uniformity and ease of administration for FDLP and FFELP. *See Chae*, 593 F.3d at 945 ("[E]xposure to lawsuits under fifty separate sets of laws and court systems could make lenders reluctant to make new federally-guaranteed student loans." (quoting Brannan v. United States

Aid Funds, Inc., 94 E3d 1260, 1264 (9th Cir.1996))); 83 Fed. Reg. at 10621 (explaining that state regulatory regimes conflict with the congressional objective of uniformity for FDLP and FFELP).

203.    State regulation also clashes with other federal policies, such as the U.S. Department of Education's recordkeeping policies to comply with the Privacy Act of 1975, as set forth in the Department of Education Memorandum.

204.    Moreover, state regulation cannot conflict with the contracts between the U.S. Department of Education and the servicers. *See Boyle*, 487 U.S. 500; 83 Fed. Reg. at 10621 ("[T]he loan servicers are acting pursuant to a contract with the Federal government, and the servicers stand in the shoes of the Federal government in performing required actions under [FDLP].").

205.    After considering these issues, the U.S. Department of Education issued the Preemption Notice "to clarify its view that State regulation of the servicing of [FDLP] Loans impedes uniquely Federal interests, and that State regulation of the servicing of [FFELP] is preempted to the extent that it undermines uniform administration of the program." 83 Fed. Reg. at 10620.

206.    Specifically, "[t]he Department believes that the statutory and regulatory provisions and contracts governing [FDLP] preclude State regulation, either of borrowers or servicers" and that federal law "preempt State servicing laws that conflict with, or impede the uniform administration of, [FFELP]." *Id.* at 10621.

207.    "Accordingly, the servicing of [FDLP] Loans is an area 'involving uniquely Federal interests' that must be 'governed exclusively by Federal law.'"  *Id.* at 10619 (quoting *Boyle*, 487 U.S. at 504).

208.    Congress thus intended to regulate the federal student loan servicing industry uniformly to protect the federal government's interests in an area where it has significant financial assets.

209.    As a result, the growth of the federal student loan programs and the increasing reality of differing and competing regulations across the states have resulted not only in numerous conflicts between federal and state law concerning the regulation of student loan servicers but also demonstrate that the federal government has occupied the field of regulating the servicing of loans.

210.    D.C. Law 21-214 and the Final Rules thus are preempted under field preemption.

211.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of D.C. Law 21-214 and the Final Rules.

212.    A declaration as to the legality and enforceability of D.C. Law 21-214 and the Final Rules would terminate the uncertainty giving rise to this proceeding.

213.    Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201 et seq., and F.R.C.P. 57 that federal law preempts D.C. Law 21-214 and the Final Rules, and the Commissioner, the Ombudsman, and the District of Columbia have no power to enforce D.C. Law 21-214 and the Final Rules because they are preempted under field preemption.

## THIRD CLAIM FOR RELIEF

(Declaratory Judgment that Federal Law Preempts the Final Rules under Express Preemption)

214.    SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 213 of this Complaint as if fully set forth herein.

215.    Express preemption occurs where Congress indicates its intent to displace state law through express language in a provision.  *Chae*, 593 F.3d at 942.

216.    In determining the proper scope of an express preemption provision, courts examine the text of the provision, the provision's surrounding statutory framework, and Congress's stated purposes in enacting the statute.  *Id.*

217.    The HEA includes an express preemption provision in 20 U.S.C. § 1098g, which states that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act . . . shall not be subject to any disclosure requirements of any State law."

218.    FDLP and FFELP fall within Title IV of the HEA and thus are subject to the express preemption provision in 20 U.S.C. § 1098g.  *See Chae*, 593 F.3d at 942.

219.    State laws that require student loans servicers that service FDLP and FFELP loans to make disclosures to borrowers fall within 20 U.S.C. § 1098g's express preemption clause and thus are preempted.

220.    Title IV of the HEA already requires that servicers make specific disclosures to borrowers.  20 U.S.C. § 1083 titled "student loan information by eligible lenders" and 34 C.F.R. § 682.205, titled "Disclosure requirements for lenders," regulate the specific disclosures that FFELP lenders and servicers must make to borrowers at specific times.  20 U.S.C. § 1087e

provides that FDLP loans are subject to "the same terms, conditions, and benefits" as FFELP loans.

