# EXHIBIT R

## COMMONWEALTH OF MASSACHUSETTS

**S**UFFOLK**, ss**                                    **SUPERIOR COURT**

_____
                                                    )
COMMONWEALTH OF MASSACHUSETTS,      )
                                                    )    **STATEMENT OF**
            Plaintiff,                              )    **INTEREST BY THE**
                                                    )    **UNITED STATES**
            v.                                      )
                                                    )
PENNSYLVANIA HIGHER EDUCATION        )    Case No. 1784CV02682
ASSISTANCE AGENCY,                          )
d/b/a FedLoan Servicing,                       )
                                                    )
            Defendant.                            )
_____)

## INTRODUCTION

The United States respectfully submits this brief pursuant to 28 U.S.C. § 517.[1]   The

United States has a substantial interest in, and a long history of, developing programs to help

students access postsecondary education.   For decades, the United States has sought to increase

access to higher education by serving as a reinsurer and guarantor of private loans, serving as the

sole originator and holder of Direct Loans, and also establishing a variety of other federal

programs to aid students.   Here, Massachusetts alleges that the Pennsylvania Higher Education

Assistance Agency (PHEAA), an entity that contracts with the Federal Government to service

federal loans, has violated state and federal consumer protection laws.   As relevant here,

Massachusetts alleges that PHEAA wrongfully failed to count periods of forbearance for

borrowers to satisfy the requirements of certain loan forgiveness programs, that PHEAA

_____

[1]  "The Solicitor General, or any officer of the Department of Justice, may be sent by the
Attorney General to any State or district in the United States to attend to the interests of the
United States in a suit pending in a court of the United States, or in a court of a State, or to attend
to any other interest of the United States." 28 U.S.C. § 517.

wrongfully converted the grants of participants who had not filed the correct documentation for

loans as required by the Teacher Education Assistance for College and Higher Education

(TEACH) Grant Program, and that PHEAA wrongfully allocated certain overpayments to

interest and fees.    PHEAA's work for the Federal Government, however, is already heavily

regulated by federal statute, federal regulations promulgated and implemented by the U.S.

Department of Education (Department), and by the terms of PHEAA's contract with the

Department.    To the extent that Massachusetts's claims conflict with the requirements of federal

law, those claims are preempted.    This result is necessary to preserve the important federal

interests in cost-effectively and uniformly administering and streamlining the federal student

loan programs.

## BACKGROUND

I.      **Statutory and Regulatory Background**

The Higher Education Act of 1965, as amended (HEA), created a complex quilt of

federal programs to help students finance postsecondary education.    Five particular programs

run by the Department are at issue here.    First, the Department provides loans to student and

parent borrowers under the William D. Ford Federal Direct Loan Program (Direct Loans).[2]    20

U.S.C. § 1087a *et seq*.    The Department is the sole owner of Direct Loans.    Second, the

Department reinsures, provides funds for guarantors, and subsidizes loans made by private and

non-profit lenders under the Federal Family Education Loan Program (FFELP) and holds and

collects on defaulted FFELP loans.    20 U.S.C. § 1071 *et seq*.    Third, the Department offers

---

[2]  In 2010, Congress passed the SAFRA Act, which halted any new loans under the FFEL
program.    *See* Pub. L. 111-152, 124 Stat. 1029 § 2201 (2010).    New federal student loans
subsequently have been issued only as Direct Loans, although many FFEL loans remain
outstanding.    *See id*.

various income-driven repayment (IDR) plans to eligible borrowers.   Fourth, the Department

forgives repayment for certain Direct Loans through the Public Service Loan Forgiveness

(PSLF) Program.   Fifth, the Department provides grants for students who plan to become

qualifying teachers through the TEACH Grant Program.

  The Department contracts with loan servicers to collect payments, respond to customer

service inquiries, and perform other administrative tasks associated with Direct Loans and

FFELP Loans the Department owns,[3] as well as to administer various programs under the HEA

related to those loans.   The HEA requires that the Secretary of the Department "to the extent

practicable" award contracts for origination, servicing, and collection of Direct Loans to entities

that have "extensive and relevant experience" and "demonstrated effectiveness."   20 U.S.C.

§ 1087f.   The Secretary must "give special consideration to State agencies with a history of

high quality performance" in awarding such contracts.   *Id.*   In 2009, the Department

contracted with PHEAA to service both Direct Loans and Department-held FFELP loans.   *See*

Solicitation Number: FSA-TitleIV-09, https://www2.ed.gov/policy/gen/leg/foia/contract/

pheaa061709.pdf.   Additionally, given its financial interest in FFELP Loans, the Department

extensively regulates the servicing of non-Department-held FFELP loans, although in that

situation the private lender is the entity that contracts with servicers such as PHEAA to arrange

for servicing.   34 C.F.R. §§ 682.410(b)(6), 682.411.

