IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STUDENT LOAN SERVICING ALLIANCE,<br><br>          Plaintiff,<br><br>     v.<br><br>STEPHEN C. TAYLOR;<br>CHARLES A. BURT; and<br>DISTRICT OF COLUMBIA,<br><br>          Defendants. | Civil Action No. 1:18-cv-0640 (PLF) |

## STATEMENT OF INTEREST OF THE UNITED STATES

## INTRODUCTION

The United States respectfully submits this brief pursuant to 28 U.S.C. § 517.[1]  The United States has a substantial interest in, and a long history of, helping students access postsecondary education.  For decades, the United States has sought to increase access to higher education by serving as a reinsurer and guarantor of private loans, serving as the sole originator and holder of Direct Loans, and establishing a variety of other federal programs to aid students.  As part of its management of federal student loans, the United States selects, contracts with, and supervises loan servicers that administer many parts of the Federal Government's student loan programs, particularly those related to interacting

---

[1] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

with borrowers.  Here, however, the District of Columbia (D.C.) seeks to second guess the Federal Government's selection of contractors by imposing a licensing requirement, and purporting to require those contractors to disclose information that federal law and their contracts require be kept confidential unless the Federal Government authorizes disclosure.  In these respects, D.C. Law 21-214 (D.C. Law), Am. Compl., Ex. B, ECF No. 19-2, and its implementing regulations conflict with federal law and thus are preempted.

## BACKGROUND

The Federal Government, through the Department of Education (Education), plays an important role in making higher education accessible to students, including by making and facilitating loans to student and parent borrowers.  The Federal Government's investment in higher education takes several forms, as set forth in the Higher Education Act of 1965, as amended (HEA).  Pub. L. No. 89-329, 79 Stat. 1219 (codified as amended at 20 U.S.C. § 1001 *et seq.*).  The Federal Government directly provides loans to student and parent borrowers under the William D. Ford Federal Direct Loan Program, 20 U.S.C. § 1087a *et seq.*  The Federal Government also guarantees loans made by private and non-profit lenders under the Federal Family Education Loan Program (FFELP), 20 U.S.C. § 1071 *et seq.*[2]  The Federal Government also owns a significant quantity of outstanding FFELP loans that it purchased from private lenders pursuant to the Ensuring Continuing Access to Student Loans Act of 2008, § 7, Pub. L. No. 110-227, 122 Stat. 740 (May 7, 2008) (amending 20 U.S.C. §§ 1087a, i), as well as some defaulted FFELP loans on which

---

[2] No new FFELP loans have been issued since the SAFRA Act was passed in 2010, Pub. L. No. 111-152, 124 Stat. 1029 § 2201 (2010), although many FFELP loans remain outstanding.

Education has made reinsurance payments, 20 U.S.C. § 1078(c).  The Federal Government

has also contributed funds towards Perkins Loans, some of which are owned by educational

institutions and some of which are owned by Education.  20 U.S.C. § 1087aa.  Education

also offers eligible borrowers a variety of income-driven repayment programs, and the

opportunity for loan forgiveness—including through the Public Service Loan Forgiveness

Program.  *See* 20 U.S.C. § 1087e(e) (income contingent repayment); *id.* § 1087(m) (Public

Service Loan Forgiveness Program).

All told, outstanding federal student loans total $1.407 trillion,[3] of which $1.196

trillion comprises loans held and managed by the Federal Government.[4]  Indeed, federal

student loans comprised more than 45% of the Federal Government's total financial assets

in the fourth quarter of 2017.  Board of Governors of the Federal Reserve System, Federal

Reserve Statistical Release, Financial Accounts of the United States, *Flow of Funds,*

*Balance Sheets, and Integrated Macroeconomic Accounts, First Quarter 2018* at 83, Table

L.106 Federal Government (June 7, 2018), https://www.federalreserve.gov/releases/z1/

20180607/z1.pdf.  In D.C. alone, Education contracts for the servicing of approximately

---

[3] *See* Federal Student Aid, Federal Student Aid Portfolio Summary (last viewed June 25, 2018), https://studentaid.ed.gov/sa/about/data-center/student/portfolio (showing $1.407 trillion total outstanding federal student loans at the end of the second quarter of 2018).  The amount for total federal student loans includes both principal and interest on all outstanding Direct Loans, FFELP loans, and Perkins Loans, regardless of whether those loans are managed by the Federal Government.

