**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STUDENT LOAN SERVICING ALLIANCE,<br><br>   *Plaintiff,*<br><br>v.<br><br>STEPHEN C. TAYLOR, *et al.*,<br><br>   *Defendants.* | Civil Action No. 18-640 (PLF) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED**
**COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND.................................................................................................2

    I.    The District's Regulation of the Student Loan Servicing Industry.............................................................................................2

        A.    Passage of the Student Loan Ombudsman Establishment and Servicing Regulation Act of 2016...........................................2

        B.    The District's Final Regulations.............................................3

    II.    The Federal Regulatory Structure...........................................6

        A.    The Federal Family Education Loan Program............................6

        B.    The Federal Direct Loan Program.........................................8

    III.    Plaintiff's Claims...............................................................9

STANDARDS OF REVIEW.................................................................................10

    I.    Federal Rule of Civil Procedure 12(b)(1)..........................................10

    II.    Federal Rule of Civil Procedure 12(b)(6)..........................................11

    III.    Federal Rule of Civil Procedure 56..............................................12

ARGUMENT.................................................................................................12

    I.    Plaintiff's Lack Standing to Assert Certain Challenges to the District's Regulations.....................................................................12

        A.    Plaintiff's Preemption Claims are Based, in Part, on Hypothetical Harms.......................................................................12

        B.    Plaintiff's Members Must be Licensed Regardless of Whether They Service Federal Loans.......................................................15

II.    Plaintiff's Preemption Claims Have No Merit.......................................17

A.    Plaintiff's Express Preemption Claim is Contrary to the Plain Meaning of the Federal Statute on Which Relies......................18

      1.    20 U.S.C. § 1098g Does Not, by Its Terms or Structure, Support Plaintiff's Express Preemption Claim.............................................................19

      2.    Prior Decisions Fail to Support Plaintiff's Position......................................................24

B.    Plaintiff's Field Preemption Claim is Contrary to Courts' Consistent Findings...........................................................26

C.    Plaintiff's Conflict Preemption Claim is Unsupported by Statutory or Regulatory Text or Congressional Intent.............29

      1.    Plaintiff Fails to Establish Any Direct Conflicts Between the District's Regulations and Federal law................................................................30

      2.    Alleged Obstacles Identified by Plaintiff and DOED Do Not Support Broad Preemptive Effect............................................................32

          i.    The DOED Notice is an Unexplained Change in Position............................................34

          ii.    The Notice is Not Entitled to Deference on the Merits as it Lacks Persuasive Analysis of the Statutory and Regulatory Context and Instead Includes Only Conclusory Statements............................................36

               a.    Plaintiff Overstates and Mis-applies the Goal of "Uniformity"...................36

               b.    The DOED Notice Describes Goals of Simplification and Saving Taxpayer Money That are Out of Context........39

          iii.    The District's Regulations Do Not Impede DOED Contracts with Servicers................42

CONCLUSION.....................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Aegis Defense Servs., LLC v. Chenega-Patriot Group, LLC*, 141 F. Supp. 3d 479
(E.D. Va. 2015) ................................................................................. 37

*Alexander v. F.B.I.*, 971 F. Supp. 603 (D.D.C. 1997) ................................... 40

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .......................................... 27

*Am. Chemical Council v. Dep't of Transp.*, 468 F.3d 810 (D.C. Cir. 2006) ............... 23

*Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015 (D.C. Cir. 2000) ...................... 41

*Arizona v. United States*, 567 U.S. 387 (2012) ............................... 26, 36, 37

*Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.*, 168 F.3d
1362 (D.C. Cir. 1999) ........................................................................ 35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................. 19, 20

*Atherton v. F.D.I.C.*, 519 U.S. 213 (1997) ............................................. 46

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ 20

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) ................................. 54

*Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988) ................................... 37, 38

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ................................... 37

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) .......................... 32-33, 35, 45-47

*Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953 (N.D. Cal. 2004) ................... 21

*Cigar Ass'n of Am. v. U.S. Food and Drug Admin.*, 323 F.R.D. 54 (D.D.C. 2017) ..... 22

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) ................................... 21

*Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004) ................. 36

iv

*College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005) ........................ 36, 48

*Com. of Mass. v. U.S. Dep't of Transp.*, 93 F.3d 890 (D.C. Cir. 1996) ...................... 34

*Comm'rs Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321 (D C. Cir. 2014) ... 27

*Crescent Care, LLC v. Total Home Health, Inc.*, Civil Action No. 08-127, 2008 WL

    4542666 (N.D. Ill. 2008) ................................................................................. 52

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ............................................. 34

*Delaware v. Surface Transp. Bd.*, 859 F.3d 16 (D.C. Cir. 2017) ............................... 42

*Doggett v. Ritter Fin. Co. of La.*, 384 F. Supp. 150 (W.D. Va. 1974) ....................... 30

*Dupnik v. United States*, 848 F.2d 1476 (9th Cir. 1988) .......................................... 49

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)............................... 28

*Empire HealthChoice Assurance, Inc. v. McVeigh*, 396 F.3d 136 (2d. Cir. 2005)..... 41

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016)...................................... 44

*Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654 (E.D. Pa. 2015) .......................... 25

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................ 44

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................... 31

*Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237 (3d. Cir. 2008) ........................ 40

*Gatrell Const. Inc. v. Aubry*, 940 F.3d 437 (9th Cir. 1991)................................. 52, 53

*Genna v. Sallie Mae, Inc.*, Civil Action No. 11-7371, 2012 WL 1339482 (S.D.N.Y.

    2012)................................................................................................................ 33, 36

*Gonzalez v. Oregon*, 546 U.S. 243 (2006)................................................................. 45

*Good v. Altria Group, Inc.*, 501 F.3d 29 (1st Cir. 2007).............................................. 42

*Grosso v. Surface Transp. Bd.*, 804 F.3d 110 (1st Cir. 2015) .................................... 42

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ....................................................... 19

*Hillsborough Cnty., Fla. v. Automated Med. Lab., Inc.*, 471 U.S. 707 (1985) ........... 37

*Holk v. Snapple Beverage Corp.*, 575 F.3d 329 (3d. Cir. 2009) ................................. 42

*In re Science Applications Int'l Corp.*, 45 F. Supp. 3d 14 (D.D.C. 2014) .................. 22

*Interstate Nat. Gas Ass'n of Am. v. Fed. Energy Regulatory Comm'n*, 285 F.3d 18

  (D.C. Cir. 2002) ...................................................................................................... 21

*Jones & Assocs., Inc. v. District of Columbia,* 797 F. Supp. 2d 129 (D.D.C. 2011) ... 22

*Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222 (9th Cir. 1994) ................................. 35

*Khadr v. United States*, 529 F.3d 1112 (D.C. Cir. 2008) ........................................... 19

*Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ........................... 31

*Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187 (1956) ........................................... 52

*Linsley v. FMS Inv. Corp.*, Civil Action No. 11-961, 2012 WL 1309840 (D. Conn.

  2012) ........................................................................................................................ 33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................... 19, 24, 26

*Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) .......... 20

*McCready v. Nicholson,* 465 F.3d 1 (D.C. Cir. 2006) ................................................. 40

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ..................................................... 26, 27

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) ........................... 22

*Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81 (D.D.C. 2010) ............................... 30

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*, Civil Action No. 17-183, 2017 WL

  6501919 (N.D. Ill. 2017) ........................................................................................ 33

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015) ................................................. 26

*Phillips v. E.I. Dupont De Nemours & Co.*, 497 F.3d 1005 (9th Cir. 2007)............... 31

*Red Lake Band of Chippewa Indians v. Dep't of Interior*, 624 F. Supp. 2d 1 (D.D.C. 2009)......................................................................................................................... 51

*Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009)...................................................... 37

*See Inner City Broad. Corp. v. Sanders*, 733 F.2d 154 (D.C. Cir. 1984).................... 29

*See U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133 (D.D.C. 2015) ................................................................................................................................... 29

*Sickle v. Torres Advanced Enter. Solutions, LLC*, 884 F.3d 338 (D.C. Cir. 2018)... 26, 35, 38

*Skidmore v. Swift*, 323 U.S. 134 (1944) ..................................................................... 42

*Solomon v. Falcone,* 791 F. Supp. 2d 184 (D.D.C. 2011) ........................................... 29

*Sperry v. Florida*, 373 U.S. 379 (1963)........................................................................ 52

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)............................................................ 21

*State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015)........................ 23

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)....................................... 21

*Thompson v. HSBC Bank USA, N.A.*, 850 F. Supp. 2d 269 (D.D.C. 2012) .............. 29

*U.S. v. Commonwealth of Va.*, 139 F.3d 984 (4th Cir. 1998) ..................................... 25

*U.S. v. Mead Corp.*, 533 U.S. 218 (2001).................................................................... 42

*United States v. Petroff-Kline*, 557 F.3d 285 (6th Cir. 2009) .................................... 29

*United States v. Yazell*, 382 U.S. 341 (1966).............................................................. 52

*Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117 (D.D.C. 2011) ...... 20

*Weber v. Great Lakes Educ. Loan Serv.'s, Inc.,* 2013 WL 3943507 (W.D. Wis. July 30, 2013) ............................................................................................................. 50

*Williams v. Lew*, 77 F. Supp. 3d 129 (D.D.C. 2015) .................................................. 22

*Williams v. Lew*, 819 F.3d 466 (D.C. Cir. 2016) ...................................................... 19

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................. 26, 42

**Statutes**

20 U.S.C. § 1071(a)(1) ............................................................................................ 15, 46

