**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRCT OF COLUMBIA**

STUDENT LOAN SERVICING
ALLIANCE,

               Plaintiff,

      v.

STEPHEN C. TAYLOR, ET AL.,

             Defendants.

Civil Action No. 18-640 (PLF)

**BRIEF OF AMICI CURIAE**
**LAWYERS' COMMITTEE FOR CIVIL RIGHT UNDER LAW**
**CENTER FOR RESPONSIBLE LENDING**
**NATIONAL STUDENT LEGAL DEFENSE NETWORK**

**CORPORATE DISCLOSURE STATEMENT**

Amici curiae have not issued shares or debt securities to the public and have no parents, subsidiaries, or affiliates that have issued shares or debt securities to the public. The general purpose of the organizations is to advocate for the public interest on a range of issues, including those that affect or bear on students and college access, civil rights, veterans, educators, and consumers.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF AMICI CURIAE'S INTERESTS ........................................... 1

ARGUMENT ............................................................................................................ 2

I.   INTRODUCTION: STUDENT LOAN SERVICING PRACTICES HAVE BEEN A CONCERN TO STATE AND FEDERAL LAW ENFORCEMENT AGENCIES ............. 3

    A. Student Loan Servicers Play an Essential Role for Borrowers of All Types of Loans Throughout the Repayment Process ............................................................................ 3

    B. Federal Regulators and States, Acting in Their Traditional Consumer Protection Function, Have Addressed Poor Servicing Practices Through Oversight and Law Enforcement ................................................................................................................ 5

II.  STUDENT LOAN SERVICERS' PROBLEMATIC PRACTICES HARM BORROWERS, CAUSE DEFAULT, AND INCREASE DEBT ............................................ 7

    A. Widespread Servicer Misconduct Threatens 140,000 Student Loan Borrowers Residing in the District of Columbia .......................................................................... 8

    B. Servicer Misconduct Causes Long-Term Financial Harm and Exposes D.C. Borrowers to Aggressive Federal Debt Collection Practices ..................................... 9

    C. Poor Servicing Practices Disproportionately Hurt Families of Color ...................... 11

III. HEA PREEMPTION OF STATE CONSUMER PROTECTION LAWS WOULD HAVE DISASTROUS IMPLICATIONS FOR THE MOST VULNERABLE CONSUMERS WHO DEPEND UPON ROBUST ENFORCEMENT OF STATE LAWS FOR PROTECTION ............................................................................................... 15

    A. The Department of Education Has Limited Statutory Authority and Has Failed to Use What Limited Authority It Has ........................................................................ 15

    B. Vulnerable Consumers Depend Upon State Oversight for Protection Within the Student Loan Sector .............................................................................................. 18

    C. The Department's Recent Reversal of Long-Standing Policies has Heightened the Need for State Oversight and Enforcement of  Student Loan Servicers ................... 19

IV.  D.C. IS MERELY STEPPING IN, AS OTHER STATES HAVE, TO ENACT STATUTORY SCHEMES DESIGNED TO PROTECT BORROWERS ........................ 22

    A. The HEA Does Not "Occupy the Field" ................................................................. 23

    B. Conflict Preemption Requires an Actual Conflict, Not Hypothetical Future Conflicts Such as Those Identified in SLSA's Complaint ...................................................... 24

CONCLUSION…………………………………………………………………………25

# TABLE OF AUTHORITIES

## CASES

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) ........................................ 24

*Chae v SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ................................................................. 3, 24

*Cipollone v. Liggett Group,* 505 U.S. 504 (1992) ................................................................. 22, 23

*Cliff v. Payco Gen. Am. Credits, Inc.,* 363 F.3d 1113 (11th Cir. 2004) ................................ passim

*Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005) ........................................ 23, 24, 25

*Commonwealth v. Pennsylvania Higher Educ. Assistance Agency*, No. 1784CV02682-BLS2, 2018 WL 1137520 (Mass. Super. Mar. 1, 2018) ........................................................................ 7

*Consumer Financial Protection Bureau v. Navient,* 103, 3:17- CV-101, (M.D. PA., Aug. 10, 2018) ............................................................................................................................................ 21

*Davis v. Navient Corp.*, No. 17-CV-00992, 2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018) ....... 25

*First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017) ........................................................ 5

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) ........................................ 5

*Gen. Motors Corp. v. Abrams*, 897 F.2d 34 (2d Cir. 1990) ........................................................ 23

*Illinois v. Navient Corp.*, 17-CH-761 (Ill. Cir. Ct. Cook Cnty., July 10, 2018) ........................... 6

*Keams v. Tempe Technical Institute, Inc.,* 39 F.3d 222 (9th Cir. 1994) ................................ 23, 24

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ...................................................................... 19, 23

*Williams v. Educ. Credit Mgmt. Corp.*, 88 F. Supp. 3d 1338 (M.D. Fla. 2015) .......................... 25

*Wyeth v. Levine*, 555 U.S. 555 (2009) .............................................................................. 23, 25

## STATUTES

12 U.S.C. § 5491 ........................................................................................................................ 22

12 U.S.C. 5481 .......................................................................................................................... 20

15 U.S.C. § 1692 ........................................................................................................................ 18

20 U.S.C. § 1071 .......................................................................................................................... 4

20 U.S.C. § 1078 .......................................................................................................................... 3

20 U.S.C. § 1083(f)(4) ................................................................................................................ 17

20 U.S.C. § 1087e ........................................................................................................................ 4

California Student Loan Servicing Act .......................................................................................... 6

Colorado H.B. 1415 (2018 Session) ............................................................................................ 6

Conn. Gen. Stat. § 36a-847 ......................................................................................................... 6

Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 ..... 4

Illinois Public Act 100-0540, November 18, 2017,
   http://www.ilga.gov/legislation/publicacts/100/PDF/100-0540.pdf ......................................... 6

Maine L.D. 1507 (2017-2018 Session) ......................................................................................... 6

Missouri, H.B. 1274 (2018 Session) ............................................................................................. 6

New York A.B. 7582 (2017-2018 Session) .................................................................................. 6

New Jersey A455/S1149 (2018-2019 session) ............................................................................. 6

Washington, Act, March 16, 2018, http://lawfilesext.leg.wa.gov/biennium/2017-
   18/Pdf/Bills/Session%20Laws/Senate/6029-S2.SL.pdf ............................................................. 6

## OTHER AUTHORITIES

*AG Hood Launches Lawsuit against Student Loan Lenders* (July 24, 2018),
   http://www.ago.state.ms.us/ag-hood-launches-lawsuit-against-student-loan-lenders/ ............... 7

12 C.F.R. § 1090.106(a) ................................................................................................................ 3

34 C.F.R. § 682.203(a) .................................................................................................................. 5

*AG Healey Secures $2.4 Million, Significant Policy Reforms in Major Settlement with Student
   Loan Servicer* (Nov. 22, 2016), http://www.mass.gov/ago/news-and-updates/press-
   releases/2016/ag-healey-secures-2-4-million-student-loan-servicer.html .................................. 7

Amy Traub, Laura Sullivan, Tatjana Meschede, and Tom Shapiro, *The Asset Value of Whiteness:
   Understanding the Racial Wealth Gap* (2017), Demos,
   http://www.demos.org/publication/asset-value-whiteness-understanding-racial-wealth-gap .. 12

*Attorney General Becerra Charges Navient Corporation, Largest Student Loan Servicer, with
   Deceitful Practices and Debt-Collection Misconduct in Lawsuit,* (June 28, 2018),
   https://oag.ca.gov/news/press-releases/attorney-general-becerra-charges-navient-corporation-
   largest-student-loan ..................................................................................................................... 7

Ben Miller, *New Federal Data Show a Student Loan Crisis for African American Borrowers*,
   Center for American Progress (2017), https://www.americanprogress.org/issues/education-
   postsecondary/news/2017/10/16/440711/new-federal-data-show-student-loan-crisis-african-
   american-borrowers/ ................................................................................................................... 13

