**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STUDENT LOAN SERVICING ALLIANCE,

       Plaintiff,

v.

STEPHEN C. TAYLOR;
CHARLES A BURT; and
DISTRICT OF COLUMBIA.

       Defendants.

Civil Action No. 1:18-cv-0640 (PLF)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION
<u>FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ON FEDERAL STUDENT LOANS ....................................... 3

    The Federal Student Loan Industry under the HEA ..................................... 3

    Role of Servicers ........................................................................................ 6

    States' Recent Attempts to Regulate Services .............................................. 9

PROCEDURAL HISTORY ............................................................................... 10

    D.C. Law 21-214 ...................................................................................... 10

    The District of Columbia Issues the First Two Sets of Emergency Rules ...... 12

    SLSA Files this Lawsuit and the District of Columbia Responds with  New
        Emergency Rules and a Motion to Dismiss ........................................... 14

    The District of Columbia Issues Final Rules and SLSA Files an Amended
        Complaint ............................................................................................ 15

STANDARDS OF REVIEW ............................................................................. 16

I.      STANDING UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) .............. 16

II.    STANDARD OF REVIEW UNDER FEDERAL RULE OF CIVIL
       PROCEDURE 12(B)(6) ........................................................................... 16

III.   STANDARD OF REVIEW UNDER FEDERAL RULE OF CIVIL
       PROCEDURE 56 ................................................................................... 17

ARGUMENT .................................................................................................... 18

I.      SLSA HAS STANDING TO CHALLENGE THE DISTRICT'S FINAL RULES ........ 18

    A.     SLSA Members' Servicing of Private Loans Is Irrelevant ................... 18

    B.     The Harm is Not Hypothetical ........................................................... 21

II.    SLSA IS ENTITLED TO SUMMARY JUDGMENT THAT FEDERAL LAW
       PREEMPTS D.C. LAW 21-214 AND THE FINAL RULES ........................... 22

    A.     SLSA's Preemption Claims Are Squarely Supported by Established Case
         Law ................................................................................................. 22

    B.     No Presumption Against Preemption Applies ..................................... 25

    C.     The Department of Education's Preemption Notice and Statement of
         Interest Are Entitled to Significant Deference ................................... 27

    D.     Federal Law Preempts D.C. Law 21-214 and the Final Rules under
         Conflict Preemption ......................................................................... 29

         1.      The District's licensing scheme is preempted as applied to
              Servicers of FDLP Loans and Government-Owned FFELP Loans ........ 31

# TABLE OF CONTENTS
(continued)

2.     The Final Rules create a conflict with the Privacy Act .......................... 39

3.     Federal law preempts D.C. Law 21-214 and the Final Rules as applied to the servicing of FFELP Loans ................................................ 41

E.    Federal Law Preempts D.C. Law 21-214 and the Final Rules under Field Preemption .......................................................................................................... 45

F.    Federal Law Preempts the Disclosure Requirements in D.C. Law 21-214 and the Final Rules under Express Preemption ................................................... 49

CONCLUSION ...................................................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguayo v. U.S. Bank,*
    653 F.3d 912 (9th Cir. 2011) ................................................26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).............................................................17

*Arizona v. United States,*
    567 U.S. 387 (2012).............................................................49

*Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.,*
    168 F.3d 1362 (D.C. Cir. 1999) .....................................46, 47

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ..............................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).............................................................16

*Auer v. Robbins,*
    519 U.S. 452 (1997).............................................................27

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................16

*Bowles v. Seminole Rock & Sand Co.,*
    325 U.S. 410 (1945).............................................................27

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988).......................................................38, 48

*Brannan v. United Student Aid Funds, Inc.,*
    94 F.3d 1260 (9th Cir. 1996) ...............................................30

*Brooks v. Salle Mae, Inc.,*
    No. FSTCV096002530S, 2011 WL 6989888 (Conn. Super. Ct. Dec. 20, 2011)...................22

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001).............................................................25

*California v. ARC America Corp.*,
490 U.S. 93 (1989) ............................................................................................25

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) ..................................................................... *passim*

*College Loan Corp. v. SLM Corp.*,
396 F.3d 588 (4th Cir. 2005) ...........................................................................46, 47

*Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance
Agency*,
Case No. 1784CV02682 ...............................................................................9, 22

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)..............................................................................29, 30, 39

*Davis v. Navient Corp.*,
No. 17-cv-00992-LJV-JJM, 2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018) ........................22

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) ..........................................................................................30

*Gartrell Constr. Inc. v. Aubry*,
940 F.2d 437 (1991) ............................................................................... *passim*

*Genna v. Sallie Mae, Inc.*,
No. 11 Civ. 7371(LBS), 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012) .............................22

*Hillman v. Maretta*,
569 U.S. 483 (2013)..........................................................................................26

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) ..............................................................................17

*Humane Soc'y v. Vilsack*,
797 F.3d 4 (D.C. Cir. 2015) .................................................................................16

*Keams v. Tempe Tech. Inst., Inc.*,
39 F.3d 222 (9th Cir. 1994) .................................................................................46

*Lawson-Ross v. Great Lakes Higher Education Corps.*,
Case No. 1:17-CV-253-MW/GRJ............................................................................9, 51

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) ............................................................................... *passim*

*Linsley v. FMS Inv. Corp.*,
No. 3:11CV961 (VLB), 2012 WL 1309840 (D. Conn. Apr. 17, 2012)...................................22

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007)...........................................................................................................27

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011)........................................................................................................17

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)...........................................................................................................30

*Mobil Oil Corp. v. Virginia*,
940 F.2d 73 (4th Cir. 1991) ...............................................................................................20

*Nat'l Recycling Coal., Inc. v. Browner*,
984 F.2d 1243 (D.C. Cir. 1993) .........................................................................................16

*Nelson v. Great Lakes Educational Loan Services, Inc., et al.*
(Case No. 3:17-CV-00183-NJR-SCW) ...........................................................................9, 51

*North Dakota v. United States*,
495 U.S. 423 (1990)...........................................................................................................45

*Oneok, Inc. v. Learjet, Inc.*,
135 S. Ct. 1591 (2015)........................................................................................................46

*Paulin v. The George Washington University School of Medicine and Health
Sciences*,
878 F. Supp. 2d 241 (D.D.C. 2012) ...................................................................................17

*Pennsylvania Higher Education Assistance Agency v. Perez, et al.*,
Case No. 1:18-cv-00770-CKK.................................................................................10, 22, 27

*Poindexter v. Wachovia Mortgage Corp.*,
No. 1:09-cv-1392, 2012 WL 1071248 (D.D.C. 2012)........................................................17

*Public Utilities Comm'n v. United States*,
355 U.S. 534 (1958)...........................................................................................................20

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
136 S.Ct. 1938 (2016)........................................................................................................27

*Rowe v. Educ. Credit Mgmt. Corp.*,
559 F.3d 1028 (9th Cir. 2009) .............................................................................................3

*Sperry v. Florida ex rel. The Fla. Bar*,
   373 U.S. 379 (1963) ...................................................................................32

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ...................................................................................28

*United States v. Virginia*,
   139 F.3d 984 (4th Cir. 1998) ..............................................20, 21, 32, 35

*Volt Info. Sciences v. Stanford Univ.*,
   489 U.S. 468 (1989) ...................................................................................30

*Wisc. Pub. Intervenor v. Mortier*,
   501 U.S. 597 (1991) ...................................................................................45

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ...................................................................................28

**Statutes**

5 U.S.C. § 552a(b) ...............................................................................................39

5 U.S.C. § 552a(m)(1) .........................................................................................39

12 U.S.C. § 1464 ..................................................................................................52

20 U.S.C. § 1018(c)(1) .........................................................................................36

20 U.S.C. § 1070, *et seq.* ...................................................................................46

20 U.S.C. § 1071(a)(1)(A), (B), (D) ....................................................................41

20 U.S.C. § 1071, *et seq.* ................................................................................3, 7

20 U.S.C. § 1077(a)(2)(C) .....................................................................................6

20 U.S.C. § 1078-8(e)(7) .......................................................................................6

20 U.S.C. § 1078-10 ..............................................................................................6

20 U.S.C. § 1078-11 ..............................................................................................6

20 U.S.C. § 1078-12 ..............................................................................................6

20 U.S.C. § 1078(b)(1)(M) ....................................................................................6

20 U.S.C. § 1082(a)(1) ................................................................................................6

20 U.S.C. § 1082(c)(2) ..............................................................................................52

20 U.S.C. § 1083 .............................................................................................. *passim*

20 U.S.C. § 1087 ........................................................................................................6

20 U.S.C. § 1087a, *et seq.* ......................................................................................3, 7

20 U.S.C. § 1087e .................................................................................................6, 50

20 U.S.C. § 1087f ............................................................................................ *passim*

20 U.S.C. § 1098e ......................................................................................................6

20 U.S.C. § 1098f(a) ..................................................................................................6

20 U.S.C. § 1098g ........................................................................................... *passim*

D.C. Code § 31-233 ..................................................................................................20

Department of Insurance and Securities Regulation Establishment Act of 1996 .........................10

Ensuring Continued Access to Student Loans Act of 2008, Pub. L. 110-227 ..............4, 46, 47, 48

Health Care and Education Reconciliation Act in 2010, Pub. L. 111-152 ...................................47

Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965) ......................... *passim*

Home Owners' Loan Act of 1993 ..............................................................................52

Privacy Act ....................................................................................................... *passim*

Student Aid and Fiscal Responsibility Act .............................................................47, 48

Student Loan Reform Act of 1993 ..............................................................................4

Truth in Lending Act ................................................................................................52

U.S. Public Law 97-320 (Oct. 15, 1982) .................................................................52

**Regulations**

34 C.F.R. Part 682 .....................................................................................................7

34 C.F.R. Part 685 .....................................................................................................7

34 C.F.R. § 682.205 .................................................................................................44, 49, 51

34 C.F.R. § 682.205(a)(4) ...............................................................................................50

34 C.F.R. § 682.208 .........................................................................................................7

34 C.F.R. § 682.208(i) .....................................................................................................52

34 C.F.R. § 682.208(c)(3)(i) ...........................................................................................44

34 C.F.R. § 682.208(c)(3)(i) and (ii) .........................................................................36, 37

34 C.F.R. § 682.209 ...........................................................................................................6

34 C.F.R. § 682.210 ...........................................................................................................6

34 C.F.R. § 682.211 ...........................................................................................................6

34 C.F.R. § 682.215 ...........................................................................................................6

34 C.F.R. § 682.215 ...........................................................................................................6

34 C.F.R. § 682.216 ...........................................................................................................6

34 C.F.R. §§ 682.300 to 305 ...........................................................................................52

34 C.F.R. § 682.402 ...........................................................................................................6

34 C.F.R. § 682.407 ...........................................................................................................6

34 C.F.R. § 682.410(b)(1) ...............................................................................................52

34 C.F.R. § 682.410(b)(5) ...............................................................................................52

34 C.F.R. § 682.414 .........................................................................................................52

34 C.F.R. § 682.416 ...........................................................................................................7

34 C.F.R. § 685.204 ...........................................................................................................6

34 C.F.R. § 685.205 ...........................................................................................................6

34 C.F.R. § 685.208 ...........................................................................................................6

34 C.F.R. § 685.209 ...........................................................................................................6

34 C.F.R. § 685.209 ...........................................................................................................6

34 C.F.R. § 685.212 ...................................................................................................6

34 C.F.R. § 685.213 ...................................................................................................6

34 C.F.R. § 685.214 ...................................................................................................6

34 C.F.R. § 685.215 ...................................................................................................6

34 C.F.R. § 685.216 ...................................................................................................6

34 C.F.R. § 685.217 ...................................................................................................6

34 C.F.R. § 685.218 ...................................................................................................6

34 C.F.R. § 685.219 ...................................................................................................6

34 C.F.R. § 685.221 ...................................................................................................6

34 C.F.R. § 685.221 ...................................................................................................6

34 C.F.R. § 685.222 ...................................................................................................6

48 C.F.R. §§ 9.100 to 9.108-5....................................................................................33

65 D.C. Reg. 8395 ("Final Rules") ..................................................................... *passim*

**Other Authorities**

139 Cong. Rec. S5628 (daily ed. May 6, 1993).........................................................36

156 Cong. Rec. H1882 (Mar. 21, 2010) (statement of Rep. Miller)...........................47

156 Cong. Rec. H1914 (Mar. 21, 2010) (statement of Rep. Petri) .............................47

156 Cong. Rec. S2079–80 (Mar. 25, 2010) (statement of Sen. Leahy).......................47

156 Cong. Rec. S2087–88 (Mar. 25, 2010) (statement of Sen. Durbin) ....................47

83 Fed. Reg. 10619 (Mar. 12, 2018)..........................................................................27

83 Fed. Reg. at 10619–21 ..........................................................................................28

83 Fed. Reg. at 10620 ...............................................................................38, 42, 48

83 Fed. Reg. at 10621 ..................................................................................... *passim*

BLACK'S LAW DICTIONARY (10th ed. 2014) .............................................................50

Explanation of Allocation and Performance Measure Methodology, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/06302 017/ExplanationQuarterEnd063017.pdf ..................................................................8

FDLP.  Trends in Student Aid 2017, College Board, Oct. 2017, at 18, *available at* https://trends.collegeboard.org/ sites/default/files/2017-trends-student-aid_0.pd..........................................................................................................47

Fed. R. Civ. P. 56(a) ................................................................................................17

Fed. R. Civ. Proc. 12(b)(1) ....................................................................................16

Fed. R. Civ. Proc. 12(b)(6) ....................................................................................16

Fed. R. Civ. Proc. 56.........................................................................................17, 18

Federal Reserve, Financial Accounts of the United States – Z.1 (last updated June 7, 2018), *available at* https://www.federalreserve.gov/releases/z1/20180607/html/levels_matrix.htm......................5

