**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STUDENT LOAN SERVICING ALLIANCE,<br><br>        Plaintiff,<br><br>        v.<br><br>STEPHEN C. TAYLOR, ET AL.,<br><br>        Defendants. | Civil Action No. 18-640 (PLF) |

**BRIEF OF AMICI CURIAE
STATES OF NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, ILLINOIS,
IOWA, INDIANA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW
JERSEY, OREGON, RHODE ISLAND, VERMONT, AND VIRGINIA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTEREST OF AMICI CURIAE ............................................................................................... 1

ARGUMENT ............................................................................................................................. 3

    A.    Until recently, the federal government itself recognized and welcomed an important role for the States in regulating student loan servicers .............................................................. 3

    B.    Federal regulation of student loan servicing has been limited and only partially effective at protecting borrowers from servicer misconduct ................................................................. 6

        1.    Federal loan servicing standards have long been underdeveloped ............................... 7

        2.    Lack of clear federal servicing standards allowed servicer misconduct to occur ........ 9

        3.    The current DOED has actively sought to thwart attempts to improve servicing standards ................................................................................................................... 13

        4.    State laws and enforcement are critical to protect borrowers, particularly in the absence of effective federal regulation ............................................................................. 15

CONCLUSION.......................................................................................................................... 16

**TABLE OF AUTHORITIES**

**Other Authorities**

CFPB, *50 state snapshot of student debt* (Oct. 2017) ................................................................. 1

CFPB, *Annual report of the CFPB Student Loan Ombudsman* (Oct. 2017) ........................... 5, 10

CFPB, *Monthly Complaint Report* (Apr. 2017)........................................................................... 10

CFPB, *Student loan servicing: analysis of public input and recommendations for reform* (Sept. 2015) ..................................................................................................................... 5, 8, 10

Commonwealth of Massachusetts, Compl., *Commonwealth v. Pennsylvania Higher Educ. Assistance Agency*, No. 1784-cv-02682-BLS2 (Mass. Sup. Ct. August 23, 2017) ........... 10, 11

Commonwealth of Pennsylvania, Compl., *Commonwealth v. Navient Corp.*, No. 17-1814, M.D.Pa. (Oct. 5, 2017)........................................................................................................... 11

*Federal Student Loans: Key Weaknesses Limit Education's Management of Contractors: Hearing Before the Subcomm. on Gov't Operations of the H. Comm. on Oversight and Gov't Reform and the Subcomm. on Higher Educ. and Workforce Training of the H. Comm. on Educ. and the Workforce*, 114th Cong. (2015) (statement of Melissa Emrey-Arras, Director, Education, Workforce, and Income Security, U.S. Gov't Accountability Office) ..................... 9

Letter from Kathleen Smith, Acting Ass't Secretary, U.S. Dep't of Education, to Richard Cordray, Director, CFPB (Aug. 31, 2017).............................................................................. 14

Letter from Patty Murray, Ranking Member, Senate Committee on Health, Education, Labor and Pensions to Betsy DeVos, Secretary, Dep't of Education (June 12, 2017), https://www.help.senate.gov/imo/media/doc/061217%20-%20Bicam%20Dem-DeVos%20Servicing%20Letter%20%20final.pdf .................................................................. 14

Letter from Vanessa A. Burton, Attorney, Office of the Gen. Counsel, Dep't of Education, to Jedd Bullman, Ass't Comm'r, Office of the Commissioner on Financial Regulation, State of Maryland (Jan. 21, 2016)........................................................................................................ 4

Navient Corp., Mem. of Law in Support of Defs.' Mot. to Dismiss, *Consumer Financial Protection Bureau v. Navient Corp.*, No. 17-00101, M.D.Pa. (Mar. 24, 2017) ........................ 9

Office of the N.Y. State Comptroller, *Student Loan Debt in New York State* (Sept. 2016) ........... 1

People of California, Compl., *People v. Navient Corp.*, No. CGC-18-567732, Ca. Sup. Ct. (June 29, 2018) ................................................................................................................................. 12

ii

Press Release, CFPB, *CFPB Sues Nation's Largest Student Loan Company Navient for Failing Borrowers at Every Stage of Repayment* (Jan. 18, 2017) ........................................................ 13

Press Release, Office of the Attorney General of Massachusetts, *AG Healey Secures $2.4 Million, Significant Policy Reforms in Major Settlement with Student Loan Servicer* (Nov. 22, 2016) ................................................................................................................................................. 12

Press Release, Office of the Vice President, *FACTSHEET: Making Student Loans More Affordable* (June 9, 2014) ............................................................................................................... 7