221.    In addition, in interpreting the scope of the express preemption provision in 20 U.S.C. § 1098g, courts have determined that misrepresentation claims related to billing practices are in essence improper-disclosure claims such that "[a] properly-disclosed FFELP practice cannot simultaneously be misleading under state law, for state disclosure law is preempted by the federal statutory and regulatory scheme." *Id.* at 943 (holding that 20 U.S.C. § 1098g expressly preempts state disclosure requirements under California's Unfair Competition Law and Consumer Remedies Act"); *see also Linsley v. FMS Inv. Corp.*, No. 3:11cv961, 2012 WL 1309840, *4 (D. Conn. Apr. 17, 2012) (holding that where a state law claim is "rooted in a failure to disclose information required by the HEA," such claim would likely be expressly preempted); *Brooks v. Sallie Mae, Inc.*, No. FSTCV096002530S, 2011 WL 6989888, at *6 (Conn. Super. Ct. Dec. 20, 2011) (holding that the plaintiff's claims for misrepresenting documentation required to determine eligibility for economic deferment and misrepresenting that payment of late fees were required to enter economic deferment were, in fact, disguised improper disclosure claims that HEA preempts).

222.    For example, "[a] state-law prohibition on misrepresenting a business practice 'is merely the converse' of a state-law requirement that alternate disclosures be made." *Chae*, 593 F.3d at 942–43 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 527 (1992)).

223.    In addition, state laws that require student loans servicers to make disclosures to third parties, such as state agencies, also fall within 20 U.S.C. § 1098g's express preemption clause and thus are preempted.

224.    Black's Law Dictionary defines "disclosure" as "[t]he act or process of making known something that was previously unknown; a revelation of facts." BLACK'S LAW DICTIONARY (10th ed. 2014).

225.    When Congress specifically preempted disclosure requirements of any state law, it did so in the context of a scheme of federally required disclosures to both borrowers and the federal government.[9]

226.    The U.S. District Court for the Southern District of Illinois reasoned that although the HEA does not define "disclosure requirements," 20 U.S.C. § 1098g's scope is broad and that "it appears Congress intended § 1098g to preempt any state law requiring lenders to reveal facts or information not required by federal law." *Nelson v. Great Lakes Educational Loan Services, Inc.*, et al., No. 3:17-CV-00183-NJR-SCW, at *9–10 (S.D. Ill. Dec. 19, 2017) (The Memorandum and Order is attached as Exhibit P).

---

[9] *See, e.g.*, 20 U.S.C. §1082(c)(2) (specifying that the U.S. Department of Education is to collect data and records from servicers); 34 C.F.R. § 682.208(i) (requiring that servicers report all FFELP loans to the U.S. Department of Education's database); 34 C.F.R. §§ 682.300 to 305 (expounding the requirements for the Lender Reporting System ("LaRS"), whereby servicers pay any lender fees, receive Special Allowance payments, and received reimbursement for any borrower subsidy benefits, and outlining the method of reporting); 34 C.F.R. § 682.414 (detailing the records FFELP servicers must keep, the reports they must make to the U.S. Department of Education through its data system, and inspection requirements, all of which require servicers to provide a significant amount of information concerning the loans, including the loans' statuses, outstanding balances, and repayment); 34 C.F.R. § 682.410(b)(1) (specifying annual audit for FFELP servicers); 34 C.F.R. § 682.410(b)(5) (requiring that servicers provide reports containing loans details to consumer reporting agencies); 20 U.S.C. § 1087f(b)(3) (specifying that the U.S. Department of Education establish a data system for the maintenance of records on all loans made under FDLP); Great Lakes Contract, Attachments A-1 to A-3 [ECF No. 1-1], at 26–60 (detailing the data financial reporting, accounting, and other reporting that servicers of federal student loans must provide to the U.S. Department of Education through its data system as part of their contracts with the federal government).

227.    This is consistent with the U.S. Department of Education's statement that it "interprets 'disclosure requirements' under section 1098g of the HEA to encompass informal or non-written communications to borrowers as well as reporting to *third parties* such as credit reporting bureaus."  83 Fed. Reg. at 10621 (emphasis added).