  PSLF is a federal program under which the Department forgives the repayment of the

balance of a Direct Loan if the borrower completes ten years of qualifying public-service

---

[3] The Department has purchased or assumed approximately 3.91 million FFELP Loans with an outstanding balance of over $94 billion.   These are government-owned assets and the Department treats them the same as Direct Loans for all intents and purposes.   As for Direct Loans, the Department contracts with servicers to service and collect on these loans.

employment, makes 120 qualifying monthly payments, and submits a completed PSLF application.   *See* 20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219.   PSLF-eligible borrowers are able to take advantage of income-driven repayment (IDR) plans, which limit monthly loan payments based on the borrower's income.   *See id.* §§ 682.215, 685.208.   PHEAA services all of the loans of borrowers who have indicated that they intend to seek loan forgiveness under the PSLF Program.   *See, e.g.*, Amendment of Solicitation/Modification of Contract, EDOFSA-12-000984 (Sept. 27, 2012).

PHEAA also services loans for borrowers enrolled in the Department's Revised Pay As You Earn (REPAYE) IDR plan, including enrolling borrowers in the plan.   REPAYE allows eligible borrowers to obtain a loan payment amount of generally 10% of the borrower's discretionary income and forgiveness of the remaining balance after 20 or 25 years of qualifying monthly payments depending on whether the loan was for undergraduate or graduate study.   34 C.F.R. § 685.209(c).

The TEACH Grant Program awards grants to college students who plan to become teachers and who work in low-income schools for four years and teach in certain high-needs areas.   *See* 34 C.F.R. §§ 686.40–43.   If the recipient of a TEACH Grant does not successfully complete the requirements of the program, the grant is converted into a Direct Loan that must be repaid.   *Id.*   PHEAA is responsible for administering and servicing the TEACH Grant Program, including determining, in consultation with the Department's office of Federal Student Aid (FSA), whether grantees have fulfilled their requirements, and, if not, converting their grants into loans.   *See* Amendment of Solicitation/Modification of Contract 0076, EDOFSA-09-D-0014 (Dec. 8, 2012).   Each year, participants must certify their compliance with the program requirements.   20 U.S.C. § 1070g-2(b)(1)(D); 34 C.F.R. § 686.43; 34 C.F.R. § 686.40(b).   The

certification requires the Chief Administrative Officer or Authorized Official to certify the

recipient's compliance with the service requirement.    If the recipient of a TEACH Grant fails to

timely complete the certification process, the participant's grants will be converted into Direct

Loans.    20 U.S.C. § 1070g-2(b)(1)(D) and (b)(2); 34 C.F.R. § 686.43.

The HEA itself imposes certain requirements for these programs, and the Department

also has promulgated extensive regulations implementing each program.    *See generally, e.g.*, 34

C.F.R. § 685.205 (forbearance in the Direct Loan Program); 34 C.F.R. § 682.211 (forbearance in

the FFELP); 34 C.F.R. Part 686 (TEACH Grant Program regulations).    In addition, PHEAA's

conduct as a loan servicer is regulated by the terms of its contract with the Department.    The

Department's contracts with servicers are extensive and detailed.    The Department's contract

with PHEAA is voluminous—spanning more than 600 pages and including provisions governing

PHEAA's financial controls, internal monitoring, communications with borrowers, and many

other topics.    The Department's contract with PHEAA contains a general provision providing

that "[t]he contractor(s) will be responsible for maintaining a full understanding of federal and

state laws . . . and ensuring that all aspects of the service continue to remain in compliance as

changes occur" and that "servicers will be required to meet all statutory and legislative

requirements."[4]    *See* Contract No. ED-FSA-09-D-0014, § C.1.4.3 (Sept. 27, 2012), Ex. C to

Decl. of William Leith.    The Department also actively manages its relationship with PHEAA

and has implemented more than 450 "change requests," or modifications to the contract.    The

---

[4] This catch-all provision does not provide for any preference for state law where federal law and state law conflict.    In addition, courts have rejected the argument that similar language precludes a preemption finding.    *See, e.g.*, *Gartrell Const. Inc. v. Aubry*, 940 F.2d 437, 440 (9th Cir. 1991) (rejecting a similar argument, and finding preemption, because "state licensing laws cannot be 'applicable', nor compliance with them 'necessary', where such laws are preempted by federal law").