[4] *See* Federal Student Aid, Portfolio by Loan Status (last viewed June 25, 2018), https://studentaid.ed.gov/sa/about/data-center/student/portfolio (the categories listed under "Federally Managed" total $1.196 trillion at the end of the second quarter of 2018).  This amount for federally managed student loans includes Direct Loans and those FFELP loans that are held by the Federal Government.  The actual value of loans managed by Education is actually somewhat higher than $1.196 trillion, as Education also holds several million dollars in Perkins Loans that are not reflected in this total due to the way Education's data are organized.

$5.1 billion in federal student loans managed and held by Education.  Declaration of Barry S. Goldstein ¶ 4 (attached as Exhibit A).  These loans relate to approximately 91,700 D.C. residents.  *Id.*

Education enters into contracts with loan servicers to manage this enormous investment in access to higher education.[5]  Loan servicers communicate with borrowers, collect payments, effectuate discharges, and perform other administrative tasks associated with student loans.  The HEA explicitly authorizes Education to enter into contracts with servicers as long as the agency "ensure[s] that such services and supplies are provided at competitive prices."  20 U.S.C. § 1087f(a)(1)*; see also* 20 U.S.C. § 1081a(c)(1) (Education should "maximize the use of performance-based servicing contracts, consistent with guidelines for such contracts published by the Office of Federal Procurement Policy, to achieve cost savings and improve service"); *see also, e.g.*, PHEAA Contract Attachment A-1 at 3[6] ("It is the intent of the Department to procure a performance-based contract(s) that promotes competition and provides best of business services."); PHEAA Contract Attachment A-4 (describing the allocation of loans among servicers based on performance).  Education complies with a variety of federal requirements in selecting its servicers.  Pursuant to the HEA, Education must "enter into contracts only with entities that have extensive and relevant experience and demonstrated effectiveness," must obtain

---

[5] Education contracts with nine student loan servicers to service Direct Loans and the FFELP loans that Education holds and manages.  Goldstein Decl. ¶ 5, Ex. A.  Portions of Education's contracts with these nine servicers are available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing.

[6] The provisions of Education's contract with PHEAA cited throughout this Statement of Interest are available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing under "Title IV Additional Servicing (TIVAS) Contracts (2009)."

"competitive prices," and select "only entities which the Secretary determines are qualified to provide such services and supplies and will comply with the procedures applicable to the award of such contracts." 20 U.S.C. § 1087f(a). Pursuant to the Federal Acquisition Regulation, Education must contract only with "responsible" contractors, which means contractors with suitable past performance and financial health, among other requirements. *See* 48 CFR §§ 9.100 to 9.108-5.

Beginning with selection and continuing throughout the life of the contracts, Education comprehensively governs its servicers' performance. Even Education's allocation of loans among servicers is driven by the servicers' performance—Education "allocat[es] more loans to servicers that meet performance metrics such as high levels of customer satisfaction and [] pay[s] servicers higher rates for loans that are in a nondelinquent status." Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers (Federal Preemption Notice), 83 Fed. Reg. 10,619, 10,622 (Mar. 12, 2018). Education's continuing supervision of its servicers is reflected in their contracts, which are extensive and lengthy, and frequently updated with modifications in the form of "change requests."[7] One of Education's components, the office of Federal Student Aid (FSA), audits the servicers and communicates daily with them. FSA also "maintains a Feedback System, which includes a formal process for borrowers to report issues or file complaints about their loan experiences, including problems with servicing." *Id.* Borrowers additionally can lodge

_____

[7] *See* Statement of Interest by the United States at 5-6, *Massachusetts v. Pa. Higher Educ. Assistance Auth.*, No. 1784-CV-02682 (Ma. Super. Ct., Jan. 8, 2018).

complaints with "the FSA Ombudsman Group—a neutral and confidential resource available to borrowers to resolve disputes related to their loans." *Id.*

Despite Education's rigorous existing structures for managing its servicers and Congress's clear direction in the HEA that Education would be responsible for that management, D.C. separately has imposed its own regime over student loan servicers. In 2016, the D.C. Council enacted a statute authorizing regulation of student loan servicers. D.C. Law 21-214 (D.C. Law), Am. Compl., Ex. B, ECF No. 19-2. The D.C. Law applies to most entities "seeking to operate as [] student loan servicer[s] in the District," D.C. Law § 7b(c)(1), and requires them to acquire a license from the D.C. Department of Insurance, Securities and Banking (DISB).