20 U.S.C. § 1082(c)(2) .................................................................................................... 31

20 U.S.C. § 1082(l) ........................................................................................................ 16

20 U.S.C. § 1083 ...................................................................................................... 30, 47

20 U.S.C. § 1087f ..................................................................................................... 18, 50

20 U.S.C. § 1098g ........................................................................................................... 27

5 U.S.C. § 522a ......................................................................................................... 23, 24

**Other Authorities**

139 Cong. Rec. H2297 (daily ed. May 5, 1993) ........................................................ 17

139 Cong. Rec. S5585 (daily ed. May 6, 1993) ......................................................... 17

80 Fed. Reg. 98, 29302 (May 21, 2015) ..................................................................... 36

H.R. Rep. No. 102-447 (1992) .............................................................................. 15, 17

S. Rep. 97-536 (Sept. 3, 1982)..................................................................................... 32

U.S. Public Law 97-320 (Oct. 15, 1982) ................................................................... 32

**Regulations**

34 C.F.R. § 5b.9............................................................................................................... 24

34 C.F.R. § 682.05 ........................................................................................ 30

34 C.F.R. § 682.100(a) ................................................................................. 16

34 C.F.R. § 682.201 ..................................................................................... 16

34 C.F.R. § 682.205 ..................................................................................... 33

34 C.F.R. § 682.208 ..................................................................................... 16

34 C.F.R. § 682.401 ..................................................................................... 36

34 C.F.R. § 682.410 ..................................................................................... 36

34 C.F.R. § 685.100(a) ................................................................................. 18

34 C.F.R. § 685.200 ..................................................................................... 18

# INTRODUCTION

Plaintiff, Student Loan Servicing Alliance (SLSA), brings this action on behalf of its members, student loan servicing companies, to prevent regulation of the industry by the District of Columbia (the District) Department of Insurance, Securities and Banking (DISB).[1] Plaintiff contends that federal preemption renders the District's regulations—and the District statute giving rise to those regulations—unlawful.

Plaintiff, however, lacks standing to bring certain preemption claims as they involve speculative harms based on hypothetical applications of the District's regulations. And, on the merits, plaintiff's claims fail to properly apply principles of preemption. Specifically, plaintiff's express preemption claim is based on a statutory interpretation that fails to consider text, structure or purpose. Plaintiff's field preemption claim is belied by established caselaw. And plaintiff's conflict preemption claim is similarly grounded in an improper reading of Congressional purposes and objectives, and is modeled after guidance from the U.S. Department of Education (DOED) that is not entitled to deference from this Court. As such, plaintiff's claims should be dismissed, or, alternatively, summary judgment should be granted in favor of the District.

---

[1]    Defendants are the District of Columbia, Stephen C. Taylor, in his official capacity as DISB Commissioner, and Charles A. Burt, in his official capacity as DISB Student Loan and Foreclosure Ombudsman. Defendants are collectively referred to as "the District."

# BACKGROUND

I. **The District's Regulation of the Student Loan Servicing Industry**

   A. **Passage of the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016**

Bill 21-877, the Student Loan Ombudsman Establishment and Regulation Amendment Act of 2016, was reported favorably to the D.C. Council on November 1, 2016. ECF No. 19-3, Committee of the Whole Committee Report, Bill 21-877 (Nov. 1, 2016).[2] In that report (which adopted and attached the report on the bill by the Subcommittee on Consumer Affairs), the Council stated that regulation of student loan servicers operating in the District of Columbia was necessary because "[the District] is comparatively the most indebted jurisdiction when it comes to average federal student loan debt," and it is "imperative that all D.C. residents have access to dependable information both before a resident takes out an educational loan and once the debt has been assumed." *Id.* at 6. Further, the Council explained that "B21-877 will enable [the District] to take a critical first step in protecting student loan borrowers by creating servicer accountability and providing appropriate oversight of the student loan servicing industry through the requirement of licensure." *Id.* at 7.

The D.C. Council approved the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016, D.C. Law 21-214, on November 21, 2016; it was signed by the Mayor on December 7, 2016 and went into effect on February 18, 2017. *See* ECF No. 19-2; 64 D.C. Reg. 2723 (Mar. 17, 2017). The law, by

---

[2]     As required by Local Civil Rule 7(h)(1), the District includes a statement of undisputed material facts with citations to the record. *See* ECF No. 21-3. This memorandum of points and authorities incorporates that statement by reference.

its terms, requires DISB to "establish a Student Loan Ombudsman" and "to regulate student loan services." ECF No. 19-2. The Ombudsman is responsible for resolving borrower complaints, developing a borrower bill of rights, monitoring and analyzing information and data from borrower complaints, providing information to borrowers, conducting examinations of servicers, and "[c]harg[ing] each student loan servicer an examination fee." *Id.* at 4.

In addition, the statute enacts a licensing process, under which a servicer must submit an application along with "[a]pplication fees and other fees as prescribed by the Commissioner." *Id.* at 5. It also provides DISB the discretion to require "[a]ny other information" it considers "necessary and appropriate" to licensing student loan servicers. ECF No. 19-2 at 5. DISB may revoke a license only after notice and a hearing, and licensees are required to submit an annual report detailing "the number of loans that were sold, assigned, or transferred in the preceding calendar year and any other information that the Commissioner reasonably requires concerning the business operations conducted by the licensee…." *Id.* at 6-7.

Finally, D.C. Law 21-214 directs the Mayor, under the D.C. Administrative Procedure Act, to "issue rules to implement the provisions of [the statute]." *Id.* at 7.[3]

### B.   The District's Final Regulations

Consistent with that delegation, DISB issued three rounds of proposed and emergency regulations. DISB first issued a notice of emergency and proposed

---

[3]   On September 8, 2017, Mayor's Order 2017-206 delegated rulemaking authority to the DISB Commissioner. ECF No. 1-16.

rulemaking on September 8, 2017. ECF No. 19-4 (published in the D.C. Register at 64 D.C. Reg. 11287 (Oct. 27, 2017)). In response to comments received, the agency published a second notice of emergency and proposed rulemaking on December 26, 2017. ECF No. 19-9 (published in the D.C. Register at 65 D.C. Reg. 692 (Jan. 26, 2018)). Third, and to again respond to comments received and continue to refine the proposed regulations, DISB adopted a third notice of emergency and proposed rulemaking on April 20, 2018. ECF No. 19-12, (published in the D.C. Register at 65 D.C. Reg. 6882 (June 22, 2018)). Fourth and finally, on August 10, 2018, and following another notice-and-comment period, DISB published a notice of final rulemaking. ECF No. 19-15, Notice of Final Rulemaking, 65 D.C. Reg. 8395 (Aug. 10, 2018) (Final Rules).

The Final Rules implement D.C. Law 21-214 in six ways. First, the regulations prescribe the contents of a licensing application for student loan servicers, including the required financial statement and surety bond. ECF No. 19-15 §§ 3002–3005. The regulations also describe the procedure for incomplete applications and withdrawal of applications, §§ 3005–3006, as well as transferability, expiration, and renewal or reinstatement of a license. §§ 3007–3010. Student loan servicers may also appeal the denial of a license application. § 3011.

Second, and more relevant here, the regulations require that loan servicers "submit an annual report," including information regarding "[t]he number of student education loans sold, assigned, or transferred during the preceding calendar year,"

and "[a]ny other relevant information related to business operations required by the Commissioner by bulletin or notice." § 3014.2.

Third, the regulations impose a number of fees, including licensing fees (an initial application fee and a renewal fee), an annual assessment fee, and an examination fee (if one is conducted). ECF No. 19-15 § 3023.1. The annual assessment fee is a "variable amount based on the number of student loan borrowers serviced in the annual license period …." § 3015. The fees are due by November 15 of each calendar year after the period for which a student loan servicer maintains a license to operate in the District.

Fourth, the regulations also impose record keeping requirements. For example, they prescribe that "[e]xcept to the extent prohibited by federal law, for each student education loan sold, assigned, transferred, or serviced, a licensee shall retain records of each transaction for at least three (3) years after the final payment is made on the student education loan, or after the assignment or transfer of the student education loan, whichever occurs first." § 3018.1.

Fifth, the regulations also provide the Commissioner the discretion to "waive or reduce requirements in this section if the Commissioner determines that compliance would require the licensee to violate federal law." § 3018.4.

Sixth, the regulations provide DISB the authority to suspend or revoke a servicer's license if DISB finds that the servicer has committed a material violation of the terms of the regulations. DISB also is permitted to conduct examinations of servicers, and to investigate written complaints regarding servicers. § 3022.

II.    **The Federal Regulatory Structure**

The Higher Education Act (HEA) was created in 1965 to assist students with financing post-secondary education. Relevant here are two separate programs governed by parts of the HEA.

A.    **The Federal Family Education Loan Program**

The Federal Family Education Loan Program (FFELP) governs loans made to students by private lenders. The FFELP's purpose is:  "(A) to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions …, (B) to provide a Federal program of student loan insurance for students or lenders who do not have reasonable access to a State or private nonprofit program of student loan insurance …, (C) to pay a portion of the interest of loans to qualified students which are insured under this part, and (D) to guarantee a portion of each loan insured under a program of a State or of a nonprofit private institution or organization which meets the requirements of [this] section …." 20 U.S.C. § 1071(a)(1).