Bureau of Labor Statistics, *Median weekly earnings by educational attainment in 2014* (2015),
   https://www.bls.gov/opub/ted/2015/median-weekly-earnings-by-education-gender-race-and-
   ethnicity-in-2014.htm ................................................................................................................. 13

C. Smith & D. Smith, *Update: Putting Student Debt Reform on the Map*, (May 10, 2018),
   https://higherednotdebt.org/blog/putting-student-debt-reform-map-2 ........................................ 6

Carolyn Carter, *Consumer Protection in the States: A 50-State Evaluation of Unfair and
   Deceptive Practices Laws,* National Consumer Law Center (March 2018),
   http://www.nclc.org/images/pdf/udap/udap-report.pdf ............................................................. 22

*CFPB Sues Nation's Largest Student Loan Company for Failing Borrowers at Every Stage of
   Repayment* (Jan. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-
   nations-largest-student-loan-company-navient-failing-borrowers-every-stage-repayment/ ...... 7

*CFPB Takes Action Against Citibank For Student Loan Servicing Failures That Harmed Borrowers* (Nov. 21, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-citibank-student-loan-servicing-failures-harmed-borrowers/ ................... 7

Complaint, *Pennsylvania Higher Education Assistance Agency v. Perez et al.*, No. 18-1114 (D. Conn. July 2, 2018) ............................................................................................................. 22

Complaint, *Pennsylvania v. Navient Corp.*, No. 17-cv-1814 (M.D. Pa. Oct. 5, 2017) ................. 7

Consumer Fin. Prot. Bureau Supervisory Highlights, Issue 15, Spring 2017, 12-14 .................... 7

Consumer Fin. Prot. Bureau, *Student Loan Servicing: Analysis of Public Input* (Sept. 2015)..... 11

Consumer Fin. Prot. Bureau, *Student Loan Servicing: Analysis of Public Input and Recommendations for Reform* (Sept. 2015), http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf ............... 10

Consumer Fin. Prot. Bureau, *CFPB Monthly Snapshot Spotlights Student Loan Complaints* (Apr. 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-student-loan-complaints/ ............................................................................................ 9

Cornerstone Support, Inc., *State by State Licensing Requirements for Debt Collection Companies*, https://cornerstonesupport.com/debt-collection-licensing-statutes/........................ 6

Council of the District of Columbia,  Subcommittee on Consumer Affairs Report on Bill 21-877, 2 (Oct. 25, 2016), http://lims.dccouncil.us/Download/36411/B21-0877-CommitteeReport1.pdf .................................................................................................................................................. 8

D. Douglas-Gabriel, *This captivating map details student debt in the Washington Area*, The Washington Post (Dec. 2, 2015) ................................................................................................ 8

Department of Insurance, Securities and Banking, Notice of Final Rulemaking, p. 8395 (Aug. 10, 2018) ........................................................................................................................................... 8

*Explanation of Allocation and Performance Measure Methodology,* Federal Student Aid an Office of the U.S. Department of Education (Sept. 9, 2018, 3:00 PM), https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/12312017/Explanation QuarterEnd123117.pdf ............................................................................................................. 16

Federal Preemption and the State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10619, (Mar. 12, 2018) ("March 2018 Notice") .............................................................................................................. 16

Financial Industry Regulatory Authority,  *Financial Capability in the United States 2016* (2016), http://www.usfinancialcapability.org/downloads/NFCS_2015_Report_Natl_Findings.pdf .... 13

Jason N. Houle & Fenaba Addo, *Racial Disparities in Student Loan Debt and the Reproduction of The Fragile Black Middle Class*, CDE Working Paper No. 2018-02, https://www.ssc.wisc.edu/cde/cdewp/2018-02.pdf..................................................................... 12

Judith Scott-Clayton and Jing Li, *Black-white disparity in student loan debt more than triples after graduation* (Oct. 2016), The Brookings Institute, https://www.brookings.edu/research/black-white-disparity-in-student-loan-debt-more-than-triples-after-graduation/ ........................................................................................................... 12

Katie Nodjimbadem, *The Racial Segregation of American Cities Was Anything But Accidental* (2017), Smithsonian, https://www.smithsonianmag.com/history/how-federal-government-intentionally-racially-segregated-american-cities-180963494/ ................................................ 12

Kristin Blagg, *The demographics of income-driven student loan repayment*, Urban Wire (Feb. 2018), https://www.urban.org/urban-wire/demographics-income-driven-student-loan-repayment........................................................................................................................ 14

Leadership Conference on Civil & Human Rights, *Gainful Employment: A Civil Rights Perspective* 2 (2014), http://www.protectstudentsandtaxpayers.org/wp-content/uploads/2014/10/Gainful-Employment-Civil-Rights-Perspective_WhitePaper_October2014.pdf .............................................................................. 13

Letter from Kathleen Smith, Acting Under Secretary, and A. Wayne Johnson, (former) COO of Federal Student Aid to Richard Cordray, Director, Consumer Fin. Prot. Bureau (Aug. 31, 2017), https://edworkforce.house.gov/uploadedfiles/2017-09-01_signed_letter_to_cfpb.pdf 19, 20

Letter from the U.S. Dep't of Educ. to Jedd Bellman, Assistant Commissioner, State of Md. (Jan. 21, 2016) ...................................................................................................................... 19

Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing* (2015), Demos, https://www.demos.org/publication/debt-divide-racial-and-class-bias-behind-new-normal-student-borrowing ................................................... 12

Memorandum from Patrick A. Bradfeld, Director, Federal Student Aid Acquisitions, Dep't of Educ. (Dec. 17, 2017), Dkt. 19-17, Ex. Q................................................................................ 21

Michal Grinstein-Weiss, Dana C. Perantie, Samuel H. Taylor, Shenyang Guo, and Ramesh Raghavan, *Racial disparities in education debt burden among low- and moderate-income households*, Children and Youth Services Review Vol. 65 (June 2016), p. 166. ..................... 12

Nat'l Consumer Law Ctr., *Fair Debt Collection*, § 1.2 (9th Ed.), https://library.nclc.org/fdc/0102 ........................................................................................................................................ 6

Peter Smith and Leslie Parrish, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures* (Oct. 2014), Center for Responsible Lending, http://www.responsiblelending.org/student-loans/research-policy/CRL-For-Profit-Univ-FINAL.pdf ............................................................................................................... 13

Press Release, Dep't of Educ., Department of Education, Department of Treasury and the Consumer Financial Protection Bureau Issue Joint Principles on Student Loan Servicing (Sept. 29, 2015), https://www.ed.gov/news/press-releases/department-education-department-treasury-and-consumer-financial-protection-bureau-issue-joint-principles-student-loan-servicing...................................................................................................................... 20

Ron Lieber, *A Student Loan Nightmare: The Teacher in the Wrong Payment Plan*, N.Y. Times (Oct. 27, 2017) ................................................................................................................... 10

*See* Marshall Steinbaum and Kavya Vaghul, *How the student debt crisis affects African Americans and Latinos*, Washington Center for Equitable Growth (Feb. 17, 2016), http://equitablegrowth.org/how-the-student-debt-crisis-affects-african-americans-and-latinos/ ........................................................................................................................................ 14

SLSA Am. Compl., Dkt. 19 ................................................................................... 15, 21

Stafford Loan, Supplemental Loans for Students, PLUS, and Consolidation Loan Programs, 55 Fed. Reg. 40120-1 (Oct. 1, 1990). ........................................................................ 19

The Urban Institute, *Debt in America: An Interactive Map*, https://apps.urban.org/features/debt-interactive-map/ ............................................................................................................. 15

Transcript of Oral Argument, *Washington v. Navient Corp.*, No. 17-2-01115-1 SEA (Wa. Sup. Ct. July 7, 2017) ................................................................................................................. 7

U.S. Dep't of Educ., Briefing on FY 2013 3-Year Official Cohort Default Rates (Sept. 28, 2016) ........................................................................................................................................ 11