Federal Reserve, Statistical Release: Consumer Credit – G.19 (July 9, 2018), *available at* https://www.federalreserve.gov/releases/g19/current/g19.pdf (showing $1.531 trillion in outstanding student loans as of June 2018)..................5

FFEL Program Lender and Guaranty Agency Reports, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/about/data-center/lender-guaranty ...........................4

FY 2018, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/ PortfolioSummary.xl..............................................................................................4

FY 2018, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/Portfoli oSummary.xls .......................................................................................................5

Great Lakes Servicing Contract, *available at* https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing......................................................................................................................8

H.R. 2055, 103rd Cong. (1993) ..............................................................................4

H.R. 4872, 111th Cong. (2010)..............................................................................47

H.R. 5715, 110th Cong. (2008).........................................................................4, 47

H.R. Rep No. 103-111 (1993)............................................................................................33

Higher Education Amendments of 1992, S. 1150, 102nd Cong. (1992) .........................................4

Loans, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/types/loans .........................4

Location of Federal Family Education Loan (FFEL) Program Loans, U.S. Dep't
    of Educ., *available at* https://studentaid.ed.gov/sa/sites/
    default/files/fsawg/datacenter/library/LocationofFFELPLoans.xls...........................................5

Location of FFELP Loans, U.S. Dep't of Educ., *available at*
    https://studentaid.ed.gov/sa/
    sites/default/files/fsawg/datacenter/library/LocationofFFELPLoans.xl ...................................5

Mary J. Davis, *Unmasking the Presumption in Favor of Preemption*, 53 S.C.L.
    REV. 963, 1016–1021 (2002) ................................................................................................41

Private Student Loan Report, *available at* https://www.measureone.com/psl.php .......................18

Student Loan Ombudsman Establishment and Servicing Regulation Amendment
    Act of 2016, D.C. Law 21-214 .............................................................................1, 10, 11, 54

*White House Fact Sheet, Presidential Memorandum, Student Aid Bill of Rights*
    (March 10, 2015), *available at* https://www.whitehouse.gov/the-press-
    office/2015/03/10/fact-sheet-student-aid-bill-rights-taking-action-
    ensurestrong-consumer-.........................................................................................................7

## INTRODUCTION

The Student Loan Servicing Alliance ("SLSA") is a non-profit, trade organization with a membership that consists of 24 student loan servicers and 14 affiliate members.  These members service over 95 percent of outstanding federal student loans.  *See* ECF No. 19, Am. Compl. ¶ 9; ECF No. 21-3.  SLSA brings this lawsuit, and now seeks summary judgment, because federal law that governs the servicing of federal student loans preempts the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016, D.C. Law 21-214, and final rules promulgated pursuant to it (the "Final Rules").  SLSA respectfully requests that this Court make this determination before the District of Columbia (the "District") begins enforcing D.C. Law 21-214 and the Final Rules this November.  This enforcement will necessarily include the District's passing on the fitness of SLSA's members to service federal student loans in the District.  SLSA's members should not be forced to expend more time and money to comply with this law and rules.

By passing D.C. Law 21-214 and the Final Rules, the District attempts to decide which servicers of federal student loans ("Servicers") can operate in the District.  Congress established the federal student loan programs as part of the Higher Education Act of 1965 (the "HEA") and created servicing standards.  The U.S. Department of Education, which administers the federal student loan programs as the creator, lender or reinsurer, and regulator of these loans, promulgated comprehensive regulations governing these programs and Servicers.  Today, the Department of Education selects Servicers, contracts with them, and commands that they service loans in accordance with specific criteria, including specifying the amounts Servicers can charge for servicing the loans.

1

D.C. Law 21-214 and the Final Rules require Servicers to apply for and obtain a license based on conditions not required under federal law, as well as accept the District's oversight authority and pay fees and assessments, before they can service federal loans of students in the District.  In so doing, the District has substituted its judgment for that of the federal government. D.C. Law 21-214 and the Final Rules thus threaten the federal government's ability to administer the federal student loan programs and the loans that the federal government funds and owns, and imperil the vitality of a critical piece of program administration: Servicers.

The District's actions are part of a growing trend of states attempting to license Servicers that has never before been litigated.  To be sure, federal courts have addressed suits by federal student loan borrowers ("Borrowers") against Servicers for alleged violations of state consumer protection laws where Servicers asserted federal preemption as an affirmative defense.  This lawsuit presents a different and simpler question:  May the District require Servicers to obtain— and maintain—a license in order to service federal student loans?  The answer is no.  Federal law preempts D.C. Law 21-214 and the Final Rules as to the servicing of federal student loans. There is simply no place for the District to substitute its judgment for that of the federal government, decide which Servicers the government may use to service these loans in the District, and impose upon Servicers additional or different requirements beyond, and in conflict, with those the federal government has mandated.  This Court should grant summary judgment in SLSA's favor and deny Defendants' Motion.

## BACKGROUND ON FEDERAL STUDENT LOANS

### *The Federal Student Loan Industry under the HEA*

Until recently, the federal government has governed and regulated federal student loan servicing without interference by state governments.  Federal student loan programs, and the servicing of loans issued pursuant to them, originated in 1965 with Congress' passage of the HEA.  Congress passed these programs "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education," Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1219 (1965), in order to "keep the college door open to all students of ability, regardless of socioeconomic background." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009) (internal quotation marks omitted).  As shown below, the vast majority of student loans are now owed to and owned by the federal government.

To effectuate these goals, Congress created two main federal student loan programs: the Federal Family Education Loan Program ("FFELP"), 20 U.S.C. § 1071, *et seq*., and, later, the William D. Ford Federal Direct Loan Program ("FDLP"), 20 U.S.C. § 1087a, *et seq*.  Servicers, such as SLSA's members, service loans issued under one or both programs.[1]  *See* ECF No. 19, Am. Compl. ¶ 9; ECF No. 21-3, Defs.' Statement of Material Facts ¶¶ 37–38.  Both FFELP and FDLP are entitlement programs.

---

[1] Currently nine of SLSA's members service all of the loans owned by the Department of Education.  *See* ECF No. 20, at 4 n.5; ECF No. 20-1 ¶ 5; ECF No. 21-3 ¶ 38.  Fifteen of SLSA's members (including the aforementioned nine) service Commercial FFELP Loans.  The last loan under FFELP was originated on June 30, 2010, *see infra* pp. 48-49, and therefore over time there will be fewer and fewer FFELP Loans.

FFELP, authorized as part of the HEA in 1965, obligates the federal government to reinsure loans made by banks (and other private lenders) and insured by guaranty agencies.  *See* FFEL Program Lender and Guaranty Agency Reports, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/about/data-center/lender-guaranty.

Subsequently, Congress authorized FDLP.  The program, which was originally a pilot program as part of the Higher Education Amendments of 1992, S. 1150, 102nd Cong. (1992) (enacted), was fully authorized through the Student Loan Reform Act of 1993 as part of the Omnibus Reconciliation Act of 1993.  H.R. 2055, 103rd Cong. (1993) (enacted).  In contrast to FFELP Loans, loans issued pursuant to FDLP are made and owned by the federal government. *See* Loans, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/types/loans.

More recently, Congress passed the Ensuring Continued Access to Student Loans Act of 2008 ("ECASLA"), Pub. L. 110-227, which gave the Department of Education authority to purchase through the end of the 2009-2010 academic year FFELP Loans that lenders originated from 2007 to 2010.  H.R. 5715, 110th Cong. (2008) (enacted).  Using its authority under ECASLA, the Department of Education purchased from private lenders approximately 3.91 million FFELP Loans with an outstanding balance of over $94 billion.  ECF No. 19-18, at 10–21. FFELP Loans that are owned by the federal government ("Government-Owned FFELP Loans") are therefore distinct from FFELP Loans owned by private lenders ("Commercial FFELP Loans").

FFELP Loans constitute $288.6 billion or approximately 20 percent of federal student loans.  *See* Federal Student Aid Portfolio Summary for the third quarter of FY 2018, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/

PortfolioSummary.xls.  However, Commercial FFELP Loans account for only $167.5 billion.[2]

*See* Location of FFELP Loans, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/

sites/default/files/fsawg/datacenter/library/LocationofFFELPLoans.xls.  FDLP Loans, in

contrast, constitute over $1.1 trillion or over 79 percent of federal student loans.  Federal Student

Aid Portfolio Summary for the third quarter of FY 2018, U.S. Dep't of Educ., *available at*

https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls.

Combining Government-Owned FFELP Loans and FDLP Loans, the federal government owns

and manages over 85 percent of all outstanding federal student loans.  *See id.* (showing the total

volume for all types of federal student loans); Location of Federal Family Education Loan

(FFEL) Program Loans, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/

default/files/fsawg/datacenter/library/LocationofFFELPLoans.xls (breaking down the FFELP

portfolio).

In total, federal student loans have grown to over $1.41 trillion in outstanding volume,

which is over 92 percent of all outstanding student loans in the country.  *See id.*; Federal

Reserve, Statistical Release: Consumer Credit – G.19 (July 9, 2018), *available at*

https://www.federalreserve.gov/releases/g19/current/g19.pdf (showing $1.531 trillion in

outstanding student loans as of June 2018).  Indeed, promissory notes issued to Borrowers

constitute over 45 percent of the financial assets of the federal government.  Federal Reserve,

Financial Accounts of the United States – Z.1 (last updated June 7, 2018), *available at*

https://www.federalreserve.gov/releases/z1/20180607/html/levels_matrix.htm.

---

[2] The outstanding volume of Commercial FFELP Loans has decreased 26.6 percent in the last
three years, in large part because Congress terminated FFELP in 2010 and required that all newly
issued federal student loans be FDLP Loans.  *See infra* pp. 48–49.

*Role of Servicers*

Servicers, who may service federal student loans under FFELP or under both FFELP and

FDLP,[3] play a vital role in the loan process and are valuable partners of the federal government

in making educational opportunities possible for millions of Americans and their families by

providing Borrowers unique assistance.  FFELP and FDLP are complex, and Servicers'

responsibilities are dictated by numerous federal statutory and regulatory requirements, as well

as contractual requirements for FDLP and Government-Owned FFELP Loans.

These programs contain a myriad of options designed to help Borrowers afford and

remain current on their student loan debt payments.  Specifically, the programs now boast 16

possible repayment plans, including 6 different income-driven repayment plans; 21 types of

deferments; 13 types of forbearance; and 8 different loan forgiveness/discharge options.[4]

To help Borrowers navigate these options and to lower the frequency of delinquency and

default, Congress enacted many requirements in the HEA and authorized the Secretary of

Education to prescribe regulations necessary to carry out the HEA's purposes, including

regulations applicable to Servicers.  *See, e.g.*, 20 U.S.C. § 1082(a)(1).  Pursuant to both statutes

and promulgated regulations, Servicers are responsible for a plethora of loan services to

---

[3] As the Defendants note, Servicers also may service private loans.  ECF 21-1, at 16.

[4] *See* 20 U.S.C. § 1078(b)(9), 20 U.S.C. § 1087e(d), 20 U.S.C. § 1098e, 34 C.F.R. § 682.209, 34 C.F.R. § 682.215, 34 C.F.R. § 685.208, 34 C.F.R. § 685.209, 34 C.F.R. § 685.221 (repayment plans);  20 U.S.C. § 1077(a)(2)(C), 20 U.S.C. § 1078(b)(1)(M), 20 U.S.C. § 1087e(f), 20 U.S.C. § 1098f(a), 34 C.F.R. § 682.210, 34 C.F.R. § 685.204 (deferments); 20 U.S.C. § 1078(c)(3), 20 U.S.C. § 1078(o), 20 U.S.C. § 1078-8(e)(7), 20 U.S.C. § 1087e(l)(2), 34 C.F.R. § 682.211, 34 C.F.R. § 685.205 (forbearance); 20 U.S.C. § 1078-10, 20 U.S.C. § 1078-11, 20 U.S.C. § 1078-12, 20 U.S.C. § 1087, 20 U.S.C. § 1087e(h), 20 U.S.C. § 1087e(m), 34 C.F.R. § 682.215, 34 C.F.R. § 682.216, 34 C.F.R. § 682.402, 34 C.F.R. § 682.407, 34 C.F.R. § 685.209, 34 C.F.R. § 685.212, 34 C.F.R. § 685.213, 34 C.F.R. § 685.214, 34 C.F.R. § 685.215, 34 C.F.R. § 685.216, 34 C.F.R. § 685.217, 34 C.F.R. § 685.218, 34 C.F.R. § 685.219, 34 C.F.R. § 685.221, 34 C.F.R. § 685.222 (loan forgiveness, discharge).

borrowers.  *See* ECF No. 19, Am. Compl. ¶¶ 38–41, 43.  For example, both the HEA and the

Department of Education regulations require Servicers to inform Borrowers of the special

programs available to them for short- and long-term economic hardship, ranging from

temporarily postponing payments to sustainable income-based repayment plans that adjust to the

Borrowers' earnings.  *See* 20 U.S.C. § 1083; 34 C.F.R. §§ 682.416, 682.208.  These services

help Borrowers avoid delinquency and default and allow for more efficient and effective

collection of these federal assets.  *See, e.g.*, 20 U.S.C. § 1071, *et seq.* (statutory scheme

governing FFELP); 34 C.F.R. Part 682 (regulations for FFELP); 20 U.S.C. § 1087a, *et seq.*

(statutory scheme governing FDLP); 34 C.F.R. Part 685 (regulations for FDLP).  Servicers thus

represent the federal government to Borrowers and provide a link to these government

repayment options.[5]

        In addition, the Secretary of Education is authorized to contract with Servicers for the

servicing and pre-default collection of loans it owns through FDLP, as well as Government-

Owned FFELP Loans.  20 U.S.C. § 1087f(a)(1), (b)(2).  The federal government awards

servicing contracts after selecting a Servicer through a process that requires the Secretary of

Education to award contracts based on allocation metrics to servicers that have "extensive and

relevant experience," "demonstrated effectiveness," and "a history of high quality performance."