Press Release, U.S. Dep't of Education, *Department of Education, Department of Treasury and the Consumer Financial Protection Bureau Issue Joint Principles on Student Loan Servicing* (Sept. 29, 2015) .................................................................................................................................. 4

Press Release, Washington State Office of the Att'y General, *AG FERGUSON FILES SUIT AGAINST SALLIE MAE OFFSHOOT NAVIENT CORP.* (Jan. 18, 2017) ............................... 12

Student Loan Servicing Association, Comment Letter on Proposed Regulations to Address Title IV Loan Program Issues (May 20, 2011), https://www.regulations.gov/document?D=ED-2011-OPE-0003-0026 ........................................................................................................................... 7

State of Illinois, Compl., *State v. Navient Corp.*, No. 17-ch-761 (Ill. Cty. Ct. Jan. 18, 2017). .... 11

U.S. Dep't of Education, [2009 Contract with Nelnet Servicing LLC], https://www2.ed.gov/policy/gen/leg/foia/contract/nelnet-061709.pdf ................................... 3, 9

U.S. Dep't of Education, *Consideration of Past Performance in Student Loan Servicing Recompete* ............................................................................................................................................. 13

U.S. Dep't of Education, Office of Federal Student Aid, *FFEL Program Lender and Guaranty Agency Reports* ..................................................................................................................................... 9

U.S. Dep't of Education, Office of Federal Student Aid, *Phase I – Solicitation, Federal Aid Servicing Solution* ............................................................................................................................... 13

U.S. Dep't of Education, Office of Federal Student Aid, *Phase I – Solicitation, Next Generation Financial Services Environment* at 21 (Feb. 20, 2018) ........................................................... 14

U.S. Dep't of Education, Office of Federal Student Aid, *Location of Federal Family Education Loan Programs*) ..................................................................................................................................... 9

U.S. Dep't of Education, *Policy Direction on Federal Student Loan Servicing* (2016) ........... 4, 13

U.S. Dep't of Education, *Recommendations on Best Practices in Performance-Based Contracting* ......................................................................................................................................... 13

U.S. Dep't of Education, *Student Loan Servicer Recompete* (2017) ............................................ 14

U.S. Dep't of Treasury, *A Financial System That Creates Economic Opportunities* (July 2018) 15

U.S. Gov't Accountability Office, GAO-18-587R, *Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers* ........................... 9, 15

**Regulations**

81 Fed. Reg. 60683 (Sept. 2, 2016) ............................................................................................ 4

## INTEREST OF AMICI CURIAE

Amici States of New York, California, Connecticut, Delaware, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Oregon, Rhode Island, Vermont, and Virginia file this amicus brief in response to the sweeping claims of federal preemption asserted by plaintiff Student Loan Servicing Alliance ("SLSA") in its amended complaint and the United States in its statement of interest ("SOI"). Amici States have a compelling interest in defending their historic police powers to protect consumers, including student-loan borrowers. As of fall 2016, more than 2.8 million student-loan borrowers lived in New York, owing $82 billion across all types of student loans. (Office of the N.Y. State Comptroller, *Student Loan Debt in New York State* (Sept. 2016) at 1, 3, 5) California has approximately 4 million student-loan borrowers, with an outstanding balance of nearly $130 billion; Illinois's borrowers owe $56.79 billion. (CFPB, *50 state snapshot of student debt* (Oct. 2017) at 7)[1] Almost all of these loans are managed by student loan servicers—companies that are responsible for, among other duties, handling loan repayment, enrolling struggling borrowers in alternative repayment plans, and processing applications for a special loan forgiveness program for borrowers working long-term in public service. The conduct of such servicers thus has a significant effect on the well-being of our residents and the economies of our States. As Amici States have discovered, however, student loan servicers have engaged in a broad range of fraudulent, unfair, or abusive practices, such as steering borrowers to less favorable repayment options or processing errors that have

---

[1] For other Amici States, the figures are as follows: Connecticut, $16.5 billion; Delaware, $4.21 billion; Indiana, $26.71 billion; Iowa, $13.08 billion; Maine, $5.9 billion; Maryland, $30.33 billion; Massachusetts, $32.83 billion; Minnesota, $26.85 billion; New Jersey, $41.67 billion; Oregon, $18.05 billion; Rhode Island, $4.37 billion; Vermont, $2.8 billion; Virginia, $36.57 billion. *Id. passim.*

caused borrowers to become "delinquent" on their loans even though they have made their payments.