228.    The Act (D.C. Law 21-214) and the Final Rules contain the very disclosure requirements and obligations under their licensing scheme that are preempted by 20 U.S.C. § 1098g.  *See* 83 Fed. Reg. at 10621 ("To the extent that State servicing laws attempt to impose new prohibitions on misrepresentation or the omission of material information, those laws would also run afoul of the express preemption provision in 20 U.S.C. 1098g.").

229.    First, D.C. Law 21-214 and the Final Rules require that student loan servicers provide disclosures to the D.C. government.

230.    Section 7b of the Act requires that all student loan servicers must apply for and obtain a license.  D.C. Code § 31-106.02(a).

231.    This Commissioner, however, may revoke or suspend a servicer's license under sections (h) and (i) of the Act for "violating any provision of this act or of any implementing regulation," which includes the Final Rules.

232.    The Final Rules therefore create duties and requirements for servicers that must be followed to service student loans in the District of Columbia.

233.    Specifically, the Final Rules require servicers to communicate or provide disclosure in at least the following ways that are not mandated under the HEA:

a. Section 3014 requires servicers to submit an annual report continuing the number of loans sold, assigned, or transferred during the previous calendar year, and other information the Commissioner requires;

b. Section 3016 requires servicers to notify the Commissioner of certain events, including settlement and resolution of any civil action or proceeding involving fraud, misrepresentation, or wrongful taking of property;

c. Section 3018 requires servicers to maintain records for at least three years after final payment is made on a student loan and make such records available to the Commissioner upon request; and

d. Section 3021 permits the Commissioner, based on a borrower complaint under Section 3022 or the Commissioner's own initiative, to examine and investigate servicers, including investigating the transactions, business, and records of any licensee or person who the Commissioner has reason to believe is engaging in any business subject to the Act.

234.    Second, these requirements create a scheme whereby the Commissioner may require information from servicers based on borrower complaints.

235.    The contents of the Student Loan Borrower's Bill of Rights, created pursuant to the Act, demonstrate the intent behind and breadth of these disclosure requirements.  The Student Loan Borrower's Bill of Rights is attached as Exhibit U.

236.    Although functionally an aspirational document, the Student Loan Borrower's Bill of Rights, which were issued without public comment beyond the input of a few

stakeholders, nevertheless states that borrowers have a panoply of purported rights, among other things, to:

    a.  have the borrower's inquiry or complaint to a servicer regarding the borrower's loan addressed and resolved;

    b.  have his or her payments applied to outstanding loan balance(s) timely, appropriately, and fairly;

    c.  receive a monthly billing statement, which indicates the outstanding balance of the loan(s) and the current amount of the payment due for the loan(s);

    d.  receive, no less than quarterly, a periodic statement that identifies: the servicer and current loan holder; for each loan, the outstanding balance, monthly payment, current term and interest rate, date of origination, and any interest and fees charged; and payments received since the last statement;

    e.  receive timely and accurate annual statements concerning student loan interest paid for tax reporting purposes;

    f.  receive payoff information upon request;

    g.  have the servicer's current schedule of fees that could be charged to the borrower, and the schedule shall disclose each event that would trigger a fee to the borrower, and disclose the applicable fee to be charged;

    h.  receive timely information of organizational changes that could affect loan repayment or borrower interactions with the servicer, including changes to the servicer's physical address or contact information, or the transfer of the borrower's account to another servicer;

     i.   timely and accurate reporting to credit bureaus of the borrower's loan payment information;

     j.   have access to default diversion services from the servicer that notifies the borrower when they are at risk of default, and the servicer shall assist the borrower with avoiding a default;

     k.   receive financing that complies with certain principles; and

     l.   receive evidence that a loan is paid in full within 30 days of the borrower paying off a student loan.

237.    These rights ostensibly require student loan servicers to make disclosures to borrowers.

238.    The Student Loan Borrower's Bill of Rights also specifies that servicers shall develop and implement procedures to ensure that these rights are upheld.

239.    The Student Loan Borrower's Bill of Rights further states that borrowers have the right to file a complaint with the Ombudsman and are encouraged to do so.