5

contract also includes reporting requirements and enforcement mechanisms to ensure that PHEAA is properly executing the contract.   *See generally* Contract No. ED-FSA-09-D-0014 (Jun. 17, 2009) (including requirements for financial controls, internal monitoring, accounting, and reporting), Ex. C to Decl. of William Leith.   In addition, FSA manages the servicing contracts through dedicated contract officers and other staff.   FSA communicates with PHEAA and other servicers on a daily basis regarding details of administrating programs like TEACH, PSLF, and the IDR plans.   These communications have the intent and effect of filling any remaining gaps for servicer discretion.   Finally, FSA uses tools such as regular audits and its Customer Feedback System to assess the performance of servicers and their compliance with the contract and to deploy appropriate enforcement measures and remedial steps when servicers make mistakes or are not fulfilling their obligations under their contract with the Department.

## II.   <u>Procedural History</u>

Plaintiff, the Commonwealth of Massachusetts filed this action alleging violations of a Massachusetts state law that bars "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."   Compl. ¶ 73, Dkt. No. 1 (citing Mass. Gen. Laws Ann. ch. 93A § 2).   In particular, Plaintiff challenges PHEAA's treatment of forbearance periods while enrolling borrowers in loan-forgiveness programs, PHEAA's enforcement of the deadline for submitting annual certifications to remain in the TEACH Grant Program, and PHEAA's application of certain overpayments to interest and fees.   Compl. ¶¶ 43, 48, 55, 58, 65, 73; *see also* Compl. at 16.

As a part of its allegations that PHEAA unreasonably delays enrolling or transferring participants into loan forgiveness programs, Plaintiff appears to argue that Massachusetts law

requires PHEAA to count periods of forbearance as qualifying payments for loan forgiveness.[5]

*See, e.g.*, Compl. ¶ 43 ("To accommodate its processing delay, PHEAA has put borrowers'

accounts into forbearance status, which is not a qualifying repayment plan for loan forgiveness

under PSLF or IDR plans."); Compl. ¶ 48 ("When PHEAA causes borrowers to lose the

opportunity to make qualifying payments towards loan forgiveness due to its own servicing

failures, PHEAA does not remediate borrowers [sic] accounts to account for the lost months.").

Although Direct Loan borrowers are not *required* to make payments during periods of

forbearance, they have the option of continuing payments, and those payments may count toward

the loan forgiveness period if the payments are made in accordance with an eligible repayment

plan, including a standard repayment plan.   *See* 34 C.F.R. § 685.219(c)(1)(iv) (governing

payments made prior to a PSLF participant enrolling in a IDR plan); 34 CFR

§ 685.209(c)(5)(iv)(C) (governing payments made prior to enrollment in REPAYE that count

towards the REPAYE payment period).

Plaintiff also argues that PHEAA violates Massachusetts law by not allowing TEACH

Grant recipients to correct their annual certifications after the deadline.   *See* Compl. ¶ 55

("PHEAA has failed to process timely and properly teachers' annual certification forms and does

not provide teachers sufficient time to resubmit or correct forms when additional information is

required."); Compl. ¶ 58 ("PHEAA's failures are caused in part by PHEAA's use of inadequate

---

[5]  The Department offers several loan forgiveness programs.   Each has different
requirements for loan forgiveness, including, *e.g.*, that a borrower making a certain number of
qualifying payments.   At various times—including while the servicer processes applications for
purposes of the loan forgiveness programs—borrowers' loans are placed in forbearance, and the
borrower need not make payments on the loan.   These periods of forbearance generally do not
count as qualifying payments and therefore do not advance the borrower toward eventual loan
forgiveness.

servicing processes that do not provide teachers with a sufficient opportunity to supplement the information provided on their certification forms when additional information is necessary.").

Finally, Plaintiff argues that PHEAA violates Massachusetts law by applying certain overpayments to interest and fees instead of principal.[6]   *See* Compl. ¶ 65 ("It is PHEAA's policy and practice to apply overcharges to interest or collection fees first when a student has overpaid because of PHEAA's servicing error."); *see also* Compl. at 16 (seeking an injunction "preventing PHEAA from . . . applying overcharges to interest and fees rather than to principal balances, unless directed to do so by borrowers").   PHEAA has moved to dismiss all claims asserted against it by Massachusetts.   Def. PHEAA's Mot. Dismiss, Dkt. No. 10.