DISB subsequently enacted three successive emergency rules, followed by a final rule, to implement the D.C. Law. *See* Notice of Emergency and Proposed Rulemaking (Sept. 8, 2017), Am. Compl., Ex. D, ECF No. 19-4; Notice of Emergency and Proposed Rulemaking (Dec. 26, 2017), Am. Compl., Ex. I, ECF No. 19-9; Notice of Emergency and Proposed Rulemaking (Third Emergency Rules) (Apr. 20, 2018), Am. Compl., Ex. L, ECF No. 19-12; Notice of Final Rulemaking (Final Rules) (Aug. 10, 2018), 65 D.C. Reg. 8395, Am. Compl., Ex. O, ECF No. 19-15. The major provisions of the D.C. Law and the Rules include a licensing requirement for student loan servicers, fees and assessments that servicers must pay, and mandatory disclosure requirements for servicers.

The Rules require student loan servicers that service the loans of D.C. residents to be licensed. To obtain a license, servicers must satisfy a variety of requirements, including (1) declaring that they have not had a similar license revoked in another jurisdiction; (2) declaring that their officers and owners have not been convicted of certain felonies;

(3) demonstrating "financial responsibility, character and general fitness," including by providing three years of audited financial statements; (4) providing a $50,000 surety bond in favor of DISB for the recovery of fees or expenses or to compensate D.C. or a person injured by a servicer's unlawful action; and (5) providing their business plan and procedures for handling customer complaints. Final Rules §§ 3000.1-3004.7.

The Rules also require that servicers pay a variety of fees and assessments to service student loans in D.C. The application fee for a license is $1,100, plus a fee charged by the Nationwide Multistate Licensing System & Registry[8] (NMLS). Final Rules § 3023.1. The license must be renewed every year for a renewal fee of $900, plus a fee charged by NMLS. Final Rules § 3023.1. In addition to the licensing fees, licensed servicers must also pay an annual assessment, set at the rate of $0.50 for each borrower residing in D.C. Final Rules § 3023.1. The Rules also contemplate that DISB will examine each licensed servicer at least every three years, and require servicers to pay $400 for every examination day. Final Rules § 3023.1.

The Rules require licensed servicers to make a number of disclosures to DISB and grant DISB broad authority to demand additional disclosures beyond those explicitly listed in the Rules. For example, in addition to mandatory annual reports that state "[t]he number of student education loans sold, assigned or transferred during the preceding calendar

---

[8] NMLS is an entity that administers licenses and other records for multiple states and jurisdictions. *See* NMLS Resource Center, https://nationwidelicensingsystem.org/ Pages/default.aspx. D.C. already uses NMLS to manage other licenses, including those required for mortgage brokers and check cashers. *See* NMLS Resource Center, State Licensing Requirements, District of Columbia, https://nationwidelicensingsystem.org/slr/ Pages/DynamicLicenses.aspx?StateID=DC.

year," licensed servicers also must report "[a]ny other relevant information related to business operations required by [DISB]."   Final Rules § 3014.2.   And servicers must provide DISB with all "complaint[s] against a licensee . . . on a form prescribed by [DISB], and in accordance with the procedures or processes prescribed by [DISB]."   Final Rules § 3022.1.   Licensed servicers have an ongoing obligation to report certain events to DISB, including bankruptcy or the resolution of lawsuits involving fraud or misrepresentation. Final Rules § 3016.1.   Licensed servicers must also retain records on loans for three years after the loans are sold, assigned or transferred, Final Rules § 3018.1,[9] and "make applicable books and records available to [DISB]" at DISB's request, Final Rules § 3018.2, presumably including as part of the examination process.[10]

## DISCUSSION

D.C.'s regulation of servicers of federal student loans violates the Supremacy Clause.   The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land."   U.S. Const. art. VI, cl. 2.   Where state law is incompatible with federal law, therefore, state law must yield.[11]   Federal law preempts state law in three situations:   first, when federal law expressly provides that state

---

[9] The record-retention requirement of the Third Emergency Rules states that it does not apply "to the extent prohibited by federal law."   Final Rules § 3018.1.

[10] Both the record-retention requirement and the requirement that licensed servicers make records available to DISB "may [be] waive[d] or reduce[d] . . . if [DISB] determines that compliance would require the licensee to violate federal law."   Final Rules § 3018.4.

[11] Although D.C. is not a state, the preemption doctrine applies to District statutes "no less" than state enactments.   *Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.,* 642 F.2d 527, 534 n.65 (D.C. Cir. 1980).

law is preempted; second, when federal law occupies an entire field; and third, when federal

law and state law conflict.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).