Legislative history provides additional context for those goals. According to the House Report accompanying the amendment to the HEA creating the FFELP in its current form, the program was intended to:  (1) correct inequities; (2) improve program integrity; (3) simplify the program for the borrower and other participants; and (4) ensure the stability in the loan program. H.R. Rep. No. 102-447, at 33 (1992). In particular, the report explained amendments were intended to enhance the integrity of student loan programs, given "student aid programs have been tarnished

6

by reports detailing the exploitation of students by unscrupulous schools, growing default costs, … and lenders with unacceptable default rates." *Id.* at 11.

In addition, the full context in which the goals of simplification and uniformity appear illustrates Congress's intent:

> H.R. 3553 simplifies the student financial aid programs. Many students and their families are denied access to student aid because they cannot navigate through the bewildering complexity of the current student aid forms and delivery system. This complexity has become a new barrier to educational opportunity. H.R. 3553 provides for dramatic simplification including a single free Federal form for applying for Federal student aid and a single need analysis and allows students to update their application from the prior year rather than filing a completely new application each year.

*Id.* Finally, the HEA instructs DOED to establish standardized forms and procedures regarding many aspects of the FFELP. *See* 20 U.S.C. § 1082(l).[4]

Under the FFELP, DOED is responsible for providing guarantees to lenders against losses, reinsuring loans, and subsidizing loans made by private and non-profit lenders. 34 C.F.R. § 682.100(a). In addition, DOED has purchased or assumed a number of FFELP loans. First Am. Compl. (Compl.) ¶ 29 (ECF No. 19). FFELP regulations govern eligible borrowers under the program, 34 C.F.R. § 682.201; charges by lenders to borrowers, § 682.202; disclosure requirements by lenders, § 682.205; payment of interest on certain FFELP loans, § 682.300; agreements between DOED and guaranty agencies, § 682.400; and DOED's ability to terminate or suspend

---

[4]     No new loans under the FFELP were issued as of July 1, 2010. 34 C.F.R. § 682.100(a). In 2010, Congress passed the Student Aid and Fiscal Responsibility Act, which terminated new FFELP loans. *See* Pub. L. 11-152, 124 Stat. 1029 § 2201 (2010).

lenders participating in the FFELP, § 682.700, *et seq.* In addition, regulations describe obligations on servicers of FFELP loans. *See* 34 C.F.R. § 682.208.

### B.   The Federal Direct Loan Program

Under the William D. Ford Federal Direct Loan Program (FDLP), DOED directly makes loans to student borrowers. While the statutory text of the FDLP does not include specific purposes or objectives, *see* 20 U.S.C. § 1087a-j, legislative history highlights Congress's intent. The FDLP was first piloted under the Higher Education Amendments of 1992. The report from the Committee on Education stated that the FDLP was intended to reduce overall costs and simplify the loan process by allowing institutions to originate loans, such that they would have "direct control over the timing and distribution of loan funds, enabling them to assist students better" and "reduce[] the amount of paperwork required." H.R. Rep. 102-447, at 46.

On May 5, 1993, the Student Loan Reform Act was introduced in the House of Representatives with the following text:

> The Student Loan Reform Act of 1993 replaces the current Federal Family Education Loan program with the Federal Direct Student Loan Program over a 4-year period. By eliminating subsidies to private lenders and making loans directly to students, direct lending will save taxpayers $4.3 billion through Fiscal Year 1998 and still allow interest rates to drop for student borrowers …. This reform simplifies the system for many students, enabling most to receive all their aid through 'one-stop shopping' at their institutions' financial aid offices.
>
> The lending reform expands choice and reduces burdens for all student borrowers by offering a variety of repayment plans …. [T]hese plans offer real choice to all and lower monthly payments to those who want them ….

139 Cong. Rec. H2297 (daily ed. May 5, 1993).[5]

Under the FDLP, DOED is responsible for all aspects of the lending process, from origination to repayment. 34 C.F.R. § 685.100(a). The HEA provides DOED with guidelines regarding the award of contracts for origination, servicing, and collection of FDLP loans. 20 U.S.C. § 1087f. FDLP regulations (which are separate from the regulations applicable to the FFELP) govern, among other things, borrower eligibility, 34 C.F.R. § 685.200; deferment and forbearance, §§ 685.204, 685.205; repayment plans, § 685.208; and participation in the FDLP by eligible schools, § 685.300. DOED is also authorized to enter into contracts with servicers, 20 U.S.C. § 1087f(a)(1). However, regulations do not define the terms of DOED's contracts with FDLP servicers. *See* 34 C.F.R. Part 685.

## III.   Plaintiff's Claims

Following initial briefing, *see* ECF Nos. 14, 16-18, and the filing of a first amended complaint, plaintiff now brings three preemption claims challenging D.C. Law 21-214 and the District's implementing regulations. First, plaintiff alleges that the District's regulations conflict with the functions and objectives of the HEA and federal regulations (Count I). Second, plaintiff alleges that field preemption prohibits the District from regulating student loan servicers altogether (Count II). Third,

---

[5]     When the bill was introduced in the Senate the next day, Senator Kennedy explained that the FDLP would "revise the current college student loan program" and "lower the interest rate charged to students by approximately half of 1 percent, saving students hundreds or even thousands of dollars over the life of the loan." 139 Cong. Rec. S5585 (daily ed. May 6, 1993) (statement of Sen. Kennedy). He added that "[t]he act will also streamline the system, and make it easier to audit and monitor." *Id.*

plaintiff alleges that at least some of the regulations are preempted because they conflict with an express preemption clause in the HEA, specifically 20 U.S.C. 1098g (Count III). Plaintiff also brings a generic claim for injunctive relief (Count IV).

Each of plaintiff's claims is based, at least in part, on a recent notice issued by DOED asserting that various preemption theories bar state regulation of federal student loan servicers. "Federal Preemption and State Regulation of [DOED's] Federal Student Loan Programs and Federal Student Loan Servicers," 83 Fed. Reg. 10619 (Mar. 9, 2018), ECF No. 19-19. In addition, on August 24, 2018, the United States filed a statement of interest (SOI) in this case pressing arguments supportive of plaintiff's claims. ECF No. 20.

## STANDARDS OF REVIEW

### I.   Federal Rule of Civil Procedure 12(b)(1)

A Rule 12(b)(1) motion may challenge the court's subject matter jurisdiction over a case or claim, including for lack of standing. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). As the party invoking the Court's jurisdiction, plaintiff must establish that the Court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted); *see also Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) ("the party claiming subject matter jurisdiction … has the burden to demonstrate that it exists").

In deciding a motion under Fed. R. Civ. P. 12(b)(1), the Court accepts all "well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir.

2016) (citations omitted). But it may "not assume the truth of legal conclusions," *id.* (citing *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), or "accept 'threadbare recitals of a cause of action's elements, supported by mere conclusory statements.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)).

## II.   <u>Federal Rule of Civil Procedure 12(b)(6)</u>

Dismissal of a claim or complaint is appropriate when a party has failed to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the factual allegations in the complaint must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "[B]ecause a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

In deciding the motion, a "court may consider … documents attached as exhibits or incorporated by reference in the complaint … or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 (D.D.C. 2011) (internal quotes omitted).

III.   <u>Federal Rule of Civil Procedure 56</u>

Summary judgment is appropriate if there is no genuine issue of material fact

in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a). Only material facts are capable of creating genuine disputes, and a fact

is material only if it affects the outcome of the suit under governing law. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Alexander v. WMATA*, 82 F. Supp. 3d

388, 391 (D.D.C. 2015) ("factual disputes that are irrelevant or unnecessary do not

affect the summary judgment determination").

## ARGUMENT

I.   <u>Plaintiff Lacks Standing to Assert Certain Challenges to the District's Regulations.</u>

### A.   <u>Plaintiff's Preemption Claims Are Based, in Part, on Hypothetical Harms.</u>

In two instances, plaintiff relies on hypothetical applications of the District's

regulations rather than alleging facts illustrating the specific effect on plaintiff's

member student loan servicers. The "triad of injury in fact, causation, and

redressability comprises the core of [Article] III's case-or-controversy requirement"

that must be satisfied in every judicial proceeding. *Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 86 (1998). The injury-in-fact element of standing requires an

allegation that is both "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical." *Interstate Nat. Gas Ass'n of Am. v. Fed. Energy*

*Regulatory Comm'n*, 285 F.3d 18, 45 (D.C. Cir. 2002) (citing *Lujan*, 504 U.S. at 559-

61). For an interest to be "particularized," it must "affect the plaintiff in a personal

and individual way," and to be "concrete," it must be a "de facto" injury, "that is, it

12

must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Especially in the preemption context, a "[s]peculative or hypothetical conflict is not sufficient: only State law that 'actually conflicts' with federal law is preempted." *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 957 (N.D. Cal. 2004) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).

First, as to the so-called "disclosure" requirements plaintiff challenges through its express preemption claim, plaintiff provides no allegations that DISB has actually required, through an investigation, examination, or document request, the hypothetical disclosures they fear. By its very terms, plaintiff's Complaint speaks to what a borrower or DISB *could* do and the potential harm that hypothetically *could* result. Compl. ¶¶ 244-45. But those allegations are insufficient to establish standing.[6] "[S]tanding cannot rest on a speculative chain of possibilities." *Williams v. Lew*, 77 F. Supp. 3d 129, 133 (D.D.C. 2015) (citation omitted); *see also Jones & Assocs., Inc. v. District of Columbia,* 797 F. Supp. 2d 129, 134 (D.D.C. 2011) ("Potential harms and possible placement in jeopardy are precisely the type of conjectural [and] hypothetical injuries that fail to satisfy Article III standing requirements.").