U.S. Dep't of Educ., Federal Student Aid, Data Center, Federal Student Loan Portfolio, https://studentaid.ed.gov/sa/about/data-center/student/portfolio (last visited Sep. 8, 2018) .... 10

U.S. Dep't of Educ., Office of Federal Student Aid, https://studentaid.ed.gov/sa/about/data-center/student/portfolio (last visited Sep. 8, 2018) .................................................................. 4

U.S. Gen. Accounting Office, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight*, 19 (May 16, 2016) ................................................ 9

U.S. Gov't Accountability Off., GAO-16-523, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* 18 (May 2016), https://www.gao.gov/assets/680/677159.pdf. .......................................................................... 17

U.S. Gov't Accountability Off., GAO-16-523, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* 26, 29 (May 2016), https://www.gao.gov/assets/680/677159.pdf .......................................................................... 17

U.S. Gov't Accountability Off., GAO-18-587R, *Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers* (July 27, 2018), https://www.gao.gov/assets/700/693475.pdf .......................................................................... 18

## STATEMENT OF AMICI CURIAE'S INTERESTS[1]

The Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a tax-exempt, non-profit civil rights organization founded in 1963 at the request of President John F. Kennedy in order to mobilize the private bar in vindicating the civil rights of African Americans and other racial and ethnic minorities. The Lawyers' Committee is dedicated, among other goals, to eradicating all forms of racial discrimination in higher education affecting racial minorities and other disadvantaged populations. The Lawyers' Committee has a vested interest in ensuring that equal educational opportunities are available to students of all racial and ethnic backgrounds.

The Center for Responsible Lending ("CRL") is a non-profit organization dedicated to eliminating abusive practices in the market for consumer financial services and to ensuring that consumers benefit from the full range of consumer protection laws designed to prohibit unfair and deceptive practices by financial services providers. CRL is an affiliate of Self-Help, a nonprofit based in North Carolina, with retail credit union branches in North Carolina, Virginia, Florida, California, Wisconsin, and Illinois. CRL seeks to end abusive lending practices, including student loan servicers' failure to comply with their contractual and statutory obligations to borrowers.

The National Student Legal Defense Network ("NSLDN") is a nonpartisan, non-profit organization incorporated in the District of Columbia. NSLDN's mission is to work, through a variety of means, to advance students' rights to educational opportunity and to ensure that higher education provides a launching point for economic mobility. NSLDN works to promote the availabity and utility of robust consumer protection law for students and student loan borrowers across higher education and the student aid life cycle.

---

[1] This brief was not authored in whole or in part by counsel for a party. No person or entity other than amici or their counsel made a monetary contribution to the preparation or submission of this brief.

This case concerns the District of Columbia's Department of Insurance, Securities and Banking's (DISB) regulations of student loan servicing companies.  Plaintiff Student Loan Servicing Alliance (SLSA) asserts that DISB's regulations and the District's statute permitting the regulations are preempted by federal law.  *Amici* have a strong interest in preserving the traditional consumer protection role of states.  *Amici* are deeply concerned about the poor servicing practices that have been widely recognized and documented by both states and the federal government.  These practices often disproportionately hurt families of color and their communities.  As advocates for students, *Amici* bring a perspective distinct from that of the Defendants in this case.  Specifically, *Amici* can describe the unique harms suffered by students as a result of poor servicing practices, precisely the harms that DISB's regulations seek to address.

## ARGUMENT

*Amici* support Defendant's motion to dismiss or, in the alternative, for summary judgment.  SLSA's argument for broad federal preemption is both legally unfounded and unwise.  State consumer protection laws such as the DISB regulations are essential for adequately protecting student borrowers in a loan servicing market that is largely unregulated.  This is especially true today when student debt is notably high and growing, poor loan servicing is prevalent, and the federal government has greatly scaled back its oversight and enforcement efforts.  This brief is structured to highlight the ways in which D.C.'s efforts to regulate loan servicers finds strong support in legal precedent, accepted practice by state and federal actors, and social imperative to prevent disastrous consequences for the most vulnerable student borrowers and communities.

Part I provides an overview of student loan servicing and describes how states have engaged in regulatory and enforcement activities within this market, consistent with states' traditional consumer protection mandate.  Part II describes the harms to borrowers of poor student

loan servicing practices.  Part III explains how any finding of preemption would have disastrous results for borrowers, especially borrowers of color.  Part IV explains D.C.'s actions are entirely appropriate, within its traditional consumer protection role, and not preempted by federal law.

I.  **INTRODUCTION: STUDENT LOAN SERVICING PRACTICES HAVE BEEN A CONCERN TO STATE AND FEDERAL LAW ENFORCEMENT AGENCIES**

A. **Student Loan Servicers Play an Essential Role for Borrowers of All Types of Loans Throughout the Repayment Process**

Student loan servicing covers a wide range of responsibilities throughout the life cycle of a student loan.  Servicers are responsible for the most basic and important interactions with borrowers, including receiving and applying payments to a student loan borrower's account, maintaining records for the borrower's account, and "[i]nteractions with a borrower, *including activities to help prevent default* [on student loans], conducted to facilitate" repayment. 12 C.F.R. § 1090.106(a) (Consumer Financial Protection Bureau regulation defining "student loan servicing") (emphasis added).

As financial services companies, student loan servicers handle the day-to-day management of three kinds of higher education loans.  While SLSA's complaint lumps all three types of loans together, they differ in key respects which may provide a basis for different regulatory regimes. First, loan servicers handle some outstanding loans made under the Federal Family Education Loan Program (FFELP).  Congress established FFELP as part of the HEA and it operated as a "system of loan guarantees meant to encourage [commercial] lenders to loan money to students and their parents on favorable terms." *Chae v SLM Corp.*, 593 F.3d 936, 938 (9th Cir. 2010).  Under FFELP, private lenders originated loans, guaranty agencies guaranteed them, and the U.S. government reinsured the loans.  *See* 20 U.S.C. § 1078(a)-(c).  FFELP loans constituted the vast majority of

Federal student loans before 2010 and there is currently nearly $295.5 billion in FFELP loans outstanding.

Second, student loan servicers handle loans issued pursuant to the "Direct Loan" program. In 2010, Congress ended origination of FFELP loans and moved entirely to a "Direct Loan" program. Under the Direct Loan program, the United States serves as the lender and contracts with non-governmental entities to service loans issued by the Department. 20 U.S.C. § 1071(d); *see also* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, 1074. Direct loans are serviced by financial services companies that contract with the Department of Education pursuant to Title IV of the HEA. Federal Direct Loans "have the same terms, conditions, and benefits" as those issued under FFELP. 20 U.S.C. § 1087e(a)(1). The Department holds more than $1.1 trillion in Direct Loans outstanding.[2]

Third, student loan servicers handle private education loans, which are usually serviced by either the originating entity or through contract with other nonbank entities. Many of the FFELP and Direct Loans servicers service private education loans as well. The Department of Education does not own or regulate servicing of private education loans. And, as noted in Defendant's motion to dismiss, SLSA's members would need to obtain licenses under DISB's regulations for their servicing of private loans, irrespective of their servicing of FFELP or Direct loans.

For FFELP, Direct Loans, and private loans, a borrower will rarely have any interaction with the lender or holder of her student loan after taking out the loan. Most student borrowers communicate exclusively with a loan servicer who has been "delegate[d]" the authority by a lender or loan holder to service the borrower's loan and who must abide by the Higher Education Act

---

[2] U.S. Dep't of Educ., Office of Federal Student Aid, https://studentaid.ed.gov/sa/about/data-center/student/portfolio (last visited Sep. 8, 2018).

(HEA) and its implementing regulations, either pursuant to Education regulations, *see* 34 C.F.R. § 682.203(a) (FFELP), or under contract with the Department (Direct).  Student loan servicers are, thus, usually the borrower's only place to turn in a variety of critical circumstances such as: reporting and resolving an error in the application of her payments, determining whether she is eligible for public service loan forgiveness, or evaluating whether financial hardship indicates she needs to access one of the federally-mandated income-driven repayment ("IDR" plans) to prevent default.  Effective servicing can be the difference between successful repayment and default.