---

[5] Recognizing Servicers' importance, the White House has expounded that "[h]igh-quality,
borrower-focused servicing helps more borrowers successfully repay their federal student loans."
*White House Fact Sheet, Presidential Memorandum, Student Aid Bill of Rights* (March 10, 2015),
*available at* https://www.whitehouse.gov/the-press-office/2015/03/10/fact-sheet-student-aid-bill-
rights-taking-action-ensurestrong-consumer-.  Borrowers' needs are best met by "find[ing] the
most innovative and effective ways to communicate with borrowers, leverag[ing] the latest
research identifying key factors that influence borrower repayment, and keep[ing] actual borrower
behavior in mind so they stay in repayment and avoid default."  *Id.*  These steps aid in setting and
adjusting a Borrower's repayment plan at an affordable rate, ensuring that "[e]very borrower has
the right to an affordable repayment plan."  *Id.*

*Id.* § 1078f; ECF No. 19-1, Great Lakes Servicing Contract, *available at*

https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (detailing

servicer responsibilities for servicing FDLP Loans and Government-Owned FFELP Loans under

the federal contract).  These contracts specify that the federal government pays Servicers on a per

Borrower basis that is based on the Borrower's repayment status.  *See* ECF No. 19-1, at 77.

Accordingly, Servicers are paid substantially less if a Borrower is not on track toward loan

repayment, such as when a Borrower becomes delinquent or the loan is placed in forbearance.

*See id.* (presenting common pricing scales where the unit price decreases significantly the longer

the delinquency).  The most a Servicer can receive for servicing the loans of a single Borrower,

who may have multiple loans of different types, is $34.20 per year.  *See id* (showing that the

maximum per month a servicer may be paid is $2.85 per borrower, allowing a potential annual

compensation of $34.20).  In fact, the Department of Education's Federal Student Aid office

("FSA") alters allocation metrics to encourage best practices and incentivizes competing

Servicers to discover the best avenues for achieving FSA's goals.  *See* Explanation of Allocation

and Performance Measure Methodology, U.S. Dep't of Educ., *available at*

https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/06302017/ExplanationQ

uarterEnd063017.pdf (explaining that the Department of Education distributes new loans to

Servicers based on performance metrics that incentivize Servicers to keep the Borrowers out of

delinquency and default).

     Therefore, the federal government, through the Department of Education, not only

created the federal student loan programs and decided to outsource its servicing, but it also

highly regulates Servicers' interactions with Borrowers based on its own priorities.

*States' Recent Attempts to Regulate Services*

D.C. Law 21-214 and the Final Rules are part of a recent trend among states to require

Servicers to obtain state licenses.  Four states besides the District have enacted laws within the

last three years requiring licensure of student loan servicers and imposing numerous and varying

regulatory requirements on servicers, and other states have considered similar legislation this

past year.[6]  Although there are several cases addressing the applicability of state consumer

protection laws and the ability of state attorneys general to enforce them against Servicers,[7] none

---

[6] California (AB 2251, Chapter 824, Statutes of 2016, effective July 1, 2018); Connecticut
(Public Act 15-62, effective July 1, 2016, as amended by Public Acts 16-65 and 17-233); Illinois
(Public Act 100-0540, effective December 31, 2018); and Washington (SB 6029, effective the
earlier of January 1, 2019 or the adoption of implementing regulations).  The Connecticut statute
has been amended twice already and both California (AB 38) and Illinois (HB 4397) are
currently considering additional legislation to modify their statutes.  Twelve other states this year
considered legislation requiring servicer licensing and regulation: Arizona (HB 2226), Maine
(LD1507 and SP532), Maryland (SB 1012 and HB 1642, plus SB 1068 and HB 1634),
Massachusetts (SB 129 and HB 2173), Minnesota (HF 21 and SF 2955), Missouri (HB 1274),
New Jersey (A455 and S1149), New Mexico (SB 85), New York (A08862, A09508, S07508),
Ohio (HB 432), Rhode Island (H7881), and Virginia (SB 362).  Most did not pass; the only
legislation still actively under consideration at this time is in Massachusetts and New Jersey.
[7] There are several active cases involving Servicers where federal preemption has been asserted
as an affirmative defense.  For example, the United States District Court for the Southern District
of Illinois' order in *Nelson v. Great Lakes Educational Loan Services, Inc.*, *et al*., Case No. 3:17-
CV-00183-NJR-SCW, which granted the Servicer's motion to dismiss on preemption grounds
[ECF No. 19-16], is currently on appeal in the Seventh Circuit and the preemption issue has been
briefed.  Another case, *Commonwealth of Massachusetts v. Pennsylvania Higher Education
Assistance Agency*, Case No. 1784CV02682, in State Superior Court in Massachusetts, concerns
similar allegations to those made in *Nelson* and in which the United States filed a Statement of
Interest. ECF No. 19-15.  The U.S. District Court for the Northern District of Florida in *Lawson-
Ross v. Great Lakes Higher Education Corps.*, Case No. 1:17-CV-253-MW/GRJ, another case
with allegations similar to those in *Nelson*, recently granted summary judgment in favor of the
Servicer on federal preemption grounds after requesting supplemental briefing from the parties
that "address (1) the deference due to the Department of Education's interpretive ruling and (2)
the substance of the Department of Education's interpretive ruling, including, but not limited to,
the interpretation that the Department gives to 'disclosure requirements.'"  Ex. 1; ECF No. 19-
20.  The only other case where a Servicer has challenged a state law requiring that Servicers be

of these cases or any prior case concerned whether federal law preempts state laws and regulations that directly regulate Servicers.  Rather, these cases addressed or are addressing circumstances under which Borrowers or the state can bring claims against Servicers under already existing state law.

## PROCEDURAL HISTORY

This case derives from the District's decision to require Servicers to obtain a license. D.C. Law 21-214 and the Final Rules inserts the District into the previously federal-only regulation of Servicers by requiring those that service student loans in the District to be licensed and abide by different regulations under the District's own scheme.  The District's actions left SLSA no choice but to seek a declaratory judgment that federal law preempts them.

### *D.C. Law 21-214*

On December 7, 2016, the Council of the District of Columbia enacted the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016, D.C. Law 21-214, to amend the Department of Insurance and Securities Regulation Establishment Act of 1996.  ECF No. 19-2.  The law went into effect on February 18, 2017.  *Id.*  Although the federal government extensively regulates Servicers, the Committee Report for D.C. Law 21-214 notes that the District passed the Act on the unsupported assumption that "[w]hile servicers must generally comply with applicable federal and state consumer financial laws and regulations, there is currently no comprehensive federal statutory or regulatory framework providing consistent, market-wide standards for servicing student loans."  ECF No. 19-3, at 3.  The Committee Report also erroneously posits that "because [this country] lack[s] robust federal

---

licensed is *Pennsylvania Higher Education Assistance Agency v. Perez, et al.*, Case No. 1:18-cv-00770-CKK, filed in the U.S. District Court in the District of Connecticut on July 2, 2018.

standards for student loan servicers, many of which generally have discretion to determine

policies related to their servicing operations, [the district's] students are at risk of receiving

subpar and/or inconsistent services and some are even being targeted by predatory debt relief

companies." *Id.* at 3–4.

Despite the fact that Servicers must be selected by the federal government to service

FDLP Loans and Government-Owned FFELP Loans, and follow federal statutory and regulatory

requirements governing the servicing of both FDLP and FFELP Loans, D.C. Law 21-214

requires "a person or entity seeking to operate as a student loan servicer" in the District of

Columbia to apply for a "SLS license."  ECF No. 19-2, § 7b(c)(1). [8]  The law prohibits Servicers

from servicing student loans in the District without a license. *Id.* § 7b(a).

To obtain a license under D.C. Law 21-214, Servicers must submit "[a] completed

application, in a form and manner prescribed by the Commissioner [of the Department of

Insurance, Securities and Banking ("DISB")], that is signed under penalty of perjury."  *Id.* §

7b(c)(1)(A).  Along with an application, Servicers must submit "[a]pplication fees and other fees

as prescribed by the Commissioner."  *Id.* § 7b(c)(1)(B).  D.C. Law 21-214 also requires that

Servicers submit a surety bond "for the recovery of damages incurred by a student loan borrower

as the result of a licensee's noncompliance with the requirements of this act or the recovery of

fees or expenses levied against a licensee pursuant to this act" and "[a]ny other information the

Commissioner considers necessary and appropriate."  *Id.* § 7b(c)(1)(D)-(E).  The Commissioner

has broad power to, among other things, issue licenses, deny applications for renewal of licenses,

and revoke licenses. *Id.* § 7b(d)-(h).

---

[8] D.C. Law 21-214 defines "SLS license" as "the business license issued by the Department
pursuant to section 7b that is required for a student loan servicer."  *Id.* § 2(12).

In addition, D.C. Law 21-214 requires DISB to establish a Student Loan Ombudsman ("Ombudsman"), who is required to resolve borrower complaints, compile and analyze data on these complaints, develop a Student Loan Borrower's Bill of Rights, conduct examinations of Servicers, and charge each Servicer an examination fee in an amount set by the Mayor.  *Id.* § 7a. The law, however, leaves many specifics to be decided by implementing regulations, which were to be issued within 180 days of the Mayor's approval on December 7, 2016.  *Id.* § 7c.

*The District of Columbia Issues the First Two Sets of Emergency Rules*

Although not within the time frame contemplated in D.C. Law 21-214, the Commissioner adopted emergency rules on September 8, 2017, as Chapter 30, Student Loan Servicers, of Title 26-C DCMR, Banking and Financial Institutions (the "First Emergency Rules").  ECF No. 19-4. It was not until the adoption of these emergency rules that SLSA and its members knew the licensure and disclosure requirements and fees the District planned to place on Servicers.

The First Emergency Rules, which were proposed as permanent rules and became effective on the date of their adoption on October 27, 2017, provided the specifics of the licensing scheme for Servicers.  They required Servicers to, among other things, apply for a license, § 3002; file a surety bond, § 3004; provide annual reports and reporting, § 3014; keep records for at least three years after a final payment is made on a loan, § 3018; be subject to examinations and investigations, § 3021; face penalties of up to $25,000 for each violation, § 3023; and pay application, renewal, and examination fees, § 3002.2 and App. A.  *Id.*

Within a week of the rules' adoption, SLSA's Executive Director, Winfield Crigler, contacted the Commissioner and requested a meeting to discuss the First Emergency Rules.  ECF 19-5.  If enforced, the rules threatened to drive SLSA's members out of business because the per-

loan-serviced fee ($800 plus $6.60 per loan serviced) would render it impossible for SLSA members to retain any revenue under their government contracts to provide services required under those contracts to borrowers in the District. *See* ECF No. 19-6. The Commissioner agreed to a meeting where he, the Ombudsman, and DISB staff heard Ms. Crigler express SLSA's and its members' concerns regarding the First Emergency Rules, including that federal law preempts them. ECF No. 19, Am. Compl. ¶ 95. The Commissioner and DISB conveyed that it read the First Emergency Rules to have become effective September 8, 2017, but that the District did not intend to impose the annual assessments, including the per-loan-serviced fee (set at $6.60 per loan serviced), until, at earliest, on November 1, 2018, pursuant to Section 3015.1 of the First Emergency Rules. *Id.* ¶ 96. Ms. Crigler sent a follow-up letter to the Commissioner on October 23, 2017, asking him to confirm as soon as possible the Commissioner and DISB's representations about the imposition of the annual assessments and the effectiveness of the First Emergency Rules. *See* ECF No. 19-7. The Commissioner never replied to Ms. Crigler's letter.

SLSA reiterated Ms. Crigler's expressed concerns in comments SLSA submitted within the comment period after the rules were published. ECF No. 19-8. DISB later promulgated new emergency rules (the "Second Emergency Rules") that were adopted on December 26, 2017 and changed the assessment fee from $6.60 per loan to $0.50 per borrower "based upon stakeholder concerns." ECF No. 19-9. No other significant change was made. *See* ECF No. 19-10. SLSA again submitted comments (the only comments submitted), which expressed its contention that federal law preempts the law and rules. ECF No. 19-11.

<u>*SLSA Files this Lawsuit and the District of Columbia Responds with*</u>
<u>*New Emergency Rules and a Motion to Dismiss*</u>

Because the District of Columbia had not addressed the vast majority of SLSA's and its

members' concerns, including federal preemption, SLSA filed a Complaint against the

Commissioner, the Ombudsman, and the District of Columbia ("Defendants") on March 20,

2018 (the "Original Complaint").  ECF No. 1.  SLSA also immediately reached out to

Defendants regarding a schedule to expedite discovery, summary judgment deadlines, and trial,

and agreed to a short extension to respond.[9]

Without providing any advance notice to SLSA or its counsel, Defendants instead

promulgated new emergency rules (the "Third Emergency Rules") on April 20, 2018, which also

was the rules' effective date.  ECF No. 19-12.  The Third Emergency Rules, which did not

substantially differ from previous iterations, specifically extended the deadlines for fees and

assessments to November 15, 2018, and made other small changes seemingly in response to the

Original Complaint.  ECF No. 19-13.[10]  Defendants also filed a Motion to Dismiss, asserting that

the promulgation of the Third Emergency Rules render SLSA's claims specific to the Second

Emergency Rules moot, that SLSA's claims as to the Third Emergency Rules are not ripe

because those rules are not final and can be altered again, that the law does not support SLSA's

---

[9] After these attempts failed, SLSA filed a Motion to Expedite Discovery, Summary Judgment Deadlines, and Trial.  ECF No. 9.