The preemption arguments made by plaintiff and the United States, if accepted by this Court, would significantly interfere with Amici States' ability to regulate student loan servicers and prevent their improper practices.  Indeed, plaintiff seeks to oust States from the field of federal student loan servicing altogether; and the United States similarly seeks to exempt all servicers of federally-owned or -guaranteed student loans from state-law requirements, on the ground that these servicers' conduct should be governed exclusively by federal laws, regulations, and contracts.

Amici States support the persuasive arguments against express, field, and conflict preemption made by defendants Stephen C. Taylor, Charles A. Burt, and District of Columbia (the "District of Columbia").  This amicus brief focuses on the practical importance of preserving state regulation over student loan servicers.  Contrary to the impression given by plaintiff's complaint and the Department of Justice's Statement of Interest ("SOI"), the federal Department of Education ("DOED") has not implemented effective regulations to govern servicers' interactions with borrowers or consistently enforced the limited rules on the books.  To the contrary, DOED has presided over a modest patchwork of contractual and regulatory provisions and has often turned a blind eye to servicer misconduct, resulting in widespread abuses of vulnerable borrowers.  Even the moderate attempts at reform in the past few years have largely been abandoned by the present DOED.

With no effective federal oversight, state laws and enforcement actions have played a critical role in protecting borrowers from shoddy and predatory servicer practices.  Indeed, the federal government previously welcomed the States to identify, prevent, and undertake

2

enforcement actions against servicer misconduct.  Ousting the States from that critical protective role would threaten the well-being of millions of our residents and improperly override our sovereign prerogative to exercise our police powers to protect our residents.  Amici States thus submit this brief to explain to the Court the importance of preserving the States' longstanding role in enforcing consumer protection laws in the context of student loan servicing.

## ARGUMENT

A.  Until recently, the federal government itself recognized and welcomed an important role for the States in regulating student loan servicers

Plaintiff's complaint alleges that state regulations of student loan servicers are subject to conflict preemption because they "constitute an insurmountable obstacle to the federal government's ability to administer the federal student loan programs."  Am. Compl. ¶ 8.  The SOI likewise asserts that state regulations improperly "attempt to second guess…Education's determination of which servicers to contract with."  SOI at 14.  These arguments abandon the federal government's longstanding position on preemption.

Until 2017, the federal government repeatedly and explicitly acknowledged the importance of state consumer protection laws and state enforcement actions in regulating student-loan servicer conduct.  Indeed, such acknowledgments appeared expressly in the federal government's contracts with servicers—the same contracts that the SOI now paradoxically cites as a basis for preemption.  Such contracts typically included a provision to the effect that "[t]he contractor(s) will be responsible for maintaining a full understanding of all federal and state laws and regulations…and ensuring that all aspects of the service continue to remain in compliance as changes occur."  (U.S. Dep't of Education, [2009 Contract with Nelnet Servicing LLC] at [23], https://www2.ed.gov/policy/gen/leg/foia/contract/nelnet-061709.pdf)

3

In other ways, too, DOED itself previously declared its willingness to work in partnership with the States to improve loan servicers' compliance with federal and state laws—thus recognizing that state regulation of loan servicers supports, rather than hinders, the administration of federal student loan programs.  Notably, in 2015, the Departments of Education and the Treasury and the CFPB announced a "Joint Statement of Principles on Student Loan Servicing" as "a framework to improve student loan servicing practices."  Under the principle of "[being] accountable," the Joint Principles stated: "If servicers fall short and violate federal *or state* consumer financial laws…federal *and state* agencies [] and law enforcement officials should have access to appropriate channels for recourse."  (Press Release, U.S. Dep't of Education, *Department of Education, Department of Treasury and the Consumer Financial Protection Bureau Issue Joint Principles on Student Loan Servicing* (Sept. 29, 2015) (emphasis added))[2]

A year later, in a memorandum intended to "provide[] policy direction for the servicing of all student loans," DOED stated that servicers "should comply with federal and state law, taking any necessary steps to support oversight by federal or state agencies," and urged the Department to continue to share information with state law enforcement agencies "so these agencies can take action if illegal practices occur."  (U.S. Dep't of Education, *Policy Direction on Federal Student Loan Servicing* (2016) at 1, 37-38 ["Mitchell Memorandum"], https://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf)  The

---

[2] Shortly thereafter, the Department of Education informed the Commissioner on Financial Regulation for the state of Maryland that "if the State determines that [student] loan servicers…are 'collection agencies' under [the state's statute for licensing debt collectors], the Department does not believe that the State's regulation of those entities would be preempted by Federal law."  (Letter from Vanessa A. Burton, Attorney, Office of the Gen. Counsel, Dep't of Education, to Jedd Bullman, Ass't Comm'r, Office of the Commissioner on Financial Regulation, State of Maryland (Jan. 21, 2016))

Department also formally amended its regulation concerning data collection and sharing "to more easily accommodate…requests" for relevant data "from Federal, State, local, or tribal governmental entities seeking to verify Department [student loan] contractors' compliance with consumer protection, debt collection, financial, and other applicable…requirements." 81 Fed. Reg. 60683 (Sept. 2, 2016).  In other words, DOED recognized the importance of providing its own data to state agencies seeking to enforce state consumer protection law, and took affirmative steps to facilitate the transfer of such data.