240.    These purported rights, which require information or communication from servicers, are in essence disclosure requirements that could trigger additional disclosures.[10]

241.    Indeed, the purported rights are combined with enforcement powers. Section 7a(c)(1) of D.C. Law 21-214 provides that the Student Loan Ombudsman's duties include assisting the Commissioner "in the enforcement of the licensing provisions of section 7b, including the referral of actions to the Office of the Attorney General for the District of Columbia

---

[10] These purported rights, if enforced, would require actions by servicers that are preempted under conflict preemption.

for the enforcement of an order of the Commissioner pursuant to section 7b or other authority of the Commissioner related to a licensee or a person required to have a license under the act."

242.    Section 7a(c)(5) of D.C. Law 21-214 requires that the Student Loan Ombudsman, in consultation with the Commissioner, "[m]onitor the actions that student loan servicers take to ensure that student loan borrowers are informed of their rights and responsibilities under the terms of the student loan borrower's student education loan in a transparent, accessible, and timely manner."

243.    Section 7b(h)(1) of D.C. Law provides that a servicer's license may be revoked upon the Commissioner's determination that, among other things, the servicer has "engaged in any dishonest activities or made any misrepresentation in any business transaction."

244.    A borrower could file a complaint with the Ombudsman against a servicer for, for example, lack of payoff information based on the Student Loan Borrower's Bill of Rights, which could trigger an investigation by the Commissioner, cause the servicer to provide additional information to the Commissioner, and result in a servicer's license being revoked.

245.    Therefore, the licensing scheme is built around the servicers providing disclosures to both borrowers and the District of Columbia government that are not included in the HEA and its implementing regulations.

246.    Additional disclosures to both borrowers and the D.C. government under D.C. Law 21-214 and the Final Rules would be redundant at best.

247.    As a result, 20 U.S.C. § 1098g of the HEA expressly preempts the disclosure obligations in the Act and the Final Rules.

248.     An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of D.C. Law 21-214 and the Final Rules.

249.     A declaration as to the legality and enforceability of D.C. Law 21-214 and the Final Rules would terminate the uncertainty giving rise to this proceeding.

250.     Therefore, SLSA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201 et seq., and F.R.C.P. 57 that federal law preempts D.C. Law 21-214 and the Final Rules, and the Commissioner, the Ombudsman, and the District of Columbia have no power to enforce the disclosure requirements in D.C. Law 21-214 and the Final Rules because they are preempted under express preemption.

### FOURTH CLAIM FOR RELIEF
(Injunctive Relief)

251.     SLSA incorporates and re-alleges the allegations contained in paragraphs 1 through 250 of this Complaint as if fully set forth herein.

252.     As stated above, federal law preempts D.C. Law 21-214 and the Final Rules.

253.     SLSA and student loan servicers have demanded that Defendants withdraw D.C. Law 21-214 and the Final Rules and refrain from enforcing them, but Defendants have not done so.

254.     Therefore, an injunction is necessary to prevent Defendants from enforcing them against student loan servicers.

## **PRAYER FOR RELIEF**

WHEREFORE, SLSA respectfully requests that the Court issue:

a.  a declaratory judgment that federal law preempts D.C. Law 21-214 and the Final
    Rules, and the Commissioner, the Student Loan and Foreclosure Ombudsman, and
    the District of Columbia have no power to enforce D.C. Law 21-214 and the Final
    Rules;

b.  an order permanently enjoining Defendants from enforcing D.C. Law 21-214 and
    the Final Rules against student loan servicers; and

c.  such other and further relief as may be provided by law or as the Court may deem
    equitable.

Respectfully submitted this 24th day of August 2018.

<div style="margin-left:auto">

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:  *s/ Christopher O. Murray*
Richard B. Benenson
Christopher O. Murray
410 17th Street, Suite 2200
Denver, CO 80202
Telephone:  303.223.1100
Fax:  303.223.1111
Email:  rbenenson@bhfs.com
          cmurray@bhfs.com


*Attorneys for Plaintiff Student Loan Servicing Alliance*

</div>

<u>Plaintiff Address:</u>
1100 Connecticut Avenue NW
Suite 1200
Washington D.C. 20036