## ARGUMENT

In this action, the Commonwealth of Massachusetts contends that state law requires PHEAA to count periods of forbearance toward loan forgiveness, to permit TEACH Grant recipients to correct their documentation after the certification deadline has passed, and change its allocation of overpayments.   Because these specific practices are either required or authorized by federal statutes, federal regulations, or PHEAA's contract with the Department, Plaintiff's state-law claims violate the Supremacy Clause.   The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land."   U.S. Const. art. VI, cl. 2.   Where state law is incompatible with federal law, therefore, state law must yield.   The Supreme Court has determined that federal law preempts state law in

---

[6] The Department, in coordination with PHEAA, has already addressed the overpayments by offering affected borrowers refunds, if they so choose.   Decl. of William Leith, ¶¶ 1-5.   To the extent that Massachusetts seeks to impose a remedy that conflicts with what the Department has required under federal law, its claim is preempted.   *See Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008) ("[S]tate laws that conflict with federal law are 'without effect.'").

three situations: first, when federal law expressly states that state law is preempted; second, when federal law occupies an entire field; and third, when federal law and state law conflict.   *Arizona v. United States*, 567 U.S. 387, 399 (2012).   This Statement of Interest focuses on the third type— "conflict preemption."   Under conflict preemption, "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law" either because it is "impossible for a private party to comply with both state and federal requirements" or because "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."   *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal quotation marks and citations omitted).   Conflict preemption does not require that the preempting federal law explicitly provide that state law is preempted.

Even a risk that plaintiffs may be deprived of relief does not remove the necessity of applying preemption doctrine.   The Ninth Circuit considered this precise argument—also in the student loan context—but rejected it because plaintiffs with preempted state-law claims against a loan servicer had alternative paths to relief: "The DOE has the power to institute informal compliance procedures against a third-party servicer who is the subject of a complaint.   When stronger medicine is required, the DOE may file suit against the servicer, impose civil penalties, and terminate the servicer's participation in the program.   If Sallie Mae's disclosures are misleading, the plaintiffs' remedy is to complain about Sallie Mae to the [Department of Education] and to ask the agency to intervene."   *Chae v. SLM Corp.*, 593 F.3d 936, 943 n.6 (9th Cir. 2010) (citations omitted).   Indeed, the claims in *Chae* arose in the FFELP context, where lenders—not the Department—contract with servicers.   *Id.* at 939.   Here, in contrast, the Department contracts directly with PHEAA and thus has an even greater ability to direct PHEAA's conduct.   Furthermore, the Department closely monitors PHEAA's compliance with

9

its contract and with federal law, and has acted as appropriate to correct issues. *See* note 6, *supra*.

Although consumer protection is within states' traditional police powers, and the Supreme Court has recognized a presumption against preemption in fields "which the States have traditionally occupied," *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 260 (2004), any such presumption, if applicable, would be rebutted here.   *See Chae*, 593 F.3d at 944 (considering the presumption, but concluding that the HEA preempted various state-law claims against loan servicers because "it is our duty to consider carefully what Congress was trying to accomplish in the HEA and whether these state law claims create an 'obstacle' to the congressional purposes"); *cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that no presumption against federal preemption was warranted because "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law").

Here, three types of conflicts compel the conclusion that certain of Massachusetts's claims are preempted: their conflict with the HEA and federal regulations enacted by the Department, their conflict with the purposes of the HEA, and their conflict with the Department's contract with PHEAA.

## I.     The HEA and Federal Regulations Require or Authorize PHEAA's Treatment of Forbearance Periods, Deadlines for TEACH Certification, and Allocation of Overpayments

Plaintiff's claims are preempted to the extent that they conflict with the HEA and the federal regulations enacted by the Department to implement the HEA.   It is well-established that "state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (citation omitted); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986) ("Pre-emption may result not

only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.").

To the extent that Massachusetts law requires PHEAA to "remediate borrowers [sic] accounts to account for the lost months," *i.e.*, count forbearance periods toward the qualifications for IDR loan forgiveness, that requirement clearly conflicts with the Department's regulations. Compl. ¶ 48.   Federal regulations explicitly provide that the Secretary may place a borrower in forbearance while processing an application for a change in repayment plan, which would include enrollment in an IDR plan such as REPAYE.   *See* 34 C.F.R. § 685.205(b)(9) (authorizing the Secretary to place a borrower in forbearance for "[a] period of up to 60 days necessary for the Secretary to collect and process documentation supporting the borrower's request for [*inter alia*] a change in repayment plan").   The regulations are likewise explicit that, except for specific circumstances not applicable here,[7] "the repayment period for any of the repayment plans described in this section *does not include periods of authorized deferment or forbearance*." 34 C.F.R. § 685.208(a)(5) (emphasis added); *see also, e.g.*, 34 C.F.R. § 685.209(c)(5)(iv) (enumerating several types of qualifying monthly payments for REPAYE payment plans, not including forbearance periods).[8]   In 2007, Congress amended the HEA to provide that periods of economic hardship deferment can count, but declined to similarly include

---

[7]  The exceptions are listed in 34 C.F.R. § 685.209 and § 685.221.