Under conflict preemption, "a federal statute implicitly overrides state law . . . when

state law is in actual conflict with federal law" either because it is "impossible for a private

party to comply with both state and federal requirements" or because "state law stands as

an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress."[12]  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal quotation

marks and citations omitted); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861,  873

(2000) ("obstacle" exists whether it "goes by the name of 'conflicting; contrary to;

. . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . .

interference,' or the like").  In an area "involving 'uniquely federal interests,'" the conflict

between state and federal law "need not be as sharp as that which must exist for ordinary

pre-emption."  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988) (citation

omitted).[13]  Conflict preemption does not require that the preempting federal law explicitly

---

[12] "Federal regulations have no less preemptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 151, 153 (1982).

[13] Federal student loans—as well as the Federal Government's relationships with its servicers and other contractors—implicate uniquely federal interests.  *See Boyle*, 487 U.S. at 504-05 (holding that federal contracts are an area of uniquely federal interest because "obligations to and rights of the United States under its contracts are governed exclusively by federal law" (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407 (1947); *Nat'l Metro. Bank v. United States*, 323 U.S. 454 (1945))); *cf. United States v. Victory Highway Vill., Inc.*, 662 F.2d 488, 497 (8th Cir. 1981) (holding that because of "an overriding federal interest in protecting the funds of the United States and in securing federal investments," federal law, rather than state or local law, must govern the remedies available upon default of a federally held or insured loan).

provide that state law is preempted.  Here, multiple sources of federal law conflict with,[14]

and therefore preempt, D.C.'s Law and Rules.

## I.   Federal Statutes and Regulations Governing the Selection of Contractors Preempt D.C.'s Licensing Requirement.

D.C. cannot usurp the Federal Government's authority to select contractors

according to its own criteria by imposing a licensing requirement for the servicing of

federal student loans.[15]  It is well established that states may not attempt to control the

Federal Government's selection of contractors through the imposition of a licensing

requirement.  The Supreme Court and the courts of appeals have frequently invalidated

state-licensing requirements for federal employees and federal contractors.  *See Sperry v.*

*Florida ex rel. The Fla. Bar*, 373 U.S. 379, 385 (1963) ("State[s] may not enforce licensing

requirements which, though valid in the absence of federal regulation, give 'the State's

licensing board a virtual power of review over the federal determination' that a person or

---

[14] Although consumer protection is within states' traditional police powers, and the Supreme Court has recognized a presumption against preemption in fields "which the States have traditionally occupied," *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 260 (2004), such a presumption is inapplicable where, as here, a state purports to regulate federal contracts and contractors.  *Boyle*, 487 U.S. at 504-05; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that no presumption against federal preemption was warranted because "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law"). Even if the presumption were applicable, it would be rebutted here.  *See Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (considering the presumption, but concluding that the HEA preempted various state-law claims against loan servicers because "it is our duty to consider carefully what Congress was trying to accomplish in the HEA and whether these state law claims create an 'obstacle' to the congressional purposes").

[15] This Statement of Interest addresses only D.C.'s licensing requirement as applied to servicers of federal student loans in the course of their contracts with Education, or, in other words, as it applies to the servicing of federally managed student loans.  This includes servicers of Direct Loans, Education-held FFELP loans, and Education-held Perkins Loans.

agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress.'" (quoting *Leslie Miller Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (footnotes omitted))); *see also United States v. Virginia*, 139 F.3d 984, 987 (4th Cir. 1998) ("[T]he Virginia regulatory scheme frustrates the objectives of the federal procurement laws by allowing the state to 'second-guess' the FBI's responsibility determination."); *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 439 (9th Cir. 1991) (holding that a state law is preempted when it "is effectively attempting to review the Federal Government's responsibility determination" in selecting its contractor (citation omitted)).

In *Leslie Miller*, the Supreme Court considered whether the State of Arkansas could require a construction company to obtain an Arkansas contractor's license to perform work for the United States. *Leslie Miller Inc.*, 352 U.S. at 187. The Supreme Court struck down Arkansas's requirement because:

> [T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on. Such a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient. It is the duty of the Department to employ persons competent for their work and that duty it must be presumed has been performed.

*Id.* at 190 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)). Yet here, D.C. seeks precisely such a forbidden power of review—that loan servicers "desist from performance until they satisfy a state officer upon examination that they are competent . . . and pay a fee for permission to go on" through its licensing requirement and fees. D.C.'s laws are

improper both because they seek to replicate the federal criteria for evaluating contractors and thereby allow D.C. to second-guess the Federal Government's evaluation, and because they attempt to add additional criteria beyond what federal law requires.