---

[6]     Plaintiff brings this case on behalf of its member student loan servicers under the principles of associational standing. Compl. ¶¶ 9, 13-16. "To establish associational standing, an organization must demonstrate" that, among other things, "at least one member would have Article III standing in his or her own right." *Cigar Ass'n of Am. v. U.S. Food and Drug Admin.*, 323 F.R.D. 54, 63 (D.D.C. 2017). To the extent that plaintiff's members lack standing to bring their claims, plaintiff as an association lacks standing as well. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).

Plaintiff may not simply rely on DISB's enforcement authority as an injury. "The degree by which the risk of harm has increased is irrelevant—instead, the question is whether the harm is certainly impending." *In re Science Applications Int'l Corp.*, 45 F. Supp. 3d 14, 25 (D.D.C. 2014). Indeed, by relying on hypothetical harms, plaintiff has improperly attempted to manufacture standing even though it cannot point to a concrete example of the regulatory action it challenges. *See Am. Chemical Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("It is not enough to show, as the dissent argues from its observation that petitioners are part of the industry being regulated by the Final Rules, that there is a substantial likelihood that at least one member may have suffered an injury-in-fact. Our standard has never been that it is likely that at least one member has standing."). And in any event, plaintiff's members would have the ability to raise express preemption as a defense in a hypothetical enforcement proceeding of the nature plaintiff speculates about in its lawsuit.

Second, plaintiff's conflict preemption claim also includes purely speculative allegations regarding the potential enforcement of DISB's regulations as to record requests. Compl. ¶¶ 181-82 (speculating on record requests that could require plaintiff's members to violate federal requirements). Here too, plaintiff lacks standing because it does not present a concrete and imminent injury-in-fact. Plaintiff fails to allege any instance where DISB has requested documents from a student loan servicer that are prohibited from release under DOED Privacy Act regulations. *See* 5 U.S.C. § 522a; 34 C.F.R. § 5b.1, *et seq.* There is no live controversy as to a potential

conflict between the application of the District regulations and the Privacy Act's restrictions on certain record disclosures. *See, e.g., State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015) ("It is premature for a court to consider the legality of how the Government *might* wield … authority in a *potential* future proceeding.").

In fact, two Privacy Act provisions show how plaintiff's concerns may never materialize. First, a borrower may give his or her consent for the release of information by DOED. 34 C.F.R. § 5b.9(a).[7] It is reasonable to assume that a borrower who is concerned enough about the servicing of his or her loan to submit a written complaint to DISB would be willing to provide consent for the release of information to be used in addressing that complaint. Second, DOED's implementing regulations provide for disclosure of records "to another government agency … for a civil … law enforcement activity if the activity is authorized by law, and if the head of such government agency or instrumentality has submitted a written request to [DOED] specifying the record desired and the law enforcement activity for which the record is sought." 34 C.F.R. § 5b.9(b)(7); *see also* 5 U.S.C. 552a(b).

**B.    Plaintiff's Members Must Be Licensed Regardless of Whether They Service Federal Loans.**

Plaintiff also lacks standing to allege that the District's regulations conflict with DOED's ability to choose which servicers it contracts with. Compl. ¶¶ 173, 180 (alleging that the District regulations' licensing requirements allow the District to

---

[7]    The DOED memorandum regarding Privacy Act requirements merely recites the agency's statutory and regulatory obligations. *See* ECF No. 19-17.

improperly second-guess DOED's contracting determination). Standing not only requires an injury-in-fact, but also "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560-61. Here, plaintiff's claim is based on a faulty assumption: that plaintiff's members do not service private loans, the servicing of which would require licensing under the District's regulations irrespective of whether they service federally-owned loans.

In particular, and as plaintiff acknowledges, its members also service private loans, as well as private FFELP loans not owned by DOED. Compl. ¶¶ 9 n.2, 20; *see also* ECF No. 20 at 3-4. In particular, DOED contracts with nine servicers to manage FDLP loans and FFELP loans owned by DOED. ECF No. 20, at 4 n.5. But those nine federal servicers, *see* ECF No. 20-1 ¶ 5 (listing servicers), also service private loans in the District of Columbia. *See* Ex. A, Charles Burt Decl. ¶ 8. In other words, plaintiff's members' contracts with DOED were not the "but-for" cause of the requirement they obtain licenses to operate in the District. *See Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 666 (E.D. Pa. 2015) ("The 'fairly traceable' requirement of Article III causation has been described as 'akin to "but for" causation.'") (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d. Cir. 2013)).

Were plaintiff's members not federal contractors, they would still be required to obtain a license to operate in the District of Columbia based on their servicing of

private loans.[8] *See also* ECF No. 20, at 10 n.15 (acknowledging limitation of position as to only "servicing of federally managed student loans."). As such, plaintiff cannot prove causation as it relates to its claim of harm resulting from interference with federal contracting decisions. Indeed, even if plaintiff could prove causation, enjoining application of the District's regulations' licensing requirements as to plaintiff's members' servicing of federal loans would not obviate their requirement to obtain licenses. *Lujan*, 504 U.S. at 560-61 ("it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

## II. <u>Plaintiff's Preemption Claims Have No Merit.</u>

Congress's preemption of state law can take two forms:  express or implied. *Sickle v. Torres Advanced Enter. Solutions, LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018). Express preemption occurs when Congress "enact[s] a statute containing an express preemption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Implied preemption, on the other hand, "supplants state law not through an explicit statutory provision, but through the substantive nature and reach of the federal regulatory scheme that Congress adopts." *Sickle*, 884 F.3d at 346. Congress "may do so either through 'field' pre-emption or 'conflict' pre-emption." *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015). Irrespective of the particular theory, "'the purpose of

---

[8]      Indeed, one case relied upon by DOED, *U.S. v. Commonwealth of Va.*, 139 F.3d 984, 987 (4th Cir. 1998), limited its holding to the preemption of state licensing requirements for private investigators working *solely* for the federal government.

Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).[9]

Further, courts must take into account "the presumption against preemption, which demands that 'in all pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied' without enacting an express preemption provision, the court must assume 'the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Comm'rs Import Export S.A.*, 757 F.3d at 333 (quoting *Wyeth*, 555 U.S. at 565). Consumer protection is "an area that is traditionally within the state's police powers to protect its own citizens." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011). Federal law therefore cannot preempt the "historic police powers of states" absent a "clear and manifest" indication of Congressional preemptive intent. *Medtronic*, 518 U.S. at 485.

A.   <u>**Plaintiff's Express Preemption Claim Is Contrary to the Plain Meaning of the Federal Statute On Which It Relies.**</u>

Plaintiff alleges that express preemption forecloses the District's regulations because 20 U.S.C. § 1098g provides that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act … shall not be subject to any disclosure requirements of any State law." *See* Compl. ¶ 219. But plaintiff overreads that provision and would have this Court interpret the phrase "disclosure requirements" to encompass all manner of state regulation of student loan

---

[9]   Although the District is not a state, "[t]raditional preemption principles apply to District of Columbia laws." *Comm'rs Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D C. Cir. 2014).

servicing, including regulations that permit document production or retention requests unrelated to communications to borrowers from lenders or servicers about the terms of their loans. *Id.* ¶ 223 (referring to disclosures to "third parties, such as state agencies"). Such a reading is not supported by that provision's text, legislative history, or context.

This is especially so because "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). In addition, and to the extent plaintiff has standing to bring this claim at all, it faces an uphill climb, given that "[t]o succeed in a typical facial attack, [a plaintiff] must establish 'that no set of circumstances exists under which [the challenged regulations] would be valid or that the statute lacks any plainly legitimate sweep.'" *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) (citing *United States v. Stevens*, 559 U.S. 460, 472 (2010)). Both the presumption against preemption and the demanding standard to succeed in a facial challenge caution against adopting plaintiff's overbroad interpretation.

1.     20 U.S.C. § 1098g Does Not, by Its Terms or Structure, Support Plaintiff's Express Preemption Claim.

In particular, plaintiff takes issue with the District's regulations' annual reporting, notification, record maintenance, and examination requirements, as well as DISB's ability to investigate written borrower complaints. Compl. ¶¶ 233-34.[10]

---

[10]     Plaintiff also challenges DISB's Student Borrower's Bill of Rights, claiming the Bill of Rights defines the scope of the purported disclosure requirements, but it later admits it is a "functionally aspirational document." *Id.* ¶ 236.

Plaintiff complains that "the licensing scheme is built around servicers providing disclosures to borrowers and the District of Columbia government that are not included in the HEA and its implementing regulations." *Id.* ¶ 245. But the statutory provisions and regulations plaintiff takes issue with are not—textually or operationally—disclosure requirements within the meaning of § 1098g for three reasons.

First, by its plain text and ordinary meaning, § 1098g applies only to "disclosures" from lenders or servicers to borrowers about the terms of borrowers' loans. *See U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 145 (D.D.C. 2015) ("[Statutory interpretation] inquiry begins where all such inquiries must begin: with the language of the statute itself.") (citation omitted). "Disclosure" is defined as "[t]he action or fact of disclosing or revealing new or secret information" or "the action of making something openly known."[11] That definition applies to particular information, not record requests more generally.

In addition, Congress is assumed to adopt a term's ordinary or common meaning. *See Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 158 (D.C. Cir. 1984) ("To determine the meaning of statutory terms, a court may consider the common usage of the term."). In the context of loans regulated by the Truth in Lending Act

---

[11] *See* Oxford English Dictionary Online, *available at* http://www.oed.com/view/Entry/53779?redirectedFrom=disclosure#eid (last accessed Sept. 4, 2018).