### B. Federal Regulators and States, Acting in Their Traditional Consumer Protection Function, Have Addressed Poor Servicing Practices Through Oversight and Law Enforcement

States have exercised their traditional consumer protection function in enforcement suits against student loan servicers and increased regulatory attention.  Enforcement and regulation of consumer protection laws, including through actions brought by the states against student loan servicers, are "well within the scope" of historic state police powers.  *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 150 (1963); *see also First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1283 (9th Cir. 2017) (Tashima, J., concurring); *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1126 (11th Cir. 2004).

States have been focusing their traditional consumer protection oversight tools on student loan servicers, responding to widespread concerns about student loan debt and poor servicing practices affecting resident borrowers.  In addition to the District of Columbia's DISB regulation of student loan servicing companies and associated statute, other states have adopted similar regimes.  California, Illinois, Connecticut, and Washington have all passed legislation requiring

licensure or regulation of student loan servicers.[3]  Bills have been introduced in at least ten other states.[4]  These types of laws are not unprecedented.  Many states have long required debt collectors, including those who collect federal student loans, to be licensed.[5]

Many states have exercised their traditional consumer production function in enforcement suits against servicers.  And servicers have attempted to block these suits by raising various preemption arguments, but courts have held that state suits against student loan servicers are not preempted by federal law.  For example, a state trial court in Illinois recently denied a motion to dismiss by Navient, the largest servicer of student loans and a member of SLSA, in a suit brought by the State of Illinois for violations of state consumer protection laws.  *Illinois v. Navient Corp.*, 17-CH-761 (Ill. Cir. Ct. Cook Cnty., July 10, 2018), attached as Exhibit A.  Specifically, the state court denied Navient's assertions that Illinois's claims were preempted by federal law.  *Id.* Washington State's claims similarly survived a motion to dismiss, including on preemption grounds.  Transcript of Oral Argument at 36-37, *Washington v. Navient Corp.*, No. 17-2-01115-1

---

[3] Conn. Gen. Stat. § 36a-847; California Student Loan Servicing Act, Sept. 29, 2016, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201520160AB2251; Illinois Public Act 100-0540, November 18, 2017, http://www.ilga.gov/legislation/publicacts/100/PDF/100-0540.pdf; Washington, Act, March 16, 2018, http://lawfilesext.leg.wa.gov/biennium/2017-18/Pdf/Bills/Session%20Laws/Senate/6029-S2.SL.pdf.

[4] *See, e.g.,* New Jersey:  NJ A455/S1149 (2018-2019 session); New York A.B. 7582 (2017-2018 Session); Maine L.D. 1507 (2017-2018 Session); Colorado: H.B. 1415 (2018 Session); Missouri, H.B. 1274 (2018 Session); *see generally* C. Smith & D. Smith, *Update: Putting Student Debt Reform on the Map*, (May 10, 2018), https://higherednotdebt.org/blog/putting-student-debt-reform-map-2.

[5] *See generally*, Nat'l Consumer Law Ctr., *Fair Debt Collection*, § 1.2 (9th Ed.), https://library.nclc.org/fdc/0102; Cornerstone Support, Inc., *State by State Licensing Requirements for Debt Collection Companies*, https://cornerstonesupport.com/debt-collection-licensing-statutes/.

SEA (Wa. Sup. Ct. July 7, 2017), attached as Exhibit B.[6]  The Commonwealth of Massachusetts

sued another servicer, PHEAA, for servicing violations related to Public Service Loan Forgiveness

and TEACH Grants under both Massachusetts and federal law.  Although the Department of

Education filed a statement of interest in the case, the trial court similarly held that the state-based

claims were not preempted.  In reaching this holding, the trial court observed that the Department's

statement was "much narrower than it may appear at first blush. The Department does not actually

argue that any of the Commonwealth's claims is preempted by federal law." *Commonwealth v.*

*Pennsylvania Higher Educ. Assistance Agency*, No. 1784CV02682-BLS2, 2018 WL 1137520, at

*9 (Mass. Super. Mar. 1, 2018).[7]

## II.   STUDENT LOAN SERVICERS' PROBLEMATIC PRACTICES HARM BORROWERS, CAUSE DEFAULT, AND INCREASE DEBT

---

[6] Pennsylvania also sued Navient, alleging similar claims under state law and the Dodd-Frank Act.  Complaint, *Pennsylvania v. Navient Corp.*, No. 17-cv-1814 (M.D. Pa. Oct. 5, 2017).  A motion to dismiss raising preemption is currently before the court.

[7] California and Mississippi also recently sued Navient. *Attorney General Becerra Charges Navient Corporation, Largest Student Loan Servicer, with Deceitful Practices and Debt-Collection Misconduct in Lawsuit*, (June 28, 2018), https://oag.ca.gov/news/press-releases/attorney-general-becerra-charges-navient-corporation-largest-student-loan; *AG Hood Launches Lawsuit against Student Loan Lenders* (July 24, 2018), http://www.ago.state.ms.us/ag-hood-launches-lawsuit-against-student-loan-lenders/.  Massachusetts settled with another servicer for $2.4 million in November 2016 for poor servicing practices related to IDR plans. *AG Healey Secures $2.4 Million, Significant Policy Reforms in Major Settlement with Student Loan Servicer* (Nov. 22, 2016), http://www.mass.gov/ago/news-and-updates/press-releases/2016/ag-healey-secures-2-4-million-student-loan-servicer.html. The federal government has also addressed poor student loan servicing practices through its consumer protection function.  For example, the Consumer Financial Protection Bureau (CFPB) sued Navient in 2017, has settled lawsuits with other student loan servicers, and highlights problems in student loan servicing. *See, e.g.*, *CFPB Sues Nation's Largest Student Loan Company for Failing Borrowers at Every Stage of Repayment* (Jan. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-nations-largest-student-loan-company-navient-failing-borrowers-every-stage-repayment/; *CFPB Takes Action Against Citibank For Student Loan Servicing Failures That Harmed Borrowers* (Nov. 21, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-citibank-student-loan-servicing-failures-harmed-borrowers/; Consumer Fin. Prot. Bureau Supervisory Highlights, Issue 15, Spring 2017, 12-14.

**A. Widespread Servicer Misconduct Threatens 140,000 Student Loan Borrowers Residing in the District of Columbia**

The District of Columbia is one of the most educated cities in the United States and home to several elite and expensive private universities.[8]  The District is the most indebted jurisdiction in the country when it comes to average federal student loan debt, with 140,000 borrowers owing an average of $40,885 as of 2015, forty percent higher than the national average.[9]  While student debt is rising across the board, delinquency rates are particularly high in the District's communities with a greater proportion of African Americans and Latinos.  The median income for families east of the Anacostia River in D.C. is roughly $30,000 per year; those residents are three times as likely to be at least nine months delinquent on their student loan payments.[10]

Because the District has a disproportionate number of both borrowers and borrowers of color, as well as disproportionately high debt totals, District residents are unusually vulnerable to servicer misconduct.  It comes as no surprise therefore that District residents have filed over 400 complaints with the Consumer Financial Protection Bureau (CFPB) in the past five years arising from their interactions with student loan servicers.[11]  A recurring theme of the complaints is poor service resulting in confusion about loan payment timetables and amounts, which magnifies the risk of default and economic distress.[12]

---

[8] Council of the District of Columbia,  Subcommittee on Consumer Affairs Report on Bill 21-877, 2 (Oct. 25, 2016), http://lims.dccouncil.us/Download/36411/B21-0877-CommitteeReport1.pdf.

[9] *Id.*

[10] D. Douglas-Gabriel, *This captivating map details student debt in the Washington Area*, The Washington Post (Dec. 2, 2015).

[11] Department of Insurance, Securities and Banking, Notice of Final Rulemaking, p. 8395 (Aug. 10, 2018).