[10] Some changes that appear to respond to the Original Complaint include: (1) the addition of Section 3018.4 and language to Section 3018.1, which give the Commissioner discretion to waive Section 3018's requirement that Servicers keep student loan records and make them available to the Commissioner if compliance would, in the Commissioner's estimation, violate federal law; and (2) the deletion of Section 3015.3, which formed the basis of SLSA's claim for relief (removed in the Amended Complaint) that the emergency rules were not in compliance with D.C. Law 21-214 and were invalid.

preemption claims, and that certain changes made in the Third Emergency Rules in any event moot various preemption and invalidity claims.  ECF No. 14.  SLSA opposed.  ECF No. 16.

After the parties briefed the Motion to Dismiss, this Court denied the motion without prejudice.  ECF No. 18.  This Court also scheduled a status conference to discuss the issues SLSA raised in its Motion to Expedite Discovery, Summary Judgment Deadlines, and Trial, where the District expressed its intent to issue final rules to implement D.C. Law 21-214 no later than August 17, 2018.  This Court then ordered that SLSA should submit an amended complaint by August 24, 2018, and set a briefing schedule so that this case may be resolved before the District begins enforcing D.C. Law 21-214 and its rules in November.

<u>The District of Columbia Issues Final Rules and SLSA Files an Amended Complaint</u>

The District of Columbia adopted the Third Emergency Rules as final on July 25, 2018 (the "Final Rules"), although it did not publish them in the D.C. Register until August 10, 2018.  ECF No. 19-15.  SLSA, once again, submitted the only comments.  ECF No. 19-14.  The Final Rules are currently enforceable, and the annual assessment fees are due on November 15th of the calendar year following the licensing period.  *See id.* § 3015.  Therefore, Servicers that registered in 2017 will have annual assessment fees dues on November 15, 2018, while Servicers that register in 2018 will have these fees due on November 15, 2019.

SLSA filed an Amended Complaint to incorporate the Final Rules on August 24, 2018.  ECF No. 19.  The United States has since filed a Statement of Interest, asserting that federal law preempts the District's regulation of Servicers because (1) federal statutes and regulations governing the selection of contractors preempts the District's licensing requirement; (2) the District's licensing requirements and annual fee violate the intergovernmental immunity doctrine;

and (3) the Privacy Act and the Servicers' contracts with the Department of Education preempt

the District's disclosure requirements.  ECF No. 20.  Defendants filed their Motion to Dismiss the

Amended Complaint, or in the Alternative, for Summary Judgment, on September 7, 2018.

## STANDARDS OF REVIEW

**I.**      <u>**Standing under Federal Rule of Civil Procedure 12(b)(1)**</u>

"To survive a motion to dismiss for lack of standing, a complaint must state a plausible

claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the

defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y v.*

*Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560–61 (1992)). In assessing standing, although the court does not assume the truth of legal

conclusions, it must accept all "well-pleaded factual allegations as true and draw all reasonable

inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19

(D.C. Cir. 2015). Both the requirements of constitutional and prudential standing must be met.

*Nat'l Recycling Coal., Inc. v. Browner*, 984 F.2d 1243, 1248 (D.C. Cir. 1993).

**II.**      <u>**Standard of Review under Federal Rule of Civil Procedure 12(b)(6)**</u>

A motion to dismiss should be denied where, as here, the allegations of the complaint

contain sufficient facts which, if true, "state a claim for relief that is plausible on its face." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (quoted in *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)). In turn, "[a] claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The standard is plausibility,

not probability.  *Iqbal*, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

In considering the factual allegations, the Court views the complaint as a whole and assumes the truth of its allegations and affords the plaintiff the benefit of reasonable inferences from the allegations. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322, 1323 (2011); *see also Poindexter v. Wachovia Mortgage Corp.*, No. 1:09-cv-1392, 2012 WL 1071248, *1 (D.D.C. 2012) ("[T]he court liberally construes the complaint in favor of the nonmoving party and grants all reasonable inferences to the nonmovant that can be derived from the facts alleged."). "It is essential to remember that, for the purposes of ruling on a motion to dismiss, the factual allegations of the complaint *must* be presumed to be true and liberally construed in favor of the Plaintiff." *Paulin v. The George Washington University School of Medicine and Health Sciences*, 878 F. Supp. 2d 241, 246 (D.D.C. 2012) (emphasis in original).

Under the foregoing standards, the Defendants' Motion to Dismiss the Amended Complaint should be denied.

## III.     Standard of Review under Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (noting that "factual disputes that are 'irrelevant or unnecessary

17

do not affect the summary judgment determination'" (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986))).  Under Rule 56, SLSA is entitled to summary judgment.

## ARGUMENT

The District passed D.C. Law 21-214 and promulgated the Final Rules based on its belief that they will better protect its Borrowers than the federal government's requirements for its Servicers.  Whether the District's law and regulations are good policy is debatable.  What is not debatable is that licensing and oversight of Servicers of federal student loans falls squarely within the province of the federal government and outside the District's police powers.  Defendants' Motion should be denied and summary judgment should be granted for SLSA.

**I.      SLSA Has Standing to Challenge the District's Final Rules**

The District once again tries to avoid review of at least some aspects of its Final Rules by asserting that SLSA lacks standing to challenge them.  Not only are the District's arguments circular and ignorant of the actual and imminent injuries to SLSA's members, but they would allow the District and its Commissioner, not a court, to decide preemption in the first instance.  Standing does not provide a basis to dismiss SLSA's Amended Complaint.

**A.      SLSA Members' Servicing of Private Loans Is Irrelevant**

The District argues that SLSA lacks standing because Servicers' contracts with the federal government for servicing FDLP Loans are not the "but-for cause" for Servicers obtaining a license under D.C. Law 21-214 and the Final Rules since all SLSA members that service federal student loans in the District also service private loans[11] and must obtain a license for

---

[11] Private student loans account for less than 8 percent of the outstanding student loan debt nationally. Measure One Q1 2018 Private Student Loan Report, *available at* https://www.measureone.com/psl.php.

servicing these private loans.  This argument is factually incorrect[12] and a red herring.  D.C. Law 21-214 and the Final Rules do not require Servicers to apply for and obtain a license for the servicing of private loans only.  SLSA's members are willing to register for the private loans they service in the District, and have done so in other states.  *See* Ex. 5, Nelnet Decl. ¶ 8; Ex. 6, PHEAA Decl. ¶ 8.  This lawsuit is not about the licensing of servicers of private student loans.

D.C. Law 21-214 and the Final Rules require Servicers to apply for and become licensed to service <u>federal</u> student loans in the District.  It is this requirement that is the causal connection between this law and the injury it has and continues to cause to SLSA's members.  If SLSA's members do not apply for a license by this November, the law and its rules forbid them from servicing federal student loans in the District pursuant to federal contracts and permit the District to assess late penalties.  If they do apply, the District has the power to deny licensure and prohibit Servicers from servicing federal student loans in the District.  In short, D.C. Law 21-214 and the Final Rules allow the District to assess fitness before a Servicer can service federal student loans in the District.  Therefore, but for the requirement that Servicers apply for and licensed to service federal student loans in the District, there would be no interference with federal contracting decisions and the District would have a better argument that some harm to SLSA's members is hypothetical.

---

[12] The Ombudsman's declaration is incorrect in a number of respects.  ECF No. 21-4.  *See also* ECF No. 21-3, ¶ 39.  Relevant to this lawsuit, three SLSA members that service federal student loans in the District do not service private student loans in the District.  They are the Oklahoma Student Loan Authority ("OSLA"), the Utah Higher Education Assistance Authority ("UHEAA"), and Great Lakes Educational Loan Services, Inc. ("Great Lakes").  *See* Ex. 2, OSLA Decl. ¶¶ 4–8; Ex. 3, UHEAA Decl. ¶¶ 4–8; Ex. 4, Great Lakes Decl. ¶¶ 4–7, 12.  Great Lakes services only FDLP Loans and Government-Owned FFELP Loans in the District.  Ex. 4, Great Lakes Decl. ¶ 8.

The core injury to SLSA's members thus is imminent.  *See* D.C. Code § 31-233 (giving the Commissioner the power to issue a cease and desist order, issue a civil fine, and seek judicial enforcement if a Servicer services loans in the District without a license).  Courts have determined standing exists in analogous cases addressing whether federal law preempts state licensing schemes before state enforcement of those schemes begins.  *See United States v. Virginia*, 139 F.3d 984, 987 n.3 (4th Cir. 1998) ("Because the Virginia Attorney General has repeatedly informed the FBI that it believes that [federal background investigation contract services program (BICS")] investigators are subject to its regulations and that it has the power to enforce those regulations against BICS investigators, we also agree with the district court that BICS investigators faced a reasonable threat of criminal prosecution and that there is thus a ripe case or controversy for this court to adjudicate.").[13]  In fact, DISB sent an email to SLSA's members on August 29, 2018, reminding them of the requirement that they obtain a license and urging them to submit an application "as soon as possible."  *See, e.g.*, Exs. 2–6 (attaching DISB's emails and the Servicers' responses).[14]  SLSA's members are not going to subject their federal loans to District oversight when such regulation is preempted.  Moreover, the

---

[13] The Fourth Circuit cited two cases in support: *Public Utilities Comm'n v. United States*, 355 U.S. 534, 538 (1958) (allowing preenforcement review of a state regulation that required common carriers to receive state preapproval before offering reduced shipping rates to the United States where the state "ha[d] plainly indicated an intent to enforce the Act"); and *Mobil Oil Corp. v. Virginia*, 940 F.2d 73, 76 (4th Cir. 1991) (allowing preenforcement review of amendments to the Virginia Petroleum Products Franchise Act, which an oil company claimed were preempted, even though Virginia had not specifically indicated that it intended to enforce that statute against plaintiffs, because the Virginia "Attorney General ha[d] not ... disclaimed any intention of exercising her enforcement authority") (emphasis added).

[14] A number of SLSA's members responded that they would not apply for a license while this case was pending before this Court.  *See* Exs. 2–6.  Some of SLSA's members with private loans in the District offered to apply for a license as to only those private loans.  Ex. 5 ¶ 8; Ex. 6 ¶ 8. To date, DISB has not responded to any of these replies.  *See* Ex. 6 ¶ 9.

overwhelming majority of loans serviced by SLSA's members in the District are federal student loans due to the vast imbalance between the volume of federal student loans and private student loans, *see infra* pp. 4–5.  These Servicers have already spent significant time and money assessing D.C. Law 21-214 and the Final Rules and preparing to apply for licenses for loans they are servicing.  ECF No. 19, Am. Compl., ¶¶ 121–28.  The small number of private student loans serviced by SLSA members does not divest SLSA of standing.

> **B.     The Harm is Not Hypothetical.**

The District also argues that two hypothetical applications of the Final Rules do not satisfy the injury-in-fact element of standing because (1) there are no allegations that DISB has actually required disclosures and (2) there is no instance alleged where DISB has requested documents prohibited from release by the Privacy Act's regulations.  Defendants are correct that SLSA does not know which documents DISB will request,[15] but that is beside the point because such uncertainty, if anything, exacerbates the burden on Servicers.

Again, the District is requesting that it be allowed to make the initial determinations on federal preemption and then have SLSA's respond to individual enforcement actions where they may assert preemption as a defense.  This is unnecessary because these hypothetical examples are reached only if federal law did not preempt the District's licensure requirements and SLSA's members become subject to the District's oversight as to the federal student loans they service.  *See, e.g.*, *Virginia*, 139 F.3d at 987 n.3.  Otherwise, the District would not have the authority to request documents as a condition of licensure.  The examples Defendants attack as hypothetical merely explain what other preemption issues exist if federal law did not preempt the District's

---

[15] As explained *infra* § II.D.3, the Commissioner has the power to request from Servicers student records that would cause Servicers to violate the Privacy Act.

initial determination of which Servicers may service federal student loans in the District.  SLSA

challenges, first and foremost, the regulatory action of requiring its members to be licensed in

accordance with the District's criteria.  There is nothing hypothetical about this requirement.

## II.    SLSA Is Entitled to Summary Judgment that Federal Law Preempts D.C. Law 21-214 and the Final Rules.

### A.    SLSA's Preemption Claims Are Squarely Supported by Established Case Law.

Despite the flurry of recent lawsuits involving Servicers and federal preemption and

Defendants' representations, SLSA's preemption claims are issues of first impression.  Besides

*Pennsylvania Higher Education Assistance Agency v. Perez*, which is still in the pleadings stage

in the District of Connecticut, the other previous and ongoing cases concern borrower claims[16]

against Servicers for alleged violations of broad state consumer protection and common law.[17]

Servicers in those cases asserted federal preemption as an affirmative defense.  None of the

claims in these cases were brought under any of the recently enacted state laws directly licensing

and regulating Servicers.

Whether federal law preempts these claims is made on a case-by-case basis.  *Chae*, the

seminal case from the Ninth Circuit addressing federal preemption of borrower state law claims

against Servicers, provides context.  In *Chae*, borrowers of FFELP Loans sued a Servicer, Sallie

---

[16] Massachusetts brought claims on behalf of borrowers in *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency*, Case No. 1784CV02682.

[17] *See, e.g., Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010); *Brooks v. Salle Mae, Inc.*, No. FSTCV096002530S, 2011 WL 6989888 (Conn. Super. Ct. Dec. 20, 2011); *Genna v. Sallie Mae, Inc.*, No. 11 Civ. 7371(LBS), 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012); *Linsley v. FMS Inv. Corp.*, No. 3:11CV961 (VLB), 2012 WL 1309840 (D. Conn. Apr. 17, 2012); *Davis v. Navient Corp.*, No. 17-cv-00992-LJV-JJM, 2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018).

Mae, for alleged fraudulent and deceptive conduct.  593 F.3d at 940–41.  The court addressed

whether federal law preempted these claims under both express and conflict preemption.