Finally, the federal Consumer Financial Protection Bureau ("CFPB"), which has supervisory authority over student loan servicers as well as the ability to bring enforcement actions against them under the Dodd-Frank Act, has also supported concurrent application of state laws.  As the CFPB has broadly stated, student loan "servicers generally must comply with applicable federal and state consumer financial laws and regulations."  (CFPB, *Student loan servicing: analysis of public input and recommendations for reform* at 11 (Sept. 2015) ("CFPB 2015 Report"))  Just last year, the CFPB again noted that "[c]onsumers benefit when the student loan industry is subject to coordinated oversight by regulators at both the federal and state levels. As the Bureau has noted in the past, a robust state-federal partnership offers tangible benefits to student loan borrowers by providing rigorous oversight in every corner of the student loan servicing market."  (CFPB, *Annual report of the CFPB Student Loan Ombudsman* at 64 (Oct. 2017) ("CFPB 2017 Report"))[3]

---

[3] While such statements may not qualify as formal agency rulemaking, they provide an important backdrop for understanding the prior legal position held by the federal government, *see* Mem. of Points and Authorities in Support of Defs.' Mot. to Dismiss at 34-36, and, of course, should be considered for their own persuasive force.

The federal government has thus repeatedly and expressly affirmed the continued force, vitality, and benefits of state consumer protection laws, and for several years invited the States to cooperate with federal authorities to regulate student loan servicers.  That consistent view, as will be discussed below, belies the current claims by plaintiff and the SOI that enforcement of state consumer protection laws serves as a hindrance to administration of federal student loan programs.  Neither plaintiff nor the Department of Justice has shown—nor could they show— any instance in which state law enforcement in this area has been a hindrance to federal enforcement.  Rather, it has been critical to fill in the gaps and extend the reach of that enforcement.

B.  Federal regulation of student loan servicing has been limited and only partially effective at protecting borrowers from servicer misconduct

Preempting state laws in the field of student loan servicing will remove an important protection that has proven critical to identify and obtain remedies for servicer misconduct. Absent state laws and enforcement, servicers would be governed only by the federal rules, an approach which has shown itself to be frequently deficient in both the establishing of adequate standards and the enforcement of them.  Contrary to plaintiff's assertion, the federal student loan programs have not historically been "highly regulated" by DOED, with "numerous regulations governing all aspects of federal student loans."  Am. Compl. at ¶ 37, 40.  The SOI also mischaracterizes the federal regulatory scheme by asserting that "[b]eginning with selection and continuing throughout the life of the contracts, Education comprehensively governs its servicers' performance," with "rigorous existing structures for managing its servicers."  SOI at 5-6.  These assertions simply do not correspond to the actual experiences of borrowers in Amici States over

the past decade.[4]  Rather, such borrowers have repeatedly been harmed by the significant gaps in what has proven to be an underdeveloped and only sporadically enforced system of federal regulation.  Far from protecting an effective system of federal regulation, preemption here would instead restore a deficient regime that would seriously harm student-loan borrowers.

    1.   Federal loan servicing standards have long been underdeveloped

Plaintiff itself has long acknowledged that federal regulations for the Direct Loan Program have been deficient.  As plaintiff complained in a formal comment to a 2011 rulemaking, "[I]t is important for the Department to better codify the regulations for the [Direct Loan program].  In many instances, the [Direct Loan] regulations provide little or no guidance on issues that might be interpreted in various and numerous ways by servicers acting in good faith." It therefore requested "[c]larification and codification of [Direct Loan] regulations and procedures." (SLSA, Comment Letter on Proposed Regulations to Address Title IV Loan Program Issues (May 20, 2011), https://www.regulations.gov/document?D=ED-2011-OPE-0003-0026)  Such clarification or codification was not immediately forthcoming.  In 2014, the federal government acknowledged that the Direct Loan program contracts at the time, "[r]ather than specifying every step of the servicing process," left servicers themselves to determine the ways to "best serve students and taxpayers," and that these contracts would be renegotiated "to better ensure high-quality servicing for student loan borrowers."  (Press Release, Office of the Vice President, *FACTSHEET: Making Student Loans More Affordable* (June 9, 2014))