[8]  Analogously, during notice-and-comment rulemaking to implement the income-contingent repayment (ICR) plan, the Department responded to, but rejected, a comment suggesting that borrowers on ICR plans should be able to count forbearance periods toward the maximum repayment period.   59 Fed. Reg. 61664, 61678 (Dec. 1, 1994).   The Department simply explained that "Under section 428(b)(7) of the HEA, the maximum years in repayment in the FFEL Program exclude periods of deferment and forbearance. Direct Loans have the same terms, conditions and benefits as FFEL Program loans, unless otherwise specified (see section 455(a)(1)); therefore, the Secretary excludes periods of forbearance and deferment from the 25 years of repayment under ICR."   *Id.*

periods of forbearance.    *See* College Cost Reduction and Access Act, Pub. Law No. 110-84, § 205, 121 Stat. 784 (2007) (amending 20 U.S.C. § 1087e(e)(7)).    Through these regulations, federal law authorizes PHEAA to place borrowers' loans in forbearance while it processes their applications, and prohibits PHEAA from counting periods of forbearance towards eventual loan forgiveness—the conduct at issue in Massachusetts's Complaint.    *See* Compl. ¶ 48.    Therefore this claim presents a clear case where "compliance with both federal and state regulations is a physical impossibility," *Arizona*, 567 U.S. at 399 (citation omitted), and Plaintiff's claims are thus preempted to the extent that they seek to require PHEAA to count forbearance periods toward loan forgiveness.

The same analysis applies for PSLF. The HEA specifies the types of qualifying payments that count towards satisfying the 120 required monthly payments and it excludes periods of forbearance. *See* 20 U.S.C. § 1087e(m)(1)(A). The Department's implementing regulations for PSLF are similarly specific as to what qualifies as one of the 120 monthly payments. *See* 34 C.F.R. § 685.219(c)(iv).

Similarly, the HEA and federal regulations set forth the annual certification process for TEACH Grant recipients.    The HEA and federal regulations specify the documentation that grant recipients must submit, including the annual certification, 20 U.S.C. § 1070g-2(b)(1)(D); 34 C.F.R. § 686.40(a)–(d), and provide that grants will be converted into loans if a recipient does not meet the annual requirements, 20 U.S.C. § 1070g-2(c); 34 C.F.R. § 686.43(a).    In addition, the Department specifically considered—but rejected—a proposal to relax the annual certification timeline.    *See* 73 Fed. Reg. 35,481-82 (June 23, 2008) (responding to a comment requesting a more forgiving timeframe for annual certifications with the observation that "[t]he Secretary believes that these timeframes [in 34 C.F.R. § 686.12(b)(2)] are reasonable for grant

recipients to meet and protect the Federal fiscal interest by allowing for the conversion of

TEACH Grants to loans when the Secretary cannot verify or document a grant recipient's intent

to satisfy the ATS").    To the extent that Massachusetts law requires PHEAA to deviate from the

certification process described in the HEA and federal regulations—for example, by retaining

participants in the TEACH Grant Program notwithstanding their failure to meet the deadline,

permitting them to correct their submissions after the deadline, or requiring PHEAA to ask the

Department to reverse the conversion of the TEACH grant into a Direct Loan—the state

requirements conflict with federal law.[9]

Likewise, federal regulations govern the allocation of payments—including

overpayments—from borrowers.    Other than for exceptions not applicable here, the regulations

provide that "the Secretary applies *any payment* first to any accrued charges and collection costs,

then to any outstanding interest, and then to outstanding principal." 34 C.F.R. § 685.211(a)(1)

(emphasis added).    The regulations further expressly define "a borrower pay[ing] any amount in

excess of the amount due" as a "prepayment," and provide that prepayments should be allocated

identically to other payments. *Id.* § 685.211(a)(2)-(4).    It would be impossible therefore for

PHEAA to apply overpayments in the way Plaintiff demands and remain in compliance with

federal law.    *Cf.* Compl. at 16 (seeking an injunction "preventing PHEAA from . . . applying