Here, as in *Leslie Miller*, D.C.'s criteria for licensing student loan servicers overlap with the criteria used by Education to select contractors.  Pursuant to the HEA, Education is required to obtain "competitive prices" and to select "only entities which the Secretary determines are qualified to provide such services and supplies and will comply with the procedures applicable to the award of such contracts."  20 U.S.C. § 1087f(a).  Congress also intended the servicers to be "selected by and responsible to the Department of Education."  H.R. Rep. No. 103-111, at 107 (1993).  Pursuant to the Federal Acquisition Regulation, Education must contract only with "responsible" contractors, which means contractors with suitable past performance and financial health.  *See* 48 C.F.R. § 9.100 to 9.108-5.  D.C.'s licensing requirements duplicate the federal requirement of demonstrating financial responsibility.  *Compare* Final Rules § 3002.2(c) (requiring applicants for a license to demonstrate "financial responsibility . . . and general fitness"), *and* Final Rules § 3003 (requiring servicers to submit financial statements and show a sufficient net worth), *with* 48 C.F.R. § 9.104-1(a) (requiring that prospective contractors "[h]ave adequate financial resources to perform the contract, or the ability to obtain them").  D.C.'s requirements also duplicate the federal requirement of good character and integrity. *Compare* Final Rules § 3002.2(c) (requiring applicants for a license to demonstrate "character"), *and* Final Rules § 3002.2(b) (requiring officers to swear they do not have recent felony convictions), *with* 48 C.F.R. § 9.104-1(d) (requiring that prospective contractors "[h]ave a satisfactory record of integrity and business ethics").

D.C.'s further attempt to impose additional and more stringent requirements on federal contractors is also improper and invalid because it impedes the accomplishment and execution of the full purposes and objectives of federal law. "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." *Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604 (1915); *see also United States v. Locke*, 529 U.S. 89, 114 (2000) ("The [federal] statute may not be supplemented by laws enacted by the States without compromising the uniformity the federal rule itself achieves."); *cf. United States v. California*, No. 2:06-CV-2649-GEB-GGH, 2007 WL 3341670, at *8 (E.D. Cal. Nov. 8, 2007) (holding that conflict preemption barred a state from refusing to disclose criminal history information to federal contractors on the grounds that state law limited such disclosures to only public officials, because the state's public-official requirement was an attempt to "second guess" the agency's determination, as required by federal law, that the contractors were responsible). Here, D.C. attempts to add several requirements for loan servicers beyond those set by the federal government. *See* Final Rules § 3003.3 (requiring licensed servicers to "continuously maintain a net worth of not less than two hundred fifty thousand dollars"); Final Rules § 3004 (requiring licensed servicers to post a surety bond). Such requirements endanger Education's goals of obtaining "competitive prices," 20 U.S.C. § 1087f(a)(1), and generating "cost savings," 20 U.S.C. § 1081a(c)(1), because D.C.'s additional requirements and fees likely would lead the contractors to pass on increased costs to the Federal Government.

For these reasons, D.C.'s attempt to second guess through its licensing requirement Education's determination of which servicers to contract with "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and is thus preempted by federal law.[16]  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also* Federal Preemption Notice, 83 Fed. Reg. at 10,620.

## II.   D.C.'s Licensing Requirements and Annual Fee Violate the Intergovernmental Immunity Doctrine.

D.C.'s burdensome licensing requirements—and the associated fees and assessments—also violate the intergovernmental immunity doctrine because they attempt to (1) "regulate[] the United States directly" and (2) "discriminate[] against the Federal Government or those with whom it deals."  *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.).[17]

Regulation of federal contractors is one way states can violate the intergovernmental immunity doctrine.  *See id.* at 438 ("[A] regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself . . . .").  The Ninth Circuit's decision in

---

[16] Any provisions in the servicers' contracts with Education requiring them to comply with applicable state requirements are not to the contrary.  *See Gartrell Constr., Inc. v. Aubry*, 940 F.2d 437, 440 (9th Cir. 1991) (rejecting the argument that a state could license federal contractors because the contract required the contractor to obtain all "applicable" licenses because "[f]ollowing *Leslie Miller*, state licensing laws cannot be 'applicable', nor compliance with them 'necessary', where such laws are preempted by federal law").

[17] Although the controlling opinion in *North Dakota* was a plurality, the Supreme Court was unanimous in concluding that states may not regulate or discriminate against the United States.  *North Dakota*, 495 U.S. at 435 (plurality op.); *id.* at 444 (Scalia, J., concurring); *id.* at 451-52 (Brennan, J., dissenting in part).

*Boeing, Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), provides an instructive example. There, California had enacted a site-specific environmental clean-up law covering a parcel of land where the Federal Government, as well as defense contractors, had conducted nuclear research and rocket testing. *Id.* at 834-35. Boeing owned most of the site, and was also cleaning the site as a federal contractor. *Id.* The Ninth Circuit invalidated the California law on intergovernmental immunity grounds, finding that it both directly regulated the contractor's conduct, and discriminated against the Federal Government and those with whom it dealt.