(TILA),[12] the term "disclosure" relates to communications from lenders to borrowers about financial terms. *See Solomon v. Falcone,* 791 F. Supp. 2d 184, 188 (D.D.C. 2011) ("In passing TILA, Congress sought to ensure the accurate and meaningful disclosure of material terms to consumers in credit transactions.") (citing 15 U.S.C. § 1601); *see also United States v. Petroff-Kline*, 557 F.3d 285, 294-95 (6th Cir. 2009) (summarizing TILA disclosure requirements); *Thompson v. HSBC Bank USA, N.A.*, 850 F. Supp. 2d 269, 276 (D.D.C. 2012) (same); *Doggett v. Ritter Fin. Co. of La.*, 384 F. Supp. 150, 153 (W.D. Va. 1974) (*rev'd in part* by *Doggett v. Ritter Fin. Co. of La.*, 528 F.2d 860 (4th Cir. 1975)) ("'Disclosure' under the [TILA] is a term of art which refers to the manner in which certain information, deemed basic by Congress to an intelligent assessment of a credit transaction, shall be conveyed to the consumer."). As a result, a reasonable understanding of the term "disclosure" in § 1098g based on how the term is used in lending is that states may not impose additional requirements on the communications lenders or servicers must make to student loan borrowers about the content and terms of their loans. D.C. Law 21-214 and the District's regulations do not require student loan servicers to make additional disclosures within that common meaning.

Second, when Congress uses the same term in different parts of the same statute, the term is generally presumed to mean the same thing. *See Ne. Hosp. Corp.*

---

[12]     Title I of the Consumer Credit Protection Act, 15 U.S.C. § 1601, is known as the TILA, and was enacted to "safeguard the consumer in connection with the utilization of credit by requiring full disclosure of the terms and conditions of finance charges in credit transactions or in offers to extent credit. 90 P.L. 321, 82 Stat. 146.

*v. Sebelius*, 699 F. Supp. 2d 81, 94 (D.D.C. 2010) (referencing the rebuttable presumption that the "same defined term in different provisions of the same statute must be interpreted identically."). 20 U.S.C. § 1083 specifies the various disclosures a servicer of FFELP loans must make; it delineates the specific types, timing, and content of disclosures made by servicers *to borrowers*.[13] 34 C.F.R. § 682.05 reiterates those disclosure requirements. Both make clear that the term "disclosure" in § 1098g solely references communications from *lenders or servicers* to *borrowers*, and, in particular, the information a lender must provide a borrower before disbursement of funds, before repayment, and during repayment (including when a borrower is having difficulty making payments). Nothing in the statutory structure indicates that the term "disclosure requirements" was intended to apply more broadly to other information, including communications between servicers and state regulators.

Plaintiff proffers several provisions that it contends constitute "disclosures." *See* Compl. ¶ 225 n.9. But, unlike § 1083, none of those provisions even uses the word "disclosure." Instead, the provisions involve, for example, data collection from lenders (not servicers), 20 U.S.C. § 1082(c)(2), as well as requirements on reporting to DOED and record retention requirements. *See, e.g.*, 34 C.F.R. §§ 682.208(i), 682.414. They do not purport to be disclosure obligations.[14] *See Kouichi Taniguchi v. Kan Pac.*

---

[13]   The relevant regulations for the FDLP do not specify the disclosures a student loan servicer must make. However, 20 U.S.C. § 1097e(p) provides that the disclosure requirements in § 1083 also apply to the FDLP.

[14]   In addition, those regulations are inapposite to answering the question of Congressional intent as to enactment of a specific statutory provision that pre-dated most of the citations offered by plaintiff. Congress cannot possibly adopt a

*Saipan, Ltd.*, 566 U.S. 560, 568 (2012) ("That a definition is broad enough to encompass one sense of a word does not establish that the word is ordinarily understood in that sense").

Third, statutory context provides clarity as to Congress's intent. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (citations omitted). Section 1098g was first codified at U.S. Public Law 97-320, § 701 (Oct. 15, 1982). That provision was an amendment to the TILA, and § 701(b) exempted HEA loans from the "disclosure requirements of any State law." *Id.* In addition, however, it also exempted HEA loans from the disclosure requirements of the TILA. Pub. L. 97-320, § 701(a) (currently codified at 15 U.S.C. § 1603(7)). Those TILA disclosure requirements were, in turn, designed to "benefit consumers by providing a more useful basis for credit decisions" and mandated "that disclosures be provided *before* consummation of the transaction." 46 Fed. Reg. 20884, 20873 (Apr. 7, 1981) (emphasis added). In exempting HEA loans from those requirements, the Senate explained that HEA loans "are already subject to statutory provisions and regulations that provide comparable disclosures and explicit controls over the issuance of loan

---

construction that has yet to be expressed. *See, e.g.*, *Phillips v. E.I. Dupont De Nemours & Co.*, 497 F.3d 1005, 1019 (9th Cir. 2007) ("Congress could not have considered whether or not the government contractor defense would affect liability under the [statute], because the Supreme Court defined the defense only a few weeks before").

proceeds to student consumers," making the TILA regulations "duplicative and unnecessary." S. Rep. 97-536 (Sept. 3, 1982).

As such, it is reasonable to interpret that Congress also viewed HEA disclosure requirements as applying only to the "issuance" of loans to borrowers. Plaintiff's express preemption claims, challenging District regulations that require reporting by student loan servicers to DISB, not communications to borrowers, are contrary to the statute and without merit.

### 2.  Prior Decisions Fail to Support Plaintiff's Position.

Even the decisions cited by plaintiff do not support its conclusion. For example, although plaintiff relies heavily on *Chae v. SLM Corp.*, there, the Ninth Circuit merely remarked that "plaintiff's claims challenging language in Sallie Mae's billing statements and coupon books are restyled improper-disclosure claims, and are therefore subject to express preemption under 20 U.S.C. § 1098g." 593 F.3d 936, 943 (9th Cir. 2010). In other words, the *Chae* court applies what the statute says: states may not impose more stringent disclosure requirements on student loan servicers than those provided for in federal law. *Id.* And the other cases relied on by plaintiff do not go beyond this conclusion. *See, e.g.*, *Linsley v. FMS Inv. Corp.*, Civil Action No. 11-961, 2012 WL 1309840, at *5 (D. Conn. 2012) ("claim is predicated on [servicer's] failure to properly disclose the HEA's requirements for loan consolidation and rehabilitation"); *Genna v. Sallie Mae, Inc.*, Civil Action No. 11-7371, 2012 WL 1339482, at *8 (S.D.N.Y. 2012) (finding § 1098g applied to claims arguing "billing statements, coupon books and standardized forms" required by federal law were

misleading, but that statute did not apply to "how a customer service representative of a third-party loan servicer like Sallie Mae shall interact with a customer … in the day-to-day servicing of his loan").

Similarly, the district court decision in *Nelson* (ECF No. 19-16), solely addressed the defendants' contention that "the manner in which [the servicer] interacts with borrowers" was regulated by DOED. *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, Civil Action No. 17-183, 2017 WL 6501919, at *3, 5-6 (N.D. Ill. 2017). And contrary to what plaintiff claims, the *Nelson* court employed a far narrower definition of the term "disclosure." *Id.* at *4 (citing 34 C.F.R. § 682.205 as defining scope of disclosures lenders must make to borrowers).

Nothing in those cases alters the long-standing presumption against preemption. *See Com. of Mass. v. U.S. Dep't of Transp.*, 93 F.3d 890, 895 (D.C. Cir. 1996) ("the long-standing presumption against preemption, reinforced by [Supreme Court's direction that courts should be "reluctant" to find preemption], would seem to demand that we reject an interpretation that would preempt not only [a state's] rule, but virtually all other state regulation."). Plaintiff's argument instead runs in the opposite direction, and asks the Court to improperly construe § 1098g as broadly as possible, a reading rejected by other courts.

In addition, plaintiff relies heavily on the explanation in the DOED notice that the disclosure requirement under § 1098g applies to communications between servicers and "third parties, such as credit reporting bureaus." ECF No. 19-19. But that interpretation is entitled to no deference to the extent it is contrary to the text

25

or structure of § 1098g. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue."). DOED fails to explain its reading of the statute, or why the text and legislative history support its conclusion. Such a conclusory statement does not constitute an exercise of DOED's administrative expertise warranting deference.[15]

### B.   Plaintiff's Field Preemption Claim is Contrary to Courts' Consistent Findings.

Plaintiff also alleges that the District's statute and regulations are preempted under field preemption. Compl. ¶¶ 193-94. "Field preemption will be found where 'a framework of regulation' is 'so pervasive' that it leaves no space for state supplementation, or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" *Sickle*, 105 F.3d at 347 (citations omitted). "Field preemption thus forecloses state regulation altogether in an area of law, such as alien deportation or nuclear safety regulation, irrespective of a state law's compatibility with the federal regime." *Id.*

As an initial (and dispositive) matter, courts, including the D.C. Circuit, have consistently found that the HEA does not support a finding of field preemption. *See Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.*, 168 F.3d

---

[15]   DOED's notice can also be read as not inconsistent with the statutory text, given it simply explains that "[t]o the extent that State servicing laws attempt to *impose new prohibitions* on misrepresentation or the omission of material information, those laws would also run afoul of the express preemption provision in 20 U.S.C. 1098g." ECF No. 19-19. Such a reading is consistent with the presumption against preemption.