[12] *Id.*

**B. Servicer Misconduct Causes Long-Term Financial Harm and Exposes D.C. Borrowers to Aggressive Federal Debt Collection Practices**

Servicers' misconduct has significant and, at times, catastrophic consequences for borrowers' financial lives.  According to an April 2017 CFPB report based upon borrower complaints, sloppy practices by servicers created obstacles to repayment, raised the costs of debt, caused distress, and ultimately contributed to driving struggling borrowers into default.[13]

For example, improperly steering borrowers into deferment and forbearance—a commonly reported practice by loan servicers—can significantly increase the amount a borrower pays over the life of the loan.  Borrowers accrue mounting interest during forbearances and deferments on unsubsidized loans.[14]  The Government Accountabilty Office (GAO) recently estimated that a borrower owing $30,000 in federal loans who spent three years in a forbearance would pay $6,742 more than a borrower on the 10-year standard repayment plan who did not spend any time in forbearance.[15]  The GAO further stated that because of loan servicers' encouraging forbearance over other options that may be more beneficial, such as Income-Driven Repayment plans, some borrowers will continue to be at risk of incurring additional costs without any long-term benefits.[16]

In an IDR plan, unlike in forbearance and most deferments, the time a borrower spends in the plan counts towards the loan eventually being forgiven instead of postponing it.  Payments in IDR plans are set based on the borrower's income and family size.  Student loan servicers, however, may improperly steer borrowers towards forbearance merely because it requires much

---

[13] Consumer Financial Protection Bureau, *CFPB Monthly Snapshot Spotlights Student Loan Complaints* (Apr. 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-student-loan-complaints/.

[14] This interest is capitalized into the principal of a borrower's loans at the end of each forbearance or deferment causing interest to be charged upon interest.

[15] U.S. Gen. Accounting Office, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight*, 19 (May 16, 2016).

[16] *Id.* at 20

less paperwork for them to process.  Pushing borrowers into forbearance and deferments results in the repayment time-period being extended and the total amount ultimately repaid increasing. Simply stated, such steering into forbearance can cause long-term debt to balloon.

Steering into forbearance or deferment is not the only form of servicer misconduct.  A recent New York Times article highlighted one borrower, Jed Shafer, who worked in a public service job and repeatedly asked his servicer whether he was on track for loan forgiveness.  While his servicer frequently assured him that he was in "good status," Mr. Shafer learned eight years into his repayment plan that he did not qualify for public service loan forgiveness.[17]  As a result, Mr. Shafer needs to make nearly a decade's worth of additional payments, likely totaling tens of thousands of dollars.[18]  As another example, servicing errors caused thousands of borrowers to have TEACH grants (that encourage teaching in high need areas) converted to loans.[19]  As these examples show, the consequences of widespread servicing abuses are causing far too many borrowers extreme financial harm.  Servicer misconduct not only risks increasing debt owed, it also increases the risk of default which impacts all aspects of borrowers' lives.

Federal data show that more than one in four federal student loan borrowers are delinquent or in default on their federal student loans.[20]  In recent years, between 11% and 15% of all federal

---

[17] Ron Lieber, *A Student Loan Nightmare: The Teacher in the Wrong Payment Plan*, N.Y. Times (Oct. 27, 2017).
[18] *Id.*
[19] U.S. Dep't of Educ., *Study of the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program* (Mar. 2018), https://www2.ed.gov/rschstat/eval/highered/teach-grant/results-in-brief.pdf.
[20] *See* U.S. Dep't of Educ., Federal Student Aid, Data Center, Federal Student Loan Portfolio, https://studentaid.ed.gov/sa/about/data-center/student/portfolio (last visited Sep. 8, 2018); *see also* Consumer Fin. Prot. Bureau, *Student Loan Servicing: Analysis of Public Input and Recommendations for Reform* (Sept. 2015), http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

student loan borrowers have defaulted within two fiscal years of entering repayment.[21]  Federal student loans are unique in that borrowers do not officially default on their loan until they have missed 270 days of payments.  During this window, competent and effective servicers can help financially distressed borrowers avoid default by accessing the myriad of alternative repayment options offered by the HEA.  Conversely, poor practices can lead borrowers to default.

The consequences of default are often devastating, exposing borrowers to damaged credit, aggressive debt collection practices, and fees that can create ballooning balances and trap them in poverty.  Consequences can expand beyond student lending because "consumer credit profiles serve as a precondition to employment, housing, and access to credit, and consequently, servicing errors can have spillover effects on many other aspects of borrowers' lives and livelihoods."[22]

These devastating consequences are intensified for student borrowers because the federal government has collection powers that far exceed the collection powers of most unsecured creditors.  The government can garnish a borrower's wages without a judgment, seize tax refunds (including the Earned Income Tax Credit), and seize portions of federal benefits such as Social Security.  Default also denies eligibility for new education loans—preventing low-income borrowers from returning to school to increase their earning potential.  These punitive collection activities often push low-income households to the financial brink, or over it.

### C.  Poor Servicing Practices Disproportionately Hurt Families of Color

Quality servicing is especially critical for addressing racial disparities in student loan outcomes.  Students of color face additional barriers in repaying their student debt due to structural

---

[21] U.S. Dep't of Educ., Briefing on FY 2013 3-Year Official Cohort Default Rates, 3 (Sept. 28, 2016).

[22] Consumer Fin. Prot. Bureau, *Student Loan Servicing: Analysis of Public Input*, 140-41 (Sept. 2015).

inequities in family wealth, education, and employment.  For generations, government-sanctioned policies kept African-American families from accumulating wealth through such practices as redlining, restrictive covenants, lending discrimination, and encouraging neighborhood segregation.[23]  With less wealth than their white peers, Black students are more likely than other racial groups to borrow and to borrow more for their education.[24]  A 2016 analysis found that Black students on average graduated with about $7,400 more student loan debt than their white peers.[25]  Disparities in income alone do not explain the gap,[26] and these disparities only widen after graduation.[27]  This same 2016 analysis found that the Black-White student debt gap more than tripled to a $25,000 difference in just four years after graduation.[28]  According to a recent empirical study,  these racial disparities are almost certainly an underestimation.[29]  Black and Latino students are also overrepresented in high-cost, low-quality for-profit institutions, which are

---

[23] *See, e.g.,* Amy Traub, Laura Sullivan, Tatjana Meschede, and Tom Shapiro*, The Asset Value of Whiteness: Understanding the Racial Wealth Gap* (2017), Demos*,* http://www.demos.org/publication/asset-value-whiteness-understanding-racial-wealth-gap; Katie Nodjimbadem, *The Racial Segregation of American Cities Was Anything But Accidental* (2017), Smithsonian, https://www.smithsonianmag.com/history/how-federal-government-intentionally-racially-segregated-american-cities-180963494/.

[24] Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing* (2015), Demos, https://www.demos.org/publication/debt-divide-racial-and-class-bias-behind-new-normal-student-borrowing.

[25] Judith Scott-Clayton and Jing Li, *Black-white disparity in student loan debt more than triples after graduation* (Oct. 2016), The Brookings Institute, https://www.brookings.edu/research/black-white-disparity-in-student-loan-debt-more-than-triples-after-graduation/.

[26] Michal Grinstein-Weiss, Dana C. Perantie, Samuel H. Taylor, Shenyang Guo, and Ramesh Raghavan, *Racial disparities in education debt burden among low- and moderate-income households*, Children and Youth Services Review Vol. 65 (June 2016), p. 166.

[27] Scott-Clayton, *Black-white disparity in student loan debt more than triples after graduation* (2016).

[28] *Id.*

[29] Jason N. Houle & Fenaba Addo, *Racial Disparities in Student Loan Debt and the Reproduction of The Fragile Black Middle Class*, CDE Working Paper No. 2018-02, https://www.ssc.wisc.edu/cde/cdewp/2018-02.pdf.

notorious for encouraging students to take on greater amounts of debt while failing to provide increased employment prospects.[30] As a result, the issues facing the for-profit sector—including higher than average loan balances and higher default rates—have a greater impact on students of color.[31] Discrimination in the labor market represents another barrier to repayment. Once in the workforce, graduates of color have lower wages than their white peers, even when controlling for education level.[32] These factors combine to create an environment where borrowers of color have outsized debt but insufficient means for repayment.