The court first held that 20 U.S.C. § 1098g's express preemption clause precludes several

of the borrowers' state law claims because, although the borrowers alleged that Sallie Mae

misled borrowers through written documents, the crux of these claims was that the Servicer

should have disclosed that it used the "installment method" rather than the "daily simple interest"

method in calculating interest.  *Id.* at 942–43.  Sallie Mae's practice was properly disclosed

under the HEA.  *Id.* at 943.  As a result, "the state-law prohibition on misrepresenting a business

practice 'is merely the converse' of a state-law requirement that alternative disclosures be made."

*Id.* (citing *Cipollone v. Liggett Grp., Inc.* 505 U.S. 504, 527 (1992)).  Therefore, 20 U.S.C. §

1098g, which provides that federal student loans "shall not be subject to any disclosure

requirements of any State law," preempted these claims.  *Id.* (noting that "preemption cannot be

avoided simply by relabeling an otherwise-preempted claim").

The Ninth Circuit also addressed whether the remaining claims—interest calculation, late

fees, and repayment start dates—are preempted under conflict preemption because the state laws

create an obstacle to accomplishing Congress's purposes and objectives.  *Id.* at 943.  After

examining Congress's goals in enacting FFELP, the Ninth Circuit in *Chae* concluded that

"Congress intended uniformity within the program.  The statutory design, its detailed provisions

for the FFELP's operation, and its focus on the relationship between borrowers and lenders

persuade us that Congress intended to subject FFELP participants to uniform federal law and

regulations."  *Id.* at 947.  As a result, the court held that these California state law claims for

alleged fraudulent and deceptive practices threatened uniformity, present an obstacle to the FFELP's uniform operation, and thus are preempted. *Id.* at 947–49.

This case, on the other hand, not only differs from these other cases because it is the first where the constitutionality of a state licensing and oversight scheme for Servicers is at issue, but what SLSA seeks is consistent with holdings from prior cases striking state laws regulating federal contractors. *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (holding that Arkansas cannot require a construction company to obtain a state contractor's license to perform work at a federal air force base because it would give the state "a virtual power of review" over the federal government's "responsibility" determination). SLSA is not challenging the enforcement of consumer protection laws against its members. Its claims are not merely allegations that federal law preempts specific Borrower claims brought under D.C. Law 21-214 and the Final Rules against its members or that Borrowers cannot sue Servicers for violations of state consumer protection laws. Rather, SLSA is principally contending that federal law preempts the District's decision to try to step into the shoes of the federal government and require that Servicers be licensed (even if state licensing alone were permitted, federal law preempts numerous other aspects of the law).

Therefore, *Chae* and other consumer protection cases are related but not analogous. Their persuasiveness is not the limited nature of their holdings but rather, for example, their identification of Congress's purposes in enacting the federal student loan programs that may be in conflict with aspects of D.C. Law 21-214 and the Final Rules. And, despite Defendants' contentions, these other cases are not dispositive and certainly have not restricted federal

preemption in the area of servicing of federal student loans to the "nuts and bolts" of Servicer interactions with Borrowers under the federal student loan programs.  *See* ECF No. 21-1, at 38.

### B.      No Presumption Against Preemption Applies.

The uniqueness of this case (and its difference from consumer protection lawsuits) explains why the presumption against preemption espoused by Defendants and the amici has no application.  The servicing of federal student loans is an area long occupied by the federal government,[18] which created the role of Servicers and regulates their conduct.  The relationship between the federal government and Servicers is federal in character and implicates unique federal interests, such as obligations to and rights of the United States under its contracts with Servicers and the protection of the funds of the United States under both FFELP and FDLP.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (refusing to apply any presumption against federal preemption because "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law"); ECF No. 19-18, at 17 ("Federal student loans are an area of uniquely federal interests.").

States, on the other hand, have only recently begun efforts to directly regulate the servicing of federal student loans.  *See California v. ARC America Corp.*, 490 U.S. 93, 101 (1989) (noting that the presumption against preemption only applies "in areas traditionally regulated by the States").  Neither Defendants nor the amicus brief field in support have identified any situation outside of the last three years where states have passed laws or regulations targeting Servicers and requiring that they become licensed to service federal student

---

[18] As explained *supra* pp. 45–49, this field has been fully occupied by the federal government since at least 2010 when Congress decided to terminate FFELP.

loans in the state and succumb to direct state oversight.  *See* ECF No. 24, Br. of Amicus Curiae

Lawyers' Committee for Civil Rights Under Law, *et al.*, 5–6 (noting that states have long

required <u>debt collectors</u> of federal student loans, but not Servicers, to be licensed, and that states

have exercised their traditional consumer protection function in <u>enforcement suits</u> against

Servicers for violation of general consumer protection laws).  SLSA does not contend in this

lawsuit that federal law preempts all claims against Servicers brought under broad state

consumer protection laws or state common law, but rather challenges D.C.'s decision to directly

regulate which Servicers can operate in the District.  Although consumer protection has, broadly

speaking, been an area within state police powers, *see Aguayo v. U.S. Bank*, 653 F.3d 912, 917

(9th Cir. 2011) (noting that claims under California's consumer-protection laws fall within an

area traditional within the state's police powers), states have not traditionally regulated the

servicing of federal student loans, which has long been strictly a federal area of concern.[19]

Federal student loan servicing thus is not within the traditional sphere of state law that is subject

to the presumption against preemption.[20]

---

[19] *See also Chae*, 593 F.3d at 944 (considering the presumption, but holding that the HEA preempted various state law claims borrowers brought against Servicers because "it is our duty to consider carefully what Congress was trying to accomplish in the HEA and whether these state law claims create an 'obstacle' to the congressional purposes"); *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (explaining that because "[t]he regulation of domestic relations is traditionally the domain of state law," "[t]here is therefore a 'presumption against pre-emption' of state laws governing domestic relations"); *but see id.* at 491 (noting that "family law is not entirely insulated from conflict pre-emption principles, and so we have recognized that state laws 'governing the economic aspects of domestic relations . . . must give way to clearly conflicting federal enactments'" (quoting *Ridgway v. Ridgway*, 454 U.S. 46, 55 (1981))).
[20] The U.S. Supreme Court also has explained that where a federal statute contains an express preemption clause that concerns an area outside of the State's historic police powers, the Court "do[es] not invoke any presumption against pre-emption but instead 'focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive

**C.      The Department of Education's Preemption Notice and Statement of Interest Are Entitled to Significant Deference.**

In addition to the Statement of Interest in this case regarding federal preemption of D.C. Law 21-214 and the Final Rules, the Department of Education filed a notice on federal preemption of state licensing schemes regulating servicers entitled "Federal Preemption and State Regulation of the U.S. Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers" (the "Preemption Notice").  ECF No. 19-19, 83 Fed. Reg. 10619 (Mar. 12, 2018).[21]  The Preemption Notice addresses federal preemption in the context of FDLP and FFELP Loans under both conflict and express preemption concepts.  Although deference to the Department's preemption analysis is not required to rule in SLSA's favor on summary judgment, this Court should nevertheless defer to the Department's interpretation.

"[A]n agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulations being interpreted."  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (internal quotations omitted; emphasis added); *see also Auer v. Robbins*, 519 U.S. 452, 461-63 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).  This substantial deference, known as "Auer" Deference, requires a court to defer to the agency's interpretation "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the

---

intent.'"  *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S.Ct. 1938, 1946 (2016) (quoting *Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582, 594 (2011)).
[21] The United States also recently filed a Motion to Dismiss in *Pennsylvania Higher Education Assistance Agency v. Perez, et al.*, Case No. 1:18-cv-00770-CKK, where it asserts regarding an analogous provision of Connecticut law that if it were to file a Statement of Interest, "the government would likely argue here that Connecticut's regulation of federal student loan servicing violates the Supremacy Clause, seeks to regulate areas 'involving uniquely federal interests,' and impedes the accomplishment and execution of the full purposes and objectives of federal law."  Ex. 7, at 6.

regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)

(quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

Courts also are to give interpretational deference to a federal agency's interpretation

regarding preemption.  *See Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (reasoning that

agencies have unique understanding of statutes that they administer and an attendant ability to

make informed determinations about how state law may pose an obstacle to accomplishment and

execution of Congress' purposes and objectives).  In the student loan context, the Ninth Circuit

in *Chae* deferred to the Department's interpretation regarding preemption in the student loan

context because "[the agency's] position about the FFELP's purpose of uniformity is in harmony

with the evidence of congressional intent."  593 F.3d at 949–50.

Here, the Department's pronouncements in the Statement of Interest and the Preemption

Notice rely on a detailed examination of the purpose and intent of the federal student loan

programs and extensively cites case law.  *See* 83 Fed. Reg. at 10619–21.  They also are not

inconsistent with prior pronouncements.  The Preemption Notice is the first time the Department

of Education expressed its interpretation regarding the constitutionality of state licensing

schemes for Servicers.  The other statements cited by Defendants were all made before states and

the District passed the Servicer licensing schemes and addressed separate topics.  For example,

the Statement of Interest in *Sanchez, et al. v. Asa College, Inc.*, from January 23, 2015, concerns

allegations by students against a privately-owned, for-profit college that participates in federal

student aid programs by inducing students to borrow millions of dollars in federal and state

financial aid by misrepresenting the nature, value, and cost of its programs. ECF No. 21-5, at 1–

2.  The Department of Education merely stated that the HEA does not preempt "all causes of

28

action, whether premised on state or federal law, against a Title IV participating institution based on conduct that touches upon HEA-related issues." *Id.* at 2.  The case did not involve Servicers or state licensing schemes.  Similarly, the Department of Education's letter to the Maryland Assistant Commissioner on Financial Regulation addressed whether, if the state determines that Servicers are "collection agencies," the state's regulation of Servicers would be preempted by federal law, and the memorandum issued by the Department of Education Under Secretary Ted Mitchell simply made a generic statement that Servicers should comply with federal and state law without any discussion of preemption or which types of state law.  ECF Nos. 21-6, 21-7.

Rather, the Department of Education's preemption interpretations in the Preemption Notice and Statement of Interest are consistent with its positions taken in its Statement of Interest in *Massachusetts v. Pennsylvania Higher Education Assistance Authority* filed January 8, 2018 [ECF No. 19-18] and as an intervenor in *Chae*, where it expressed its position that certain borrower claims against Servicers are preempted.  Ex. 8, Br. for Pl.-Intervenor-Appellee, *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) (No. 08-56154), 2009 WL 2444650.[22]  As explained below, the Department correctly analyzes the preemption issues relevant to this case.

> ### D.   Federal Law Preempts D.C. Law 21-214 and the Final Rules under Conflict Preemption.

Conflict preemption occurs where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941));

---

[22] Similarly, the Department of Education drafted a memorandum on December 27, 2017, regarding ownership of and access to Department of Education records and data, where it explained that (1) FSA maintains federal student loan information that is protected by the Privacy Act, (2) that all Servicers must comply with the Privacy Act, and (3) that all third-party requests for these records must be made directly to the Department.  ECF No. 17.

*see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("'[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case."). An obstacle occurs when a state law would directly conflict with federal law or would "undermine [its] goals and policies." *See Volt Info. Sciences v. Stanford Univ.*, 489 U.S. 468, 477–78 (1989).

In deciding whether conflict preemption applies, the Court must consider both the statute's text and its purpose and objectives. *See Crosby*, 530 U.S. at 373 ("For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed."); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("In determining whether state law stands as an obstacle to the full implementation of a federal law it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." (internal quotation marks and citations omitted)). Additionally, in determining whether a conflict exists, the Court must give weight to an agency's determination of the objectives. *See Brannan v. United Student Aid Funds, Inc*., 94 F.3d 1260, 1264 (9th Cir. 1996) ("Because Congress has delegated to the Secretary its authority to implement the provisions of the HEA, the Secretary 'is uniquely qualified to determine whether a particular form of state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, . . . and therefore, whether it should be preempted'" (quoting *Medtronic*, 518 U.S. at 496)).

Federal law preempts three distinct aspects of D.C. Law 21-214 and the Final Rules under conflict preemption. First and principally, the requirement that Servicers apply for, obtain,

and maintain a license to operate in the District, which gives the District the power to determine

who is fit or responsible to service federal student loans in the District, conflicts with the federal

government's statutory power to enter into contracts for the servicing of FDLP Loans and

Government-Owned FFELP Loans.  *See* 20 U.S.C. § 1087f.  Because the District does not get to

determine who services FDLP Loans and Government-Owned FFELP Loans within its

boundaries, federal law preempts D.C. Law 21-214 and the Final Rules' licensing scheme,

including the requirements to obtain and maintain a license, for the servicing of these loans.

Second, D.C. Law 21-214 and the Final Rules' requirements on records create an impossibility:

Servicers cannot comply with both the requirement and the Privacy Act.  Third, even though the

federal government does not contract with Servicers for the servicing of Commercial FFELP

Loans, federal law preempts D.C. Law 21-214 and the Final Rules as to the servicing of FFELP

both generally and as to specific conflicts.  As SLSA attempted to explain to DISB upon passage

of the emergency rules, these conflicts leave little, if anything, remaining in D.C. Law 21-214

and the Final Rules that is not preempted.

  Perhaps recognizing that specific conflicts exists, Defendants do not engage with these

conflicts but rather disagree with the applicable case law and challenge the deference that should

be given to the Department of Education's interpretation in the Preemption Notice.  Although the

Department's analysis is persuasive, if not dispositive, these conflicts exist regardless.

  1. *The District's licensing scheme is preempted as applied to Servicers of*
   *FDLP Loans and Government-Owned FFELP Loans.*

  D.C. Law 21-214 and the Final Rules create an undeniable obstacle to the federal

government's administration of FDLP Loans and Government-Owned FFELP Loans.  The

licensing scheme, whereby the District decides who can service federal student loans within its

borders, conflicts with the federal government's statutory prerogative to choose which Servicers will service FDLP Loans and Government-Owned FFELP Loans under government contracts. Because the District's regulation of Servicers is based on this licensing scheme—the District does not obtain oversight over Servicers or require them to provide anything unless they are licensed—none of their provisions can apply as to the servicing of FDLP Loans and Government-Owned FFELP Loans. The scheme does what it cannot do and thus is preempted as to the servicing of these loans.