The federal government continued to recognize the ongoing problem of underdeveloped and piecemeal servicing standards the next year, finding that "[t]here are no consistent, market-

---

[4] As student loan servicing continues for the life of the loan, up to as much as thirty years, many present-day borrowers will have been affected by servicing failures dating back years into the past.

wide federal standards for student loan servicing and servicers generally have discretion to determine policies related to many aspects of servicing operations…[T]here is no existing, comprehensive federal statutory or regulatory framework providing consistent standards for the servicing of all student loans."  (CFPB 2015 Report at 3, 11)[5]  Indeed, the CFPB reported, based on its own inquiry into the subject, that "the two largest participants in the student loan market[6] [identified] certain student loan servicing practices where there is significant diversity in the marketplace and suggest[ed] that policymakers require consistent approaches to common servicing functions." (*Id.* at 5)

Finally, the General Accounting Office noted at the end of 2015:

> The Department of Education's Office of Federal Student Aid's (FSA) instructions and guidance to [federal] loan servicers are sometimes lacking, resulting in inconsistent and inefficient services to borrowers. While FSA has taken some steps to improve program instructions and guidance, six of the seven servicers[7] GAO interviewed reported various issues resulting from absent, unclear and inconsistent guidance and instructions from FSA…in certain instances when FSA provided additional guidance or clarifications, it did not consistently share them with all servicers…Without improved guidance and instructions to servicers, borrower finances or the integrity of the Direct Loan program could be negatively affected.

(*Federal Student Loans: Key Weaknesses Limit Education's Management of Contractors: Hearing Before the Subcomm. on Gov't Operations of the H. Comm. on Oversight and Gov't Reform and the Subcomm. on Higher Educ. and Workforce Training of the H. Comm. on Educ.*

---

[5] While this report addressed the entire student loan market, there is no indication that either Direct or FFEL (the older program replaced by Direct) loans were an exception to this observation.

[6] While not identified, it is very likely that, as SLSA's membership reportedly "collectively service[s] over 95 percent of the outstanding [Direct and FFEL] student loans," Am. Compl. ¶ 9, these two "largest participants in the student loan market" are members of plaintiff SLSA.

[7] Again, it is very likely that most or all of the servicers interviewed are or were members of plaintiff SLSA.

*and the Workforce* at *0, 114th Cong. (2015) (statement of Melissa Emrey-Arras, Director,

Education, Workforce, and Income Security, U.S. Gov't Accountability Office))[8]

     As these analyses demonstrate, the federal government itself has repeatedly recognized

that its regulation of student loan servicing has been far from "comprehensive."[9]

     2.  Lack of clear federal servicing standards allowed servicer misconduct to occur

     DOED's failure to effectively regulate servicers has unsurprisingly led to a wide range of

abusive practices.  Left largely to their own devices, servicers have advanced their own interests

over those of borrowers.  Indeed, Navient, historically the nation's largest federal student loan

servicer, openly stated, in a motion to dismiss a CFPB lawsuit, that "there is no expectation that

the servicer will 'act in the interest of the consumer.'"  (Mem. of Law in Support of Defs.' Mot.

to Dismiss at 20-21, *Consumer Financial Protection Bureau v. Navient Corp.*, No. 17-00101,

M.D.Pa. (Mar. 24, 2017))

---

[8] In addition to weak guidance to servicers, the GAO found weaknesses in DOED's process for monitoring borrower calls for quality and for tracking borrower complaints and found that "the performance metrics used [to evaluate servicers]…did not fully align with its goals of superior service and program integrity."  (U.S. Gov't Accountability Office, GAO-18-587R, *Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers* at 3-6 (2018) ("GAO 2018 Report"))

[9] Plaintiff and the SOI also rely on the allegedly "comprehensive" terms of DOED's contracts with servicers in the Direct Loan Program.  These contracts are far from comprehensive. Contracts between DOED and servicers lack detailed standards for basic servicing functions. For example, the contracts do not provide detailed requirements related to the content or timing of communications with borrowers.  (*See, e.g.*, U.S. Dep't of Education, [2009 Contract with Nelnet Servicing LLC], https://www2.ed.gov/policy/gen/leg/foia/contract/nelnet-061709.pdf.) Furthermore, contracts are not even in place for much of the nearly *$300 billion* in outstanding loans issued under the older FFEL program.  Those loans were originated by private entities, not the federal government, and are mostly subject to private servicing contracts rather than the DOED contracts relied on by plaintiff and the SOI.  (U.S. Dep't of Education, Office of Federal Student Aid, *FFEL Program Lender and Guaranty Agency Reports*; U.S. Dep't of Education, Office of Federal Student Aid, *Location of Federal Family Education Loan Programs*)