---

[9] However, the regulations are not as draconian as Plaintiff suggests. The Department's contract requires PHEAA to provide participants with specific documentation when additional information is needed or missing.    *See* Solicitation/Modification of Contract, ED-FSA-09-D-0014 MOD 0076, §§ 3.26, 12.5 (Dec. 8, 2014).    In addition, in consultation with the Department, PHEAA may provide a thirty-day grace period for borrowers to finish submitting their information.    Q&A to TEACH Grant Worksheet v20_04252013, line 26, Ex. A to Decl. of William Leith.    If grant recipients object to the conversion of their grants into loans, they can dispute the conversion, and PHEAA will escalate disputes to the Department in appropriate cases.    CR 2486 ¶¶ 6-8, Ex. B to Decl. of William Leith.

overcharges to interest and fees rather than to principal balances, unless directed to do so by borrowers").   Massachusetts law is therefore preempted to the extent that it requires a different allocation of overpayments.

## II.   Massachusetts's Claims Concerning PHEAA's Treatment of Forbearance Periods and the Allocation of Payments by Borrowers Conflict with the HEA's Purpose

In addition to their conflicts with the text of the HEA and with federal regulations, Plaintiff's claims are preempted to the extent that they conflict with the purposes of the HEA. State law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."   *Freightliner Corp.*, 514 U.S. at 287 (internal quotation marks and citations omitted); *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) ("'[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case."). The Court must consider not only the explicit text of a federal statute, but also the statute's purpose and objectives.   "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed."   *Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation omitted); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("In determining whether state law stands as an obstacle to the full implementation of a federal law it is not enough to say that the ultimate goal of both federal and state law is the same.   A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." (internal quotation marks and citations omitted)).   In determining whether a conflict exists, the Court must give weight to an

agency's determination of the objectives.[10]   *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996) ("Because Congress has delegated to the Secretary its authority to implement the provisions of the HEA, the Secretary 'is uniquely qualified to determine whether a particular form of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," . . . and therefore, whether it should be preempted.'" (quoting *Medtronic*, 518 U.S. at 496)).

In creating the Direct Loan Program, Congress intended to: "(1) [S]implify the delivery of student loans to borrowers and eliminate borrower confusion; (2) provide borrowers with a variety of repayment plans . . . .; (3) replace, through an orderly transition, the Federal Family Education Loan program with the Federal Direct Student Loan Program; (4) avoid the unnecessary cost to taxpayers and borrowers and the administrative complexity associated with the Federal Family Education Loan program through the use of a direct student loan program; and (5) create a more streamlined student loan program that can be managed more effectively at the Federal level." 139 Cong. Rec. S5628 (daily ed. May 6, 1993).   Of particular relevance here is Congress's intent to reduce costs to taxpayers, reduce the administrative complexity experienced in the FFELP, and streamline student lending through the Direct Loan Program. *See, e.g.*, 156 Cong. Rec. S1831 (daily ed. Mar. 23, 2010) (statement of Sen. Harkin) ("Simply put, this bill cuts out the middleman, saves $61 billion over the next 10 years, and gives it to students.").

---

[10]   The agency may indicate its views through a legal brief, such as this statement of interest.   *See Long Island Care at Home, Ltd., v. Coke,* 551 U.S. 158, 171 (2007) ("Where, as here, an agency's course of action indicates that the interpretation of its own regulation reflects its considered views . . . we have accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief." (citation omitted)).

To the extent that Plaintiff's allegations implicate the FFELP program, Congress had similar objectives.   Congress intended "to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions," "to provide a Federal program of student loan insurance," and "to guarantee a portion of each loan insured." 20 U.S.C. § 1071(a)(1)(A), (B), (D).   As discussed below, these objectives would be imperiled by permitting each state to impose unique requirements on PHEAA that conflict with federal regulations and the Department's contract with PHEAA. Thus, the Ninth Circuit concluded, "Congress intended uniformity within the [FFEL] program. The statutory design, its detailed provisions for the FFELP's operation, and its focus on the relationship between borrowers and lenders persuade us that Congress intended to subject FFELP participants to uniform federal law and regulations."   *Chae*, 593 F.3d at 947.   This need for uniformity thus required that federal regulations providing for specific late fees, interest rates, and repayment start dates preempt any contrary state requirements for late fees, interest rates, and repayment start dates.[11]   *Id.* at 948-50.   Of course, in *Chae* the Ninth Circuit was not directly called upon to consider the objectives of the Direct Loan Program, but the court noted