First, the Ninth Circuit held that the California law violated the intergovernmental immunity doctrine by directly regulating Boeing's conduct because the law "mandate[d] the ways in which Boeing renders services that the federal government hired Boeing to perform" and "regulate[d] not only the federal contractor but the effective terms of the federal contract itself." *Id.* at 840. Here, the D.C. Law and Rules, similarly, attempt to directly dictate how the servicers perform their contracts with Education, including by requiring servicers to maintain records, Final Rules § 3018.1; requiring servicers to report complaints to D.C., Final Rules § 3022.1; and mandating that the servicers disclose information in violation of their federal contracts, as discussed in Part III, *infra*. As the Ninth Circuit concluded in *Boeing*, this direct regulation of a federal contractor's duties is improper and is fatal to the D.C. Law and Rules.

In addition to direct regulation, the D.C. Law and Rules also discriminate against the Federal Government and its contractors by placing burdensome regulations, including a licensing requirement and fees, that apply only to student loan servicing—an area where the Federal Government is the primary actor—rather than loan servicing or consumer

lending in general. The D.C. regulations impose substantial financial burdens on the servicers. Servicers must pay a yearly renewal fee, undergo periodic examinations at a daily rate of $400, and pay a yearly assessment of $0.50 per borrower serviced in D.C., Final Rules § 3023.1, a significant amount relative to the servicers' total income per borrower.[18] These economic burdens would be felt largely by the servicers under contract with the Federal Government.

The fact that the D.C. Law and Rules will ostensibly also apply to purely private loan servicing does not belie the intergovernmental immunity concerns. In *Boeing*, for example, California's law applied to the entire waste cleanup site, of which the Federal Government owned only portions, yet the Ninth Circuit still determined that the regulation discriminated against the Federal Government or those with whom it dealt because it attempted to apply more stringent cleanup requirements to the parcel than were generally applicable in California. *Boeing*, 768 F.3d at 842. Likewise, here, the burden of D.C.'s Law and Rules will be felt disproportionately by Education's contractors because federal student loans constitute the vast majority of all extant student loans,[19] and federal

---

[18] *See* Letter from Winfield P. Crigler, Executive Director, SLSA, to Christian A. Washington, Legislative Analyst, DISB at 5 (Feb. 26, 2018), Am. Compl., Ex. N, ECF No. 19-14 ("[T]he annual assessment contained in the proposed regulation[] [of] $0.50 per borrower serviced is onerous in that it would make it difficult for servicers to retain enough revenue to provide the services required. Federal loan servicers are paid on a sliding scale per borrower . . . . The most a servicer can be paid is $2.85 per borrower per month . . . . [A] servicer is paid only 45 cents per month [at the lowest]. . . . Any amount more than a few pennies per borrower will significantly impair federal servicers' ability to service loans under the contract with the U.S. Department of Education.").

[19] According to the Federal Reserve, $1.531 trillion was outstanding in all types of student loans at the end of the second quarter in 2018. Board of Governors of the Federal Reserve, Consumer Credit – G.19 (Aug. 7, 2018), https://www.federalreserve.gov/releases/g19/current/default.htm. At that time, $1.407 trillion was outstanding in *federal* student loans, or about 92% of the total student loan amount. Federal Student Aid, Federal

contractors service nearly all federal student loans.[20]   *See North Dakota*, 495 U.S. at 435 ("[T]he question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation. Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory 'with regard to the economic burdens that result.'" (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983))).

Indeed, the discriminatory effect of D.C.'s regime on the Federal Government and those with whom it deals is further apparent from the text of the D.C. law itself.  In *Boeing*, one of the reasons for the Ninth Circuit's finding of discrimination was the specific statement in the California law that it was singling out the waste clean-up zone because it disagreed with the federal agency's choice of clean-up standards.[21]   Here, likewise, the Emergency Rules explicitly stated that they intended to address defects in the administration of loans by *federal*—not private—contractors because D.C. disagrees with the Federal Government's contracting standards, including recent changes in Education's administration of *federal* student lending.   *See* Third Emergency Rules at 1 ("This emergency rulemaking is necessary because . . . [t]he federal government has begun to

---

Student Aid Portfolio Summary (last viewed July 18, 2018), https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

[20] Of the $1.407 trillion outstanding in federal student loans at the end of the second quarter in 2018, $1.196 trillion was managed by the Federal Government.  *See* Federal Student Aid, Portfolio by Loan Status (last viewed June 12, 2018), https://studentaid.ed.gov/sa/about/data-center/student/portfolio (summing outstanding amounts in "Federally Managed" category).