1362, 1369 (D.C. Cir. 1999) (citing *Jackson v. Culinary Sch.*, 27 F.3d 573, 580-81 (D.C.

Cir. 1994) (*vacated on other grounds*, 515 U.S. 1139, *on reconsideration*, 59 F.3d 254

(D.C. Cir. 1995)) ("Because Congress carved out particular contexts in which the HEA

has preemptive effect, the conclusion is virtually inescapable that Congress did not

intend to give the HEA preemptive effect in every context.")). As the Ninth Circuit

explained, the implication that Congress intended to occupy the field "cannot be

reconciled with the narrow and precise preemptions expressed. It is apparent from

the language of the express preemption clauses that Congress expected state law to

operate in much of the field in which it was legislating." *Keams v. Tempe Tech. Inst.,*

*Inc.*, 39 F.3d 222, 225-26 (9th Cir. 1994); *see also Chae,* 593 F.3d at 941-42 ("field

preemption is off the table to resolve this case involving the HEA and its attendant

federal regulations.").[16]

    To rebut this conclusion, plaintiff instead notes the size of the outstanding

national student loan debt, and claims that a sufficient number of alleged conflicts

equates to Congressional intent to occupy the field. Compl. ¶¶ 197, 202, 209. As the

decisions cited above explain, however, the HEA was not structured in a manner

---

[16]    Numerous courts have reached this same conclusion. *See College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 596 n.5 (4th Cir. 2005) ("Because Congress deemed it necessary to specifically preempt certain state laws, it is clear that Congress could not have intended the HEA to so 'occupy the field' that it would automatically preempt all state laws."); *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1126 (11th Cir. 2004); *Genna*, 2012 WL 1339482, at *7 ("No court in any circuit that has considered the matter … has found that field preemption applies to the HEA."). In addition, in 2015 the Consumer Financial Protection Bureau explained that "[f]or student loan borrowers, there is no existing comprehensive federal statutory or regulatory framework providing uniform standards for the servicing of all student loans." 80 Fed. Reg. 98, 29302, 29305 (May 21, 2015).

consistent with such intent. And field preemption is based on Congressional intent, not a plaintiff's alleged conflicts. *See Arizona*, 567 U.S. at 401 ("Field preemption reflects a *congressional* decision to foreclose any state regulation in the area, even if it is parallel to federal standards.") (emphasis added). Indeed, DOED's regulations are inconsistent with field preemption as they both acknowledge the role of state law, *see* 34 C.F.R. § 682.401 (requiring FFELP guaranty agencies to meet requirements of federal and state laws), and explicitly preempt other state laws where necessary. *See* 34 C.F.R. § 682.410 (identifying specific debt collection provisions that preempt state law).[17]

Finally, plaintiff relies on *Boyle* to broadly apply its novel theory of field preemption based on DOED's contractual administration of the FDLP. *See Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988). But *Boyle* is largely inapposite to the issues presented in this matter. That case found preemption of state tort actions by "federal common law" because of "uniquely federal interests" in defense contracts. *Id.* at 504 (citations omitted).[18] *See Aegis Defense Servs., LLC v. Chenega-Patriot Group, LLC,*

---

[17]   Plaintiff also attached to its Complaint another U.S. SOI filed in litigation brought by the state of Massachusetts. *See* ECF No. 19-18, SOI, *Commw. of Mass. v. Penn. Higher Education Assistance Agency*, Civil Action No. 1784-2682 (Mass. Super. Ct. Jan. 18, 2018). That SOI, however, does not even reference field preemption. If field preemption applied, the U.S. would have had no reason to engage in a conflict preemption analysis.

[18]   Any federal interest in regulating student loan servicers cannot compare with those interests courts have found justified field preemption. *See Arizona*, 567 U.S. at 400-01 (federal regulation of alien registration occupied field because there is a "single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders."); *Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009) (unique federal interest in "detention of enemy combatants"); *but see Hillsborough Cnty., Fla. v. Automated Med. Lab., Inc.*, 471 U.S. 707, 719 (1985)

141 F. Supp. 3d 479, 488 (E.D. Va. 2015) ("Importantly, *Boyle* stands for a very narrow proposition:  Federal common law applies 'whenever the allegedly tortious decisions attributed to the contractor are actually discretionary decisions made by the government itself.'"). Here, the interests at hand are distinct from performance of Department of Defense procurement contracts and the scope of liability for federal officials and defense contractors. *Boyle*, 487 U.S. at 505.[19] And even if read generously, *Boyle* does not support field preemption, given it applied conflict preemption principles (albeit heightened ones) to a determination of whether state tort law was displaced. *See id*. at 507-08 ("to put the point differently, the fact that the area in question *is* one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can. But a conflict there must be.").[20]

## C.   Plaintiff's Conflict Preemption Claim is Unsupported by Statutory or Regulatory Text or Congressional Intent.

Conflict preemption "exists where the operation of federal and state law clash in a way that makes 'compliance with both state and federal law … impossible,' or

---

("the regulation of health and safety matters is primarily, and historically, a matter of local concern").

[19]    In addition, despite DOED's claims regarding an interest in contractor liability, the Supreme Court has made clear that a contractor does not acquire immunity for acts, such as affirmative misrepresentations, beyond the scope of its contract. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-73 (2016).

[20]    An analysis of whether specific FDLP contract provisions prohibit particular state regulations is one falling under conflict, not field, preemption. And the FDLP contract incorporated by reference by plaintiff explains that servicers must maintain compliance with state laws. *See* ECF No. 19-1, at 20, § C.1.4.3.

when 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Sickle*, 884 F.3d at 347 (citing *Oneok*, 135 S. Ct. at 1595)). Plaintiff's conflict preemption claim alleges the District's regulations directly conflict with federal law, as well as Congress's purposes and objectives. In both instances, plaintiff is incorrect.

### 1. Plaintiff Fails to Establish Any Direct Conflicts Between the District's Regulations and Federal Law.

Plaintiff takes issue with a number of specific provisions including, among other things, the District's regulations' recordkeeping and record production requirements and the ability for DISB to conduct examinations of student loan servicers. Compl. ¶¶ 174, 178, 181-82.

As an initial matter, plaintiff fails to specifically describe how the District's regulations conflict with the statutes and regulations governing FFELP or FDLP loans. Although plaintiff relies on the DOED notice to enumerate FFELP conflicts, the District's regulations do not:   (1) require servicers to respond to borrower complaints in a specified time; (2) impose deadlines for notification of transfer between servicers; (3) impose dispute resolution procedures; (4) require communication with authorized representatives of a borrower; or (5) impede guaranty agency collection charges or servicers' duty to perform due diligence in the collection. *See* ECF No. 19-19; *see generally* ECF No. 19-15. As for the FDLP, plaintiff points to DOED's position that state requirements that impose deadlines on servicers to respond to complaints or establish deadlines for completing transfers of loans conflict with federal requirements. But the District's regulations do neither. *See id.*

30

The crux of plaintiff's direct conflict argument, then, is that the District's regulations impose record retention requirements that conflict with the Privacy Act. As an initial, and dispositive, matter, DISB's regulations include a provision stating that student loan servicers shall retain records "[e]xcept to the extent prohibited by federal law." ECF No. 19-15 § 3018.1. A failure by DISB to cede to a federal prohibition on document retention or release would not constitute a violation of the Supremacy Clause, but simply a failure by the agency to comply with the terms of its own regulations. And, as described above, plaintiff cannot rely on a hypothetical scenario to manufacture a conflict.

Similarly, plaintiff's claim also improperly defines the scope of the Privacy Act. But an array of potential records—including servicers' business and financial documents and loan records that do not contain personal borrower information— facially fall outside the purview of the statute and are subject to request by DISB during an examination. *See id.* § 3021.1. "The Privacy Act of 1974 governs federal agencies' acquisition, maintenance, use and disclosure of information concerning *individuals.*" *Alexander v. F.B.I.*, 971 F. Supp. 603, 605 (D.D.C. 1997) (emphasis added). "Put simply, the Act 'safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records … by allowing an individual to participate in ensuring that his records are accurate and properly used.'" *McCready v. Nicholson,* 465 F.3d 1, 7-8 (D.C. Cir. 2006) (quoting *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984)). The Privacy Act does

31

not preempt the requirement to maintain information aside from personal borrower information.

Finally, the U.S. SOI is incorrect that specific FDLP contract terms themselves have preemptive effect. ECF No. 20 at 22. In general, "federal law capable of preempting state law is [not] created every time someone acting on behalf of an agency makes a statement or takes an action within the agency's jurisdiction." *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 245 (3d. Cir. 2008). Here, the U.S. essentially argues that terms in a private contract, negotiated without public comment or congressional oversight, should supersede validly-enacted state laws. To that end, in 2005 then-Judge Sotomayor stated that "[t]here is no constitutional basis for making the terms of contracts with private parties … 'supreme' over state law." *Empire HealthChoice Assurance, Inc. v. McVeigh*, 396 F.3d 136, 143 (2d. Cir. 2005) (aff'd, 547 U.S. 677). And in any event, an actual conflict is still required.

### 2.   The Alleged Obstacles Identified by Plaintiff and DOED Do Not Support Broad Preemptive Effect.

Plaintiff also alleges that the District's regulations conflict with the HEA's purposes and goals of:  (1) uniformity; (2) ease of administration (or streamlining); (3) saving taxpayer money; (4) ensuring the repayment of federal student loans; and (5) allowing the federal government to contract with FDLP servicers. Compl. ¶¶ 171-80. As described below, each claimed objective is misstated or overstated, especially when applied to the specific content of the District's regulations.