It is therefore not surprising that Black and Latino borrowers experience higher rates of default than white borrowers (49%, 36%, and 21% respectively).[33] Black and Latino borrowers also report higher rates of late payment on student loans as compared to white borrowers (49%, 41%, and 32% respectively).[34] Moreover, this debt becomes more burdensome over time for Black students: the typical African American student who started college in 2003-04 and took on debt

---

[30] Leadership Conference on Civil & Human Rights, *Gainful Employment: A Civil Rights Perspective* 2 (2014), http://www.protectstudentsandtaxpayers.org/wp-content/uploads/2014/10/Gainful-Employment-Civil-Rights-Perspective_WhitePaper_October2014.pdf.

[31] Peter Smith and Leslie Parrish, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures* (Oct. 2014), Center for Responsible Lending, http://www.responsiblelending.org/student-loans/research-policy/CRL-For-Profit-Univ-FINAL.pdf.

[32] Bureau of Labor Statistics, *Median weekly earnings by educational attainment in 2014* (2015), https://www.bls.gov/opub/ted/2015/median-weekly-earnings-by-education-gender-race-and-ethnicity-in-2014.htm.

[33] Ben Miller, *New Federal Data Show a Student Loan Crisis for African American Borrowers*, Center for American Progress (2017), https://www.americanprogress.org/issues/education-postsecondary/news/2017/10/16/440711/new-federal-data-show-student-loan-crisis-african-american-borrowers/.

[34] Financial Industry Regulatory Authority, *Financial Capability in the United States 2016* (2016), http://www.usfinancialcapability.org/downloads/NFCS_2015_Report_Natl_Findings.pdf.

owed 113% of what they originally borrowed 12 years later, compared to the typical white borrower, who owed around 65% of their original loan balance.[35]

Borrowers of color are more likely to experience financial distress on their loans than their white counterparts,[36] and servicers should provide borrowers in such distress with the options for staying in good standing on their loans.  As a result, borrowers of color are the most exposed to loan servicers' unfair, deceptive, or abusive tactics that prevent distressed borrowers from reaching optimal options.  A recent analysis of the 2016 Survey of Consumer Finances, for example, suggests that Black households would disproportionately benefit from greater access to IDR plans. The highest proportion of Black families report "not making payments" because they are in forbearance, unable to afford payments, or in another loan forgiveness program.[37]  Most borrowers in this position are eligible for IDR plans which generally provide the most complete relief for the reasons described above.  When loan servicers fail to assist students to get into such plans—for example, by steering borrowers into forbearances instead of IDR plans—the adverse consequences are disproportionately borne by borrowers of color who face increasing debt rather than enrollment in a manageable repayment plan.  Thus, borrowers of color and their communities have a heightened interest in preserving their rights under state consumer protection laws to combat unfair and deceptive practices by student loan servicers.  Beyond the irreparable harm to individual borrowers, insulating servicers from such state law claims exacerbates racial economic gaps and hinders minorities' ability to obtain wealth and security.

---

[35] *Id.*

[36] *See* Marshall Steinbaum and Kavya Vaghul, *How the student debt crisis affects African Americans and Latinos*, Washington Center for Equitable Growth (Feb. 17, 2016), http://equitablegrowth.org/how-the-student-debt-crisis-affects-african-americans-and-latinos/.

[37] Kristin Blagg, *The demographics of income-driven student loan repayment*, Urban Wire (Feb. 2018), https://www.urban.org/urban-wire/demographics-income-driven-student-loan-repayment.

These larger trends are particularly true in the District of Columbia.  While only five percent of white borrowers in D.C. have student loan debt in collections, fifteen percent of nonwhite borrowers do.[38]  This trend also holds true across the entire population of those with a credit record—one percent of D.C.'s white population have student loan debt in collections, compared to four percent of D.C.'s nonwhite population.[39]  Of note, D.C.'s racial disparity is far wider than the national average.[40]

### III.   HEA PREEMPTION OF STATE CONSUMER PROTECTION LAWS WOULD HAVE DISASTROUS IMPLICATIONS FOR THE MOST VULNERABLE CONSUMERS WHO DEPEND UPON ROBUST ENFORCEMENT OF STATE LAWS FOR PROTECTION.

#### A.  The Department of Education Has Limited Statutory Authority and Has Failed to Use What Limited Authority It Has

In support of its claim that the HEA preempts state regulation of student loan servicers, SLSA asserts that federal student loans are "highly regulated" by the Department.  SLSA Am. Compl. ¶ 37, Dkt. 19.  SLSA is mistaken.  SLSA points to the Department's authority to issue regulations, adopt standard forms, and audit lenders or guarantee agencies and cites various regulations promulgated by the Department.  SLSA describes the regulations as "all-encompassing."  *Id.* at ¶ 42.  In fact, the Department's regulations provide few borrower protections; they are more in the nature of programmatic guidance.  Moreover, the Department's regulations only offer protection for borrowers when (1) they are enforced and (2) servicing errors on a loan are resolved and remedied for that individual borrower.  Under the HEA, the Department lacks a strong enforcement mechanism, with *no* ability bring an enforcement action against a

---

[38] The Urban Institute, *Debt in America: An Interactive Map*, https://apps.urban.org/features/debt-interactive-map/.
[39] *Id.*
[40] *Id.*

servicer to provide remedies to borrowers for consumer protection violations.  The Department's current approach to oversight of servicers neither induces proper servicing practices, nor remedies the harms to borrowers caused by improper servicing practices.

Earlier this year (only days before SLSA filed its original complaint in this matter), the Department published an interpretation that the HEA broadly preempts State regulation.[41]  This March 2018 Notice suggested that state consumer protection oversight was not necessary by pointing to the Department's "Existing Borrower Protections," described as (1) the Department's monitoring of servicer compliance with the Department's contracts; (2) performance incentives, driven by the Department's system for allocating more loans to servicers and higher payment rates for loans that are in a non-delinquent status; (3) a "Feedback System" where borrowers can report issues or file complaints about their loan servicing, which includes elevation of certain complaints to the FSA Ombudsman Group.[42]

None of these "protections" are adequate substitutes for state consumer protection laws. The first two sources of authority only offer protection in the aggregate.  For example, the Department uses a formula to determine allocation of new loans among servicers with whom the Department contracts.  However, this formula does not directly measure a servicer's compliance with either program guidelines or applicable laws.[43]  Moreover, at best, the Department's

---

[41] Federal Preemption and the State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10619, (Mar. 12, 2018) ("March 2018 Notice").

[42] *Id.* at 10622.

[43] While the formula allocates the most weight to a servicer's relative score among its peers on quarterly customer satisfaction surveys, the surveys only reach approximately 250 borrowers per quarter. *Explanation of Allocation and Performance Measure Methodology,* Federal Student Aid an Office of the U.S. Department of Education (Sept. 9, 2018, 3:00 PM), https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/12312017/ExplanationQ uarterEnd123117.pdf. The remaining four factors only broadly measure consumer well-being;

monitoring and allocation methodology might address large-scale mishandling of loans by a servicer only *after* borrowers have been harmed.  Those who end up in forbearance rather than IDR plans, or find that their payments have been improperly allocated, charged, or not recorded must take solace in the prospect that, eventually, their servicer might get a smaller allocation of more loans.[44]

The feedback system similarly does not provide a clear mechanism to remedy errors. Whatever the benefits of the feedback system, they are obtained informally—the borrower cannot petition the Department or otherwise seek formal review of the legality of the servicer's actions.[45] Likewise, the Department itself cannot bring an enforcement action to resolve the borrower's complaint or even multiple complaints from borrowers.[46]  Moreover, the feedback system only helps borrowers who complain to the Department, not those that complain to their servicer.  The Department lacks an oversight system of how servicers handle such complaints.[47]

In July of this year, GAO provided an update to Congress indicating that the Department has yet to resolve either the misalignment of its allocation method or the complaint tracking

---

none indicate the frequency or severity of improper servicing practices.  *Id.*  Without any concrete metric identifying improperly serviced loans, it is unclear that even a sizable number of mistakes would affect a servicer's overall compensation, much less the mishandling of an individual loan.