State licensing requirements are preempted and cannot be enforced when they "give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress." *Sperry v. Florida ex rel. The Fla. Bar*, 373 U.S. 379, 385 (1963) (quoting *Leslie Miller*, 352 U.S. at 190). This principle has been applied in a number of contexts. *Leslie Miller*, 352 U.S. at 189–90 (holding that Arkansas cannot require a construction company to obtain an Arkansas contractor's license to perform work at an air force base for the United States); *Sperry*, 373 U.S. at 385 (holding that Florida cannot enjoin a non-lawyer registered to practice before the U.S. Patent Office from preparing and prosecuting patent applications in Florida when non-lawyers are authorized to practice before the office under federal statute and regulations); *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 439–41 (1991) (holding that California cannot require a construction contractor to obtain a California contractor's license to perform work for a Department of the Navy air station); *Virginia*, 139 F.3d at 987 (holding in favor of a contractor for the FBI's background investigation contract services program and granting declaratory and

injunctive relief to prevent Virginia from requiring these types of contractors to comply with its licensing and registration requirements for private security services).  If a comparison of the federal contractor requirements in statute and regulations with the state requirements shows that the state licensing scheme requires the federal contractor to "desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on," then the state licensing scheme is preempted.  *Leslie Milller*, 352 U.S. at 190 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)); *see also Gatrell*, 940 F.2d at 439–40 (reasoning that the *Leslie Miller* rule applies regardless of whether the state licensing scheme presents a condition precedent to obtaining a federal contract or does not require compliance until after the federal contract has been awarded).

Here, D.C. Law 21-214 and the Finals Rules improperly accord the District the power to review the federal government's determination of which Servicers will service FDLP Loans and Government-Owned FFELP Loans. The HEA explicitly authorizes the Department of Education to enter into contracts with Servicers.  20 U.S.C. § 1087f(b)(2).  Congress intended these Servicers to be "selected by and responsible to the Department of Education."  H.R. Rep No. 103-111, at 107 (1993).  Contracts are to be awarded to entities "which the Secretary [of Education] determines are qualified to provide such services."  *Id.* § 1087f(a)(2).  Servicers, who the Secretary must first "determine[] . . . will comply with the procedures applicable to award of such contracts," must "have extensive and relevant experience and demonstrated effectiveness."  *Id.*  The Department can contract only with "responsible" contractors with suitable past performance and financial health, *see* 48 C.F.R. §§ 9.100 to 9.108-5 (requiring, for example, past performance reviews and "adequate financial resources" as part of a

"responsibility" determination), and shall "ensure that such services and supplies are provided at competitive prices."  20 U.S.C. § 1087f(a)(1).

D.C. Law 21-214 and the Final Rules' licensing requirements are duplicative of these federal requirements regarding responsibility, such as past performance, financial responsibility, and fitness.  *See Leslie Miller*, 352 U.S. at 189–90 ("Mere enumeration of the similar grounds for licensing under the state statute and for finding 'responsibility' under the federal statute and regulations is sufficient to indicate conflict.").  These similar requirements results in an impermissible conflict because the District is attempting to second-guess the federal government's application of the similar standard.  D.C. Law 21-214 requires that all Servicers operating in the District must obtain a license by completing an application, paying application fees and other fees, providing three years of audited financial statements that are "acceptable to the [DISB] that show a net worth of at least $250,000," and by providing "[a]ny other information the Commissioner considers necessary and appropriate" per the Final Rules.  ECF No. 19-2, § 7b(a), (c)(1).  The Final Rules require Servicers to submit an application that is "[e]vidence of the applicant's financial responsibility, character and general fitness," § 3002.2(c), which must be demonstrated by submitting three-years' worth of audited financial statements and evidence of the ability to "maintain a net worth of not less than" $250,000.00, § 3003.  ECF No. 19-15.  Servicers must swear they do not have recent felony convictions and that they have not had their servicing license revoked by any governmental agency.  *Id.*, § 3002.2(a)-(b).  Both D.C. Law 21-214 and the Final Rules require that applicants post a surety bond of $50,000.00.  *Id.* § 3004; ECF No. 19-2, § 7b(c)(1).  As a result, the District's licensing scheme "frustrates the objectives" of FDLP by allowing the District to impermissibly "second-

34

guess the [federal government's] responsibility determination and by giving [the District] 'a virtual power of review over the federal determination of "responsibility."'" *United States v. Virginia*, 139 F.3d at 989 (quoting *Leslie Miller*, 352 U.S. at 190).  The District, "through its licensing requirements, is effectively attempting to review the federal government's responsibility determination," which is "prohibited by *Leslie Miller*."  *Gartrell*, 940 F.2d at 439.

Indeed, the District's licensing scheme is not limited to what must be provided in an application.  The Final Rules require that Servicers pay annual assessments and licensing fees, § 3023; provide annual reports, § 3014; maintain records, § 3018; be subject to Commissioner examinations and investigations, § 3021; submit a yearly renewal application, § 3009; and, if the Commissioner so determines in his discretion, submit special reports, § 3017.  These additional requirements demonstrate the District's desire to determine Servicers' continued competence. In this respect, the District's scheme is no different than Virginia's in *United States v. Virginia*, 139 F.3d at 989–90, where the court reasoned that the state's rationale of ensuring investigators' "continued competence" shows that it "believes that the FBI's assessment of its investigators' competence is inadequate because it does not ensure their continuing competence" and "that the state intends to substitute its competency judgment for the FBI's."  As stated by the court in *United States v. Virginia*, "[t]his rationale clearly runs afoul of the Supreme Court's holding that federal contractors cannot be required to satisfy state "'qualifications in addition to those that the [Federal] Government has pronounced sufficient.'" *Id.* at 990 (quoting *Leslie Miller*, 352 U.S. at 190).  These additional requirements, including the licensing fees and surety bond, would increase costs to Servicers that would be passed on to the federal government, threatening the federal goals of obtaining "competitive prices," 20 U.S.C. § 1087f(a)(1), and generating

"costs savings" to the federal government, 20 U.S.C. § 1018(c)(1).[23]

The number of specific conflicts between federal law and D.C. Law 21-214 demonstrates why, in cases such as this one, courts determine that state licensing schemes of federal contractors are preempted.  *See, e.g.*, ECF No. 19, Am. Compl. ¶ 180.  In addition, to the requirements regarding responsibility and licensure, Section 7a(c)(2) of D.C. Law 21-214 requires the Ombudsman to "[r]eceive, review, and attempt to resolve any complaints from a student loan borrower, including attempts to resolve such complaints in collaboration with student loan servicers, and any other participants in student-loan lending, including those entities engaging Borrowers about existing student debt."   This requirement conflicts with FDLP because it involves matters in the laws and regulations governing FDLP, namely that resolution of borrower disputes is provided for in 34 C.F.R. § 682.208(c)(3)(i) and (ii).

Likewise, the licensing fees, examination fees, and assessments in Sections 3015 and 3023.1 of the Final Rules (which implement Sections 7a(c)(12) and 7b(c)(1)(B) of D.C. Law 21-214) undermine Congress's goal of saving the federal government and taxpayers in administering FDLP by increasing the costs of student loan servicing.  *See* ECF No. 19-19, 83 Fed. Reg. at 10620–21 (noting that state laws that purport to impose licensing fees and assessments "will increase the costs of student loan servicing, perhaps exceeding the amount a servicer receives on a per loan basis under its contract with the Department, and certainly distorting the balance the Department has sought to achieve between costs to servicers and

---

[23] In replacing FFELP with FDLP, Congress intended to, among other things, "avoid the unnecessary cost to taxpayers and borrowers and the administrative complexity associated with [FFELP] through the use of a direct student loan program," and "create a more streamlined student loan program that can be managed more effectively at the Federal level." 139 Cong. Rec. S5628 (daily ed. May 6, 1993).

taxpayers and the benefits of services delivered to borrowers").  The same applies to Section

3003's minimum net worth requirements; Section 3004's surety bond requirement; Section

3002.2(l)'s requirement that servicer applications must provide "[o]ther data, financial

statements, and information as the Commissioner may require with respect to the applicant, its

partners, members, officers, directors, trustees, or agents"; Section 3014's annual reporting

requirements (including $50.00/day late penalties); and various other disclosure requirements in

the Final Rules.  *See id.*  Because "[a] servicer does not have the choice to refrain from

operating in a particular State to avoid licensing fees and other costs imposed by the State," the

District is "using the servicers' compliance with Federal law and contracts to extract payments

that benefit the State at the expense of the Federal taxpayer."  *Id*. at 10621 (expressing that "[a]

requirement that Federal student loan servicers comply with 50 different State-level regulatory

regimes would significantly undermine the purpose of [FDLP] to establish a uniform,

streamlined, and simplified lending program managed at the Federal level").

It also is of no consequence that Servicers' contracts with the federal government to

service FDLP Loans and Government-Owned FFELP Loans reference state laws and

regulations.  *See* ECF No. 19-1, at 24, § C.1.4.3 (stating that Servicers "will be responsible for

maintaining a full understanding of all federal and state laws and regulations").  This argument

was rejected in *Gartrell*, where the court reasoned that a clause in the federal contract stating

that the contractor is "responsible for obtaining any necessary licenses and permits, and for

complying with any Federal, State, and municipal laws, codes, and regulations applicable to the

performance of the work" was inapposite because, "[f]ollowing *Leslie Miller,* state licensing

laws cannot be 'applicable,' nor compliance with them 'necessary,' where such laws are

preempted by federal law." 940 F.2d at 440. The court determined that the wording in the federal contract, which is a stronger suggestion of the applicability of state licensing schemes than in Servicers' contracts that do not use the word "licenses," did not demonstrate that Congress authorized state regulation of a federal activity.[24] *Id.* at 440–41. No such authorization can be found here where Servicers' contracts to service FDLP Loans predate the District's and other states' decisions to regulate Servicers through licensing schemes.

Therefore, D.C. Law 21-214 and the Final Rules' licensing scheme is preempted as applied to the servicing of FDLP Loans and Government-Owned FFELP Loans. This requirement is consistent with the Department of Education's statements in the Statement of Interest and Preemption Notice, which are both entitled to deference. *See* 83 Fed. Reg. at 10620 (explaining, based on the cases cited above, that state regulations requiring licensure of Servicers of FDLP Loans in order to perform work for the federal government are preempted); ECF No. 20 (same). Because all other requirements in the law and its rules pertain to licensees, *see, e.g.*, ECF No. 19-15, § 3014.1 ("A student loan servicer <u>licensee</u> shall, on or before January 30, submit an annual report for the preceding calendar year to the Commissioner in a form prescribed by the Commissioner"); § 3023.1 ("The following Student Loan Servicing Licensing Fees shall be applicable to an <u>applicant</u> or a <u>licensee</u>") (emphasis added), they in turn have <u>no</u> <u>applicability</u> to Servicers as to the servicing of FDLP Loans.

---

[24] Contrary to Defendants' contention, the servicing of <u>federal</u> student loans is a "federal activity," where Servicers act on behalf of the federal government. D.C. Law 21-214's and the Final Rules' conflicts with the federal government's contracts with student loan servicers are amplified because they seek to regulate in an area of unique federal interest and clash with that interest. *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); 83 Fed. Reg. at 10621 ("These conflicts with statutes, regulations, Federal contracts, and congressional objectives suggest that State regulation of loan servicers would be preempted by Federal law. That result is even more evident where, as in [FDLP], State regulation implicates uniquely Federal interests.").

2.      *The Final Rules create a conflict with the Privacy Act.*

Even if Servicers were required to be licensed in the District, the requirement in Section

3018 of the Final Rules creates an impermissible conflict.  Conflict preemption of state laws

also occurs "where it is impossible for a private party to comply with both state and federal

law."  *Crosby*, 530 U.S. at 372.

The Department of Education has made clear that Servicers of FDLP Loans and

Government-Owned FFELP Loans must comply with the requirements of the Privacy Act and

that Servicers necessarily will possess Privacy Act-protected records—Borrower records

containing names, identification numbers, contact information, and other personally-identifiable

information—that are the records of the Department and not the Servicer.  ECF Nos. 19-17, 20.

The Privacy Act prohibits the Department from disclosing these records without Borrower

permission. 5 U.S.C. § 552a(b).  Servicers cannot provide these records to third parties: "Any

request from any third party for Department records to which a contractor has access must be

made directly to the Department, where it will be evaluated for compliance with the

requirements of the Privacy Act, unless the contract has specifically provided otherwise."  ECF

No. 19-17; *see also* ECF No. 1, Attachment A-2 ¶ 80(d) (prohibiting servicers from

disseminating information covered by the Privacy Act).  If Servicers violate the Privacy Act,

they are subject to criminal liability.  5 U.S.C. § 552a(m)(1).

Provisions in the Final Rules would place Servicer compliance with the Privacy Act in

the Commissioner's hands, exposing Servicers to liability and creating impossibility. Section

3018 of the Final Rules requires Servicers to make records of each loan sold, assigned,

transferred, or serviced available to the Commissioner within seven days after the

Commissioner's official request.[25]  Because Servicers cannot provide student loan records directly to the Commissioner pursuant to Section 3018 since all third-party requests must be made directly to the Department of Education, Servicers would have to violate federal law to satisfy the conditions in Final Rules, including the surety bond requirement that they comply with all District and federal laws regulating Servicer activities.  *See* ECF No. 19-15, § 3004.2(c)(1).