Servicers have engaged in misconduct on a large scale.  In a 2015 report, the CFPB

surveyed complaints it had received concerning federal student loans and described a wide range

of abusive practices, including "servicing problems or practices that discourage utilization of

alternative repayment plans…[and] result in payment shock, lost benefits, and increased interest

charges…problems related to customer service, including issues for borrowers seeking to resolve

servicing errors…payment processing problems, increase[d] interest charges and late fees,

prolong[ed] repayment, and…confusion for student loan borrowers." (CFPB 2015 Report at 4)

From September 2016 to September 2017 alone (the most recent period for which numbers are

available), the CFPB reported receiving nearly 13,000 complaints concerning federal student

loan servicing.  (CFPB 2017 Report at 2)  The historically largest federal student loan servicer

(which also services private loans) was the single company in *any* industry about which the

CFPB received the most complaints from November 2016-January 2017, and federal student

loans generally were the seventh most common subject of complaints (behind such vast product

categories as all mortgages and all credit cards).  (CFPB, *Monthly Complaint Report* at 5, 9 (Apr.

2017))

States bringing suit against servicers have identified similar problems.  For example,

Massachusetts found that a loan servicer, the Pennsylvania Higher Education Assistance Agency

("PHEAA"), failed to timely and properly process borrowers' applications for "income-driven

repayment plans," which tie monthly payments to income and family size and provide for loan

forgiveness after a specified number of qualifying monthly payments.  Compl. at ¶ 43,

*Commonwealth v. Pennsylvania Higher Educ. Assistance Agency*, No. 1784-cv-02682-BLS2

(Mass. Sup. Ct. August 23, 2017).  PHEAA's failure to timely and properly process income-

driven repayment plan applications deprived borrowers of the opportunity to reduce monthly

payments and make qualifying monthly payments that count toward loan forgiveness. Massachusetts further found that PHEAA failed to timely and properly process the annual certification forms required for a teacher grant program, causing some teachers to lose the grants they had earned through work in schools serving low-income families.  *Id.* at ¶¶ 55-56.

Servicers have also been found to improperly steer struggling borrowers to less favorable loan repayment plans, such as forbearance (which permits a borrower to temporarily suspend payment on a loan) over income-driven repayment options (which tie monthly payments to income and family size and offer loan forgiveness after a specified number of qualifying payments).  Interest continues to accrue on unsubsidized loans during forbearance, so borrowers who enter forbearance end up paying more over the life of the loan.  Steering borrowers to forbearance thus adds to the cost of borrowers' loans, deprives borrowers of the benefits of income-driven repayment options, and increases their likelihood of falling into financial distress, including delinquency or default on their loans.  Enrolling borrowers in forbearance is simpler— and therefore cheaper—for servicers than providing counseling on income-based repayment.

A number of states have found that servicers engage in such improper steering.  For example, Illinois found that Navient, historically the nation's largest servicer of federal loans, had steered struggling borrowers into entering forbearance rather than counsel borrowers about income-driven repayment plans.  Compl. at 2, *State v. Navient Corp.*, No. 17-ch-761 (Ill. Cty. Ct. Jan. 18, 2017).  Pennsylvania similarly found that Navient, "despite publicly assuring borrowers that it will help them," had "routinely disregarded that commitment and instead steered borrowers experiencing long-term financial hardship into forbearance."  Compl. ¶ 109, *Commonwealth v. Navient Corp.*, No. 17-1814, M.D.Pa. (Oct. 5, 2017).

Servicers also engaged in other abuses identified by the states.  Washington found that "when servicing student loans, Navient misapplied borrower payments and failed to follow borrower instructions concerning how excess payments should be allocated, causing borrowers to receive unnecessary collection calls, and requiring them to spend time correcting Navient's mistakes."  (Press Release, Washington State Office of the Att'y General, *AG FERGUSON FILES SUIT AGAINST SALLIE MAE OFFSHOOT NAVIENT CORP.* (Jan. 18, 2017); *see also* Compl. ¶¶ 162-72, *Commonwealth v. Navient Corp.*, No. 17-1814.)  California found that, despite assurances from Navient that it would give borrowers specific notice when their income-drive repayment plans were due for recertification, Navient instead sent borrowers only a vague, cryptic email, which led to more than 60% of borrowers failing to recertify and suffering negative financial consequences.  Compl. ¶¶ 59-72, *People v. Navient Corp.*, No. CGC-18-567732, Ca. Sup. Ct. (June 29, 2018)  Massachusetts found one servicer, ACS, charged improper late fees, failed to comply with federal requirements aimed at protecting active-duty servicemembers, and engaged in harassing debt collection practices.  The servicer, ACS, paid Massachusetts $2.4 million in 2016 to settle the state's claims.  (Press Release, Office of the Attorney General of Massachusetts, *AG Healey Secures $2.4 Million, Significant Policy Reforms in Major Settlement with Student Loan Servicer* (Nov. 22, 2016))