---

[11] Nor is the conclusion of *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 590 (4th Cir. 2005), to the contrary.   Although the Fourth Circuit was "unable to confirm" if uniformity was an important goal of the FFELP program, *id.* at 597, it reached that conclusion without the benefit of the views of the Department, which were provided to the Ninth Circuit in *Chae* through the intervention of the United States.   *See generally* Mem. Supp. United States' Mot. Summ. J., *Chae v. SLM Corp.*, (C.D. Cal. May 12, 2008), ECF No. 141.   Furthermore, *College Loan* involved one lender seeking to *enforce* HEA provisions against another lender, and it was in that context—where concerns about conflict necessarily would be much less acute—that the Fourth Circuit found preemption did not apply.   *College Loan*, 396 F.3d at 599. As the Seventh Circuit concluded in favorably citing both *College Loan* and *Chae*, "the plaintiff in *College Loan Corp.* had sought to enforce FFELP rules, not to vary them" (and thus preemption should not apply) but in *Chae*, the plaintiffs "were asking the court to impose a higher standard of compliance than was required by federal law."   *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 653 (7th Cir. 2015) (internal quotation marks and citations omitted).

that "[i]n the rules governing the Direct Loan Program, Congress created a policy of interprogram uniformity [between the Direct Loan Program and the FFELP]. Congress's instructions to the DOE on how to implement the student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board."   *Id.* at 945 (internal citation omitted).   Indeed, because the Department contracts directly with loan servicers to administer the Direct Loan Program, the desire for—and ability to obtain—uniformity is even greater than in the FFELP.

Two of Plaintiff's state-law claims are contrary to these goals.   Plaintiff apparently believes that PHEAA should be compelled to count borrowers' periods of forbearance toward the completion of their qualifying payments for loan forgiveness.   *Cf.* Compl. ¶ 48 ("When PHEAA causes borrowers to lose the opportunity to make qualifying payments towards loan forgiveness due to its own servicing failures, PHEAA does not remediate borrowers [sic] accounts to account for the lost months.").   Permitting such an outcome based on state law potentially would lead to different rules for loan forgiveness for borrowers in every state, resulting in borrowers being treated differently depending on the state in which they live, to the detriment of the uniformity and ease of administration sought by the Direct Loan program and FFELP.   Furthermore, that result would reduce the payments received by the Federal Government because some loans would be forgiven after fewer payments, thus harming the objective of conserving taxpayer funds.   In addition, contractors likely would require increased payments to compensate for the increased administrative complexity, in turn increasing the cost to the Federal Government.   *See Chae*, 593 F.3d at 945–46 (finding the HEA preempted state law claims, in part because "[p]ermitting varying state law challenges across the country, with state law standards that may differ and impede uniformity, will almost certainly be harmful to the

17

FFELP.   The costs of the program would go up and either there would be fewer loans made or loans made for lesser amounts or for higher interest, making it harder for students to gain the loan funds they need to get the education they want").   Loan servicers also might flee the market entirely (or at least decline contracts in states with the most draconian regulations), thereby reducing the beneficial competition among loan servicers.   *See, e.g.*, 156 Cong. Rec. H1883 (daily ed. Mar. 21, 2010) (statement of Rep. Miller) ("In addition, by including more high-quality servicers in the contracting process, competition will be increased thereby delivering better quality for student borrowers.").

Similar problems would arise if, as Plaintiff suggests, Massachusetts law were permitted to dictate the allocation of payments among interest and principal.   Such separate requirements in various states would be costly and burdensome and lead to non-uniform results.   The increased administrative burden would increase the Federal Government's costs. Plaintiff's claims therefore would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399 (citation omitted), and are therefore preempted by the HEA.   *Cf. Chae*, 593 F.3d at 950 ("Subjecting the federal regulatory standards to the potentially conflicting standards of fifty states on contract and consumer protection principles would stand as a severe obstacle to the effective promotion of the funding of student loans.   Such an obstacle, which we consider hostile to the purposes of Congress in this program, must bow to the overriding principles of conflict preemption and federal law supremacy.").

### III.   <u>The Department's Contract with PHEAA Sets Deadlines for TEACH Certification that PHEAA Must Follow</u>

Finally, Plaintiff's claims are also preempted to the extent that they conflict with the Department's contract with PHEAA.   Conflict preemption may also arise from conflicts

between state law and the provisions of contracts between the Federal Government and contractors.   *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (holding that federal preemption may apply even "in the absence of either a clear statutory prescription, or a direct conflict between federal and state law" (internal citations omitted)).   In *Boyle*, the Supreme Court concluded that where a federal contract required the contractor to provide a helicopter with a particular escape-hatch, state tort law was preempted to the extent that it required a different escape-hatch.   *Id.* at 509.   The Supreme Court cabined this type of preemption to (1) areas of "uniquely federal interests" with (2) "'significant conflict' . . . between an identifiable 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* at 507 (citations omitted).   Here, both requirements are met.