[21] *See Boeing*, 768 F.3d at 843 ("[The California law] specifically targets [the site] because of the radioactive pollution created by federal activity on the site and because [of federal agency decisions].  [The California law] applies more stringent cleanup standards than generally applicable state environmental laws.  By doing so, [it] discriminates against the federal government and against Boeing as a federal contractor.  Therefore, it is invalid under the doctrine of intergovernmental immunity.").

amend and repeal several federal regulations and policies related to student aid."); *id.* ("The Department of Education has also withdrawn several Obama administration memoranda crafted to strengthen consumer protections for student loan borrowers, including consideration of a loan servicer's records related to consumer complaints and investigation prior to the award of any *federal* contract." (emphasis added)).  Although this language has been removed from the introduction to the Final Rules, the Final Rules are substantively identical to the Third Emergency Rules and there is no indication that D.C.'s intent in promulgating the rules has changed.  *Cf.* Introduction to Final Rules 65 D.C. Reg. at 8396 ("[T]here have been no changes to the final rulemaking.").  D.C.'s regulations therefore disproportionately burden federal contracts for loan servicing in effect and by design— D.C. intended to target *federal* contracts.

**III.    D.C.'s Disclosure Requirements Are Preempted Because They Conflict with the Privacy Act and the Servicers' Contracts with Education.**

Federal law—including the Privacy Act and the servicers' contracts with Education—preempts portions of D.C.'s disclosure requirements.  The Privacy Act provides that "[n]o agency shall disclose any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior consent of, the individual to whom the record pertains"—unless an exception applies.  5 U.S.C. § 552a(b). The Privacy Act governs records "about an individual . . . maintained by an agency . . . and that contain[] [the individual's] name, or the identifying number, symbol, or other identifying particular assigned to the individual," *id.* § 552a(a)(4), that are stored in a "system of records," or "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual," *id.* § 552a(a)(5).

Contractors, such as student loan servicers, are subject to criminal liability if they violate the Privacy Act. *See id.* § 552a(m)(1) (providing that contractors are considered employees for the purposes of § 552a(i)); *id.* § 552a(i) (providing for criminal penalties for disclosures by employees). In addition, the servicers' contracts require compliance with the Privacy Act. *See, e.g.*, PHEAA Contract, Attachment A-2 ¶ 80(d) (prohibiting servicers from "disseminati[ng] copies of any deliverable that contains information covered by the Privacy Act"); PHEAA Contract, Addendum 2 at B.2 (incorporating by reference two Federal Acquisition Regulation clauses pertaining to the Privacy Act: 52.224-1 and 52.224-2); 48 C.F.R. § 52.224-1 (Privacy Act Notification clause requiring contractors to "design, develop, or operate a system of records on individuals" and warning that that system will be "subject to the Privacy Act" and that "[v]iolation of the Act may involve the imposition of criminal penalties"); 48 C.F.R. § 52.224-2 (Privacy Act clause requiring contractors to comply with the Privacy Act).

As these provisions contemplate, the servicers necessarily will possess Privacy Act-protected records. For example, servicers possess borrower records containing their names, contact information, identification numbers, and other personally-identifiable information. The D.C. regulations conflict with the servicers' Privacy Act obligations by purporting to require that servicers reveal potentially unlimited types and amounts of sensitive information to DISB. Servicers must "make applicable books and records available to [DISB]," Final Rules § 3018.2,[22] and provide an annual report to DISB

---

[22] Nor does the Rules' statement that DISB "may waive or reduce requirements in this section if [DISB] determines that compliance would require the licensee to violate federal law," Final Rules § 3018.4, resolve the conflict. This provision, which applies only

including "[a]ny other relevant information related to business operations required by [DISB]," Final Rules § 3014.2(b).   DISB may also request a "special report" from a servicer which must contain any information required by DISB.  Final Rules § 3017.1; *see also* Final Rules § 3007.3 (permitting DISB to "restrict or impose conditions on any license," which could include disclosure conditions).  And, servicers must provide to DISB "[a] complaint against a licensee . . . on a form prescribed by [DISB], and in accordance with the procedures or processes prescribed by [DISB]."  Final Rules § 3022.1.  There is apparently no limit on what material DISB may elect to deem "applicable" or "relevant." These extremely broad grants of authority in turn place no limits on the information that DISB could demand from servicers, which certainly could encompass Privacy Act protected records.  D.C.'s disclosure requirements are thus preempted by federal law to the extent that they authorize compelling servicers to disclose Privacy Act-protected materials.[23]

---

to § 3018, purports to permit *DISB* to determine when compliance would interfere with federal law, leaving servicers exposed to sanctions if DISB errs.