Plaintiff's claims rest largely, if not wholly, on DOED's recent preemption notice. ECF No. 19-19. But, that notice should be given little deference, if any, by this

Court. Although published in the Federal Register, the notice did not undergo the typical process for legislative rulemaking (*i.e.*, notice-and-comment). As such, to the extent the notice constitutes a formal administrative decision with preemptive effect, DOED's action is unlawful. *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established that an agency may not escape the notice and comment requirements … by labeling a major substantive legal addition to a rule a mere interpretation."). Said differently, "[l]imiting the preemptive power of federal agencies to exercises of formal rulemaking authority … ensures that the states will have enjoyed [administrative] protections before suffering the displacement of their laws." *Good v. Altria Group, Inc.*, 501 F.3d 29, 51 (1st Cir. 2007).

And even if the notice constitutes merely interpretive guidance (despite DOED's effort to cloak it in the trappings of formal rulemaking), it is entitled to little deference on its merits. Courts do not "defer[] to an agency's *conclusion* that state law is preempted," instead examining "an agency's explanation of how state law affects the regulatory scheme." *Wyeth* 555 U.S. at 576. Thus, an agency's explanation is only afforded deference based on its "thoroughness, consistency, and persuasiveness." *Id.* at 577 (citing *U.S. v. Mead Corp.*, 533 U.S. 218, 234-35 (2001); *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)); *see also Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 21 (D.C. Cir. 2017) (discussing level of deference owed to agency interpretation of express preemption clause); *Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 116 (1st Cir. 2015) ("the courts of appeals have been unanimous in concluding that *Chevron* deference does not apply to preemption decisions by federal agencies."). Under that standard,

33

DOED's notice does not warrant this Court's deference as it is inconsistent with the agency's past positions, not based on statutory and regulatory analysis, and grounded in conclusory statements regarding the scope of the HEA's preemptive reach. *See, e.g., Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 341 (3d. Cir. 2009) (no deference to FDA policy statement lacking "fairness and deliberation").

### i.    The DOED Notice Is an Unexplained Change in Position.

As an initial matter, the notice represents an unexplained change in position (as do the two recent SOIs, ECF Nos. 19-18, 20). In 2015, the United States, through the U.S. Attorney's Office for the Southern District of New York, filed an SOI in a lawsuit challenging the lending practices of a for-profit college. *See* Ex. B, U.S. SOI, *Sanchez, et al. v. Asa College, Inc.*, Civil Action No. 14-5006 (S.D.N.Y. Jan. 23, 2015). There, the U.S. took the position that "[n]othing in the text of the HEA or its legislative history even suggests that the HEA should be read to preempt or displace state or federal laws. Nor is there anything in the HEA or its regulations promulgated thereunder to evince any intent of Congress or [DOED] that the HEA or its regulations establish an exclusive administrative review process of student claims brought under state or federal law, even if the conduct alleged may separately constitute an HEA violation." Ex. B, at 2-3.

Similarly, in response to a December 30, 2015 letter from Assistant Commissioner Jedd Bellman of the Maryland Office of the Commissioner on Financial Regulation regarding whether FDLP servicers were subject to the Maryland Collection Agency Licensing Act, DOED explained that it did "not believe

that the State's regulation of those entities would be preempted by Federal law. Further, such regulation would not conflict with [DOED's] contracts with those entities, which provide generally that loan servicers … must comply with State and Federal law." Ex. C, at 2. Last, on July 20, 2016, DOED Under Secretary Ted Mitchell issued a memorandum explaining that "[s]ervicing contractors should comply with federal and state law, taking any necessary steps to support oversight by federal or state agencies, regulators, or law enforcement officials. Student loan servicers and other service providers, including sub-servicers, subcontractors, and other providers of specialty student loan servicing functions should meet all applicable requirements set forth by federal law. [DOED] shall codify the importance of cooperation with federal and state authorities in any agreement to provide services on behalf of borrowers." Ex. D, at 38, *available at* https://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf.

DOED's notice and the two recent SOIs do not even acknowledge that the notice constitutes a dramatic change in position, given DOED now believes all state regulation of federal student loan servicers is prohibited.[21] For this reason alone, the notice merits no deference, as it represents an unexplained "dramatic change in position." *Wyeth*, 555 U.S. at 580. While "[a]gencies are free to change their existing policies" they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Said differently, an agency

---

[21]    DOED withdrew the July 20, 2016 memorandum stating only that withdrawal was necessary to "negate any impediment, ambiguity or inconsistency." *See* https://www2.ed.gov/documents/press-releases/student-loan-servicer-recompete.pdf.

must display an "awareness that it *is* changing position" and not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009). Here, DOED's notice does not even acknowledge the change in policy, let alone explain why the agency's reading of the relevant statutes and regulations changed in the past three years.

> ii. **The Notice Is Not Entitled to Deference on the Merits as it Lacks Persuasive Analysis of the Statutory and Regulatory Context and Instead Includes Only Conclusory Statements.**

Moreover, the notice's persuasiveness is limited at best, given its paucity of statutory and regulatory analysis and the fact it is inconstant with the very provisions it purportedly interprets. "An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Gonzalez v. Oregon*, 546 U.S. 243, 257 (2006). The DOED notice is, at base, a collection of self-serving conclusions, bereft of statutory and regulatory interpretation.[22]

> a. **Plaintiff Overstates and Mis-applies the Goal of "Uniformity."**

Plaintiff's argument (and the DOED notice upon which it relies) hinges on an application of the goal of "uniformity" that originates in *Chae*, 593 F.3d 936. *See*

---

[22]   And the HEA and DOED's regulations are not the type of technical, extensive, and complex rules that warrant deference to an agency's expertise. *But see Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 883 (2000) (deference given to agency's interpretation of safety and airbag regulations due to complex regulatory history and necessity of balancing public health risks and benefits).

Compl. ¶ 191; ECF No. 19-19, at 10621. In other words, plaintiff broadly promotes DOED's position that "[a] requirement that Federal student loan servicers comply with 50 different State-level regulatory regimes would significantly undermine the purpose of the [FDLP] to establish a uniform, streamlined, and simplified lending program managed at the Federal level." *Id.*

But taking *Chae* on its merits, plaintiff (and by extension DOED) reads the case much too broadly and out of context. The "uniformity" discussion in *Chae* occurred in the context of California rules that sought to alter specific aspects of loan servicing (*i.e.*, efforts to prohibit a servicer from assessing late fees and state laws that conflicted with the servicer's practice of setting the first repayment date and charging interest until that date). 593 F.3d at 940. The court analyzed the federal regulations governing FFELP loans and found that the federal positions on late fees and repayment start dates were clearly set out in regulations, and that as to the calculation of interest, application of state law would conflict with a calculation method that regulations made a "practical requirement." *Id.* at 948. For all the discussion of "uniformity," the court reached a fairly unremarkable position:  state law could not conflict with specific federal regulations setting forth the mechanics of loan repayment. Applied here, the issues identified by the court in *Chae* as endangering "uniformity" are not present. As described above, the District's regulations do not conflict with DOED's regulations mandating the specific content of loans or repayment terms, making plaintiff's reliance on the case's actual holding inapposite.

Further, the statutory analysis in *Chae* does not support plaintiff's attempt to extend the uniformity principle to preempt all state regulation of loan servicers. *See Atherton v. F.D.I.C.*, 519 U.S. 213, 220 (1997) ("To invoke the concept of 'uniformity' … is not to prove its need."). The *Chae* court began by examining the HEA's statutory purposes (discussed above at 20 U.S.C. § 1071(a)(1)), *id.* at 944, and adopted DOED's view that because the HEA "describe[s] the nuts and bolts of the FFELP," including defining required terms of loans and mandating specific repayment terms, "Congress intended that the core aspects of the FFELP be uniform." *Id.*[23]

But despite those routine findings, the court then broadly implied that it was improper to "subject a national-level lender to the potentially varying laws of fifty states …." *Id.* at 946. The statement ignores that *which* state laws are at issue is crucial (as many do not affect the "nuts and bolts" of loan programs), and it also overstates the statutory context. That a statute describes the details of the program it creates and establishes minimum standards, including the use of common forms and procedures, does not warrant inference of overarching preemptive intent beyond compliance with those requirements. Indeed, to the extent that Congress intended uniformity, it is unclear such uniformity was intended to extend beyond loan origination at all. *See* 20 U.S.C. § 1082(m)(1)(A) ("[DOED] … shall prescribe common

---

[23]     The court also pointed to DOED's authority to "prescribe regulations necessary 'to establish minimum standards' for lenders and servicers," 20 U.S.C. § 1082(a)(1), the requirement that DOED develop standardized forms and procedures for all aspects of the loan process involving lenders and guaranty agencies, § 1082(l)(2)(A), and the requirement that common application forms and promissory notes be used, §1082(m)(1)-(3). *Id.*

application forms and promissory notes, or master promissory notes, to be used for applying for loans under this part."). In fact, uniformity is mentioned only a handful of times in the entire section of the HEA dedicated to student assistance programs.[24] It is never mentioned in the FDLP section, *see* 20 U.S.C. § 1087a-j, and where mentioned elsewhere primarily addresses requiring lenders and guaranty agencies to use uniform reporting formats, not regulation of servicers by states. As such, plaintiff's and DOED's attempt to extend the findings in *Chae* is not supported by the statutory text. Indeed, the Fourth Circuit was "unable to confirm that the creation of 'uniformity,' … was actually an important goal of the HEA." *College Loan Corp.*, 396 F.3d at 597. To that end, the court explained that "[t]he existence of comprehensive federal regulations that fail to occupy the field do not, by their mere existence, preempt non-conflicting state law." *Id.* at 598. So too here. This Court should decline to extend *Chae* beyond its context.