[44] However, the current allocation methodology appears to fail at even this modest goal.  In May 2016, a GAO analysis found the Department's allocation system lacks "any performance metrics to measure servicers' program compliance." U.S. Gov't Accountability Off., GAO-16-523, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* 26, 29 (May 2016), https://www.gao.gov/assets/680/677159.pdf.

[45] *Id.* at 18.

[46] Federal law endows the Department with relatively blunt enforcement powers.  *See* 20 U.S.C. § 1083(f)(4).

[47] *See* U.S. Gov't Accountability Off., GAO-16-523, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* 18 (May 2016), https://www.gao.gov/assets/680/677159.pdf.

system.[48]  The fact that these longstanding issues remain unresolved is particularly troubling in light of the Department's recent prolific, aggressive challenges to the authority of both state and federal regulators to protect consumers against loan servicers.  *See infra* Part III.C.  The GAO did report that the Department continues to work on these unresolved issues.  However, this stated aspiration to become competent at monitoring loan servicers hardly justifies preempting states from their traditional role in consumer protection.

### B.  Vulnerable Consumers Depend Upon State Oversight for Protection Within the Student Loan Sector

Because the Department's regulatory scheme and monitoring do not directly remedy improper loan servicing, student borrowers depend upon state law to address harms caused by loan servicers.  Federal law affords borrowers few alternatives.  "It is well-settled that the HEA does not expressly provide debtors with a private right of action."  *Cliff*, 363 F.3d at 1123 (citing *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1221 (11th Cir. 2002) and *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995)).  Outside of a few protections offered under federal law, such as the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, which often may not apply to their claims, state law is the only means by which student borrowers may pursue their legal rights against a loan servicer.  Preemption of state laws would leave these borrowers with no means of judicial recourse whatsoever when they are harmed.  The absence of any private right of action under the HEA cuts against giving the Act a broad reading of preemption.  "[I]t is, to say the least, 'difficult to believe that Congress would, without comment, remove all means of

---

[48] U.S. Gov't Accountability Off., GAO-18-587R, *Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers* (July 27, 2018), https://www.gao.gov/assets/700/693475.pdf.

judicial recourse for those injured by illegal conduct . . . .'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

487 (1996) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)).

### C. The Department's Recent Reversal of Long-Standing Policies has Heightened the Need for State Oversight and Enforcement of Student Loan Servicers

SLSA initiated this action in the midst of a series of steps by the Department which seeks

to leave student borrowers with fewer protections and prevent any other government body, state

or federal, from coming to their aid.[49]  Indeed, this action is part of a strenuous effort by the

Department and loan servicers not to protect federal interests, but to reach an outcome whereby no

government entity provides meaningful regulation.  Without a clear basis for broad preemption

under the HEA, the protection of student borrowers must not be left solely to a regulator with

limited enforcement authority and a propensity to shield servicers from investigation.

The Department's recent vigorous assertion of its supremacy is in stark contrast to its

previous statements regarding preemption.  Prior to 2017, the Department had acknowledged the

role of state regulation in the student loan servicing context[50] and narrowly-tailored the preemption

of state law under express HEA provisions.[51]  Moreover, the Department had shown a willingness

to work with state and federal regulators to address issues in the student loan servicing context.

---

[49] *See, e.g.,* Letter from Kathleen Smith, Acting Under Secretary, and A. Wayne Johnson, (former) COO of Federal Student Aid to Richard Cordray, Director, Consumer Fin. Prot. Bureau (Aug. 31, 2017), https://edworkforce.house.gov/uploadedfiles/2017-09-01_signed_letter_to_cfpb.pdf  (revoking agreements with the CFPB to facilitate oversight, claiming "[t]he Department has full oversight responsibility for federal student loans.")

[50] Letter from the U.S. Dep't of Educ. to Jedd Bellman, Assistant Commissioner, State of Md. (Jan. 21, 2016).

[51] Stafford Loan, Supplemental Loans for Students, PLUS, and Consolidation Loan Programs, 55 Fed. Reg. 40120-1 (Oct. 1, 1990).

For example, a September 2015 joint announcement by the Department, the Department of Treasury, and the CFPB recognized the need for a comprehensive approach.[52]

The recent change in approach has been swift.  As noted above, SLSA filed this action shortly after the Department published the March 2018 Notice, asserting a broad theory of preemption.  The March 2018 Notice followed a number of statements by the Department, declaring that it has sole authority to intervene in handling federal student loans, leaving little or no room for the traditional consumer protection role of state governments.  *See supra* Part III.A. The Department has also sought to limit the effectiveness of the CFPB, an independent financial regulator with authority related to student loan servicing.[53]

On August 31, 2017, the Department informed the CFPB that it intended to terminate two memoranda of understanding pertaining to the supervision of student loan servicers and complaints against them.[54]  In its letter stating its intent to abandon the memoranda, the Department stated that it "has full oversight responsibility for federal student loans" and that the handling of complaints related to servicing of federal student loans was outside the jurisdiction of the CFPB.[55] The Department's letter provided no basis for either characterization.

Equally troubling, the Department has provided a basis for student loan servicers to resist disclosing information to state and federal investigators.  In December 2017, the Department issued a memorandum proclaiming that "all federal student loan servicers must comply with the

---

[52] Press Release, Dep't of Educ., Department of Education, Department of Treasury and the Consumer Financial Protection Bureau Issue Joint Principles on Student Loan Servicing (Sept. 29, 2015), https://www.ed.gov/news/press-releases/department-education-department-treasury-and-consumer-financial-protection-bureau-issue-joint-principles-student-loan-servicing.
[53] The CFPB is a creation of the Dodd-Frank Act and generally has authority to enforce federal consumer protection laws. *See generally* 12 U.S.C. 5481.
[54] Letter from Kathleen Smith et al., *supra* note 49.
[55] *Id.*

requirements of the Privacy Act" and "[a]ll records maintained in any Department systems of records to which the Department provides its contractors access remain at all times records of the Department, not records of a contractor."[56]  The memorandum goes on to state that any third-party request for these records "must be made directly to the Department [of Education]".[57]  Under this reasoning, a servicer's record of handling an account—including recorded customer calls, application of payments, etc.—is a record subject to the Privacy Act.  This policy effectively inserts the Department into any investigation concerning a servicer's handling of the loan.[58]

As noted above, *supra* Part I, states have brought enforcement actions to protect student loan borrowers being harmed in violation of state and federal law.  The Department has recently come to the aid of industry in these state proceedings by filing Statements of Interest, such as in the lawsuit brought by the Commonwealth of Massachusetts against the loan servicer PHEAA, discussed earlier.  While the Massachusetts court upheld the state law claims against PHEAA by reading the Department's Statement of Interest narrowly, *see supra* Part I, the fact that the Statement of Interest was filed at all—which SLSA notes is a rare step for the Department of Justice to take, dkt. 19 ¶ 139—indicates the degree of hostility that the new administration has

---

[56] Memorandum from Patrick A. Bradfeld, Director, Federal Student Aid Acquisitions, Dep't of Educ. (Dec. 17, 2017), Dkt. 19-17, Ex. Q, at 2.

[57] *Id.* at 2.

[58] The Department's new privacy policy substantially risks hampering rather than fostering consumer protection as illustrated by a recent ruling by the Middle District of Pennsylvania on a discovery dispute between the CFPB and Navient.  Following the denial of Navient's motion to dismiss, the CFPB had sought discovery from Navient. Navient resisted discovery regarding the records, which it did not dispute were within its possession, by claiming that the Privacy Act precluded disclosure on the basis that "the discovery dispute is really between [CFPB] and the Department of Education." The district court ultimately resolved the dispute by ruling that Navient could not shield the documents from discovery. Memorandum Opinion, *Consumer Financial Protection Bureau v. Navient,* 103, 3:17- CV-101, (M.D. PA., Aug. 10, 2018). That the CFPB encountered a defendant using the Department as a shield illustrates how the Department's newfound views harbor hostility to consumer protection.

expressed towards state enforcement of consumer protection statutes.  (And the Department of Justice has again filed on behalf of the Department of Education in this case.  Dkt. 20.)