Only the Commissioner, and not the federal government, has the discretion to waive or reduce the requirements on record keeping.  *Id.* § 3018.4.  If the Commissioner does not waive or reduce these requirements, a physical impossibility results.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (explaining that under conflict preemption, "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law" when it is "impossible for a private party to comply with both state and federal requirements").  The Commissioner's power to unilaterally determine which record requests would be preempted does not save these provisions from preemption.  The Department of Education's interpretation on this important issue of the privacy of student records—that the Privacy Act and the Servicer's contract with the Department preempts these disclosure requirements—is entitled to deference. ECF No. 20, at 18-22; *see also* Ex. 7, Dep't of Educ.'s Mot. to Dismiss, at 7 (noting that the Connecticut statutes at issue in the case "purport to require servicers to release information that federal law and Education's contracts require be kept confidential absent authorization form Education").  At the very least, the Commissioner's discretion undermines Congress' goal of "ensuring uniformity and stability within the [federal student loan programs]."  *Chae*, 593 F.3d at

---

[25] The Commissioner could require additional records subject to the Privacy Act pursuant to his power to request an annual report, § 3014.2(b); request a "special report" with any information required by DISB, § 3017.1; or place conditions on a license, § 3007.3.

949; *see also* Mary J. Davis, *Unmasking the Presumption in Favor of Preemption*, 53 S.C. L. REV. 963, 1016–1021 (2002) (explaining that "[t]he Court favors the value of certainty and predictability that results from a uniform federal rule," which benefits "entities subject to federal regulation," administrators, and others).

> 3. *Federal law preempts D.C. Law 21-214 and the Final Rules as applied to the servicing of FFELP Loans.*

Although the servicing of Commercial FFELP Loans is not performed pursuant to federal contracts, it is performed pursuant to similar federal statutory and regulatory requirements. Because D.C. Law 21-214 and the Final Rules stand as obstacles to Congress's goals in establishing FFELP and the federal student loan programs in general,[26] they conflict with federal law and thus also are preempted as to the servicing of these loans.

In establishing FFELP, Congress aimed "to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions," "to provide a Federal program of student loan insurance," and "to guarantee a portion of each loan insured." 20 U.S.C. § 1071(a)(1)(A), (B), (D). These layers of insurance and guarantees helps Congress encourage private lenders to fund higher education. *See Chae*, 593 F.3d 936, 944 (9th Cir. 2010)

Recognizing these goals and deferring to the Department of Education's interpretation in its Brief as Intervenor, the Ninth Circuit in *Chae* concluded that Congress intended uniformity and stability in the administration of FFELP. *Id.* at 945, 947 ("Congress intended uniformity

---

[26] Although specific conflicts in the FDLP context do not need to be reached because federal law preempts the District's licensing scheme as applied to the servicing of FDLP Loans, provisions in D.C. Law 21-214 and the Final Rules present impermissible obstacles in the context of FDLP Loans for the reasons described in the previous subsection.

within the program.  The statutory design, its detailed provisions for the FFELP's operation, and its focus on the relationship between borrowers and lenders persuade us that Congress intended to subject FFELP participants to uniform federal law and regulations.").[27]  Although before the court was whether federal law preempted California state law claims regarding the mechanics of loan repayment, the court's pronouncements on uniformity have broad application.  *See* 83 Fed. Reg. at 10620 (discussing *Chae*'s reasoning as to the goal of uniformity).  Specifically, the court determined "that subjecting the federal regulatory standards to the potentially conflicting standards of fifty states on contract and consumer protection principles would stand as a severe obstacle to the effective promotion of the funding of student loans."  593 F.3d at 950 (noting that "[s]uch an obstacle, which we consider hostile to the purposes of Congress in this program, must bow to the overriding principles of conflict preemption and federal law supremacy").  Indeed, "Congress's instructions to the [Department of Education] on how to implement the student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board."  *Id.* at 945 (internal citation and quotations omitted).   As a result, the *Chae* court determined that because Congress intended FFELP to operate uniformly, California state law claims for alleged fraudulent and deceptive practices present an obstacle to FFELP's uniform operation and are preempted.  *Id.* at 947–49.  *See also* 83 Fed. Reg. at 10620 (expressing the Department of Education's view "that State regulation of the servicing of [FDLP] Loans impedes uniquely Federal interests, and that State regulation of the servicing of [FFELP] is preempted to the extent that it undermines uniform administration of the program").

---

[27] The court also explained that "[i]n the rules governing [FDLP], Congress created a policy of interprogram uniformity by requiring that loans made to borrowers [under FDLP] shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFELP]."  *Id.* at 945.

D.C. Law 21-214 and the Final Rules threaten Congress' goals of uniformity and stability for the same reasons that the licensing scheme thwarts the federal government's prerogative to select Servicers under FDLP and as to Government-Owned FFELP Loans.  The District's licensing scheme adds a new layer of regulations, fees, and disclosure requirements on Servicers of FFELP Loans, which undermines the effective promotion of the funding of student loans.  Subjecting Servicers to D.C. Law 21-214 and the Final Rules' provisions, such a licensing scheme, reporting requirements, examinations, and investigations, would increase the costs of servicing FFELP Loans.  This consequentially would cause Servicers to either service fewer FFELP Loans or pass the costs on to lenders and guarantors.  Either way, lenders and servicers are dissuaded from continuing to fund higher education, creating "a severe obstacle to the effective promotion of the funding of student loans."  The law and its rules create different servicing deadlines and processes than in the HEA for Servicers that operate in the District, and, if permitted, "would subject [Servicers] to the potentially varying laws of fifty states, dissuading lenders from FFELP participation and contravening the congressional purpose of facilitating student loans."  *See Chae*, 593 F.3d at 946.

Moreover, specific provisions in the Final Rules present additional obstacles to Congress' goals of uniformity and stability.  *See* 83 Fed. Reg. at 10621 ("The HEA and Department regulations governing [FFELP] preempt State servicing laws that conflict with, or impede the uniform administration of, the program.").  First, Section 7a(c)(2) of D.C. Law 21-214 requires the Ombudsman to "[r]eceive, review, and attempt to resolve any complaints from a student loan borrower, including attempts to resolve such complaints in collaboration with student loan servicers, and any other participants in student-loan lending, including those

entities engaging Borrowers about existing student debt."  This provision conflicts with 34

C.F.R. § 682.208(c)(3)(i) and (ii)'s requirements that govern the resolution of borrower disputes.

*See* 83 Fed. Reg. at 10621 ("The imposition of required dispute resolution procedures under

State law would also conflict with the specific Federal regulations that govern the resolution of

disputes raised by borrowers." (citing 34 C.F.R. § 682.208(c)(3)(i) and (ii))).

Second, the Final Rules' disclosure requirements undermine Congress's goal of

establishing uniform regulations for the servicing of federal student loans, including what

information must be provided to borrowers and third parties.  20 U.S.C. § 1083 titled "student

loan information by eligible lenders" and 34 C.F.R. § 682.205, titled "Disclosure requirements

for lenders," regulate the specific disclosures that FFELP lenders and servicers must make to

borrowers at specific times.  The Final Rules require disclosures beyond those in the HEA or its

regulations, including (1) disclosures to the District in the form of annual reports (§ 3014),

occurrence of events (§ 3016), records (§ 3018), and as part of Commissioner examinations and

investigations (§§ 3021–3022); and (2) disclosures to borrowers based on potential liability for

failure to disclose information to borrowers required under the Student Loan Borrower's Bill of

Rights.[28] *See* ECF No. 19-21.

Third, the Commissioner's power to suspend or revoke a Servicer's license in Section

7b(h) of D.C. Law 21-214 and Sections 3019 and 3020 of the Final Rules threaten FFELP's

administration.  A Servicer who is no longer able to service these loans in the District endangers

stability within the program by requiring lenders to find new Servicers for affected loans.[29]

---

[28] *See* Section II.F for a broader description of all of the preempted disclosure requirements.
[29] These conflicts regarding the servicing of FFELP Loans, as well as those in the context of
FDLP Loans and Government-Owned FFELP Loans, demonstrate why federal law preempts

44

Therefore, because D.C. Law 21-214 and the Final Rules impede the uniform

administration and stability of FFELP, they are also preempted as to the servicing of these loans.

### E.      Federal Law Preempts D.C. Law 21-214 and the Final Rules under Field Preemption.

D.C. Law 21-214 and the Final Rules are also preempted because the federal

government, through its actions, has occupied the field of federal student loan servicing.  Field

preemption occurs where, even without a conflict between federal and state law, "the federal

interest is so dominant that the federal system will be assumed to preclude enforcement of state

laws on the same subject, or if the goals sought to be obtained and the obligations imposed

reveal a purpose to preclude state authority."  *Wisc. Pub. Intervenor v. Mortier*, 501 U.S. 597,

605 (1991).

---

D.C. Law 21-214 and the Finals Rules.  Although not necessary to determine preemption, the
Final Rules' required fees and assessments, including the per-borrower annual assessment fee in
Section 3023.1 and the late penalty of $50.00 per day in Section 3014, threaten the effective
administration of the FFELP because they cut into SLSA members' revenue source, either
leaving Servicers with less revenue to service borrowers in the District and adhere to federal
regulations or passing down costs to the federal government.  This situation differs from that in
*North Dakota v. United States*, 495 U.S. 423 (1990).  At issue in *North Dakota* was the sale of
alcohol in two military bases.  A Department of Defense regulation required that alcohol
purchases be made in such a manner as to obtain "the most advantageous contract, price and
other considered factors."  *Id.* at 427. North Dakota, in response to evidence that liquor sold to
the military bases was being diverted for use elsewhere in the state, promulgated regulations that
required all persons bringing liquor into the State file monthly reports and that out-of-state
distributors selling directly to a federal enclave, such as a military base, attach a label to each
individual item indicating that the liquor is for consumption only within the enclave.  *Id.* at 428–
29.  This labeling requirement, of course, increased the cost of liquor purchased from out-of-state
distributors.  The Court held that despite this, the state reporting and labeling requirements were
not preempted, because their effect of increasing cost was merely incidental.  *Id.* at 442–43.
Here, unlike in *North Dakota* where the state had a legitimate state interest in preventing
diversion of alcohol off the military base, *see id.* at 432–33, 443–44, there is no legitimate state
interest being paid for by the assessments and fees because they fund the District's ability to
second-guess the federal government's determination of Servicers' fitness to service federal
student loans in an area—federal student loans and its servicing—with unique federal interests
that is already regulated and dominated by the federal government.

Here, D.C. Law 21-214 and the Finals Rules target the servicing of federal student loans by requiring that Servicers be licensed. *See Oneok, Inc. v. Learjet, Inc*., 135 S. Ct. 1591, 1599 (2015) (holding that whether the Natural Gas Act preempts a particular state law under field preemption turns on "the *target* at which the state law *aims*").  No court has yet addressed whether federal law occupies the field of regulating the servicing of federal student loans made or guaranteed by the federal government.  Rather, courts have refused to apply field preemption to the entire, much broader field of the HEA itself.  *See, e.g.*, *Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999) (noting that "Congress did not intend to give the HEA preemptive effect in every context"); *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225–26 (9th Cir. 1994) (determining that Congress did not occupy the entire field of the HEA); *Chae*, 593 F.3d at 941–42; *College Loan Corp. v. SLM Corp*., 396 F.3d 588, 598 (4th Cir. 2005) ("The fact that the Secretary has promulgated extensive regulations pursuant to the HEA does not, standing alone, persuade us to the contrary.  The existence of comprehensive federal regulations that fail to occupy the regulatory field do not, by their mere existence, preempt non-conflicting state law."). The HEA, however, is a comprehensive statutory scheme that authorizes numerous federal aid programs that support individuals pursuing a postsecondary education as well as institutions of higher education.  Only Title IV of the HEA, 20 U.S.C. § 1070, *et seq*., specifically authorizes and governs FDLP and FFELP.  The other seven titles of the HEA address other aspects of postsecondary education.

The federal government's actions over the last decade have completed its occupation of the field of the servicing of federal student loans.  This process began with Congress' passing of ECASLA and purchase of FFELP Loans in response to the disruptions in financial markets in

2008.  H.R. 5715, 110th Cong. (2008) (enacted).  Congress then passed the Health Care and

Education Reconciliation Act in 2010, Pub. L. 111-152.  *See* H.R. 4872, 111th Cong. (2010)

(enacted).  The legislation included the Student Aid and Fiscal Responsibility Act ("SAFRA"),

which effectively ended FFELP by mandating that no new FFELP Loans be made after June 30,

2010.  By passing SAFRA, Congress removed banks as the intermediary lender between the

federal government's guarantees and Borrowers and required all future federal student loans be

made directly to students through the federal government pursuant to FDLP.

Congress enacted SAFRA because it determined that FDLP is more cost effective and

therefore best served the interests of students and taxpayers.  It specifically determined that

FDLP would save the government billions of dollars because FFELP causes taxpayers to absorb

the risk to private lenders of student loan defaults.  *See* 156 Cong. Rec. H1914 (Mar. 21, 2010)

(statement of Rep. Petri); 156 Cong. Rec. H1882 (Mar. 21, 2010) (statement of Rep. Miller); 156

Cong. Rec. S2079–80 (Mar. 25, 2010) (statement of Sen. Leahy); 156 Cong. Rec. S2087–88

(Mar. 25, 2010) (statement of Sen. Durbin).  Because FFELP loans are no longer available to

Borrowers, over 90 percent of new student loans today are made through FDLP.  Trends in

Student Aid 2017, College Board, Oct. 2017, at 18, *available at* https://trends.collegeboard.org/

sites/default/files/2017-trends-student-aid_0.pdf.  Therefore, as a result of its commanding share

of the market, its regulatory oversight, and the termination of FFELP in favor of FDLP, the

federal government has a unique and essentially unilateral ability to determine who services

federal student loans, how those loans are serviced, and how much Servicers are compensated.