The extent of the problems can been seen in the 2017 lawsuit the CFPB brought against the nation's historically largest servicer of federal loans, Navient, "for systematically and illegally failing borrowers in every stage of repayment," having "created obstacles to repayment by providing bad information, processing payments incorrectly, and failing to act when borrowers complained."  The CFPB has alleged that "[t]hrough shortcuts and deception, the company also illegally cheated many struggling borrowers out of their rights to lower

repayments, which caused them to pay much more than they had to for their loans." (Press

Release, CFPB, *CFPB Sues Nation's Largest Student Loan Company Navient for Failing*

*Borrowers at Every Stage of Repayment* (Jan. 18, 2017))

3. The current DOED has actively sought to thwart attempts to improve servicing standards

The absence of effective federal regulations led DOED to engage in some efforts to

establish better servicing standards starting in 2014.  Regulations governing the federal loan

programs were somewhat updated and expanded that year, and new contracts with certain

servicers were negotiated.  The federal government also began to consider long-term

improvements in the program.  A task force recommended in 2015 that DOED should "set[]

more specific requirements for contractors" for communications with student loan borrowers in

order to "maintain a consistent level of service [and] improve overall borrower communication."

(U.S. Dep't of Education, *Recommendations on Best Practices in Performance-Based*

*Contracting* at 9 (Aug. 2015))  DOED determined that it would seek to resolicit servicing

contracts, substantially expand requirements for customer assistance, especially for delinquent or

defaulted borrowers, and create a new servicing platform to make interactions with borrowers

easier and more uniform. (Mitchell Mem. at 1-2, 7, 13-41)[10]  In the solicitation process, the

Secretary of Education directed in an internal memorandum, "the most important noncost factor

in the evaluation" of vendors was to be "past performance evaluation." (U.S. Dep't of Education,

*Consideration of Past Performance in Student Loan Servicing Recompete* at 2 (2016) ["Runcie

---

[10] Unsurprisingly, the Phase I solicitation for this project required that "[t]he contractor(s) will be responsible for maintaining a full understanding of all federal *and state* laws and regulations…and ensuring that all aspects of the…services provided continue to remain in compliance as changes occur."  (U.S. Dep't of Education, Office of Federal Student Aid, *Phase I – Solicitation, Federal Aid Servicing Solution* at 4 (2016) (emphasis added))

Memorandum"])  That evaluation would hold servicers accountable if they had already failed to provide quality servicers to borrowers.

DOED, however, has since halted even these fledgling efforts.  In spring 2017, the new Secretary of the Department issued another memorandum withdrawing both the Mitchell and Runcie Memorandums concerning new servicing standards and platforms, purportedly "to negate any impediment, ambiguity or inconsistency" in the Department's approach.  (U.S. Dep't of Education, *Student Loan Servicer Recompete* (2017))[11]  In August 2017, the Department also withdrew memoranda of understanding with the CFPB that had been in place since 2011 to permit the CFPB to access borrower complaints made to the Department so that it might bring enforcement actions like the one it had already brought against Navient, the Department's largest servicer at the time.  (Letter from Kathleen Smith, Acting Ass't Secretary, U.S. Dep't of Education, to Richard Cordray, Director, CFPB (Aug. 31, 2017), https://edworkforce.house.gov/uploadedfiles/2017-09-01_signed_letter_to_cfpb.pdf)  The withdrawal of these memoranda will hamstring even CFPB law enforcement against servicers and demonstrates DOED's resistance to effective policing of servicers by regulators at *any* level of government.  Not long after, the Department submitted its Statement of Interest in the

---

[11] In spring 2018, after public protest by Congressmembers of this "remov[al of] key requirements that would make the loan servicer adhere to standards…in order to reduce rates of delinquency and default," DOED issued a new solicitation for bids for a new servicing system, which no longer considers past performance as the "most important noncost factor" in selection of vendors.  (Letter from Patty Murray, Ranking Member, Senate Committee on Health, Education, Labor and Pensions to Betsy DeVos, Secretary, Dep't of Education (June 12, 2017), https://www.help.senate.gov/imo/media/doc/061217%20-%20Bicam%20Dem-DeVos%20Servicing%20Letter%20%20final.pdf; U.S. Dep't of Education, Office of Federal Student Aid, *Phase I – Solicitation,* at 21 (Feb. 20, 2018))  DOED has not proposed more extensive and specific servicing standards of the kind outlined in the withdrawn Mitchell Memorandum.