Federal student loans are an area of uniquely federal interests that satisfy the first requirement.   *Boyle* itself dealt with federal contracts as an area of uniquely federal interest. *See id.* at 504-05 ("We have held that obligations to and rights of the United States under its contracts are governed exclusively by federal law." (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407 (1947); *Nat'l Metro. Bank v. United States*, 323 U.S. 454 (1945))).   Where the subject matter of the contract involves, as here, loans made by the Federal Government, the federal interest is heightened. *See* Additional Servicer FULL Requirements, Attachment A-3, at page 4 ¶ 2, Ex. C to Decl. of William Leith ("The servicer shall meet all previously identified requirements for Federally Held Debt (i.e. Accounting, Treasury, Reconciliation, Internal Controls, etc.) for the Direct Loan portfolio."); *see also Clearfield Trust Co. v. United States,* 318 U.S. 363, 366 (1943) ("The rights and duties of the United States on commercial paper which it issues are governed by federal

rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power.").

The second requirement, a significant conflict between state law and the federal interest,[12] exists for Massachusetts's claims.   The Department's contract with PHEAA is very specific about the annual certification process and identifies precise deadlines that participants must meet.   Q&A to TEACH Grant Worksheet v20_04252013, line 25, Ex. A to Decl. of William Leith.   After a TEACH Grant has been converted into a loan due to the grant recipient's failure to comply with the program's requirements, the contract identifies some circumstances in which the conversion may be reversed, but explicitly requires PHEAA to "deny requests to convert the loan back to a grant where certification requests were timely sent and the sole issue is that the recipient failed to certify as required."   CR 2486 ¶ 3, Ex. B to Decl. of William Leith.   PHEAA therefore could not both provide Plaintiff's requested lenity and comply with its contract with the Department.   Therefore, this is a case where, as in *Boyle*, the

---

[12]   The requirement of significant conflict, in particular, limits this doctrine to situations in which the state law conflicts with a specific contract provision that is important to the Federal Government's purpose.   As the Supreme Court noted, if "for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature."   *Boyle*, 487 U.S. at 509.   State law therefore generally can operate against those features left unspecified by the contract.   *See id.* ("If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary.   The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.").
    Thus preemption does not apply when there is no conflict between state and federal duties, or when any conflict is insignificant.   *Cf.* Statement of Interest of the United States of America, *Sanchez v. ASA College, Inc.*, 14-cv-5006 (S.D. N.Y. Jan. 23, 2015), ECF No. 64 (arguing that the HEA did not preempt several RICO and state-law claims).

federal interest inherent in the contract provision providing for the conversion of TEACH Grants into loans when certifications are not timely completed preempts Massachusetts's claim that PHEAA should permit participants to correct their certifications.   Moreover, as in *Boyle*, the federal fisc would be negatively affected by the application of contrary state law because PHEAA (and similarly situated contractors) if held liable here would pass on the increased costs to the Federal Government.   *Cf. Boyle*, 487 U.S. at 511-12 ("The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.").   This result would conflict with the Direct Loan program's objective of reducing costs to the Federal Government. *See supra* Part II, *supra*.   Plaintiff's claim is thus preempted to the extent that it would require PHEAA to violate its contract with the Department.

## CONCLUSION

For the foregoing reasons, this Court should find Massachusetts's claims that PHEAA must count periods of forbearance towards loan forgiveness, extend the timeline for TEACH participants to certify their compliance, and change its allocation of overpayments preempted to the extent that they conflict with federal law.


Dated:   January 8, 2018                                    Respectfully submitted,


CHAD A. READLER                                    ANDREW E. LELLING
Acting Assistant Attorney General                  United States Attorney

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

21

/s/ *Rebecca M. Kopplin*
REBECCA M. KOPPLIN
Cal. Bar No. 313970
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 514-3953
Fax: (202) 616-8470
rebecca.m.kopplin@usdoj.gov

MICHELLE LEUNG
BBO #568624
Assistant U.S. Attorney
District of Massachusetts
Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel:    (617) 748-3626
Fax:    (617) 748-3971
michelle.leung@usdoj.gov