[23] As required by the Privacy Act, Education has published System Of Records Notices (SORNs) describing Education's records concerning student-borrowers and setting forth how Education may use and disclose the information contained in those records. Although the relevant SORNs permit Education to disclose to state regulators borrower data held by servicers, that decision is a discretionary one by Education.  *See, e.g.*, Notice of an Altered System of Records entitled "Common Services for Borrowers (CSB)" (18-11-16), 81 Fed. Reg. 60,683, 60,686 (Sept. 2, 2016) ("The Department *may* disclose information contained in a record in this system of records under the routine uses listed in this system without the consent of the individual . . . . These disclosures *may* be made on a *case-by-case* basis . . . ." (emphasis added)); *id.* at 60,687 (listing as a routine use "disclosures to governmental entities at the Federal, State, local, or tribal levels regarding the practices of Department contractors . . . (e.g., Federal Loan servicers [ )] . . . in order to permit these governmental entities to verify the contractor's compliance with . . . applicable statutory, regulatory, or local requirements"); *cf.* Notice of a Modified System of Records entitled "Customer Engagement Management System (CEMS)" (18-11-11), 83 Fed. Reg. 27,587 (June 13, 2018) (addressing discretionary releases for enforcement purposes).  The

D.C.'s disclosure requirements are also preempted by the servicers' contracts with Education.  Conflict preemption may arise from conflicts between state law and the provisions of contracts between the Federal Government and contractors.  *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *e.g.*, *id.* at 509 (identifying a conflict because "the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the Government contract").  In *Boyle*, the Supreme Court recognized that such preemption could occur in (1) areas of "uniquely federal interests" with (2) "'significant conflict' . . . between an identifiable 'federal policy or interest and the [operation] of state law,' or [where] the application of state law would 'frustrate specific objectives' of federal legislation."  *Id.* at 507 (citations omitted).

Both requirements for preemption by contract are met here.  Federal student loans are an area of uniquely federal interests.  *See id.* at 504-05 (finding that federal contracts are an area of uniquely federal interest because "obligations to and rights of the United States under its contracts are governed exclusively by federal law" (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407 (1947); *Nat'l Metro. Bank v. United States*, 323 U.S. 454 (1945))).  As previously discussed, there are significant conflicts between D.C.'s laws and Education's interest in controlling the release of its information. This is especially the case because, here as in *Boyle*, the federal fisc would be negatively affected by D.C.'s law and Rules because the servicers would pass increased costs on to the Federal Government.  *Cf. Boyle*,

---

servicers are not authorized to release information absent approval by Education, and Education is certainly not required to accede to any request for information by a state regulator.  Furthermore, the exception applies only to disclosures pursuant to "applicable" state laws, and, for the reasons previously discussed, D.C.'s laws here are not "applicable."

487 U.S. at 511-12 ("The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.")

Education's contracts with its servicers conflict with the Rules because they provide that the Federal Government, not the servicers, controls the data, records, and other information produced in performing the contract. *See, e.g.*, PHEAA Contract, Attachment A-2 ¶ 80(b) ("Contractor shall treat all deliverables under the contract as the property of the U.S. Government for which the Government Agency shall have unlimited rights to use, dispose of, or disclose such data contained therein as it determines to be in the public interest."); PHEAA Contract, Attachment A-2 ¶ 80(f) ("The Government Agency owns the rights to all data/records produced as part of this contract."). Any disclosures of data produced as part of the servicers' performance of their contracts—even if the disclosed data were not covered by the Privacy Act—would therefore violate the servicers' contracts with Education. D.C.'s disclosure requirements are therefore preempted to the extent that they conflict with the data provisions in the Department's contracts with its servicers.

## CONCLUSION

For the above reasons, the United States respectfully submits that the D.C. Law and Rules are preempted because they require servicers to obtain a D.C. license as a condition of servicing federal student loans, have the practical effect of burdening the servicing of federal student loans, and require servicers to disclose information in contravention of the Privacy Act or the servicers' contracts.

Dated: August 24, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

/s/ Rebecca M. Kopplin
REBECCA M. KOPPLIN
Trial Attorney (California Bar No. 313970)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Mass. Ave. NW
Washington, D.C.  20001
Telephone:  (202) 514-3953
Facsimile:  (202) 616-8202
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for the United States*