> ### b.   The DOED Notice Describes Goals of Simplification and Saving Taxpayer Money That are Out of Context.

In addition, DOED's alleged goals of simplification, saving taxpayer money, and ensuring repayment of federal loans are based on an incomplete (if not incorrect) reading of the HEA's text and legislative history. As to the alleged goal of

---

[24]   For example, 20 U.S.C. 1087dd(c)(3)(B):   "Pursuant to uniform criteria established by the Secretary, the repayment period for any student borrower who during the repayment period is a low income individual may be extended …."; 20 U.S.C. § 1070a-27(b)(2):   "Evaluation of activities under this section should be done with consistent and uniform data protocols and procedures."

simplification, the actual legislative history states the FDLP was intended "to simplify[] the *delivery* of student loans to borrowers and eliminate confusion." 139 Cong. Rec. S5585 (emphasis added). In addition, Senator Kennedy stated that "the Federal Government should simplify the process by which a student and his or her parents can *obtain* loans for the student's postsecondary education." *Id*. Absent is any mention of simplicity or savings for loan servicers.

Similarly, streamlining is only mentioned once: "[t]he act will also streamline the system, and make it easier to audit and monitor. One stop student loans will enable students to receive all their financial aid through the existing aid offices. Schools will have only one form to use and one entity to deal with. Colleges, alternative loan originators, loan servicers, and [DOED] will share data and develop a well-coordinated data system." *Id*. That text makes clear that Congress's intent was to improve the experience for student *borrowers* and streamline the process of originating and disbursing loans. It is not clear how requiring servicers to comply with state regulations would create confusion for borrowers or harm this goal.

The notice's reiteration of the goal of "saving taxpayer dollars," ECF No. 19-19 at 10621, is also misplaced. Specifically, DOED argues that laws which impose licensing fees, assessments, minimum net worth requirements, surety bonds, and other requirements may result in servicers facing fees that exceed the revenue they receive on a per-loan basis under their contracts. *Id*. However, the goal of saving taxpayer dollars, as DOED frames it, is not stated in the statutory text, nor is it supported by legislative history. The FDLP was intended to save costs by replacing

the FFELP and save student borrowers money by lowering interest rates. *See* H.R. Rep. No. 103-111, 158 (1993). But there is no support to the notion that Congress sought to reduce costs in the servicing phase. *See Dupnik v. United States*, 848 F.2d 1476, 1483 (9th Cir. 1988) (noting that courts have adopted state laws even when they "add modest expense to the administration of [federal] loans."). DOED's reference to "competitive prices" is a direction from Congress to engage in a competitive procurement process and consider price in selecting servicers, *see* 20 U.S.C. §1087f(a)(2), not one preempting state licensing regimes. And DOED provides no citations, data, or evidence for its speculative claim that state regulation will harm competitive prices or lead servicers to pass on increased costs to DOED.

Finally, the notice states that in going "beyond the requirements of Federal law in restricting the actions a servicer may take to collect on a loan" state laws "impede the ability of the Department to protect Federal taxpayers by ensuring the repayment of Federal loans." ECF No. 19-19 at 10621. That position is again untethered from the structure of the HEA. For example, the availability of income-driven repayment plans, under which a federal borrower's monthly payment may be substantially reduced, with forgiveness of the balance after a set term, contradicts any conclusion that Congress's goal was simply to ensure repayment of every dollar of student loans. *Cf. Weber v. Great Lakes Educ. Loan Serv.'s, Inc.,* 2013 WL 3943507 (W.D. Wis. July 30, 2013) ("[I]n the context of the overall FFEL program, it seems apparent that Congress' goal for the HEA collections provisions was to ensure that lenders make a good-faith effort to collect, not to maximize loan repayment rates at

all costs."). And here, the District's regulations do not impede DOED's servicers from using collection tools, or "create a scheme that includes different servicing deadlines." Compl. at 47. Plaintiff once again falls back on purely hypothetical harms.

### iii.     The District's Regulations Do Not Impede DOED Contracts with Servicers.

Plaintiff, the DOED notice, and the U.S. SOI also argue that state licensing requirements for student loan servicers (such as the District's) conflict with DOED's decision to award contracts to servicers. Compl. ¶ 173; ECF No. 19-19, at 10620; ECF No. 20 at 10. To the extent plaintiff has standing to bring this allegation at all, it too is, aside from being an unexplained change of position, based on a misreading of the relevant authorities and a significant overreach of federal preemptive effect.

As an initial matter, the text of FDLP contracts and master promissory notes (MPN), as well as FFELP regulations, contradict plaintiff's position. For example, the FDLP contract attached by plaintiff states that "[t]he contractor(s) will be responsible for maintaining a full understanding of all federal and state laws and regulations … and ensuring that all aspects of the service continue to remain in compliance as changes occur." ECF No. 19-1, at 24, § C.1.4.3. In addition, the sample FDLP MPN provides that "[u]nder applicable state law, except as preempted by federal law, you may have certain borrower rights, remedies, and defenses in addition to those stated in this MPN and the Borrower's Rights and Responsibilities Statement." Ex. E. Similarly, FFELP regulations anticipate the functioning of state laws; 34 C.F.R. § 682.401 explains that "[t]he student loan guaranty agency shall ensure that all program materials meet the requirements of Federal and State law." The inclusion

of those statements is inconsistent with the broad preemptive effect advanced by plaintiff. "Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls." *Red Lake Band of Chippewa Indians v. Dep't of Interior*, 624 F. Supp. 2d 1, 15 (D.D.C. 2009); *see also United States v. Yazell*, 382 U.S. 341, 352 (1966) (federal contract should not be presumed to preempt state law without specific reference).

In addition, the cases cited in the DOED notice are distinguishable. First, *Sperry v. Florida*, 373 U.S. 379 (1963) concerned practice before the Federal Patent Office, where Congress explicitly permitted the Commissioner of Patents to authorize the practice of non-lawyers. *Id.* at 383-84. There, Congress was proceeding according to an enumerated power to issue patents. *See* U.S. Const. art. I, § 8, cl. 8 (Patent and Copyright Clause). A state's power to license conduct before an exclusively federal board or agency is distinct from curtailing state consumer protections more generally. In *Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187 (1956), upon which *Sperry* relied, a state licensing law conflicted with (and was preempted by) a contract for work on a military base awarded under the Armed Services Procurement Act of 1947. *Id.* at 188. As with *Sperry*, it is an unremarkable conclusion that a state licensing law cannot disrupt or supersede military contracting on a military base. *See also Gatrell Const. Inc. v. Aubry*, 940 F.3d 437 (9th Cir. 1991) (concerning work performed on a military base); *Crescent Care, LLC v. Total Home Health, Inc.*, Civil Action No. 08-127, 2008 WL 4542666, at * 5 (N.D. Ill. 2008) (referring to *Gatrell* as holding "contractors are

43

exempt from state licensing requirements for services performed on federal property").

Moreover, the *Gatrell* court improperly dismissed the applicability of a contract clause explaining that the contractor was responsible for "obtaining any necessary licenses and permits" and complying with "State, and municipal laws, codes, and regulations applicable to the performance of the work." *Id.* at 440; *see also* ECF No. 20 at 14 n.16. The court found that state laws could not be "applicable" or "necessary" if they were preempted by federal law. *Id.* That finding, however, turns preemption analysis on its head. Keeping in mind the presumption against preemption, a court should first look to the text of the applicable statutes, regulations, and contracts to determine federal preemptive intent. *Gatrell* ignores that directive, and infers preemption under a theory that overlooks the intent found in an agency's actions. And, of course, the FDLP contract here presents an even stronger case; it provides that "[t]he contractor(s) will be responsible for maintaining a full understanding of all federal and state laws and regulations … and ensuring that all aspects of the service continue to remain in compliance as changes occur." ECF No. 19-1 at 24, § C.1.4.3. There is no caveat for "applicable" or "necessary" state laws.

The *Gatrell* court also relied on the wording of the contract, which was not sufficiently clear to authorize "state regulation of a federal activity"—in that case, construction on a military base. 940 F.2d at 441 n.4 (citing *Hancock v. Train*, 426 U.S. 167, 176 (1976) for the proposition that clear congressional authorization is needed for state regulation of "federal installations and activities."). But here, servicers are

not engaged in such a purely "federal activity." Instead, they interact with a non-federal entity—borrowers—as well as the federal government. The District's regulations do not concern a federal installation, but rather the interaction between servicers and borrowers, an interaction that remains a core function of state consumer protection. Plaintiff's argument would remove state consumer protections for individuals based simply on who services their loans, and is contrary to the presumption against preemption in consumer protection matters.[25]

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Amended Complaint, with prejudice. In the alternative, the Court should grant summary judgment in favor of defendants.

Dated:  September 7, 2018.　　　Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Gregory M. Cumming*
GREGORY M. CUMMING [1018173]
JESSICA N. KRUPKE [1019967]

---

[25]　　The SOI also relies on the intergovernmental immunity doctrine, a claim not raised by plaintiff. In any event, the District's regulations do not mandate the way services are rendered, and the U.S.'s citation to *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), is inapposite given the regulations here apply to both federal and private loan servicers.

Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-6627
(202) 715-7769 (fax)
gregory.cumming@dc.gov

*Counsel for Defendants*