This sequence of events culminated in the issuance of the Department's March 2018 Notice and SLSA's initiation of this matter.  Similar litigation has been filed against the Department of Connecticut's regulation of student loan servicing, with the same set of unilateral actions by the Department as its basis.[59]

The Department is not implementing a new legislative scheme.  Indeed, the most significant change in the student loan servicing landscape in recent years is the creation of the now six years-old CFPB and its authorization to enforce consumer financial protection laws against student loan servicers.[60]  Meanwhile, states are merely acting within their traditional role in enforcing and implementing consumer protections, as they do in other contexts.  However, the Department's new approach seeks to cut off the CFPB and shut down states' traditional consumer protection role in an area where borrowers have little recourse save for state law.

## IV.   D.C. IS MERELY STEPPING IN, AS OTHER STATES HAVE, TO ENACT STATUTORY SCHEMES DESIGNED TO PROTECT BORROWERS

States are well-positioned to provide consumer protections for borrowers.  Consumer protection more broadly is historically a classic example of police powers left to the competence of states.  *Cipollone v. Liggett Group,* 505 U.S. 504 (1992).  Every state has a consumer protection law that prohibits the deceptive practices of companies; many states also prohibit unfair or unconscionable practices as well.[61]  States are as capable of regulating student loan servicers as

---

[59] Complaint, *Pennsylvania Higher Education Assistance Agency v. Perez et al.*, No. 18-1114 (D. Conn. July 2, 2018).
[60] *See generally* 12 U.S.C. § 5491 *et seq*.
[61] Carolyn Carter, *Consumer Protection in the States: A 50-State Evaluation of Unfair and Deceptive Practices Laws,* National Consumer Law Center at 9 (March 2018), http://www.nclc.org/images/pdf/udap/udap-report.pdf.

they are other forms of consumer products, as they have traditionally done.  States are considering and, in many cases, passing legislation to regulate student loan servicing.  *See supra* Part I.B.

### A.  The HEA Does Not "Occupy the Field"

The "two cornerstones of . . . pre-emption jurisprudence" are "[f]irst, the purpose of Congress is the ultimate touchstone in every pre-emption case" and "[s]econd in all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . [the court] start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotations omitted).  "[C]onsumer protection is a field traditionally regulated by the states  .  .  . and the Supreme Court has [] reaffirmed that there is a presumption against finding implied preemption of state law in these fields."  *Cliff*, 363 F.3d at 1125-26 (internal citations omitted); *see also Cipollone,* 505 U.S. at 518 (referring to the "presumption against the pre-emption of state police power regulations").  Absent a "clear and manifest" indication that Congress intended to preempt state law, federal law cannot preempt "the historic police powers of the States."  *Medtronic, Inc.*, 518 U.S. at 485.  The evidence for Congress's intent to preempt the states' traditional role in consumer protection must be compelling.  *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990). "[T]he presumption against preemption is even stronger against preemption of state remedies . . . when no federal remedy exists."  *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005).

Far from presenting compelling evidence that Congress intended to entirely displace state law, the language of the HEA suggests that Congress intended preemption to be "narrow and precise."  *Keams v. Tempe Technical Institute, Inc.,* 39 F.3d 222, 225-26 (9th Cir. 1994).  The Act

includes only "isolated preemptive provisions that expressly preempt certain provisions of state law" suggesting Congress did not intend to preempt state law more generally.  *Cliff*, 363 F.3d at 1124-25.  "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (internal quotation marks omitted). The "presumption against finding implied preemption of state [consumer protection] law . . . is reinforced by those provisions of the HEA . . . that *expressly preempt isolated provisions of state law*."  *Cliff*, 363 F.3d at 1125-26 (emphasis added).

Courts have rejected arguments that the HEA supports field preemption.  *See, e.g., Keams*, 39 F.3d at 225-26.[62]  Even where it did find conflict preemption in limited circumstances, the Ninth Circuit in *Chae* acknowledged "under our precedent field preemption is off the table to resolve this case involving the HEA and its attendant federal regulations."  *Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010); *see also Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 596 n.6 (4th Cir. 2005) ("Our analysis reveals that the courts addressing the issue have consistently concluded that the HEA does not occupy the field of higher education loans.").

**B. Conflict Preemption Requires an Actual Conflict, Not Hypothetical Future Conflicts Such as Those Identified in SLSA's Complaint**

The HEA and its implementing regulations create "conflict preemption" to the extent that a particular state law makes it impossible to comply with both or that state law obstructs or

---

[62] In *Keams*, the Ninth Circuit found that an "implication [theory of preemption] cannot be reconciled with the narrow and precise preemptions expressed. It is apparent from the language of the express preemption clauses [in the HEA] that Congress expected state law to operate in much of the field in which it was legislating. Thus, there can be no inference that Congress 'left no room' for supplementary state regulation."  *Keams*, 39 F.3d at 225-26 (citations omitted).

frustrates the objectives and purposes of the federal statutory scheme.  *See Wyeth*, 555 U.S. at 571-73, 588-89.  "Impossibility pre-emption is a demanding defense."  *Id.* at 573.  "The mere possibility that a claim based on [state law] *might* be preempted by the HEA is not enough for us to conclude that [the state law claim] *is* preempted, especially when it is clear that third-party debt collectors can comply with both the HEA and [the state law]."  *Cliff*, 363 F.3d at 1127 (emphasis in original).  Furthermore, "an entire state statute is not preempted because some of its provisions may actually conflict with federal law."  *Id.* at 1129.  "The correct analysis is therefore whether a claim arising under each of the asserted provisions of [state law] is preempted, not whether the [state law] as a whole is preempted . . . ."  *Williams v. Educ. Credit Mgmt. Corp.*, 88 F. Supp. 3d 1338, 1345 (M.D. Fla. 2015).

Among courts, there is hardly a consensus that "uniformity" is a critical purpose of the HEA or that "uniformity" justifies displacement of state law.  Courts have declined to find "uniformity" an important goal of the HEA.  *See Coll. Loan*, 396 F.3d at 597 ("We are unable to confirm that the creation of 'uniformity' . . . was actually an important goal of the HEA. . . . [N]either the district court nor the parties have explained how these statutory purposes would be compromised by a lender, such as College Loan, pursuing breach of contract or tort claims against other lenders or servicers."); *Davis v. Navient Corp.*, No. 17-CV-00992, 2018 WL 1603871, at *3 (W.D.N.Y. Mar. 12, 2018) (declining to follow *Chae* and rejecting argument that "Congress intend[ing] to create a uniform structure for serving FFELP loans . . . is inconsistent with allowing regulation through state law causes of action").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or in the alternative, for summary judgment, should be granted.

Respectfully Submitted,

/s/ Martha U. Fulford
Martha U. Fulford (D.C. Bar # 1011954)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1015 15th St NW, Suite 600
Washington D.C. 20005
Tel: 202-734-7495
martha@nsldn.org

/s/ Jon M. Greenbaum
Jon M. Greenbaum (D.C. Bar # 489887)
Brenda Shum*
Genevieve Bonadies Torres*
Samuel Weiss*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW
Washington, DC 20005
Tel: (202) 662-8600
jgreenbaum@lawyerscommittee.org

/s/ William R. Corbett
William R. Corbett
Lisa Stifler
CENTER FOR RESPONSIBLE LENDING (CRL)
302 West Main Street
Durham, NC 27701
Tel: (919) 313-8544
Will.Corbett@responsiblelending.org

Dated:  September 10, 2018               COUNSEL FOR *AMICI CURIAE*

                                         *D.C. bar membership pending, practice is
                                         limited pursuant to D.C. App. Rule 49(c)(3)*