The precedent established in *Kearns* (1994), *Armstrong* (1999), *College Loan* (2005), and

*Chae* (2010) either predate the passage and implementation of ECASLA and SAFRA or were

announced too recently after Congress passed those acts.  Those cases did not benefit from observing the increasingly dominant federal interests in the servicing of federal student loans. As a result of ECASLA and SAFRA, not only do federal student loans constitute over 45 percent of the total financial assets of the U.S. government, but the federal government owns and manages over 85 percent of the $1.41 trillion in outstanding federal student loans.

Because over 90 percent of new student loans today are made through FDLP, and FDLP Loans constitute over $1.1 trillion, or over 79 percent, of federal student loans, field preemption has particular force in the context of servicing these loans made and managed by the federal government.  The Department of Education expounded on the dominant federal interests in the servicing of FDLP Loans in stating in its Preemption Notice that "the loan servicers are acting pursuant to a contract with the Federal government, and the servicers stand in the shoes of the Federal government in performing required actions under [FDLP]."  83 Fed. Reg. at 10621.  The notice "clarify[ies] its view that State regulation of the servicing of [FDLP] impedes uniquely Federal interests, and that State regulation of the servicing of [FFELP] is preempted to the extent that it undermines uniform administration of the program."  83 Fed. Reg. at 10620; *see also Boyle*, 487 U.S. at 504–505 (procurement of military equipment is an area of "uniquely federal interest" that preempts state regulation).

Therefore, the growth of the federal student loan programs has rendered federal interests dominant and thus has resulted in the federal government occupying the field of regulating the servicing of federal student loans.  D.C. Law 21-214 and the Final Rules are preempted as to the servicing of federal student loans under field preemption.

**F.      Federal Law Preempts the Disclosure Requirements in D.C. Law 21-214 and the Final Rules under Express Preemption.**

Finally, federal law expressly preempts specific disclosure requirements in D.C. Law 21-214 and the Final Rules.  Express preemption arises when Congress "enact[s] a statute containing an express preemption provision."  *Arizona v. United States*, 567 U.S. 387, 399 (2012); *see also Chae*, 593 F.3d at 942 (noting that express preemption occurs where Congress "indicate[s] its intent to displace state law through express language").  Courts examine "the text of the provision, the surrounding statutory framework, and Congress's stated purposes in enacting the statute to determine the proper scope of an express preemption provision."  *Chae*, 593 F.3d at 492.

The HEA includes an express preemption provision in 20 U.S.C. § 1098g, which states that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act . . . shall not be subject to any disclosure requirements of any State law."[30]  Although the term "disclosure" is not defined in the HEA, there is no qualifying language in Section 1083.  In addition, the surrounding statutory scheme, the legal definition of the term, and the Department of Education's interpretation demonstrate that the provision's preemptive scope includes information state law requires Servicers to provide to Borrowers beyond what is required in the HEA, as well as reporting to third parties such as state agencies.

The HEA, in 20 U.S.C. § 1083, titled "student loan information by eligible lenders," and its regulation in 34 C.F.R. § 682.205, titled "Disclosure requirements for lenders," contain the specific disclosures that Servicers must make to Borrowers at various stages of the loan

---

[30] FDLP and FFELP fall within Title IV of the HEA and thus are subject to the express preemption provision in 20 U.S.C. § 1098g.  *See Chae*, 593 F.3d at 942.

repayment process, including before disbursement of the student loan, before repayment, during repayment, and during delinquency.[31]  These "disclosures" range from "a statement prominently and clearly displayed and in bold print that the borrower is receiving a loan that must be repaid," 20 U.S.C. § 1083(a)(1), to information Servicers must provide to Borrowers having difficulty making payments, *Id.* § 1083(e)(2); 34 C.F.R. § 682.205(a)(4).  No other information is required to be provided by Servicers to Borrowers.  Therefore, state disclosure requirements that require additional information be provided to Borrowers are preempted.

20 U.S.C. § 1098g, though, is not merely limited to state law disclosure requirements to Borrowers.  In its Preemption Notice, the Department of Education notes that Congress "carefully crafted" a "disclosure regime specifying what information must be provided" in the context of FFELP and FDLP.  83 Fed. Reg. at 10621 (citing the disclosures required in 20 U.S.C. § 1083 and 34 C.F.R. § 682.205 that Servicers must make to Borrowers as well as additional types of required disclosures, such as those institutions must make, in the HEA and its regulations).  In light of this scheme, the Department "interprets 'disclosure requirements' . . . to encompass informal or non-written communications to borrowers as well as reporting to third parties such as credit reporting agencies."  *Id.*  This interpretation is consistent with the definition of "disclosure" in Black's Law Dictionary, which defines the term as "[t]he act or process of making known something that was previously unknown; a revelation of facts." BLACK'S LAW DICTIONARY (10th ed. 2014).

At least two courts have reached the same conclusion in similar contexts.  Based on the statutory framework and the definition of "disclosures," the United States District Court for the

---

[31] 20 U.S.C. § 1087e provides that FDLP Loans are subject to "the same terms, conditions, and benefits" as FFELP loans.

Southern District of Illinois' in *Nelson v. Great Lakes Educational Loan Services, Inc.*, *et al.*,

Case No. 3:17-CV-00183-NJR-SCW,[32] determined that Congress intended 20 U.S.C. § 1098g

"to preempt any state law requiring lenders to reveal facts or information not required by federal

law." ECF No. 19-16, at 10.  The U.S. District Court for the Northern District of Florida in

*Lawson-Ross v. Great Lakes Higher Education Corps.*, Case No. 1:17-CV-253-MW/GRJ

reached the same conclusion after determining that the reasoning in *Nelson* and in the

Department of Education's interpretation in the Preemption Notice are "persuasive" and that the

Preemption Notice is entitled to "due deference."  Ex. 1, at 7–9.  Although the question of

whether disclosures requirements to third parties is within 20 U.S.C. § 1098g's preemptive

scope was not before each court, these courts nevertheless interpreted 20 U.S.C. § 1098g

broadly and to encompass disclosures to borrowers beyond the standardized provision of the

core terms of the loan transaction.

     Defendants attempt to limit 20 U.S.C. § 1098g's preemptive scope to "disclosures" from

lenders or Servicers to Borrowers about the terms of the Borrowers' loans.  But the sources

Defendants cite do not support such a narrow interpretation.  The required "disclosures" in 20

U.S.C. § 1083 and 34 C.F.R. § 682.205 are not limited to terms of the Borrowers' loans.

Instead, 20 U.S.C. § 1083(e)(2) requires that Servicers provide Borrowers as "disclosures": (1)

"[a] description of the repayment plans available to the borrower, including how the borrower

should request a change in repayment plan; (2) "[a] description of the requirements for obtaining

forbearance on a loan, including expected costs associated with forbearance; and (3) "[a]

description of the options available to the borrower to avoid defaulting on the loan, and any

---

[32] As indicated *supra* p. 9 n.7, *Nelson* is on appeal in the Seventh Circuit.  Oral argument will be held October 23, 2018.

relevant fees or costs associated with such options."  In addition, the HEA and its regulations require that Servicers provide information to Borrowers and the federal government in a variety of other contexts, including the provision of data, reports, and records.[33]

Defendants' reliance on Congress' discussion of the Truth in Lending Act ("TILA") during debate on the bill that added 20 U.S.C. § 1098g is also misplaced.  Because the context of 20 U.S.C. § 1098g confirms that "disclosure" is not so limited, there is no need to examine the statute's legislative history.  Nevertheless, the fact that in enacting Section 1098g Congress may have been concerned about lenders and servicers being required to provide duplicative disclosures under TILA does not answer what Congress meant when it expressly preempted state law disclosure requirements.  Nothing in the legislative history addresses the scope of preempted state disclosure requirements under the statute.  Rather, U.S. Public Law 97-320 (Oct. 15, 1982), where Section 1098g was first codified, amended other federal provisions such as the Home Owners' Loan Act of 1993, and 12 U.S.C. § 1464 of the Act, for example, defines "public disclosures" broadly to include reports of conditions to federal banking agencies.  There

---

[33] *See, e.g.*, 20 U.S.C. §1082(c)(2) (specifying that the Department of Education is to collect data and records from servicers); 34 C.F.R. § 682.208(i) (requiring that servicers report all FFELP loans to the Department of Education's database); 34 C.F.R. §§ 682.300 to 305 (expounding the requirements for the Lender Reporting System ("LaRS"), whereby servicers pay any lender fees, receive Special Allowance payments, and received reimbursement for any borrower subsidy benefits, and outlining the method of reporting); 34 C.F.R. § 682.414 (detailing the records FFELP servicers must keep, the reports they must make to the Department of Education through its data system, and inspection requirements, all of which require servicers to provide a significant amount of information concerning the loans, including the loans' statuses, outstanding balances, and repayment); 34 C.F.R. § 682.410(b)(1) (specifying annual audit for FFELP servicers); 34 C.F.R. § 682.410(b)(5) (requiring that servicers provide reports containing loans details to consumer reporting agencies); 20 U.S.C. § 1087f(b)(3) (specifying that the Department of Education establish a data system for the maintenance of records on all loans made under FDLP); ECF 19-1, Attachments A-1 to A-3, at 26–60 (detailing the data financial reporting, accounting, and other reporting that servicers of federal student loans must provide to the Department of Education through its data system as part of their federal contracts).

is no suggestion that Congress intended Section 1098g to be limited to communications to Borrowers about financial terms.  Congress simply wanted states to refrain from requiring information from Servicers as to the servicing of federal student loans.

As a result, two types of disclosure requirements in D.C. Law 21-214 and the Final Rules fall within 20 U.S.C. § 1098g's scope.  First, D.C. Law 21-214 and the Final Rules require that Servicers provide disclosures to the District.  Specifically, the Final Rules require servicers to communicate or provide disclosure in at least the following ways that are not mandated under the HEA: (1) Section 3014 requires Servicers to submit an annual report detailing the number of loans sold, assigned, or transferred during the previous calendar year, and other information the Commissioner requires; (2) Section 3016 requires Servicers to notify the Commissioner of certain events, including settlement and resolution of any civil action or proceeding involving fraud, misrepresentation, or wrongful taking of property; (3) Section 3017 requires Servicers to provide a "special report" with any information the Commissioner requires; (4) Section 3018 requires Servicers to maintain records for at least three years after final payment is made on a student loan and make such records available to the Commissioner upon request; and (5) Section 3021 permits the Commissioner, based on a borrower complaint under Section 3022 or the Commissioner's own initiative, to examine and investigate servicers, including investigating the transactions, business, and records of any licensee.[34]  Because the Commissioner may revoke or suspend a servicer's license under Sections 7a(h) and (i) of D.C. Law 21-214 for violating "any provision of this act or of any implementing regulation," which includes the Final Rules, these rules create duties and requirements for Servicers that must be followed to service federal

---

[34] If the Commissioner places conditions on a license that includes additional disclosures of information to the District under Section 3007.3 of the Final Rules, this is likewise preempted.

student loans in the District.  They are expressly preempted.

Second, D.C. Law 21-214 and the Final Rules create a scheme whereby the Commissioner may require information from Servicers based on borrower complaints.  Under the Student Loan Borrower's Bill of Rights, created pursuant to D.C. Law 21-214, the District's Borrowers have numerous purported rights and it is Servicers' responsibility to ensure that each of them are upheld.  *See* ECF No. 19-21.  These purported rights, which require that Servicers provide information to Borrowers beyond what is required in the HEA, are in essence requirements to provide disclosures beyond those in the HEA.[35]   Indeed, the purported rights are combined with enforcement powers.  Section 7a(c)(1) of D.C. Law 21-214 provides that the Ombudsman's duties include assisting the Commissioner "in the enforcement of the licensing provisions of section 7b, including the referral of actions to the Office of the Attorney General for the District of Columbia for the enforcement of an order of the Commissioner pursuant to section 7b or other authority of the Commissioner related to a licensee or a person required to have a license under the act."  In addition, Section 7a(c)(5) requires that the Ombudsman, in consultation with the Commissioner, "[m]onitor the actions that student loan servicers take to ensure that student loan borrowers are informed of their rights and responsibilities under the terms of the student loan borrower's student education loan in a transparent, accessible, and timely manner," and Section 7b(h)(1) provides that a servicer's license may be revoked upon the Commissioner's determination that, among other things, the servicer has "engaged in any

---

[35] The Bill of Rights requires that Servicers provide to Borrowers monthly billing statements regarding outstanding loan balances, quarterly statements regarding loan specifics, annual statements concerning interest paid, payoff information upon request, the Servicer's current schedule of fees, timely information of organizational changes, timely and accurate reporting to credit bureaus of Borrower's loan payment information, and evidence within 30 days that a loan is paid in full.  None of these are in such a manner in the HEA or its implementing regulations.

dishonest activities or made any misrepresentation in any business transaction."

Consequently, a Borrower could file a complaint with the Ombudsman against a Servicer for, for example, lack of payoff information based on the Student Loan Borrower's Bill of Rights, which could trigger an investigation by the Commissioner, cause the Servicer to provide additional information to the Commissioner, and result in a Servicer's license being revoked. Therefore, the licensing scheme combined with the Student Loan Borrower's Bill of Rights requires that Servicers provide disclosures to both Borrowers and the District that are not included in the HEA and its implementing regulations, and thus are preempted.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss Plaintiff's Amended Complaint or, in the Alternative, for Summary Judgment, and grant SLSA's Cross-Motion for Summary Judgment.

Respectfully submitted this 21st day of September, 2018.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:  *s/ Christopher O. Murray*
     Richard B. Benenson
     Christopher O. Murray
     David B. Meschke
     410 17th Street, Suite 2200
     Denver, CO 80202
     Telephone:  303.223.1100
     Fax:  303.223.1111
     Email:   rbenenson@bhfs.com
            cmurray@bhfs.com
            dmeschke@bhfs.com

*Attorneys for Plaintiff Student Loan Servicing Alliance*