Massachusetts litigation against PHEAA, announcing its opposition to states' efforts to enforce their own consumer protection laws against servicers.

In short, since 2017, DOED has not only halted efforts to improve federal student loan servicing standards that have long been seen as deficient, but also begun actively undermining both federal and state enforcement efforts against servicers.  As a consequence—and remarkably, given DOED's claim of comprehensive regulation—as the Department of the Treasury recently concluded, "Federal student loan servicing currently lacks effective minimum servicing standards."  (U.S. Dep't of Treasury, *A Financial System That Creates Economic Opportunities,* at 125 (July 2018))[12]

4.  State laws and enforcement are critical to protect borrowers, particularly in the absence of effective federal regulation

Faced with such widespread servicer misconduct, and in the absence of an effective federal regime, a number of states have acted to protect borrowers by bringing enforcement actions under their own consumer protection laws.  No fewer than five states (Washington, Illinois, Pennsylvania, California, and Mississippi) have sued the historically largest servicer of federal student loans, Navient, for violations of consumer-protection law.  Two of these cases (Washington and Illinois) have survived motions to dismiss on the grounds of preemption. Massachusetts, meanwhile, has sued PHEAA for failing to properly handle the federal public-service loan forgiveness program for which it is responsible and settled with another servicer, ACS, which was once the exclusive servicer for the federal Direct Loans program.  Other states are conducting their own investigations of various servicers.  And the District of Columbia is not alone in establishing a licensing regime for servicers: Connecticut, Illinois, and California have

---

[12] Similarly, the GAO reported in July 2018 that DOED had still not addressed four of its six findings in its 2016 report.  (GAO 2018 Report at 3)

also done or are in the process of doing so.  While many of the cases or investigations have not yet had an opportunity to reach their conclusion, the States have demonstrated their capability and commitment to ensure that servicers help, rather than hinder, their residents in repaying their student loans.

In light of DOED's retreat from implementing and enforcing federal student loan servicing standards and the States' robust efforts to protect borrowers, plaintiff and the SOI are simply wrong to suggest that preemption here will result in better regulation of student loan servicers.  The opposite is true: preempting state law here would lead to dramatically more servicer misconduct by limiting the States' protective efforts and relying exclusively on a federal system that was already deficient, and is now being actively undermined.  This Court should accordingly reject the preemption arguments made by plaintiff and the SOI.

## CONCLUSION

The Court should grant plaintiff District of Columbia's motion to dismiss, or, in the alternative, for summary judgment.

Respectfully submitted,

BARBARA D. UNDERWOOD
Attorney General for the State of New York

By:        /s/ Sarah E. Trombley
           Assistant Attorney General
           Consumer Frauds and Protection Bureau
           Office of the Attorney General
           State of New York
           28 Liberty St.
           New York, NY 10005
           Tel: 212-426-8294

(additional counsel on following page)

16

Jane M. Azia
Bureau Chief
Consumer Frauds and Protection Bureau
Office of the Attorney General
State of New York
28 Liberty St.
New York, NY 10005

XAVIER BECERRA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

GEORGE JEPSEN
*Attorney General of Connecticut*
55 Elm Street
Hartford CT 06106

MATTHEW P. DENN
*Attorney General of Delaware*
Carvel State Building
820 N. French St.
Wilmington, DE 19801

LISA MADIGAN
*Attorney General of Illinois*
100 West Randolph Street
Chicago, IL 60601

CURTIS T. HILL, JR.
*Attorney General of Indiana*
200 West Washington Street, Room 219
Indianapolis, IN 46204

TOM MILLER
*Attorney General of Iowa*
1305 E. Walnut Street
Des Moines IA 50319

JANET T. MILLS
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 St. Paul Place, 16th Floor
Baltimore, MD 21202

MAURA HEALEY
*Attorney General of Massachusetts*
One Ashburton Place
Boston, MA 02108

LORI SWANSON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

GURBIR S. GREWAL
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor, West Wing
Trenton, NJ 08625-0080

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street
Salem, OR 97301-4096

PETER F. KILMARTIN
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

T. J. DONOVAN
*Attorney General of Vermont*
109 State St
Montpelier, VT 05609

MARK R. HERRING
*Attorney General of Virginia*
202 North 9th Street
Richmond, Virginia 23219