UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STUDENT LOAN SERVICING ALLIANCE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 18-0640 (PLF) |
| DISTRICT OF COLUMBIA, et al., | ) ) | |
| Defendants. | ) ) | |

## OPINION

This case involves the important question of whether the District of Columbia – and inferentially other states – may require student loan servicers who manage federally-owned and federally-guaranteed student loans to obtain a license to operate in the District of Columbia in an effort to protect the consumers of those loans.  Plaintiff Student Loan Servicing Alliance ("SLSA") maintains that the District of Columbia may not regulate such servicers because Congress has preempted the field of regulating student loans servicers or has otherwise preempted the law at issue – D.C. Law 21-214 and the Final Rules.  SLSA's position is supported by the United States, which has filed a statement of interest in this case.

Defendants – the District of Columbia; Stephen C. Taylor, Commissioner, Department of Insurance, Securities, and Banking; and Charles A. Burt, Student Loan and Foreclosure Ombudsman – have moved [Dkt. No. 21] to dismiss SLSA's amended complaint or, in the alternative, for summary judgment.  SLSA filed a cross-motion [Dkt. No. 27] for summary judgment.  Upon careful consideration of the parties' papers, the relevant legal authorities, the

oral arguments of counsel at a motions hearing on October 23, 2018, and the entire record in this

case, the Court will deny defendants' motion to dismiss; grant defendants' motion for summary

judgment in part; and grant in part and deny in part plaintiff's motion for summary judgment.[1]

---

[1]      The Court has reviewed the following filings in resolving the pending motions: SLSA's Amended Complaint ("Am. Compl.") [Dkt No. 19]; Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def. MTD") [Dkt No. 21]; Defendants' Statement of Material Facts As To Which There Is No Genuine Dispute ("Def. Facts") [Dkt. No. 21-3]; SLSA's Cross-Motion for Summary Judgment ("Pl. Cr-MSJ") [Dkt No. 27-1]; SLSA's Statement of Facts ("Pl. Facts") [Dkt. No. 27-3]; Defendants' Memorandum in Opposition to SLSA's Cross-Motion for Summary Judgment and Reply in Support of Motion to Dismiss ("Def. Opp.") [Dkt. No. 30]; SLSA's Reply in Support of Cross-Motion for Summary Judgment ("Pl. Reply") [Dkt. No. 33]; Defendants' Supplemental Filing in Response to the Court's October 10, 2018 Minute Order ("Def. IG Immunity") [Dkt. No. 34]; SLSA's Supplemental Brief on Application of the Intergovernmental Immunity Doctrine ("Pl. IG Immunity") [Dkt. No. 35]; United States' Statement of Interest ("U.S. SOI") [Dkt. No. 20]; Amicus Brief by Lawyers' Committee, et al. ("Am. Br. Lawyers' Committee) [Dkt. No. 24]; Amicus Brief by State of New York, et al. ("Am. Br. NYS") [Dkt No. 29]; D.C. Law 21-214 ("D.C. Law") [Dkt. No. 19-2]; D.C. Final Rules implementing the D.C. Law ("Final Rules") [Dkt. No. 19-15]; U.S. Department of Education Preemption Notice ("DOED Notice") [Dkt. No. 19-19]; and Transcript of the Motions Hearing on October 23, 2018 ("Transcript") [Dkt. No. 37].  The Court has also reviewed the following exhibits: SLSA's Comments on the Regulations Implementing D.C. Law 21-214 ("SLSA's Comments"), Am. Compl. Ex. H [Dkt. No. 19-8]; Council of the District of Columbia, Committee of the Whole, Subcommittee on Consumer Affairs Report ("D.C. Committee Report"), Am. Compl. Ex. C [Dkt. No. 19-3]; <u>Sanchez, et al. v. ASA College, Inc.</u> United States' Statement of Interest ("<u>Sanchez</u> U.S. SOI"), Def. MTD Ex. B [Dkt. No. 21-5]; U.S. Department of the Treasury, A Financial System that Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation ("Treasury Report"), Def. MTD Ex. F [Dkt. No. 21-9]; U.S. Department of Education Privacy Act Memo ("DOED Privacy Act Memo"), Am. Compl. Ex. Q [Dkt. No. 19-17]; Memorandum by Ted Mitchell, Under Secretary, U.S. Department of Education ("Mitchell Memo"), Def. MTD Ex. D [Dkt. No. 21-7]; Letter from U.S. Department of Education to the State of Maryland ("DOED-Maryland Letter", Def. MTD Ex. C [Dkt. No. 21-6]; Sample U.S. Department of Education-Servicer Contract, Am. Compl. Ex. A ("Sample DOED-Servicer Contract) [Dkt. No. 19-1]; the Declaration of Barry S. Goldstein ("Goldstein Declaration"), U.S. SOI Ex. A [Dkt. No. 20-1]; and Sample FDLP Master Promissory Note ("Sample Master Promissory Note"), Def. MTD Ex. E [Dkt. No. 21-8].

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. The Higher Education Act

Congress passed the Higher Education Act of 1965 ("HEA"), 20 U.S.C.

§§ 1001-1155, "[t]o strengthen the educational resources of our colleges and universities and to

provide financial assistance for students in postsecondary and higher education." See Pub. L.

No. 89-329, 79 Stat. 1219, 1219 (1965); Am. Compl. ¶¶ 22-24.  In order to improve access to

higher education for all students, Congress created federal student loan programs that "provide

federal taxpayer-funded benefits to borrowers that are not found in other consumer loans." See

Am. Compl. ¶ 32.

The two student loan programs at issue in this case are the William D. Ford

Federal Direct Loan Program ("FDLP"), 20 U.S.C. § 1071, et seq., and the Federal Family

Education Loan Program ("FFELP").  See 20 U.S.C. §1087a, et seq.  The FFELP, originally

known as the Guaranteed Student Loan Program, was first created in 1965 as part of the HEA.

See Am. Compl. ¶ 26.  Later, the FDLP was fully authorized pursuant to the Student Loan

Reform Act of 1993 as part of the Omnibus Reconciliation Act of 1993.  See id. ¶ 27.  The two

programs differ in terms of the federal government's role.  Under the FDLP, the federal

government is the lender; students and their parents borrow directly from the federal

government.  See 20 U.S.C. § 1087a, et seq.; U.S. SOI at 2.  The FFELP is more complicated.

FFELP loans were originally issued by private lenders and insured by guaranty

agencies, and the federal government reinsured the loans.  See 20 U.S.C. §§ 1071(a)(1)(D),

1078(c); 34 C.F.R. § 682.404; Am. Compl. ¶¶ 26, 62 n.6.[2]  In response to the 2008 financial

crisis, Congress passed the Ensuring Continued Access to Student Loans Act ("ECASLA"),

---

[2]     For a subset of FFELP loans, the federal government guarantees the loans
directly.  See 34 C.F.R. § 682.100(b)(1).

which authorized the United States Department of Education ("DOED") to purchase FFELP

loans from private lenders until the end of the 2009-2010 academic year. See Am. Compl. ¶¶ 29,

71.  The DOED purchased approximately 3.91 million FFELP loans under ECASLA, see Am.

Compl. ¶ 29, worth $94 million.  See id. ¶ 197.  For those loans, the federal government is now

the "lender."  In addition, under the Student Aid and Fiscal Responsibility Act ("SAFRA"), part

of the Health Care and Education Reconciliation Act of 2010, Congress discontinued the FFELP

program.  See id. ¶ 72; Pl. Facts at 4.  For that reason, "over 90 percent of new student loans

today are made through FDLP."  See id. ¶ 73.

   The types of federal student loans created by the HEA, therefore, can be grouped

into three different categories for purposes of this lawsuit.  First are the FDLP loans – those are

owned by the federal government.  Second are the FFELP loans that were purchased by the

federal government under ECASLA ("Government-Owned FFELP loans") – those are now

owned by the federal government.  Third are the original FFELP loans ("Commercial FFELP

loans") – those are owned by private lenders and the federal government reinsures or guarantees

them.[3]

   The DOED extensively regulates the federal student loan industry and has

established specific standards and procedures to which borrowers, lenders, educational

institutions, and other actors – including loan servicers – must adhere.  See 34 C.F.R. Parts 682,

685.  With respect to FDLP loans, "DOED is responsible for all aspects of the lending process,

---

[3]   There exists a fourth type of loan:  private loans.  For purposes of this lawsuit, the federal government is not involved in the creation or servicing of those loans.  SLSA represents that its "members are willing to register for the private loans they service in the District," and thus do not challenge the D.C. Law and Final Rules as applied to their members' servicing of private loans.  See Pl. Cr-MSJ at 19.  "Private student loans account for less than 8 percent of the outstanding student loan debt nationally."  See Pl. Facts ¶ 24.

from origination to repayment." See Def. Facts ¶ 29 (citing 34 C.F.R. § 685.100(a)).  In

contrast, "[u]nder the FFELP, DOED is responsible for providing guarantees to lenders against

losses, reinsuring loans, and subsidizing loans made by private and non-profit lenders." See Def.

Facts ¶ 22 (citing 34 C.F.R. § 682.100(a)).

Consequently, student loans constitute an enormous industry, and the federal

government plays a major role.  Thirty-four million Americans are obligated to pay federal

student loans, and the federal government made, owns, or guarantees 92 percent of all student

loans in the United States.  See Am. Compl. ¶ 4.[4]  Federal student loans represent a large

proportion of the federal government's assets:  "Nearly half of the financial assets of the United

States government – over a trillion dollars – are promissory notes related to unpaid loans made to

America's students for their higher education."  See id. ¶ 3.  "[O]utstanding federal student loans

have more than doubled from less than $600 billion in 2008 to over $1.4 trillion today."  See id.

¶ 34.[5]  The District of Columbia, in particular, is "the most indebted jurisdiction in the country

when it comes to average federal student debt."  See Am. Br. Lawyers' Committee at 16.  "As of

March 31, 2018, the average student loan borrower in the District of Columbia had

approximately $51,192.00 in outstanding federal student debt."  See Am. Compl. ¶ 35.

### B.  Federal Regulation of Student Loan Servicers

Student loan servicers serve as a kind of middle-man between lenders and

borrowers.  Student loan servicers "process[] Income-Driven Repayment ('IDR') applications,

---

[4]       The federal government owns and manages over 85 percent of federal student
loans as FDLP and Government-Owned FFELP loans.  See Pl. Facts ¶ 21.

[5]       FDLP loans, worth $1.1 trillion in total, constitute over 79 percent of total federal
student federal loans.  See Pl. Facts ¶ 20.  Of the $288.6 billion in FFELP loans outstanding,
$167.5 billion are Commercial FFELP loans.  See Pl. Facts. ¶¶ 11-12.

maintain[] account records, send[] statements and other account notices, process[] payments, process[] paperwork associated with a myriad of payment statuses, operat[e] incoming and outgoing call enters to help inform and educate borrowers about their loans and select the best repayment plan within their budget, and even facilitat[e] temporary cessation of payments, all in an effort to avoid the consequences of delinquency and default." See Am. Compl. ¶ 58. The HEA and its implementing regulations govern certain procedures that loan servicers must follow and standards they must meet in servicing federal student loans. See id. ¶ 39 (citing 20 U.S.C. §§ 1082, 1087a, 1087e).

Congress has delegated to the Secretary of Education the authority to contract directly with servicers for the administration of FDLP loans. See 20 U.S.C. § 1087f. The HEA specifies certain standards that the Secretary must adhere to in selecting and contracting with servicers, 20 U.S.C. § 1087f, but the "[r]egulations do not define the terms of DOED's contracts with FDLP servicers." See Def. Facts ¶ 32 (citing 34 C.F.R. Part 685).

The HEA also grants the Secretary of Education the authority to prescribe regulations to "carry out the purposes of [the FFELP program] . . . applicable to third party servicers" and "to establish minimum standards with respect to sound management and accountability." See 20 U.S.C. § 1082(a)(1).[6] Pursuant to this authority, the DOED has issued regulations that dictate certain standards of financial and administrative capability that servicers must meet to contract with private lenders to service FFELP loans. See 34 C.F.R. § 684.416. DOED regulations also establish processes to limit, suspend, or terminate a third-party servicer's eligibility to contract with private lenders, 34 C.F.R. § 682.700, and impose certain obligations on FFELP loan servicers, including reporting requirements. See id. § 682.208. In addition, the

---

[6]      Unless otherwise specified, FDLP Loans are subject to "the same terms, conditions, and benefits" as FFELP loans. See 20 U.S.C. § 1087e(a)(1).

DOED manages the office of Federal Student Aid, which "audits the servicers and communicates daily with them," maintains a "Feedback System," and receives complaints through the "FSA Ombudsman Group — a neutral and confidential resource available to borrowers to resolve disputes related to their loans." See U.S. SOI at 5-6 (quoting DOED Notice at 5).

The federal government's relationship with servicers, therefore, differs based on the type of federal student loans being serviced. First are the FDLP loans, owned by the federal government – the federal government contracts directly with servicers. Second are the Government-Owned FFELP loans that were purchased by the federal government under ECASLA and are now owned by the federal government – those are serviced pursuant to federal government contracts. Third are the Commercial FFELP loans, owned by private lenders and the federal government reinsures or guarantees them. The private lenders contract directly with third-party servicers.

## C. The District of Columbia Law and Final Rules

The Council of the District of Columbia enacted the Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016, known as D.C. Law 21-214 ("D.C. Law"), on December 7, 2016. See Am. Compl. ¶ 74; D.C. Law 21-214, Student Loan Ombudsman Establishment and Servicing Regulation Amendment Act of 2016, Council Period 21, Permanent L. (Feb. 18, 2017), https://code.dccouncil.us/dclaws/21/permanent/. The D.C. Law went into effect on February 18, 2017. See Def. Facts ¶ 3. The D.C. Department of Insurance, Securities, and Banking ("DISB") issued three rounds of emergency rules to implement the D.C. Law, each "enforceable upon promulgation until superseded." See Am. Compl. ¶ 114. SLSA has actively engaged with the District of Columbia in providing feedback on the different iterations of the Rules. See id. ¶¶ 92-100, 102, 108, 112, 116; SLSA's

Comments. The Third Emergency Rules were adopted as final ("Final Rules") on July 25, 2018

and published in the D.C. Register on August 10, 2018. See Am. Compl. ¶ 115; Final Rules.

The Final Rules are currently enforceable. See Am. Compl. ¶ 118.

       The D.C. Law was enacted and the Final Rules were promulgated in response to

increasing evidence of misconduct by student loan servicers.[7] The Amicus Briefs filed by the

State of New York and the Lawyers' Committee for Civil Rights Under Law describe patterns of

fraud, abuse, and deceptive practices by servicers, and a lack of regulatory oversight or

enforcement by the DOED. See Am. Br. NYS; Am. Br. Lawyer's Committee.[8] Because the

HEA does not provide a private right of action for borrowers, see Nelson v. Great Lakes Educ.

Loan Serv., Inc., No. 3:17-CV000183-NJR-SCW, 2017 WL 6501919, at *2 n.1 (S.D. Ill. Dec.

19, 2017), state consumer protection laws act as an important check on the regulatory failures of

the DOED. The Committee of the Whole, Subcommittee on Consumer Affairs, of the Council of

the District of Columbia recognized that "[t]he student loan market has grown significantly in

recent years, outpacing the ability of federal regulators to provide sound oversight and

enforcement of the market." See D.C. Committee Report at 7. In turn, the Council of the

District of Columbia created a licensing scheme to counter the lack of "comprehensive federal

---

    [7]    Connecticut, Illinois, and California have also created or are in the process of
creating licensing schemes similar to the District of Columbia's. See Am. Br. NYS at 20. "Four
states besides the District have enacted laws within the last three years requiring licensure of
student loan servicers and imposing numerous and varying regulatory requirements on servicers,
and other states have considered similar legislation this past year." See Pl. Cr-MSJ at 21.

    [8]    According to the Lawyers' Committee in its Amicus Brief, "the [DOED's]
regulations provide few borrower protections; they are more in the nature of programmatic
guidance . . . . Under the HEA, the [DOED] lacks a strong enforcement mechanism, with no
ability [to] bring an enforcement action against a servicer to provide remedies to borrowers for
consumer protection violations." See Am. Br. Lawyer's Committee at 23-24 (emphasis in
original).

statutory or regulatory framework providing consistent, market-wide standards for servicing

federal loans." See id. at 6.

The D.C. Law was enacted to "protect[] student loan borrowers by creating

servicer accountability and providing appropriate oversight of the student loan servicing industry

through the requirement of licensure." See D.C. Committee Report at 7.[9]  In practice, the D.C.

Law and the Final Rules require servicers to be licensed by the Commissioner of the D.C.

Department of Insurance, Securities and Banking ("Commissioner") in order to service the loans

of D.C. residents.  See D.C. Law 21-214 §§ 7b(a)-(d).  To qualify for a license, a servicer must

submit an application, obtain a surety bond, pay the associated fees, and comply with on-going

requirements – including maintaining a minimum net worth, undergoing periodic financial

auditing and annual assessments, submitting an annual report, reapplying annually for a license,

and responding to all requests for "[a]ny other information" the DISB considers "necessary and

appropriate." See D.C. Law 21-214 § 7b(c)(1)(E); Final Rules §§ 3002, 3003, 3004, 3007, 3009,

3014-15.  The Commissioner retains discretion to grant or deny a license and may revoke a

license after notice and a hearing.  See D.C. Law 21-214 §§ 7b(d), (h)(1).  The D.C. Law also

creates an "Ombudsman who is responsible for resolving borrower complaints, developing a

borrower bill of rights, monitoring and analyzing information and data from borrower

complaints, providing information to student loan borrowers, and conducting examinations of

student loan servicers." See Def. Facts ¶ 4; D.C. Law 21-214 § 7a.

---

[9]     In particular, "because [the District of Columbia] lack[s] robust federal standards
for student loan servicers, many of which generally have discretion to determine policies related
to their servicing operations, [its] students are at risk of receiving subpar and/or inconsistent
services and some are even being targeted by predatory debt relief companies." See D.C.
Committee Report at 6-7.

*D. The Case Before this Court*

Plaintiff SLSA is a membership organization comprised of student loan servicers. See Am. Compl. ¶ 9. SLSA's national membership consists of 24 student loan servicers that service federal or private loans or both, and 14 affiliate members. See id. ¶ 9. SLSA's members "service over 95 percent of the outstanding [FDLP] and [FFELP] student loans." See id. ¶ 9. All FDLP and Government-Owned FFELP loans are serviced by nine servicers; all nine are members of the SLSA. See Pl. Facts ¶ 54. Fifteen of SLSA's members (including the aforementioned nine) service Commercial FFELP loans. See id. ¶ 55.[10]

SLSA brought suit on behalf of its members against the District of Columbia; Stephen C. Taylor, Commissioner of the Department of Insurance, Securities, and Banking; and Charles A. Burt, Student Loan and Foreclosure Ombudsman. See Am. Compl. ¶¶ 9-12. SLSA challenges the D.C. Law and Final Rules as unconstitutional under the Supremacy Clause as applied to all three types of loans: FDLP loans, Government-Owned FFELP loans, and Commercial FFELP loans. See Pl. Cr-MSJ at 43. The SLSA members who service federal student loans in the District of Columbia – whether they be FDLP, Government-Owned FFELP, or Commercial FFELP loans, or a mix of the three – are subject to the D.C. Law and the Final Rules. See Pl. Facts ¶ 54. SLSA requests two different forms of relief: (1) a declaratory judgment that federal law preempts the D.C. Law and the Final Rules; and (2) an order permanently enjoining the District from enforcing the D.C. Law and Final Rules against student loan servicers. See Am. Compl. at 64.

The Court previously denied without prejudice the District's earlier motion [Dkt. No. 14] to dismiss SLSA's complaint, ruling that the motion was premised on an outdated

---

[10]      The District disputes SLSA's assertion that it has at least one member that services only government-owned loans in the District of Columbia. See Def. Opp. at 3 n.4.

version of the Rules that had been superseded by the third emergency rules. See Student Loan

Servicing Alliance v. District of Columbia, 317 F.Supp.3d 89 (D.D.C. 2018).[11]  The Court

directed SLSA to file an amended complaint addressing the third set of emergency rules

promulgated to implement the D.C. Law.  SLSA filed an amended complaint on September 7,

2018.  The District of Columbia has since enacted the Final Rules to implement the D.C. Law,

and they are currently in effect.

        The question before the Court now is whether the D.C. Law and Final Rules

unconstitutionally infringe upon protected federal sovereignty under the Supremacy Clause.  The

defendants have moved to dismiss SLSA's amended complaint pursuant to Rule 12(b)(1) and

Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary

judgment under Rule 56 of the Federal Rules of Civil Procedure.  SLSA has cross-moved for

summary judgment under Rule 56.

## II.  LEGAL STANDARD

### A.  Motion to Dismiss Under Rule 12(b)(1) of the Federal Rules of Civil Procedure

        The District of Columbia argues that the Court lacks subject matter jurisdiction

over SLSA's claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because

SLSA does not have standing.  Federal courts are courts of limited jurisdiction, possessing only

those powers authorized by the Constitution and an act of Congress.  See, e.g., Janko v. Gates,

741 F.3d 136, 139 (D.C. Cir. 2014); Beethoven.com LLC v. Librarian of Cong., 394 F.3d 939,

945 (D.C. Cir. 2005); Abulhawa v. U.S. Dep't of the Treasury, 239 F. Supp. 3d 24, 30 (D.D.C.

2017).  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the

---

[11]     The Court also denied without prejudice SLSA's motion [Dkt. No. 9] to expedite
discovery, summary judgment deadlines, and trial.

burden of establishing that the Court has jurisdiction.  See Walen v. United States, 246 F. Supp.

3d 449, 452 (D.D.C. 2017); Tabman v. FBI, 718 F. Supp. 2d 98, 100 (D.D.C. 2010).  In

determining whether to grant a motion to dismiss, the Court must construe the complaint in

plaintiff's favor and treat all well-pleaded factual allegations as true.  See Attias v. Carefirst, Inc.,

865 F.3d 620, 627 (D.C. Cir. 2017); Walen v. United States, 246 F. Supp. 3d at 452-53.  And in

determining whether a plaintiff has met the burden of establishing jurisdiction, the Court may

consider materials beyond the pleadings where appropriate.  See Walen v. United States, 246 F.

Supp. 3d at 453 (citing Am. Nat'l Ins. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011)); Tabman

v. FBI, 718 F. Supp. 2d at 100 (citing Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d

18, 22 (D.D.C. 2000)).

### B.  Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure

The District also moves to dismiss SLSA's amended compliant under Rule

12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(6) allows dismissal of a complaint

if a plaintiff fails "to state a claim upon which relief can be granted."  See FED. R. CIV. P.

12(b)(6).  Generally, under Rule 8 of the Federal Rules of Civil Procedure, a plaintiff need only

provide "a short and plain statement of the . . . claim showing that the pleader is entitled to

relief" that "give[s] the defendant fair notice of what the claim is and the grounds upon which it

rests."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alternation in original)

(quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Although "detailed factual allegations" are

not necessary to withstand a Rule 12(b)(6) motion to dismiss, the complaint "must contain

sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"

See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

at 555, 570); see also Henok v. Kessler, 78 F. Supp. 3d 452, 457 (D.D.C. 2015).  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. at 678).

In deciding a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002) (citation omitted); see also Henok v. Kessler, 78 F. Supp. 3d at 457. The Court considers the complaint in its entirety, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), and construes it "liberally in the plaintiffs' favor." See Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012). The Court must grant a plaintiff "the benefit of all inferences that can [reasonably] be derived from the facts alleged," although it need not accept plaintiff's legal conclusions or inferences drawn by the plaintiff if those inferences are unsupported by facts alleged. See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d 338, 345 (D.C. Cir. 2018) (alternation in original); see also Hettinga v. United States, 677 F.3d at 476 (citations omitted); Henok v. Kessler, 78 F. Supp. 3d at 457-58.

### C. Motions for Summary Judgment

In the alternative, the District moves and SLSA cross-moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting FED. R. CIV. P. 56(c)); see also Baumann v.

District of Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015); FED. R. CIV. P. 56(a).  In making that

determination, the Court must view the evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences in its favor.  See Baumann v. District of Columbia, 795

F.3d at 215; see also Tolan v. Cotton, 572 U.S. 650, 656-57 (2014) (per curiam); Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255; Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

      A disputed fact is "material" if it "might affect the outcome of the suit under the

governing law."  See Talavera v. Shah, 638 F.3d at 308 (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248).  A dispute over a material fact is "genuine" if it could lead a reasonable

jury to return a verdict in favor of the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380

(2007); Grimes v. District of Columbia, 794 F.3d 83, 94-95 (D.C. Cir. 2015); Paige v. DEA, 665

F.3d 1355, 1358 (D.C. Cir. 2012).  "Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at

summary judgment.  Thus, [the Court] do[es] not determine the truth of the matter, but instead

decide[s] only whether there is a genuine issue for trial."  Barnett v. PA Consulting Grp., Inc.,

715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo-Kronemann v. Donovan, 601 F.3d 599, 604

(D.C. Cir. 2010)); see also Tolan v. Cotton, 570 U.S. at 656; Baumann v. District of Columbia,

795 F.3d at 215; Allen v. Johnson, 795 F.3d 34, 38 (D.C. Cir. 2015).

## III. DISCUSSION

### A. Standing

      As a preliminary matter, the District of Columbia contends that SLSA lacks

standing to bring this lawsuit because it has failed to allege sufficient "causation" and a

justiciable "injury in fact."  See Def. MTD at 21-24.[12]  The Court disagrees.

---

[12]    The District does not take issue with SLSA's associational standing.

"Three inter-related judicial doctrines—standing, mootness, and ripeness—ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'" Worth v. Jackson, 451 F.3d 854, 855 (D.C. Cir. 2006) (quoting U.S. CONST. art. III, § 2). Standing is an Article III requirement under which the plaintiffs must show, at an "irreducible constitutional minimum": (1) that they have suffered an injury in fact – the invasion of a legally protected interest; (2) that the injury is fairly traceable to the defendant's conduct (a causal connection); and (3) that a favorable decision on the merits likely will redress the injury. See Lujan v. Def. of Wildlife, 504 U.S. 555, 560-61 (1992); see also Worth v. Jackson, 451 F.3d at 858; Gettman v. DEA, 290 F.3d 430, 433 (D.C. Cir. 2002). The alleged injury in fact must be concrete and particularized and actual or imminent, not conjectural, hypothetical or speculative. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016); Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408-09 (2013); Lujan v. Def. of Wildlife, 504 U.S. at 560-61; Worth v. Jackson, 451 F.3d at 858; Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002).

Among other things, the District argues that there is insufficient causation because SLSA members will be required by the D.C. Law and Final Rules to obtain and maintain a license to service private loans, irrespective of the applicability of the D.C. licensing regime to the servicing of federal loans. See Def. MTD at 24-26. SLSA responds that the District's argument is irrelevant because the D.C. licensing scheme would require SLSA members to obtain and maintain a license or be barred from servicing their federal loans in the District of Columbia, substantiating causation. See Pl. Cr-MSJ at 31. The Court agrees. Whether SLSA members must obtain a license to service their private loans is an issue not before this Court. SLSA has explained that its members would be willing to obtain licenses to service their private

loans in the District of Columbia. <u>See</u> <u>id</u>. at 31.  The issue is whether the D.C. Law requires a

license to service federal loans, and it indisputably does.

Nine of SLSA's members service federal loans in the District of Columbia. <u>See</u>

Def. Facts ¶ 38.  As plaintiff puts it: "If SLSA's members do not apply for a license by this

November, the law and its rules forbid them from servicing federal student loans in the District

pursuant to federal contracts and permit the District to assess late penalties.  If they do apply, the

District has the power to deny licensure and prohibit Servicers from servicing federal student

loans in the District." <u>See</u> Pl. Cr-MSJ at 31.  There is sufficient causation between the

application of the D.C. Law and Final Rules and SLSA members' alleged inability to service

their federal loans consistent with the HEA and the terms of their contracts with the federal

government.  Moreover, although the servicers will have to pay a flat fee to obtain a license to

service their private loans in the District of Columbia, many of the fees and reporting

requirements of the D.C. Law and Final Rules apply on a per borrower or per loan basis, so

"SLSA's members would not spend nearly the time and money to comply with these

requirements if the licensure applied solely to private student loans." <u>See</u> Pl. Reply at 14.

The District further argues that SLSA relies on hypothetical applications of the

D.C. Law and Final Rules to evidence preemption, failing to allege a sufficient injury-in-fact.

<u>See</u> Def. MTD at 21.  SLSA responds, correctly, that the "regulatory action of requiring its

members to be licensed in accordance with the District's criteria" is not hypothetical. <u>See</u> Pl.

Cr-MSJ at 34.  It is true that the District of Columbia has not yet denied or revoked the license of

a federal loan servicer and that the disclosures feared by SLSA have not yet been ordered.

Courts have found sufficient injury-in-fact, however, when plaintiffs allege that they face

increased compliance costs from conflicting regulatory regimes, as SLSA does here. <u>See</u>, <u>e.g.</u>,

City of Waukesha v. EPA, 320 F.3d 228, 236-37 (D.C. Cir. 2003) (finding injury-in-fact where there was a "substantial probability" that plaintiff would face "significant monitoring, compliance, and disposal costs" from new regulations); Nat'l Mining Ass'n v. U.S. Dep't of Interior, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (finding injury-in-fact where conflicting enforcement schemes created uncertainty and forced company to "expend money to satisfy one and then the other"). See also Public Util. Comm'n v. United States, 355 U.S. 534, 538 (1958); United States v. Virginia, 139 F.3d 984, 987 nn.2, 3 (4th Cir. 1998).  Moreover, SLSA members are already subject to enforcement of the Final Rules. See Am. Compl. ¶ 118.  Three members have obtained their licenses under the Final Rules and paid the required fees, and others have begun to expend money, resources, and time to comply with licensing requirements. See id. ¶¶ 122-28.[13]

The injury faced by SLSA members is not hypothetical, and a pre-enforcement review of the D.C. Law is appropriate.  For that reason, the Court concludes that SLSA has standing and therefore will deny the District's motion to dismiss under Rule 12(b)(1).

*B.  The Supremacy Clause*

The Court now turns to the merits of SLSA's challenges to the D.C. Law and Final Rules, all based on the Supremacy Clause of the Constitution.  The Supremacy Clause dictates that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State

---

[13]     One of SLSA's members applied for a license in 2017 and its annual assessment fees were due on November 15, 2018. See Am. Compl. ¶ 123.

to the Contrary notwithstanding." <u>See</u> U.S. CONST. art. VI, cl. 2.[14]  A state law or regulation may

be unconstitutional under the Supremacy Clause in two ways.  First, under the doctrine of

intergovernmental immunity, a state law is unconstitutional if it "regulate[s] the [federal]

Government directly or discriminate[s] against it."  <u>See</u> <u>North Dakota v. United States</u>, 495 U.S.

423, 434 (1990).  Second, a state law is unconstitutional if it "conflict[s] with an affirmative

command of Congress."  <u>See</u> <u>id</u>. at 434.  The intergovernmental immunity doctrine provides the

federal government a minimum level of constitutional protection, but Congress can provide a

"further degree of immunity" by acting to preempt a state law or regulation that would otherwise

be constitutionally permissible.  <u>See</u> <u>id</u>. at 435, 442 & n.7.  In the present case, SLSA asserts that

Congress has deliberately sought to displace state law by passing the HEA. The more appropriate

starting point for this analysis, therefore, is preemption rather than intergovernmental immunity.

### C. Preemption

The Supremacy Clause vests in Congress the power to preempt state law.  <u>See</u>

<u>Arizona v. United States</u>, 567 U.S. 387, 399 (2012); <u>see</u> <u>also</u> <u>North Dakota v. United States</u>, 495

U.S. at 439 ("Congress has the power to confer immunity from state regulation on Government

suppliers beyond that conferred by the Constitution alone . . . .");  <u>Sickle v. Torres Advanced</u>

<u>Enter. Sols., LLC.</u>, 884 F.3d 338, 346 (D.C. Cir. 2018) ("The decision whether a federal law

should preempt or operate alongside state law is Congress's to make.").  Congressional purpose,

therefore, is the "ultimate touchstone in every preemption case."  <u>See</u> <u>Wyeth v. Levine</u>, 555 U.S.

555, 565 (2009) (quoting <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 485 (1996)).  To determine

---

[14]      For purposes of the Supremacy Clause, the District of Columbia is treated as a
state. "Traditional preemption principles apply to District of Columbia laws." <u>See</u> <u>Comm'n</u>
<u>Imp. Exp. S.A. v. Republic of the Congo</u>, 757 F.3d 321, 326 (D.C. Cir. 2014).

Congress' preemptive purpose, "[e]vidence . . . is sought in the text and structure of the [federal] statute at issue." See CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).

Foundational principles of federalism caution courts against interpreting a federal statute to preempt state law "unless that [is] the clear and manifest purpose of Congress." See Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992) (alteration in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see also Arizona v. United States, 567 U.S. at 400; CSX Transp., Inc. v. Easterwood, 507 U.S. at 663-64 ("In the interest of avoiding unintended encroachment on the authority of the States . . . a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption."); Bourbeau v. Jonathan Woodner Co., 549 F. Supp. 2d 78, 88 (D.D.C. 2008). Indeed, there is an established presumption against preemption. See Medtronic, Inc. v. Lohr, 518 U.S. at 485 ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). Contrary to SLSA's assertion, this presumption against preemption guides courts in all preemption cases, "and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied." See Wyeth v. Levine, 555 U.S. at 565 (alteration in original) (quoting Medtronic, Inc. v. Lohr, 518 U.S. at 485); see also Comm'n Imp. Exp. S.A. v. Republic of the Congo, 757 F.3d 321, 333 (D.C. Cir. 2014). Consumer protection is one such area that traditionally has been regulated by the states. See California v. ARC Am. Corp., 490 U.S 93, 101 (1989); Fla. Lime & Avocado Growers, 373 U.S. 132, 146 (1963); Chae v. SLMS Corp., 593 F.3d 936, 944 (9th Cir. 2010); Gen. Motors Corp. v. Abrams, 897 F.2d 34, 41-42 (2d Cir. 1990).

Congress preempts state law in two ways:  express preemption and implied preemption.  See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 346.  Express preemption arises when Congress announces its intent to invalidate state law through "an express preemption provision" explicit in the federal statute itself.  See Arizona v. United States, 567 U.S. at 399; see also Oneok, Inc. v. Learjet, Inc., 135 S.Ct. 1591, 1595 (2015) ("Congress may . . . pre-empt, i.e., invalidate, a state law through federal legislation.  It may do so through express language in a statute."); Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 712-13 (1985).

In contrast, implied preemption occurs "not through an explicit statutory provision, but through the substantive nature and reach of the federal regulatory scheme that Congress adopts."  See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 346; see also Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 388 (2000).  Implied preemption, in turn, can take two forms:  field preemption and conflict preemption.  See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 346; see also Oneok, Inc. v. Learjet, Inc., 135 S.Ct. at 1595.  The Supreme Court has established that "[p]re-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."  See La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 369 (1986); see also Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 713 (explaining that "state laws can be pre-empted by federal regulations as well as by federal statutes").

SLSA challenges the D.C. Law and Final Rules under all three theories of preemption – express, field, and conflict preemption.  The Court will address each theory in turn.  Before turning to these three theories, however, the Court will first address the Department of

Education's Preemption Notice ("DOED Notice"), which SLSA asserts deserves judicial deference.

### 1. Deference to the Department of Education Preemption Notice

The DOED issued informal guidance, published in the Federal Register on March 12, 2018, entitled "Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers." See DOED Notice, Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10619 (Mar. 12, 2018). The DOED Notice outlines the Department's position that recent state enactments of regulatory requirements for loan servicers, such as the District of Columbia's requirements, are preempted by federal law. See id. According to the DOED Notice, the HEA and its implementing regulations preempt the licensing scheme created by the D.C. Law under both express and conflict preemption.

The parties disagree as to how much deference should be accorded the DOED's Notice. SLSA explains that its claims stand on their own, but that the "Court should [also] defer to the Department's interpretation," which would all but decide this case. See Pl. Cr-MSJ at 39. The District argues that the DOED Notice should be accorded "little [interpretive] deference." See Def. MTD at 42.

The level of deference courts should accord to agencies on the issue of preemption is an unsettled area of law. See Delaware v. Surface Transp. Bd., 859 F.3d 16, 20 (D.C. Cir. 2017) ("There is some legal uncertainty in this circuit about the appropriate level of deference a court owes to an agency's determination of its own preemption."); Blue Cross and Blue Shield of Okla. v. Bell, 823 F.3d 1198, 1202 (8th Cir. 2016) ("The law concerning

application of <u>Chevron</u> to an agency's view on preemption is unsettled.").[15]   The Court must

decide first what type of deference should be considered, if any, based on the qualities of the

DOED's Notice, and then determine whether the Notice passes the applicable test to qualify for

deference.   This calculation may be different with respect to the two different types of

interpretation undertaken by the DOED in its Notice.   On the one hand, the DOED is interpreting

the statute that it is authorized to administer – specifically, the scope of one of the HEA's express

preemption provisions.   On the other hand, the DOED is interpreting the conflict preemptive

effect of its own regulations.   As will be explained, the Court concludes that so-called <u>Skidmore</u>

deference is the correct test to apply to both of these types of agency interpretation.

First, the Court considers the DOED's interpretation of the HEA's express

preemption provision.   This analysis qualifies as "an agency's construction of the statute which it

administers," positioned squarely within the <u>Chevron</u> framework.   <u>See</u> <u>Chevron, U.S.A., Inc. v.</u>

<u>Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 842 (1984); <u>see</u>, <u>e.g.</u>, <u>United States v. Mead Corp.</u>,

533 U.S. 218, 229 (2001); <u>Wachovia Bank, N.A. v. Burke</u>, 414 F.3d 305, 314-15 (2d Cir. 2015).

When an agency does not "speak with the force of law" meriting <u>Chevron</u> deference, <u>United</u>

<u>States v. Mead Corp.</u>, 533 U.S. at 229, however, and instead issues informal guidance – such as

an "interpretive bulletin," informal ruling, or advisory opinion – it is accorded only <u>Skidmore</u>

deference.   <u>See</u> <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 138, 140 (1944); <u>see also</u> <u>Encino</u>

<u>Motorcars, LLC. v. Navarro</u>, 136 S.Ct. 2117, 2125 (2016); 33 CHARLES ALAN WRIGHT,

CHARLES H. KOCH, JR., & RICHARD MURPHY, FEDERAL PRACTICE & PROCEDURE §§ 8426, 8436

(2d ed. 2018).   The DOED's Notice qualifies as such informal guidance, nothing more.   The

---

[15]   The question before the Court is not whether the DOED Notice itself has
preemptive effect.   <u>See</u> <u>Wyeth v. Levine</u>, 555 U.S. at 576.   The DOED Notice was not issued
"with the force of law," so "the question [before the Court] is what weight we should accord the
[agency's] opinion" that its regulations preempt state law.   <u>See</u> <u>id.</u> at 576-76.

DOED did not undergo the proper rulemaking procedures to qualify as "acting with the force of law" when it issued the DOED Notice. See 20 U.S.C. § 1098a (outlining procedural requirements for rulemaking). For that reason, Skidmore is the appropriate test to apply to the DOED's interpretation of the HEA's express preemption provision.

Second, the Court considers the DOED's interpretation of its own regulations' preemptive effect under conflict preemption. The Skidmore framework also applies to this aspect of the agency's interpretation.[16] In Wyeth v. Levine, the Supreme Court faced similar facts. See Wyeth v. Levine, 555 U.S. at 577. There, the agency had not promulgated a regulation "with the force of law [to] pre-empt conflicting state requirements," and the Supreme Court instead was forced to confront "an agency's mere assertion that state law is an obstacle to achieving its statutory objectives" found in the preamble of a regulation. See id. at 576. As in Wyeth v. Levine, the DOED Notice here does not have the "force of law" because it did not undergo the proper, statutorily-proscribed rulemaking process. See 20 U.S. C. § 1098a. The Court in Wyeth v. Levine determined Skidmore deference to be the appropriate test when assessing an "agency's explanation of state law's impact on the federal scheme," because agencies "do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements" may be preempted by federal law. See Wyeth v. Levine, 555 U.S. at 577. Skidmore deference, therefore, is the appropriate

---

[16] Courts typically give agencies' interpretations of their own regulations so-called Auer deference. See Auer v. Robbins, 519 U.S. 452 (1997). The Supreme Court has not applied Auer deference, however, when the agency's interpretation relates to preemption. In that situation, as SLSA concedes, the agency's interpretation is analyzed under Skidmore, according a lower level of deference to the agency's interpretation if it meets the Skidmore test. See Wyeth v. Levine, 555 U.S. at 576-77; Pl. Cr-MSJ at 40. But see Chae v. SLM Corp., 593 F.3d at 949-50.

23

lens through which to consider the DOED's interpretation of its own regulations' preemptive effect, as well.

Having found that so-called Skidmore deference is the appropriate test by which to assess the DOED Notice – as to both its express preemption and conflict preemption interpretation – the Court next determines whether the DOED Notice warrants such deference. The U.S. District Court for the Northern District of Florida is the only court thus far to have considered the DOED Preemption Notice. See Order, Lawson-Ross & Bryne v. Great Lakes Higher Educ. Corp. (N.D. Fla. Sep. 20, 2018) (No. 17-0253) [Dkt. No. 27-4]. It determined that the DOED Notice should be accorded Skidmore deference, and it also concluded that the DOED Notice is "persuasive" and should be accorded "due deference under Skidmore." See id. at 8. This Court does not agree.

To be considered persuasive guidance under Skidmore, the Court would need to find the DOED Preemption Notice to be sufficiently thorough, consistent, and persuasive. See Skidmore v. Swift & Co., 323 U.S. at 138, 140. But no deference is owed to an "agency's conclusion that state law is preempted." See Wyeth v. Levine, 555 U.S. at 576 (emphasis in original). And the DOED has provided only conclusions in this informal guidance. The DOED Notice is a retroactive, ex-post rationalization for DOED's policy changes, and therefore does not merit Skidmore deference. It does not analyze in any real way the regulations it cites.

The DOED Preemption Notice fails the Skidmore test most notably because the agency's view represents a stark, unexplained change in the DOED's position. Contrary to SLSA's assertion that the pronouncement is not inconsistent because this "is the first time the Department of Education expressed its interpretation regarding the constitutionality of state licensing schemes for Servicers," the District points to past statements by the United States that

24

explicitly rejected the preemptive effect of the HEA.  See Pl. Cr-MSJ at 40; Def. MTD at 43.

Those statements include a Statement of Interest filed by the United States in federal court in

New York in Sanchez v. Asa College, Inc., No. 14-5006, 2015 WL 3540836 (S.D.N.Y. June 5,

2015), a case involving a for-profit college's lending practices.[17]  In its Statement of Interest, the

United States declared that "[n]othing in the HEA or its legislative history even suggests that the

HEA should be read to preempt or displace state or federal laws.  Nor is there anything in the

HEA or the regulations promulgated thereunder to evince any intent of Congress or [the DOED]

that the HEA or its regulations establish an exclusive administrative review process of student

claims brought under state or deferral law, even if the conduct alleged may separately constitute

an HEA violation."  See Sanchez U.S. SOI at 8-9.  The DOED does not make any attempt to

explain its change in position, which may have excused such dramatic inconsistency.  See

Encino Motorcars, LLC v. Navarro, 136 S.Ct. at 2125 ("Agencies are free to change their

existing policies as long as they provide a reasoned explanation for the change.").

SLSA also argues that "[t]he other statements cited by Defendants were all made

before [several] states and the District [of Columbia] passed the Servicer licensing schemes and

addressed separate topics" and that the DOED Notice is consistent with the United States'

Statement of Interest filed on January 8, 2018 in Massachusetts v. Pennsylvania Higher

Education Assistance Authority, No. 1784CV02682 (Mass. Sup. Ct.) [Dkt. No. 19-18], and its

statement as an intervenor in Chae v. SLM Corp., 593 F.3d 936 (9th Cir. 2010).  See Pl. Cr-MSJ

at 40-41.  The Court is unpersuaded.  The January 2018 Statement of Interest filed in

Massachusetts Superior Court is subject to the same criticism as the DOED Preemption Notice; it

---

[17]     The District also points to a DOED memoranda that reiterate servicers'
obligations to comply with state law as evidence of the federal government's contradictory
position.  See Def. MTD at 44.

was issued three months prior to the DOED Preemption Notice and also marks a stark, unexplained break from the DOED's previous position. And the DOED's statement as an intervenor in Chae v. SLM Corp. only further exemplifies the DOED's inconsistency. The United States held one position in 2010 in Chae v. SLM Corp., another in 2015 in Sanchez v. ASA College, Inc., and yet another in the DOED Preemption Notice in 2018. The Court does not know whether the United States explained its inconsistency in its statement as an intervenor in Chae v. SLM Corp. or whether that was an issue before the Ninth Circuit. What is clear, though, is that the DOED has not been consistent in its position about the HEA's preemptive effect, and the DOED Preemption Notice does nothing to alleviate or explain those contradictions.

As the District argues, the Preemption Notice also lacks requisite thoroughness and persuasiveness because it fails to specify the regulations that it is interpreting. The Court cannot agree with the Northern District of Florida that the DOED Notice is "well-reasoned and sensible." See Order at 8, Lawson-Ross & Bryne v. Great Lakes Higher Educ. Corp. (N.D. Fla. Sep. 20, 2018) (No. 17-0253); Pl. Reply at 24. It is not. The DOED Notice draws broad conclusions about the regulations' preemptive effect without actually interpreting any specific regulations. Thus, the Court gives no deference to the DOED Preemption Notice and turns now to its own independent preemption analysis.

2. Express Preemption

Congress' intent to preempt state law is most easily identified by its own legislative language. Express preemption arises when Congress announces its intent to invalidate state law through "an express preemption provision" explicit in the federal statute itself. See Arizona v. United States, 567 U.S. at 399; see also Oneok, Inc. v. Learjet, Inc., 135

S.Ct. at 1595; Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 712-13.

Although the presence of an express preemption provision may be a clear indication that

Congress "intended [the statute] to pre-empt at least some state law, [the Court] must nonetheless

'identify the domain expressly pre-empted' by that language." See Medtronic, Inc. v. Lohr, 518

U.S. at 484 (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. at 517).

   Despite the existence of several express preemption clauses contained in the

HEA, the only express preemption provision discussed by the parties is Section 1098g.  Section

1098g provides in full: "Loans made, insured, or guaranteed pursuant to a program authorized by

Title IV of the [HEA] (20 U.S.C. [§] 1070 et seq.) shall not be subject to any disclosure

requirements of any State law." 20 U.S.C. § 1098g.  FDLP loans are authorized pursuant to 20

U.S.C. § 1087a, et seq. (Part D), and FFELP loans are authorized pursuant to 20 U.S.C. § 1071,

et seq. (Part B), two separate parts of Title IV of the HEA.  The federal student loans at issue in

this case, therefore, shall not be "subject to any disclosure requirements of any State law."  See

id. § 1098g.  The parties agree that the term "disclosure requirements" is not defined by the

HEA, so the Court must determine what type of disclosure requirements Congress intended to

preempt.

   SLSA argues that Congress intended Section 1098g to prohibit states from

requiring servicers to report to third parties or to make any disclosures to borrowers that are not

explicitly set out in the HEA.  See Pl. Cr-MSJ at 61; Am. Compl. ¶ 233.  SLSA extrapolates

from this reasoning to challenge the entire D.C. licensing scheme, not just the reporting

requirements.  SLSA argues that because disclosures by servicers to the D.C. government are

required to facilitate oversight of licensed servicers, if those disclosures are expressly preempted

by the HEA under Section 1098g, then the entire licensing scheme collapses.  See Am. Compl.

¶¶ 245-47.  The District, on the other hand, maintains that the "disclosure requirements" preempted by Section 1098g should be read narrowly to include only particular communications between lenders and borrowers, thus leaving states free to legislate additional requirements related to communications by servicers, as the District of Columbia has done.  See Def. MTD at 29-33.

Even if Section 1098g prohibited states from regulating communications by servicers to borrowers, the D.C. Law and Final Rules do not require any such communications. SLSA is only able to point to the D.C. Student Loan Borrower's Bill of Rights as evidence of D.C. requirements that servicers communicate with borrowers.  See Am. Compl. ¶¶ 234-40.  As an aspirational document, there is nothing to indicate that the District intends to or would be able to enforce the Student Loan Borrower's Bill of Rights.  Thus, the D.C. Law and Final Rules do not require any "disclosures" – if defined as communications between servicers and borrowers – that could be preempted by Section 1098g.

This leaves SLSA's argument that Section 1098g expressly preempts state regulation of communications by loan servicers to third parties.  See Am. Compl. ¶¶ 229-33.  If the Court were to define "disclosure requirements" as including those made by servicers to third parties, SLSA argues that a number of provisions in the Final Rules requiring servicers to report to the D.C. Commissioner or respond to requests for information by the D.C. government would be preempted by Section 1098g.  Those provisions include Sections 3014 (annual reporting requirements), 3016 (requirements to notify the Commissioner of certain events), 3018 ("Each licensee shall make applicable books and records available to the Commissioner . . . ."), 3021 (the Commissioner's ability to investigate), and 3022 (the Commissioner may respond to borrower complaints) of the Final Rules.  SLSA takes particular issue with the provisions of the

28

D.C. Law that allow the Commissioner to request information based on borrower complaints or

in the course of an investigation into "any dishonest activities or [] any misrepresentation in any

business transaction." See D.C. Law 21-214 § 7b(h)(1); see also Final Rules § 3021; Pl. Cr-MSJ

at 66.

No court has considered whether Section 1098g of the HEA expressly preempts

state requirements for "disclosures" by servicers to third parties, like those required by the D.C.

Law and the Final Rules. Nonetheless, SLSA argues that this Court should align itself with

recent decisions by other federal courts that have interpreted Section 1098g within the context of

disclosures by servicers to borrowers. See, e.g., Chae v. SLM Corp., 593 F.3d at 942-43; Order

at 4-9, Lawson-Ross & Bryne v. Great Lakes Higher Educ. Corp. (N.D. Fla. Sep. 20, 2018) (No.

17-0253); Nelson v. Great Lakes Educ. Loan Serv., Inc., 2017 WL 6501919, at *4-5.

In Chae v. SLM Corp., plaintiffs claimed that their student loan servicer

misrepresented details related to their first repayment date, late fees assessment, and interest rate

calculations. See Chae v. SLM Corp., 593 F.3d at 938, 942. The Ninth Circuit characterized

plaintiffs' claims as "improper-disclosure claims" because they were "a challenge to the

allegedly-misleading method [the servicer] used to communicate with the plaintiffs about its

practices." See id. at 942-43. The Ninth Circuit found that Section 1098g preempted plaintiffs'

state law claims because California's "prohibition on misrepresenting a business practice 'is

merely the converse' of a state-law requirement that alternate disclosures be made." See id. at

943 (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. at 527). Other courts have latched onto

this reasoning, and SLSA argues that these cases support its position that Section 1098g

preempts any state laws that require additional disclosures to borrowers or to third parties that go

beyond those required in the HEA. See Pl. Cr-MSJ at 63; Am. Compl. ¶ 226-28. The cases it

cites, however, only deal with diclosures by servicers to borrowers, not third parties.  See, e.g.,

Nelson v. Great Lakes Educ. Loan Serv., Inc., 2017 WL 6501919, at *4 (concluding that

Congress intended for 1098g to "preempt any state law requiring lenders to reveal facts or

information not required by federal law"); Order at 8, Lawson-Ross & Bryne v. Great Lakes

Higher Educ. Corp. (N.D. Fla. Sep. 20, 2018) (No. 17-0253) (finding the reasoning in Nelson

"persuasive").  The Court declines SLSA's invitation to extend those decisions to interpret

Section 1098g as prohibiting any state regulation that requires servicers to make disclosures to

third parties that exceed those mandated by the HEA.

        In the absence of any controlling precedent, and because Congress retains the

exclusive ability to preempt state law expressly, the Court looks to the plain language of Section

1098g as the best evidence of how Congress intended to define the "domain" or scope of the

preemption provision.  See Medtronic, Inc. v. Lohr, 518 U.S. at 484; see also CSX Transp., Inc.

v. Easterwood, 507 U.S. at 664.  In addition, of course, the Court may also consider the

"statutory framework surrounding [the preemption provision]," and "the structure and purpose of

the statute as a whole, as revealed not only in the text, but through the reviewing court's

reasoned understanding of the way in which Congress intended the statute and its surrounding

regulatory scheme to affect business, consumers, and the law."  See Medtronic, Inc. v. Lohr, 518

U.S. at 485-86 (internal citations and quotations omitted); see also Chae v. SLM Corp., 593 F.3d

at 942 (interpreting Section 1098g of the HEA using "the text of the provision, the surrounding

statutory framework, and Congress's stated purposes in enacting the statute to determine the

proper scope of an express preemption provision" (citing Medtronic, Inc. v. Lohr, 518 U.S. at

485-86)).

First, the plain language of the statute does not provide much clarity with respect to the meaning of the word "disclosure." Turning to Black's Law Dictionary, as relied upon by SLSA, a "disclosure" is any "act or process of making something known that was previously unknown; a revelation of facts." See Pl. Cr-MSJ at 62 (quoting Disclosure, BLACK'S LAW DICTIONARY (10th ed. 2014)). If read consistently with its plain meaning without context, Section 1098g might well prohibit state regulation of all foreseeable types of communication. Without a more explicit indication from Congress that it meant to preempt states from mandating or prohibiting all types of communications within the context of federal student loans, however, the Court declines to read the term "disclosure" so broadly. In light of the presumption against preemption and the fact that express preemption arises only when "the federal statute itself announces its displacement of state law," Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 346, "when the text of a[n express] pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" See Altria Grp., Inc. v. Good, 555 U.S. 70, 77 (2008) (quoting Bates v. Dow Agrosciences LLC., 544 U.S. 431, 449 (2005)).

For the same reasons, the Court rejects SLSA's argument that the larger structure of the HEA should compel this Court to broaden its interpretation of "disclosure" to include servicers' communications to third parties. According to SLSA, the broader regulatory scheme set out in the HEA dictates the outermost limits of the "disclosures" that can be required of servicers – that is, states may not require servicers to make any type of "disclosure" that is not

set out in the HEA. See Pl. Cr-MSJ at 62; Am. Compl. ¶ 225.[18] But the Court does not see any reason to read Section 1098g as prohibiting state regulation of all communications that are additional to those required under the HEA. As one reason, most of the HEA provisions that govern communications cited by SLSA relate to the reporting required by insurers or lenders, not servicers. See Pl. Cr-MSJ at 61-62.[19]

Second, the Court looks for clues of Congressional intent elsewhere in the language and structure of the statute. "[I]dentical words used in different parts of the same act are intended to have the same meaning." Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 571 (2012) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995)). The term "disclosure" is used in only one other provision of the HEA, Section 1083(a). Section 1083(a) specifies in detail the disclosures that lenders are required to make to borrowers before disbursement; it makes no reference to disclosures to third parties. See 20 U.S.C. § 1083(a).[20] Referring to

---

[18] As examples of the "comprehensive disclosure scheme" already set out in the HEA, SLSA references reporting provisions that do not relate directly to servicers. See, e.g., 20 U.S.C. § 1082(c)(2) (data collected by Secretary from insurers); 20 U.S.C. § 1083 (disclosure requirements by lenders to borrowers at different stages of loan repayment process); and implementing regulations 34 C.F.R. § 682.205 (disclosure requirements for lenders); 34 C.F.R. § 682.208(i) (requirements for reporting by lender to Secretary or guaranty agency on enrollment and loan status information); 34 C.F.R. §§ 682.300-682.305 (regulations related to interest benefits and special allowance payments by Secretary to lenders), among others. See Pl. Cr-MSJ at 62; Pl. Facts ¶ 37.

[19] Section 682.414 is the only regulation cited by SLSA that relates to servicer reporting and record retention. See 34 C.F.R. § 682.414. Section 682.414 is entitled "[r]ecords, reports, and inspection requirements for guaranty agency programs" and dictates that "[a]ny reference to a guaranty agency under this section includes a third-party servicer that administers any aspect of the FFEL[P] programs under a contract with the guaranty agency." See id. § 682.414(a)(1)(i).

[20] In addition, the only explicit reference to "disclosures" in the DOED regulations is found in Section 682.205, which also relates to "[d]isclosure requirements from lenders." See 34 C.F.R. § 682.205. Contrary to SLSA's argument, the Court does not see any indication from the statutory language that Section 682.205 applies to servicers. See Am. Compl. ¶ 220.

communications by lenders to borrowers as "disclosures" is consistent with the use of the term "disclosure" in other loan settings. See, e.g., Solomon v. Falcone, 791 F. Supp. 2d 184, 188 (D.D.C. 2011) ("In passing [the Truth in Lending Act], Congress sought to ensure the accurate and meaningful disclosure of material terms to consumers in credit transactions.").

The legislative history also supports reading "disclosures" as communications only between lenders and borrowers. As the District explains, Section 1098g was first codified as an amendment to the Truth in Lending Act ("TILA"). See S. Rep. No. 97-536, at 42, 71 (1982); Act of Oct. 15, 1982, Pub. L. No. 97-320, § 701, 96 Stat 1469 (1982); Def. MTD at 32. In enacting Section 1098g, Congress explained that it would exclude federal student loans from the TILA lending regulations because "student loan programs, contained in the Higher Education Act of 1965 . . . are already subject to statutory provisions and regulations that provide comparable disclosures and explicit controls over the issuance of loan proceeds to student consumers." See S. Rep. No. 97-536, at 42 (1982) (emphasis added). Under the TILA, "disclosure requirements" are those between "creditor or lessor" to "the person who is obligated on a . . . consumer credit transaction," i.e., between a lender and a borrower. See 15 U.S.C. § 1631(a). The legislative history thus makes clear that the term "disclosure" in the context of the TILA – and therefore in the context of the origin of Section 1098g – relates only to the disclosures that lenders make to consumers – that is, the student borrowers. It follows, then, that Section 1098g was meant to prohibit states from regulating communications by lenders to borrowers, and nothing more.

Without a stronger indication of Congress' "clear and manifest purpose" to preempt all state regulation related to communications between servicers and third parties, the Court declines to read Section 1098g to prohibit the types of reporting requirements created by

the D.C. Law and Final Rules. See Cipollone v. Liggett Group, Inc., 505 U.S. at 516 (quoting

Rice v. Santa Fe Elevator Corp., 331 U.S. at 230). And the Court certainly does not see reason

to derive from this one sentence provision an intent by Congress to invalidate an entire state

regulatory scheme that would require reporting. See, e.g., Medtronic, Inc. v. Lohr, 518 U.S. at

487 (refusing to read an express preemption clause of the Medical Device Amendments to

preclude all common law claims of injury due to a defective medical device without more

explicit instruction from Congress). SLSA therefore fails as a matter of law on its Third Claim

that federal law preempts the D.C. Law 21-214 and the Final Rules under principles of express

preemption. Its motion for summary judgment on its Third Claim for declaratory judgment relief

therefore is denied.

### 3. Field Preemption

Even where Congress has not expressed its intent to supplant state law, its intention to

do so may be inferred when it "occup[ies] the entire field." See Volt Info. Scis. v. Bd. of Trs. of

the Leland Stanford Junior Univ., 489 U.S. 468, 477 (1989); see also Sickle v. Torres Advanced

Enter. Sols., LLC., 884 F.3d at 346-47. By occupying a field, Congress "forecloses state

regulation altogether in an area of law, such as alien deportation or nuclear safety regulation,

irrespective of a state law's compatibility with the federal regime." See Sickle v. Torres

Advanced Enter. Sols., LLC., 884 F.3d at 347; see also Oneok, Inc. v. Learjet, Inc., 135 S.Ct. at

1595. Thus, "[w]here Congress occupies an entire field . . . even complementary state regulation

is impermissible. Field preemption reflects a congressional decision to foreclose any state

regulation in the area, even if it is parallel to federal standards." See Arizona v. United States,

567 U.S. at 401.

34

Courts identify field preemption "through the substantive nature and reach of the federal regulatory scheme that Congress adopts."  See Sickle v. Torres Advanced Enterprise Solutions, LLC., 884 F.3d at 346.  Congress' intent to occupy a field can be inferred from (1) "'a framework of regulation' . . . 'so pervasive' that it leaves no space for state supplementation, or [2] where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'"  See id. at 347 (quoting Arizona v. United States, 567 U.S. at 399); see also Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 605 (1991); Boyle v. United Techs. Corp., 487 U.S. 500, 504-05 (1988).

At the outset, the Court must define the "field" in order to determine if Congress has occupied it.  To define the field, the Supreme Court has instructed courts to "consider[] the target at which the state law aims."  See Oneok, Inc. v. Learjet, Inc., 135 S. Ct. at 1599-1600 (emphasis in original) (citing N. Nat. Gas Co. v. State Corp. Comm'n of Kan., 372 U.S. 84 (1963); Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan., 489 U.S. 493, 514 (1989)).  The relevant field, therefore, is the regulation of student loan servicers because it is the "target" of the D.C. Law and Final Rules.

Although no court has addressed whether federal law occupies the field of regulating student loan servicers, courts have consistently held that the HEA does not have field preemptive effect.  See, e.g., Armstrong v. Accrediting Council for Continuing Educ. And Training, Inc., 168 F.3d 1362, 1369 (D.C. Cir. 1999) (citing Jackson v. Culinary Sch., 27 F.3d 573, 580-81 (D.C. Cir. 1994), vacated on other grounds, 515 U.S. 1139 (1995)); Keams v. Tempe Tech. Inst., Inc., 39 F.3d 222, 225-26 (9th Cir. 1994); Chae v. SLM Corp., 593 F.3d at 941-42 ("[F]ield preemption is off the table to resolve this case involving the HEA and its attendant federal regulations."); Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1126

(11th Cir. 2004). In so holding, courts have reasoned that Congress could not have intended to occupy the field because the HEA requires adherence to state law in particular provisions and explicitly preempts state law in others. See Coll. Loan Corp. v. SLM Corp., 396 F.3d 588, 596 n.5 (4th Cir. 2005); Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d at 1126. When Congress expressly preempts state law in certain provisions, it follows that Congress did not intend for state law to be preempted in all situations – or Congress would not have deemed it necessary to legislate express preemptions. See Freightliner Corp. v. Myrick, 514 U.S. at 288; Cipollone v. Liggett Grp., Inc., 505 U.S. at 517; Jackson v. Culinary Sch. of Wash., Ltd., 27 F.3d at 580-81. Considering both tests of field preemption – the pervasiveness of federal regulation or the dominance of the federal interest – the Court sees no reason to disturb this precedent.

Under the first prong, the Court must determine whether the regulatory scheme is so pervasive that it leaves no room for state supplementation, Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 347, which is "a question of ascertaining the intent underlying the federal scheme." See Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 714. SLSA alleges that the federal government has "fully occupied this field by extensively regulating the servicing of loans." See Am. Compl. ¶ 194. It points out that student loan servicers are regulated directly by the DOED and by the Consumer Financial Protection Bureau ("CFPB"), as well as through HEA statutory provisions and implementing regulations. See Am. Compl. ¶ 198.[21]

The Supreme Court has explained, however, that the promulgation of comprehensive regulations in a field is not sufficient to find full occupation of that field. "We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than

---

[21]     For examples of the types of regulations issued by the DOED to regulate FDLP and FFELP generally, see Def. MTD at 18.

from the comprehensiveness of statutes . . . . To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive.  Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence."  See Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 717.

It is true that the HEA is a mammoth statute and its implementing regulations pertain to a diverse and extensive number of aspects of higher education.  But even when discussing the HEA as a whole, courts have found that the federal government does not occupy the field.  See, e.g., Keams v. Tempe Tech. Inst., Inc., 39 F.3d at 225-26.  SLSA has not provided any evidence that the federal government has occupied the more limited field of regulating student loan servicers.

Under the HEA, the Secretary of Education has the authority to contract directly with servicers to service FDLP loans.  See 20 U.S.C. § 1087f(a)(1).  Because the terms of the contracts – and not other regulations – govern the servicers of FDLP loans for the most part, the regulatory scheme itself does not evidence Congress' intention to exclude state supplementation in regulating FDLP loan servicers.  With respect to FFELP loans, the HEA delegates to the Secretary of Education the authority to "prescribe such regulations as may be necessary to carry out the purposes of [the FFELP], including regulations applicable to third party servicers . . . to establish minimum standards with respect to sound management and accountability."  See id. § 1082(a)(1).  Pursuant to this authority, the DOED has issued regulations that dictate certain standards of financial and administrative capability that servicers must meet to contract with private lenders to service FFELP loans, 34 C.F.R. § 684.416, as well as processes governing the limitation, suspension, or termination by the Secretary of a third-party servicer's eligibility to

contract with student loan lenders. See 34 C.F.R. § 682.700. The HEA also establishes

oversight mechanisms that would apply to federal student loan servicers, including a

"Performance-Based Organization," which the DOED has named the office of Federal Student

Aid, tasked with providing customer service and "ensuring the integrity of the Federal student

assistance programs." See 20 U.S.C. § 1018(a), (b)(2)(A); 48 C.F.R. § 3402.101. In addition,

the HEA directs the DOED to appoint a Student Loan Ombudsman who is tasked with reviewing

and resolving borrower complaints. See 20 U.S.C. § 1018(f).

There is no indication, however, that Congress, in legislating in this field, left no

room for state supplementation. See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at

347. The federal regulatory scheme establishes a "floor" – the very language of the statute

indicates that Congress intended DOED to set "minimum standards." See 20 U.S.C.

§ 1082(a)(1). And the fact that the DOED established oversight mechanisms pursuant to the

HEA does not indicate that Congress intended to "foreclose any state regulation in the area,"

which is, in this case, "parallel to federal standards." See Arizona v. United States, 567 U.S. at

401. Moreover, the HEA and its regulatory framework apply to federal student loan programs

and servicers, and do not regulate the entire field targeted by the D.C. Law and Final Rules,

which encompasses student loan servicers more broadly.

The District points to two other statements authored by agencies of the federal

government indicating their agreement that the "substantive nature and reach of the federal

regulatory scheme that Congress [has adopted]" is not so pervasive as to exclude state regulation.

See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 346. In a 2015 request for

information regarding student loan servicing, the CFPB contrasted recent efforts to strengthen

consumer protections in the context of mortgage and credit card servicing with the lack of

similar advancements in the student loan industry. The CFPB concluded that "there is no existing, comprehensive federal statutory or regulatory framework providing uniform standards for the servicing of all student loans." See Request for Information Regarding Student Loan Servicing, 80 Fed. Reg. 29302-01, 29305 (May 21, 2015). Similarly, in July 2018, the U.S. Department of the Treasury recommended that the DOED "establish and publish minimum effective servicing standards to provide servicers clear guidelines for servicing and help set expectations about how the servicing of federal loans is regulated," indicating that no such regulations already existed. See Treasury Report at 19. SLSA has not given this Court any reason to rule to the contrary.

Under the second test for field preemption, this Court must determine whether the federal interest is "'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 347 (quoting Arizona v. United States, 567 U.S. at 399). SLSA argues that the federal government's dominant interest as a lender, guarantor, and regulator has only grown due to recent policy changes that increased the proportion of federal student loan debt owned by the federal government – namely purchasing FFELP loans under ECASLA and eliminating the FFELP program under SAFRA in 2010. See Pl. Reply at 30. Over 90 percent of new student loans today are made through FDLP, and with the discontinuation of FFELP, "[a]ll new federal student loans are serviced in accordance with federal contracts." See id. at 30. Such a dynamic, SLSA contends, gives the federal government a "commanding share of the market" and a "unique and essentially unilateral ability to determine who services federal student loans." See Am. Compl. ¶ 30. In addition, the sheer size of federal student loan debt is indicative of the

federal government's significant interest.  See Pl. Cr-MSJ at 60.  The Court agrees with SLSA

that the federal interest in regulating federal student loans generally is substantial.

Separately, the federal government has a unique interest in protecting the rights

and obligations established in its contracts.  See Boyle v. United Techs. Corp., 487 U.S. at

504-05 ("The dispute in the present case borders upon two areas that we have found to involve

such 'uniquely federal interests.'  We have held that obligations to and rights of the United States

under its contracts are governed exclusively by federal law.") (citing United States v. Little Lake

Misere Land Co., 412 U.S. 580, 592-94 (1973); Priebe & Sons, Inc. v. United States, 332 U.S.

407, 411 (1947); Nat'l Metro. Bank v. United States, 323 U.S. 454, 456 (1945); Clearfield Tr.

Co. v. United States, 318 U.S. 363 (1943)).

On the other hand, the District of Columbia has a compelling interest in protecting

its consumers by providing oversight of federal student loan servicers.  According to the

Committee of the Whole, Subcommittee on Consumer Affairs of the Council of the District of

Columbia, there are 140,000 student loan borrowers residing in the District of Columbia, owing

an average of "$40,885 [in student loan debt], about 40 percent higher than the national

average."  See D.C. Committee Report at 5.  Those consumers have encountered difficulties with

and reported complaints about their servicers.  Between March 2012 and October 2016, CFPB

received 225 complaints about student loans from D.C. residents.  See id. at 7.

The District also argues that "[a]ny federal interest in regulating student loan

servicers cannot compare with those interests courts have found justified field preemption."  See

Def. MTD at 37 n.18.  When courts have found federal law to "occupy the field" to the exclusion

of state law it has been in areas like:  registration of aliens, Arizona v. United States, 567 U.S. at

401; military equipment procurement, Boyle v. United Techs. Corp., 487 U.S. 500; and tort

liability for private contractor integrated in wartime combatant activities, Saleh v. Titan Corp., 580 F.3d 1, 6 (D.C. Cir. 2009). See also Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 716-20 (finding no federal intent to pre-empt whole field of plasmapheresis regulation, a particular type of medical procedure). The District maintains that servicing of federal student loans does not implicate the same type of exclusive federal interests.

Weighing these factors, the Court concludes that the federal government's interests are not so dominant as to preclude the District of Columbia's legislating on the same subject. See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 347. SLSA therefore fails as a matter of law on its field preemption claim that federal law preempts D.C. Law 21-214 and the Final Rules. Its motion for summary judgment on its Second Claim for declaratory judgment relief is denied.

### 4. Conflict Preemption

Lastly, the Court turns to SLSA's conflict preemption claim. "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." See Hillsborough County v. Auto. Med. Labs., Inc., 471 U.S. 707, 713 (1985) (emphasis added); see also Arizona v. United States, 567 U.S. at 399-400; Freightliner Corp. v. Myrick, 514 U.S. at 287; Volt Info. Scis. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 477. Such a conflict arises (1) "when 'compliance with both federal and state regulations is a physical impossibility,' or [2] when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" See Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 713 (quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. at 142-43; Hines v. Davidowitz, 312 U.S. 52, 67 (1941)); see also Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 347. An

actual conflict must be identified; the "'[m]ere possibility of inconvenience' is not a sufficient obstacle—the repugnance must be 'so direct and positive that the two acts cannot be reconciled or consistently stand together.'"  See United States v. California, 314 F. Supp. 3d 1077, 1088 (E.D. Cal. 2018) (quoting Goldstein v. California, 412 U.S. 546, 554-55 (1973); Kelly v. Washington ex rel. Foss Co., 302 U.S. 1, 10 (1937)).  Nonetheless, the Supreme Court "has recognized that a '[c]onflict in technique'" – such as a conflict in the method of enforcement – "can be fully as disruptive to the system Congress erected as conflict in overt policy."  See Arizona v. United States, 567 U.S. at 406 (alteration in original) (quoting Motor Coach Emps. v. Lockridge, 403 U.S. 274, 287 (1971)).  And in determining whether there is an actual conflict between state and federal law, "[f]ederal regulations have no less pre-emptive effect than federal statutes," so long as the regulations clearly were "intended to pre-empt state law."  See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153-54 (1982); see also Wyeth v. Levine, 555 U.S. at 576 (2009); City of New York v. Fed. Commc'ns Comm'n, 486 U.S. 57, 64 (1988); Lazar v. Kroncke, 862 F.3d 1186, 1195 (9th Cir. 2017).

a.  Impossibility Preemption

As noted, there are two possible bases for conflict preemption – impossibility or obstacle preemption.  SLSA invokes both.  SLSA's "impossibility" argument does not hold water.  SLSA argues that its members would be required to violate the HEA in order to comply with a number of the provisions of the D.C. Law and Final Rules.  Upon closer inspection of the state and federal provisions, it is apparent that there is no actual conflict on the grounds of impossibility.

First, SLSA argues that the reporting requirements of the D.C. Law and Final Rules conflict with the federal Privacy Act.  The Privacy Act governs the disclosure of

42

individuals' personal information by federal government departments and agencies. <u>See</u> 5

U.S.C. § 552; <u>see also</u> <u>Alexander v. FBI</u>, 971 F. Supp. 603, 605-06 (D.D.C. 1997).  According to

a memorandum authored by the DOED, all records maintained by the DOED are agency

property and therefore, under the Federal Privacy Act, "[a]ny request from any third party for

Department records to which a [federal loan servicer] has access must be made directly to the

Department, where it will be evaluated for compliance with the requirements of the Privacy

Act." <u>See</u> DOED Privacy Act Memo at 2; Def. MTD at 51.

       SLSA argues that its members cannot comply with the requirements of the D.C.

Law and Final Rules to provide records to the government of the District of Columbia because

all requests for information must be made to the DOED; if servicers were to provide records

directly to the D.C. government, they would violate the Federal Privacy Act.  This is a false

conflict.  The D.C. Final Rules themselves specify that student loan servicers shall retain records

"[e]xcept to the extent prohibited by federal law." <u>See</u> Final Rules § 3018.1.  To comply with

federal law, the District explains that if it wished to obtain information that might be covered

under the Privacy Act, it would "request borrower consent, 34 C.F.R. § 5b.9(a), or submit a

written request to DOED, 34 C.F.R. § 5b.9(b)(7)." <u>See</u> Def. Opp. at 18.  In addition, the

Commissioner retains the discretion to "waive or reduce [record keeping] requirements if [she]

determines that compliance would require the licensee to violate federal law." <u>See</u> Final Rules

§ 3018.4.  Furthermore, requests for documentation by the D.C. government could provide for

the submission of redacted records that would not disclose borrower information or other

individual, personal information, consistent with the Privacy Act. <u>See</u> <u>In re Subpoena to Nat'l</u>

<u>Sci. Found., Office of Inspector Gen.</u>, No. 18-0006, 2018 WL 5017612, at *3 (E.D. Va. Oct. 16,

2018); see also Def. Opp. at 18; Def. MTD at 40. Thus, compliance with the D.C. Law and Final Rules does not, by itself, engender a violation of the Privacy Act.

SLSA also contends that there exist two conflicting dispute resolution mechanisms between the federal and state regulations. Again, this is a false conflict. Section 7a(c)(2) of the D.C. Law gives the D.C. Ombudsman authority to resolve borrower complaints, which is, according to SLSA, in direct contention with HEA implementing regulations, specifically 34 C.F.R § 682.208(c)(3)(i) and (ii), "requir[ing] a three-step process for resolving a dispute regarding the terms of the student loan." See Pl. Reply at 29. As the District explains, however, the two dispute resolution procedures can work in harmony because neither requires mandatory action: the D.C. Law gives the student loan ombudsman the power to attempt to resolve any complaints from a borrower, while the HEA provides instructions for lenders about how to resolve complaints from a borrower. See Def. Opp. at 17. The first is akin to facilitation or mediation, while the second merely dictates a timeline for lenders to respond to any inquiries and the type of information that lenders and guaranty agencies must provide a borrower if she disputes the terms of her loan. Lastly, SLSA contends that "the [D.C. Law] and its rules create different servicing deadlines and processes than in the HEA," see id. at 16; Def. MTD at 39, but it does not point to any specific instances, and the District denies any such conflicts.[22] Without any actual conflicts between the procedures set forth by the federal and state regulations, there can be no impossibility preemption.

---

[22]     According to the District, the D.C. Law and Final Rules "do not: (1) require servicers to respond to borrower complaints in a specified time; (2) impose deadlines for notification of transfer between servicers; (3) impose dispute resolution procedures; (4) require communication with authorized representatives of a borrower; or (5) impede guaranty agency collection charges or servicers' duty to perform due diligence in the collection." See Def. MTD at 39.

b.  Obstacle Preemption

Finally, the Court turns to the crux of SLSA's conflict preemption argument – and more accurately the core of its entire complaint:  obstacle preemption.  Here, the D.C. Law and Final Rules have met their match, at least in part.  Under obstacle preemption, a state law actually conflicts with federal law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  See Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. at 713 (quoting Hines v. Davidowitz, 312 U.S. at 67).

Unlike with field preemption and express preemption, where the Court can consider the D.C. Law and Final Rules in their entirety, conflict preemption requires the Court to undertake a more detailed analysis to identify actual conflicts between the HEA and the D.C. licensing scheme.  For purposes of this conflict analysis, the Court must compare the particular regulations that apply to each of the three types of loans at issue here:  (1) the FDLP loans, which the federal government owns and are serviced pursuant to federal government contracts; (2) the Government-Owned FFELP loans, for which the federal government was originally the reinsurer or guarantee agency, but later purchased pursuant to ECASLA – also serviced pursuant to federal government contracts; and (3) the Commercial FFELP loans, the private loans that the government reinsures or guarantees.

i.  FDLP Loans

SLSA's conflict preemption arguments are on their strongest footing with respect to the federal government's contracting decisions.  This argument is premised on recognizing that Congress' purpose in enacting the HEA was to delegate authority to the federal government to select and contract directly with servicers for its FDLP loans.  SLSA argues that by creating duplicative and additional requirements for loan servicers, the D.C. licensing scheme

45

impermissibly second-guesses the federal government's decisions to contract with these servicers. See Pl. Reply at 18. The Court agrees.

Courts have consistently held that any state law that impedes the federal government's ability to contract – including state licensing regimes that effectively second guess United States' contracting decisions – are preempted. See, e.g., United States v. Virginia, 139 F.3d 984, 987-89 (4th Cir. 1998); Gartrell Constr. Inc. v. Aubry, 940 F.2d 437, 439-41 (9th Cir. 1991). A "[s]tate may not enforce licensing requirements which, though valid in the absence of federal regulation, . . . impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress." See Sperry v. Florida ex rel. Fla. Bar, 373 U.S. 379, 385 (1963). The seminal case is the Supreme Court's unanimous decision in Leslie Miller, Inc. v. Arkansas, in which the Court found an insurmountable conflict between the state licensing requirements placed on federal contractors and the actions taken by Congress and the Department of Defense to ensure "the reliability of persons and companies contracting with the Federal Government." See Leslie Miller, Inc. v. Arkansas, 352 U.S. 187, 190 (1956). The Court held that to subject a federal contractor to the Arkansas licensing requirements "would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." See id. at 190. It is difficult to see any light between the facts of Leslie Miller, where obstacle preemption was found to bar state regulation, and the FDLP loan servicers here.

The HEA delegates authority to the Secretary of Education to select and contract with loan servicers to service FDLP loans. See 20 U.S.C. § 1087f. The Secretary of Education is instructed to contract "at competitive prices" with those servicers "which the Secretary

46

determines are qualified," specifically those "that have extensive and relevant experience," and have "demonstrated effectiveness." See id. § 1087f(a)(1)-(2).  Pursuant to this authority, the DOED has selected and contracted with nine servicers to service FDLP loans.  See Pl. Facts ¶ 55.

The D.C. Law and Final Rules require the same servicers to obtain a license to operate within the District of Columbia.  See D.C. Law 21-214 § 7b(a).  And the Commissioner retains the ability to grant, deny, or revoke servicer licenses.  See Final Rules §§ 3007, 3011, 3019.  As part of the Commissioner's initial determination to issue a license, a servicer's application for licensure must include "[e]vidence of the applicant's financial responsibility, character and general fitness" and "[e]vidence demonstrating that the applicant has met the applicable net worth and surety bond requirements."  See id. § 3002.2(c), (d).  The Commissioner may also revoke a license for a number of reasons, including if the servicer has "[d]emonstrated incompetency and untrustworthiness to act as a licensee."  See D.C. Law 21-214 § 7b(h)(1)(E).

The District argues that "none of [the] requirements [of the D.C. Law and Final Rules] substitutes the District's judgment for DOED's as to 'effectiveness'" and "instead [merely] impose basic business requirements."  See Def. Opp. at 20.  But the D.C. licensing scheme, in effect, requires SLSA's members to "desist from performance until they satisfy a state officer upon examination that they are competent [to perform their duties] and pay a fee for permission to go on."  See Leslie Miller, Inc. v. Arkansas, 352 U.S. at 190 (quoting Johnson v. Maryland, 254 U.S. 51 (1920)).  Here, there is a risk that the federal government will contract with a servicer after evaluating its qualifications under federal law and regulations, and that servicer nevertheless will be determined to be unqualified by the Commissioner and barred from operating in the District of Columbia under the D.C. Law and Final Rules.  The threat of District

of Columbia officials' second-guessing the federal government's contracting decisions is

sufficient under Leslie Miller to invalidate the state licensing scheme as applied to servicers

when servicing their FDLP loans.  See United States v. Virginia, 139 F.3d at 987-990.  Even if

the Commissioner's assessment mirrored the federal government's – based on the same

qualifications and culminating in the same outcome – it would not only thwart the federal

government's general contracting discretion protected under Leslie Miller, but it would directly

conflict with HEA's explicit delegation to the DOED to make that assessment.

   The District's principal counter-argument rests on the existence of provisions

within servicer contracts that anticipate and require servicers' compliance with state law.  A

provision in the sample contract submitted by SLSA provides that "contractor(s) will be

responsible for maintaining a full understanding of all federal and state laws and regulations

. . . and ensuring that all aspects of the service continue to remain in compliance."  See Sample

DOED-Servicer Contract at 24.  It is the District's contention that if servicers must comply with

state law according to their federal contracts, there can be no conflict.  See Def. Opp. at 20.  The

District points to a letter issued on January 21, 2016 by the DOED to the State of Maryland as

evidence that the DOED, at least at one point, agreed with this proposition.  In the letter, Vanessa

Burton, an attorney with the DOED's Division of Postsecondary Education, explained that if

loan servicers were determined to be "collection agencies," the Maryland Collection Agency

Licensing Act "would not conflict with the Department's contracts with [loan servicers], which

provide generally that loan servicers . . . must comply with State and Federal law."  See

DOED-Maryland Letter at 2.  Similarly, a memorandum issued by Ted Mitchell, Under

Secretary of DOED, explained that "[s]ervicing contracts should comply with federal and state

law, taking any necessary steps to support oversight by federal or state agencies, regulators, or law enforcement officials." See Mitchell Memo at 38.[23]

The DOED's position, as set forth in its letter and memorandum, and the existence of contractual provisions directing servicers to comply with state law do not save the D.C. Law and Final Rules.  The Ninth Circuit held in Gartrell Constr. Inc. v. Aubry that similar contractual provisions requiring a federal contractor to "obtain any necessary licenses and comply with any applicable state laws, codes and regulations" did not negate the binding effect of Leslie Miller.  See Gartrell Constr. Inc. v. Aubry, 940 F.2d at 437 (emphasis omitted). According to the Ninth Circuit, "state licensing laws cannot be 'applicable', or compliance with them 'necessary', where such laws are preempted by federal law."  See id. at 440.  On this, the Court agrees with the Ninth Circuit.  If a state law is preempted under the Supremacy Clause, that state law is invalid, and state actors may not adhere to it whether directed to by a contract or not.  The District's suggestion that the Court must first look to the contract provisions to determine if there is preemptive intent is incorrect – only Congress has the power to preempt state law, and the contracting parties' intent is not relevant.  See Arizona v. United States, 567 U.S. at 399; Def. MTD at 53.

The District's attempts to distinguish the Leslie Miller line of cases are also unsuccessful.  See Def. MTD at 52.  The factual differences between those cases and the one before this Court are inconsequential.  In particular, the District argues that Leslie Miller should not apply because federal student loan servicing contracts do not pertain merely to a federal installation, as in Leslie Miller, but rather concern a third-party – the student borrowers – implicating strong state consumer protection concerns that were not present in Leslie Miller

---

[23]     The memorandum authored by Ted Mitchell has since been withdrawn by the DOED.  See Def. MTD at 44 n.21.

and its progeny.  See Def. MTD at 54.  But Leslie Miller and its progeny are not so limited.  In

Sperry v. Florida ex rel. Fla. Bar, the Supreme Court applied Leslie Miller to vacate an

injunction enjoining a non-lawyer from practicing before the United States Patent Office because

he was not licensed by the state bar.  See Sperry v. Florida ex rel. Fla. Bar, 373 U.S. 379 (1963).

The Court in Sperry considered state action that prohibited the unauthorized practice of law

– also quintessentially a measure of consumer protection that implicated third-party consumers

– but nevertheless held that state attorney licensing requirements "must yield" to Congress'

delegation to authorize non-lawyers to represent applicants before the U.S. Patent Office.  See id.

at 384-85 (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 211 (1824)); see also United States

v. Virginia, 139 F.3d at 987-88.  Thus, the distinction that the District attempts to draw is without

merit.

          Moreover, the fact that Leslie Miller and its progeny did not explicitly employ a

presumption against preemption is not dispositive. [24]  The presumption against preemption

applies here when considering congressionally-delegated contracting decisions, regardless of

courts' previous analysis.  That presumption is overcome if there is indication of Congress'

"clear and manifest purpose" to preempt state law.  See Cipollone v. Liggett Grp., Inc., 505 U.S.

at 516 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. at 230).  Here, Congress has

deliberately delegated the authority to DOED to contract with servicers to service FDLP loans.

---

[24]     The Court notes that Leslie Miller has also been characterized as a discussion of the
intergovernmental immunity doctrine, which is logical given the overlap between second-
guessing federal contracting decisions as prohibited under conflict preemption and the direct
regulation by a state of the federal government prohibited under the intergovernmental immunity
doctrine.  See, e.g., North Dakota v. United States, 495 U.S at 452-55.  When considering federal
contracting authority as immunized by the broad protections of the Supremacy Clause, the
Supreme Court has recognized a presumption against state regulation of federal activities or
property, unless there is clear instruction to the contrary from Congress.  See, e.g., Don't Tear It
Down v. Pa. Ave. Dev. Corp., 642 F.2d 527, 534-35 & nn.71 & 76 (D.C. Cir. 1980) (discussing
Supreme Court cases).

<u>See</u> 20 U.S.C. § 1087f.  Congress' purpose is clear, and allowing a state to impose separate, and potentially conflicting, contracting requirements would nullify that provision.

### ii. Government-Owned FFELP Loans

The rationale employed to find the D.C. Law and Final Rules preempted as they apply to the servicing of FDLP loans also would apply to the servicing of Government-Owned FFELP loans.  ECASLA temporarily authorized the DOED to purchase FFELP loans.  <u>See</u> Ensuring Continued Access to Student Loans Act of 2008, § 7, Pub. L. No. 110-227, 122 Stat. 740, 746-48 (2008) (codified at 20 U.S.C. § 1087i-1).  To carry out this new authority, the HEA was amended in 2008 to allow the DOED to contract with servicers to service its newly purchased FFELP loans.  <u>See id.</u>; Pl. Facts ¶ 42.  The amendment dictated that "[t]he Secretary may, if agreed upon by an eligible lender selling loans under this section, contract with such lender for the servicing of loans purchased," provided it met the detailed conditions.  <u>See</u> 20 U.S.C. § 1087i-1(c).  The legislative history explains that this amendment "clarifie[d] that the Secretary ha[d] the authority to enter into forward commitments to purchase new loans; and clarifie[d] that, at the discretion of the Secretary, a loan purchased by the Secretary [could] continue to be serviced by the current lender."  <u>See</u> H.R. Rep. No. 110-590, at 3 (2008) (summary of Representative George Miller's statement).

As owners of $94 million worth of Government-Owned FFELP loans, the federal government is now a party to the servicing contracts and the loans are federal assets.  <u>See</u> Am. Compl. ¶ 197.  According to the parties, the DOED contracts with the same nine loan servicers to service both FDLP and Government-Owned FFELP loans.  <u>See</u> Goldstein Declaration at 3; Def. Facts ¶ 38; Pl. Facts ¶ 54; U.S. SOI at 4 n.5.  Thus, under <u>Leslie Miller</u>, the DOED's contracting

decisions with respect to servicing Government-Owned FFELP loans should be accorded the same preemptive effect as those decisions in the context of its FDLP loans.

Unlike FDLP loans, however, the federal government was not an original party to the contracts between the lenders and servicers of the FFELP loans, and it therefore did not play a role in assessing servicer fitness when the contract originated.  It is possible to read Leslie Miller and its progeny as protecting federal contracting decisions premised on determinations of "initial responsibility" – the federal government's choice to enter into a contract with a contractor.  See Transcript at 28.  But, the Court does not see any reason to draw a distinction between those contracts into which the federal government entered initially, and those that it assumed and enforces.  Here, Congress determined that it was at the DOED's discretion to retain the same servicer or to choose a different one, to modify or nullify the lender-servicer contracts it assumed, and presumably the DOED undertook the same kind of "responsibility" assessment when it purchased the FFELP loans.

As the Ninth Circuit put it: "The concern in Leslie Miller was that a state was asserting a right or power of review over the federal government's determination of 'responsibility.'  The Court did not focus on the distinction between bidding and performance but on the state's interference with the federal government's responsibility determination.  That interference occurs when, as here, the state requires a contractor with the federal government to comply with its licensing laws even if that requirement is not enforced until after performance has begun."  Gartrell Constr. Inc. v. Aubry, 940 F.2d at 440-41 (rejecting the state of California's argument that the Ninth Circuit should distinguish between "placing a condition precedent on [the federal government's] right to bid" and requiring a contractor to comply with a state licensing law "after it has been awarded the contract . . . leaving the federal government free to

shop for the most favorable bidder"). Ultimately, the DOED has exercised and will continue to exercise its contracting discretion – including its ability to re-contract with different servicers following the purchase of loans – and has decided to maintain contracts with a select number of servicers to service Government-Owned FFELP loans, the same servicers with whom it contracts to service its FDLP loans. See Transcript at 48-49. The District of Columbia may not second-guess DOED's contracting decisions with respect to servicing Government-Owned FFELP loans, just as it may not second-guess DOED's contracting decisions with respect to servicing its FDLP loans.

### iii. Commercial FFELP Loans

Unlike FDLP and Government-Owned FFELP loans, the federal government does not contract with servicers for the servicing of Commercial FFELP loans. Nor has it purchased those loans and assumed the obligations and responsibilities under contracts governing the servicing of Commercial FFELP loans. It acts only as a reinsurer or guarantor. Loan servicers contract directly with private lenders to service Commercial FFELP loans. Those contracting decisions, therefore, are not accorded the same type of preemptive effect mandated by the Leslie Miller line of cases. And the Court agrees with the District of Columbia that there is no reason to "[i]mmunize [s]tudent [l]oan [s]ervicers [f]rom [s]tate [r]egulation [m]erely [b]ecause [s]ome [a]lso [a]ct as [f]ederal [c]ontractors." See Def. Opp. at 19. The federal government nonetheless has some regulatory authority over Commercial FFELP loans under the HEA. For that reason, the Court now turns to the remainder of SLSA's conflict preemption arguments as they apply to Commercial FFELP loans. Because the regulation of those loans by the District of Columbia is not preempted under the Leslie Miller line of reasoning, the Court analyzes them under more traditional principles of obstacle preemption.

Under the obstacle theory of conflict preemption, the Court must first identify a congressional purpose and then determine whether the state regulation obstructs the accomplishment of that purpose – that is, whether it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." See Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. at 713 (quoting Hines v. Davidowitz, 312 U.S. at 67); see also Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d at 347. To ascertain the goals or purposes of Congress in enacting a federal statute, the Court first looks to the "text and structure of the [federal] statute at issue." See CSX Transp., Inc. v. Easterwood, 507 U.S. at 664. Then, to identify an obstacle to the accomplishment of those goals that is sufficient to warrant preemption, it is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." See Crosby v. Nat'l Foreign Trade Council, 530 U.S. at 373; see also Gobeille v. Liberty Mut. Ins., 136 S. Ct. 936, 943 (2016); Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 477-78.

According to SLSA, Congress had three relevant goals or purposes in mind when enacting the HEA: (1) to operate student loan programs cost-efficiently (saving taxpayer money); (2) to protect taxpayer money by preventing student loan default; and (3) to administer the federal student loan programs, and specifically loan servicing, in a uniform manner. See Pl. Am. Compl. ¶¶ 171-76. The Court concludes that the presumption against preemption is not overcome here because the D.C. Law and Final Rules do not impermissibly obstruct any of these three asserted congressional goals as applied to Commercial FFELP loans.

At the outset, the Court considers Congress' own description of its purpose in enacting the HEA. Section 1071 of the HEA states that FFELP was intended to "enable the

Secretary [of Education] (A) to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions . . . , (B) to provide a Federal program of student loan insurance for students or lenders who do not have reasonable access to a State or private nonprofit program of student loan insurance . . . ,  (C) to pay a portion of the interest on loans to qualified students which are insured [under FFELP], and (D) to guarantee a portion of each loan insured under a program of a State or of a nonprofit private institution or organization." See 20 U.S.C. § 1071(a)(1).  On their face, the goals expressly identified in the HEA do not match any of the three purposes that SLSA argues motivated Congress in enacting the HEA.  That said, the Court nonetheless will consider whether Congress' purposes in enacting the HEA align with the goals that SLSA has identified, as reflected in the structure, legislative history, and remaining text of the statute.

First, the Court has found no evidence that Congress intentionally sought to save taxpayer money when it created the FFELP program.  SLSA points to the fact that the HEA itself requires the Secretary of Education to award servicer contracts at "competitive prices." See 20 U.S.C. § 1087f(a)(1); Pl. Reply at 19-20.  But that provision relates to FDLP loans where the government is directly lending government money.  The legislative history is clear that one of the overarching goals of Congress in creating the FDLP was to "reduce the costs of the student loan program to taxpayers and borrowers." See 139 Cong. Rec. S5585-02, at S5627; 139 Cong. Rec. H2297-02; Pl. Facts ¶ 17.  There is no indication, however, that saving taxpayer money motivated the creation of the FFELP.  For example, in attempting to improve access to higher education for borrowers, the federal student loan programs purposefully act contrary to the federal government's financial interests by subsidizing loans and offering more lenient interest rates. See, e.g., 20 U.S.C. §§ 1077a, 1078; H.R. Rep. No. 103-111, at 158 (1993); Am. Compl.

¶ 32.  While cost-efficiency might be an ever-present goal of Congress, without more explicit evidence, the Court finds that saving taxpayer money did not underpin Congress' purpose or intent in legislating in the area of FFELP servicing.

Second, the Court is unpersuaded that Congress consciously aimed to protect taxpayer money by preventing student loan default when it created the FFELP program.  SLSA provides no support for this assertion, relying only on the DOED Preemption Notice, which states in a conclusory fashion that protecting taxpayer money was a goal of Congress – also without any substantiation.  See DOED Notice at 3-4.  Indeed, the federal student loan programs themselves operate contrary to this goal in order to improve access to higher education for all students.  Borrowers need not pass a credit test to take out a federal loan, which could lead to a higher risk of delinquency or default.  See 20 U.S.C. § 1091.  And, as the District points out, borrowers have access to income-driven repayment plans that forgive the balance of their loans after a set term.  See id. §§ 1078-10 to -12; Def. MTD at 50.

Finally, SLSA focuses on the congressional goal of uniformity, and this is its strongest obstacle preemption argument.[25]  In deciding whether uniformity motivated Congress in passing the HEA, courts have come to different conclusions.  Compare Coll. Loan Corp. v. SLM Corp., 396 F.3d at 597 (explaining that the Fourth Circuit was "unable to confirm that the creation of 'uniformity,' . . . was actually an important goal of the HEA"), with Chae v. SLM Corp., 593 F.3d at 947 ("Congress intended uniformity within the [FFELP]."); see also Order at 6-7, Daniel v. Navient Sols., LLC. (M.D. Fla. June 25, 2018) (No. 17-2503) ("Uniformity, however, is not one of Congress's expressed goals in enacting the HEA, and broadening the

---

[25]     SLSA discusses uniformity interchangeably with "ease of administration" and "stability."  See, e.g., Am. Compl. ¶ 171; Pl. Cr-MSJ at 53-57.  The Court agrees that these concepts are related.

scope of the preemption statute would not rest upon a 'fair understanding of congressional

purpose.'" (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. at 530)).

In the absence of any controlling authority, the Court begins with the text and

structure of the statute and then considers legislative history.  The term "uniformity" features

most prominently in Section 1082 of the HEA.  Subpart L of Section 1082 of the HEA – entitled

"Uniform administrative and claims procedures" – provides that "[t]he Secretary shall, by

regulation . . . prescribe standardized forms and procedures" regarding a number of procedures,

including origination of loans, electronic funds transfers, guaranty of loans, and servicing.  See

20 U.S.C. § 1082(l)(1).[26]  That subpart further tasks the Secretary of Education with reviewing

such regulations at least annually and soliciting recommendations from other relevant entities to

"simplify[] and standardiz[e] the administration of the [FFELP program]." See id. § 1082(l)(4).

To be sure, these requirements support an inference that Congress intended to simplify the

administration of the FFELP program in every state through the creation of standardized forms

and procedures.  Without more, however, these requirements do not support an inference that

Congress broadly intended that all aspects of the FFELP program be identical nationwide; that

would be "field preemption by another name," see Transcript at 22, an argument that the Court

already has rejected.  See supra at 34-41.  Indeed, many regulatory schemes that involve

standardized procedures are not grounded in the congressional goal of uniformity as to the entire

scheme.  As the District posits, the fact "[t]hat a [federal] statute describes the details of the

---

[26]       In addition, Section 20 U.S.C. § 1082(m)(1) directs the Secretary of Education to
"prescribe common application forms and promissory notes, or master promissory notes" for
FFELP loans.  See 20 U.S.C § 1082(m)(1)(A).  SLSA cites to Section 1087e, as referenced in
Chae, to evidence the congressional goal of uniformity.  It reads: "[L]oans made to borrowers
[under the FDLP program] shall have the same terms, conditions, and benefits, and be available
in the same amounts, as loans made to borrowers under the [FFELP program]." See 20 U.S.C.
§ 1087e(a)(1)

program it creates and establishes minimum standards, including the use of common forms and

procedures, does not warrant inference of overarching preemptive intent beyond compliance with

those requirements." See Def. MTD at 47.  The Court agrees with the District.  See Bourbeau v.

Jonathan Woodner Co., 549 F. Supp. 2d at 88.  Cf. Geier v. Am. Honda Motor Co., 529 U.S.

861, 868 (2000); Harris v. Great Dane Trailers, Inc., 234 F.3d 398, 401 (8th Cir. 2000).

      Looking beyond the text of the statute to its legislative history, the congressional

record provides no greater support for SLSA's broad uniformity argument.  It indicates only that

Congress sought to simplify the federal student loan process for borrowers.  As the House

Committee Report notes, "H.R. 3553 [the 1992 amendments to the HEA] simplifies the student

financial aid programs. Many students and their families are denied access to student aid because

they cannot navigate through the bewildering complexity of the current student aid forms and

delivery system.  This complexity has become a new barrier to educational opportunity.  H.R.

3553 provides for dramatic simplification including a single free Federal form for applying for

Federal student aid and a single need analysis."  See H.R. Rep. No. 102-447, at 343 (1992).

From this record, the Court concludes that Congress intended to simplify the FFELP program for

student borrowers in order to further its foundational objective – improving access to higher

education for all borrowers – nothing more.  Congress sought the uniform administration of the

FFELP program to the extent that it ensures that all borrowers have the same opportunity to

obtain federal student loans.

      If the Court assumes that the uniform administration of the FFELP program,

including the use of standardized forms and procedures, was a congressional goal or purpose, the

question is whether that purpose is obstructed or impeded by the D.C. Law and Final Rules.  See,

e.g., Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 477-78;

Chae v. SLM Corp., 593 F.3d at 943.  In other words, to find that this congressional goal is

obstructed, the D.C. Law and Final Rules would have to interfere with the DOED's uniform

administration of the FFELP program in ways that hamper the access of borrowers to federal

student loans.  The Court concludes that the D.C. licensing scheme does not.

      The D.C. Law and Final Rules set standards that student loan servicers must meet

and procedures they must follow to be found eligible to do business in the District of Columbia.

See, e.g., Final Rules §§ 3002-04.  Those standards, however, do not interfere with the uniform

administration of the DOED's regulations.  The HEA tasks the Secretary of Education with

setting minimum standards by issuing regulations:

> [The Secretary of Education] may prescribe such regulations as
> may be necessary to carry out the purposes of this part, including
> regulations applicable to third party servicers (including
> regulations concerning financial responsibility standards for, and
> the assessment of liabilities for program violations against, such
> servicers) to establish minimum standards with respect to sound
> management and accountability of [the FFELP program].

See 20 U.S.C. § 1082(a)(1) (emphasis added).  Pursuant to this authority, the DOED has issued

regulations that establish baseline qualifications for third-party servicers to participate in the

FFELP program, including standards of administrative capability and financial responsibility.

See 34 C.F.R. § 682.416(a), (b) (incorporating 34 C.F.R. § 668.15).  There is no indication that

Congress, or the DOED for that matter, intended for the prescribed federal minimums to be

ceilings.  The D.C. licensing scheme merely supplements the minimum standards created by the

DOED.  No matter where the borrower resides – whether in the District of Columbia or

elsewhere – her Commercial FFELP loans can be serviced by loan servicers that have (at least)

met the DOED's baseline qualifications.[27]   The D.C. Law and Final Rules, therefore, do not

threaten the DOED's ability to uniformly administer the Commercial FFELP program consistent

with its regulations.   The D.C. licensing scheme merely supplements the DOED's regulations in

a way that does not obstruct borrowers' access to federal student loans.

   In the absence of statutory text and legislative history to support its position,

SLSA relies almost exclusively on the DOED's Preemption Notice and on the Ninth Circuit's

decision in Chae v. SLM Corp. as evidence that Congress' goal of uniformity is obstructed by

the District of Columbia's licensing scheme.   See Chae v. SLM Corp., 593 F.3d at 947.[28]   As

explained supra at 21-26, the DOED Preemption Notice is due no deference whatsoever.   And as

for Chae, the District maintains that the "uniformity argument as to the mechanics of the loan

servicing or the core aspects of servicing" involved in Chae should not be extended to "state

regulations and oversight of loan servicers that don't change those core aspects."   See Transcript

at 8-9; Def. MTD at 46.   The Court agrees.   In Chae, the Ninth Circuit held that the state law

claims – challenging a student loan servicer's method of setting late fees, repayment start dates,

and interest calculations – were preempted because they "pose[d] an obstacle to the uniform

implementation of the FFELP."   See Chae v. SLM Corp., 593 F.3d at 950.   Unlike the D.C.

---

[27]  Similarly, the two different dispute facilitation processes established by the
District of Columbia and by the DOED do not impede borrowers' access to federal aid by
disrupting the uniform administration of the FFELP program.  Instead, they provide borrowers
more options to resolve their complaints – options which are not mutually exclusive or
inconsistent with one another.  See supra at 44.

[28]  SLSA also argues that the "add[ed] layer of regulations, fees, and disclosures
requirements" imposed by the District of Columbia's licensing scheme would "increase the costs
of servicing FFELP Loans," which would, in turn, undermine the stability of the FFELP program
because it would "cause Servicers to . . . service fewer FFELP Loans."  See Pl. Cr-MSJ at 55.
This argument is more accurately characterized as an attempt to show how the D.C. licensing
scheme obstructs the Congressional goal of operating the FFELP program cost-efficiently.  And
the Court has already declined to recognize that goal.

licensing scheme however, the state law claims at issue in <u>Chae</u> threatened to interfere with the uniform administration of the FFELP program in a way that would obstruct borrowers' access to federal student loans by creating variations in the core aspects of the servicing of their loans – the methods for calculating interest, assessing late fees, and setting repayment dates. The Ninth Circuit therefore held that federal law preempted the state law claims that related to those aspects of the servicers' administration of student loans – that is, <u>how</u> they service student loans. <u>See</u> <u>id.</u> at 947-50. Here, the D.C. Law and Final Rules create and implement an oversight scheme that was designed to regulate the servicers themselves – that is, <u>who</u> may service student loans. To the extent that the D.C. licensing scheme creates variations in the oversight of FFELP loan servicers, those variations do not interfere with borrowers' ability to access federal student aid – in contrast to the state law claims in <u>Chae</u> that affected the "mechanics of loan repayment." <u>See</u> Def. MTD at 46.[29]

The Court is not persuaded by the argument that if the D.C. licensing scheme is upheld, servicers would be subject to 51 different types of processes and rules, thus undermining Congress' goal of administering federal student loan programs uniformly. <u>See</u> Pl. Cr-MSJ at 55. Private companies are subject to 51 different sets of taxation, reporting, and licensing regimes in a broad range of industries that are similar to the licensing scheme created by the District of

---

[29]      In <u>Chae</u>, the Ninth Circuit "examine[d] the FFELP to evaluate whether it show[ed] a preference for uniformity, and, if [it] [found] such intent demonstrated, [it would] determine whether the plaintiffs' claims conflict with a policy of uniformity." <u>See</u> <u>Chae v. SLM Corp.</u>, 593 F.3d at 947. The Court declines to follow this broad approach to conflict preemption analysis. The Supreme Court has said that "state law is nullified to the extent that it actually conflicts with federal law." <u>See</u> <u>Hillsborough County v. Auto. Med. Labs., Inc.</u>, 471 U.S. at 713. To identify such a conflict, the Supreme Court has instructed courts to determine whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>See</u> <u>id.</u> at 713 (quoting <u>Hines v. Davidowitz</u>, 312 U.S. at 67). The Ninth Circuit in <u>Chae</u> appears to reverse this analysis, identifying actual conflicts in order to determine if Congress' objective is obstructed.

Columbia here. There is nothing wrong with subjecting third-party loan servicers, who contract with private lenders, to varying types of licensing and regulatory schemes, so long as those regimes do not conflict with the federal regulatory standards or impede borrowers' access to student loans – which, the Court concludes, the D.C. licensing scheme does not.

Moreover, the D.C. Law and Final Rules do not actually conflict with the Secretary of Education's authority to review servicers' compliance with the DOED's baseline qualifications. The DOED regulations provide for enforcement of its minimum standards: "The Secretary [of Education] may review a third-party servicer to determine that it meets the administrative capability and financial responsibility standards in this section . . . . If the servicer does not, the Secretary may initiate an administrative proceeding." See 34 C.F.R. § 682.416(c)(1), (4). If the Secretary of Education "determine[s] [a servicer] does not meet the requirements," "[a] lender that participates in the FFEL[P] programs may not enter into a contract with [that] third-party servicer." See id. § 682.416(f). In the context of Commercial FFELP loans therefore – that is, the FFELP loans that are not now owned by the federal government – the DOED does not have the authority to affirmatively choose servicers to the exclusion of states' eligibility determinations, as it does in the context of FDLP and Government-Owned FFELP loans. Instead, the DOED only retains the authority to review the servicers' minimum qualifications and to disqualify those that it deems ineligible, nothing more. The D.C. Law and Final Rules do not interfere with that discretion. If the DOED determines a third-party servicer to be unqualified, that servicer will not be permitted to operate in the District of Columbia – or any jurisdiction – and therefore will be ineligible to obtain a license under the D.C. Law. See D.C. Law 21-214 § 7b(a). No part of the D.C. Law or Final Rules contradicts the DOED's authority to nullify contracts that govern the servicing of Commercial FFELP loans.

62

If, on the other hand, the DOED undertakes a review of a third-party servicer and deems that servicer to be qualified, the District of Columbia could come to the opposite conclusion based on its own additional criteria. The standards that the DOED has created are baseline qualifications – the DOED has set the floor. An actual conflict does not exist when a state adds qualifications that are additional to, and in no way displace those created by the federal government. And that is all that the District of Columbia has done here. The DOED serves as a "check" on the fitness of servicers of Commercial FFELP loans – it does not undertake a threshold analysis of servicer eligibility, nor does it have the authority to enforce its affirmative determinations of eligibility. Consistent with the presumption against preemption, the Court declines to conclude that the potential for a conflicting eligibility determination – that is, if the DOED determines a third-party servicer qualified to service Commercial FFELP loans, and the District of Columbia denies that servicer a license – constitutes an actual conflict for purposes of conflict preemption. As this Court has said, "[a] state law that imposes additional requirements over and above those imposed by a federal law does not . . . necessarily 'conflict' with federal law." See Bourbeau v. Jonathan Woodner Co., 549 F. Supp. 2d at 88 (citing Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 290-92 (1987)); see also Coll. Loan Corp. v. SLM Corp., 396 F.3d at 599 ("[T]he states are sometimes entitled to impose more stringent common law or statutory requirements in areas regulated by federal law, so long as such requirements are not incompatible with those established under federal law." (citing Int'l Paper Co. v. Ouellette, 479 U.S. 481, 498 (1987))); Harris v. Great Dane Trailers, Inc., 234 F.3d at 401.

In sum, the Court concludes that the D.C. Law and Final Rules are not preempted as applied to the servicing of Commercial FFELP loans because the D.C. licensing scheme does not conflict with the HEA under either impossibility or obstacle preemption. For these reasons,

the Court will grant SLSA's motion for summary judgment on its First Claim (conflict preemption) in part and deny it in part. SLSA is entitled to judgment as a matter of law and a declaratory judgment on its conflict preemption claim as it respects servicing of (1) FDLP loans and (2) Government-Owned FFELP loans, but not with respect to (3) Commercial FFELP loans.

### D. Intergovernmental Immunity

Even though the D.C. Law and Final Rules are not preempted as applied to Commercial FFELP loans, they may still be unconstitutional if they violate the overarching doctrine of intergovernmental immunity derived from the Supremacy Clause. See North Dakota v. United States, 496 U.S. at 439. The Court now turns to that alternative argument as applied to Commercial FFELP loans.

As an initial matter, the Court addresses the District's argument that it is not appropriate for the Court to consider the intergovernmental immunity argument at all. The District points out that the intergovernmental immunity theory was initially raised by the United States in its Statement of Interest, not by SLSA in its opening brief. See Def. IG Immunity at 5. But the District has not identified a single rule that prohibits the Court from considering SLSA's argument, and the cases that the District relies upon are not persuasive. Most of them are appellate court decisions that discuss the scope of the issues that courts of appeal may consider on appeal if they have not been raised first in the district court. Those cases and their reasoning are inapplicable here. See id. at 5.

SLSA explains that it is appropriate for the Court to consider the intergovernmental immunity argument because, in its complaint, it asked for relief under the Supremacy Clause, which encompasses both legal theories – preemption and intergovernmental immunity. As SLSA's counsel put it: "[A] complaint which asks for relief under preemption or a

complaint which asks for relief under intergovernmental immunity is asking for relief under the

[S]upremacy [C]lause." See Transcript at 50. The Court is not persuaded by this argument, but

nevertheless thinks it is appropriate, in its discretion, to consider the intergovernmental immunity

argument.

Rule 8 of the Federal Rules of Civil Procedure, which governs the sufficiency of a

complaint, "does not require a plaintiff to set forth in [its] complaint all of the legal theories on

which [it] may rely. Any theory advanced, however, must be supported by the facts in the

complaint and a defendant must have notice and the opportunity to respond." See Otay Mesa

Prop. L.P. v. U.S. Dep't of Interior, 714 F. Supp. 2d 73, 85 (D.D.C. 2010) (citation omitted)

(citing Krieger v. Fadely, 211 F.3d 134, 136 (D.C. Cir. 2000); Hanson v. Hoffmann, 628 F.2d

42, 53 (D.C. Cir. 1980); Arent v. Shalala, 70 F.3d 610, 618-19 (D.C. Cir. 1995)), rev'd on other

grounds, 646 F.3d 914 (D.C. Cir. 2011). While the Court agrees that SLSA made Supremacy

Clause arguments in its amended complaint, SLSA's claims for relief were limited to

preemption. Nonetheless, the Court requested, and both parties submitted, supplementary briefs

responding to the intergovernmental immunity claim raised first by the United States in its

Statement of Interest. The parties therefore were on notice that the Court might consider this

argument and had adequate opportunity to address it. The Court will consider the

intergovernmental immunity doctrine arguments even though they were not contained in the

amended complaint.

Under the intergovernmental immunity doctrine, "a state regulation is invalid

only if it [1] regulates the United States directly or [2] discriminates against the Federal

Government or those with whom it deals." See North Dakota v. United States, 495 U.S. at 435.

Because "a [state] regulation imposed on one who deals with the Government has as much

potential to obstruct governmental functions as a regulation imposed on the Government itself," intergovernmental immunity may apply to state regulation that impacts government contractors. See id. at 438; see also Boeing Co. v. Movassaghi, 768 F.3d 832, 842-43 (9th Cir. 2014) ("The federal government's decision to hire Boeing to perform the cleanup rather than using federal employees does not affect our immunity analysis on [the grounds of discrimination]. When the state law is discriminatory, a private entity with which the federal government deals can assert immunity."). Nevertheless, courts have consistently held that "neutral state law[s] regulating [the federal government's] suppliers" are not unconstitutional because they "are but normal incidents of the organization within the same territory of two governments." See North Dakota v. United States, 495 U.S. at 435 (quoting Helvering v. Gerhardt, 304 U.S. 405, 422 (1938)).

Under the first prong of the intergovernmental immunity doctrine, only those state laws that regulate the federal government directly are unconstitutional. See North Dakota v. United States, 495 U.S. at 435. The Supreme Court has "decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." See id. at 434.

To determine if the D.C. Law and Final Rules qualify as direct regulation of the federal government, the Court looks to analogous case law. On the one hand, courts have invalidated state laws that interfered with a federal contractor's ability to "discharge its contractual obligations" consistent with the terms set out by the federal government. See, e.g., Boeing Co. v. Movassaghi, 768 F.3d at 840. In contrast, in North Dakota v. United States, the Supreme Court found that "concerns about direct interference with the Federal Government . . . [were] not implicated" when the state's "reporting requirement and the labeling regulation operate[d] against suppliers [of liquor to military bases], not the Government." See North

66

Dakota v. United States, 495 U.S. at 436.  The situation here is more akin to the facts of North Dakota v. United States.  Although SLSA's members may also operate as government contractors for purposes of FDLP and Government-Owned FFELP loans, those servicers are not operating as government contractors when servicing Commercial FFELP loans.  With respect to those loans, the servicer is acting pursuant to its contract with a private lender.  By definition, then, the servicer cannot be operating as a federal contractor protected from state direct regulation.

    The fact that the federal government guarantees and reinsures Commercial FFELP loans is also insufficient to warrant providing intergovernmental immunity.  Intergovernmental immunity prevents states from regulating the federal government's "operations" or its "property."  See Blackburn v. United States, 100 F.3d 1426, 1435 (9th Cir. 1996) (citing Hancock v. Train, 426 U.S. 167, 178-80 (1976); McCulloch v. Maryland, 17 U.S. 316 (1819)).  Commercial FFELP loans are not owned by the federal government, and they therefore do not qualify as federal government property for purposes of Supremacy Clause protection.  The question remains whether the federal government's interests in Commercial FFELP loans – as a guarantor or reinsurer – are sufficient to qualify them as federal property.  In a case involving the intergovernmental tax immunity doctrine – a corollary to the intergovernmental immunity doctrine that prohibits states from taxing federal property – the Supreme Court held that a federal agency's guarantee of privately-owned securities was insufficient to render it property of the United States.  See Rockford Life Ins. v. Ill. Dep't of Rev., 482 U.S. 182, 189-91 (1987).  The Court reasoned that because the United States only guaranteed the loans, it had "[no] fixed and certain obligations," and that the state tax at issue had no "adverse effect" on the borrowing power of the United States.  See id. at 190.  In the instant case, where the federal government

acts as a guarantee agency or reinsurer only, the Court concludes that its interests in Commercial

FFELP loans likewise do not qualify as federal property for purposes of intergovernmental

immunity.

Under the second prong of the intergovernmental immunity doctrine, the D.C.

Law and Final Rules may still violate the intergovernmental immunity doctrine if they

discriminate against the federal government or those with whom it deals.  To find that a state law

discriminates against the federal government, the Court must conclude that the state "treats

someone else better than it treats" the federal government or those with whom it deals.  See

North Dakota v. United States, 495 U.S. at 438 (quoting Washington v. United States, 460 U.S.

536, 544-45 (1983)).  A regulation is non-discriminatory if it is "imposed on some basis

unrelated to the object's status as a Government contractor or supplier, that is, [if it is] imposed

equally on other similarly situated constituents of the State."  See id. at 438.  The D.C. licensing

scheme applies to all student loan servicers operating in the District – whether they contract with

the federal government or not.  See D.C. Law 21-214 § 3000.1.  The D.C. Law and Final Rules

do not treat any other student loan servicers better than they treat those that contract with the

federal government, and therefore are not impermissibly discriminatory.

SLSA argues that the District of Columbia's purpose in enacting the D.C. Law

and Final Rules should be dispositive in finding the D.C. licensing scheme discriminatory.

Specifically, SLSA argues, the D.C. licensing scheme was created because the District of

Columbia disagrees with federal policy, and the D.C. Law was intended to correct perceived

deficiencies in the federal government's regulation of student loan servicers.  It maintains that

the Council of the District of Columbia targeted the federal government, as evidenced by the

statute's legislative history and the Council's choice to regulate student loan servicing, in which

the federal government plays a major role, as opposed to other types of loan servicing.  See Pl. IG Immunity at 8-10.  The Supreme Court has never addressed whether discriminatory intent is enough to violate the Supremacy Clause.  But "[i]t is a familiar principle of constitutional law that [the Supreme] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  See United States v. O'Brien, 391 U.S. 367, 383 (1968).  In United States Postal Serv. v. City of Berkeley, the United States Postal Service sought declaratory relief, alleging that a city zoning ordinance was unconstitutional under the Supremacy Clause.  See United States Postal Serv. v. City of Berkeley, 228 F. Supp. 3d 963, 968 (N.D. Cal. 2017).  In denying the City's motion to dismiss, the Northern District of California relied upon United States v. O'Brien to distinguish between discriminatory intent of a facially neutral state law and its discriminatory, practical effect or impact.  See id. at 969.  The district court explained that "allegations of legislative motive behind [the state law's] passage would not suffice to establish unconstitutionality," but "the inevitable effect of a statute on its face may render it unconstitutional."  See id. at 969 (quoting United States v. O'Brien, 391 U.S. at 384-85).  Thus, even if the D.C. Law and Final Rules were enacted with the discriminatory motive that SLSA alleges, it is insufficient to render the state law discriminatory for purposes of finding a violation of the Supremacy Clause.  The Court would need to find a discriminatory impact, and none exists here.

The D.C. Law and Final Rules, therefore, do not violate the intergovernmental immunity doctrine as they apply to Commercial FFELP loans.  The D.C. licensing scheme constitutionally regulates servicers in their servicing of Commercial FFELP loans.  The Court will deny SLSA's motion for summary judgment on its First Claim for declaratory judgment as it respects servicing of Commercial FFELP loans.

## IV. CONCLUSION

For the reasons set forth in this Opinion, the D.C. Law and Final Rules are preempted under principles of conflict preemption as they relate to the servicing of FDLP and Government-Owned FFELP loans, but not with respect to Commercial FFELP loans. Under Claim One, conflict preemption, SLSA is entitled to judgment as a matter of law with respect to its members' servicing of FDLP and Government-Owned FFELP loans. The Court therefore declares the D.C. Law 21-214 and Final Rules preempted under the Supremacy Clause as applied to the servicing of FDLP and Government-Owned FFELP loans. The District of Columbia is enjoined from enforcing the D.C. Law 21-214 and Final Rules against student loan servicers with respect to their servicing of FDLP and Government-Owned FFELP loans.

SLSA is not entitled to judgment as a matter of law with respect to its field preemption (Claim Two) or express preemption (Claim Three) claims, nor is it entitled to judgment as a matter of law with respect to its conflict preemption claim (Claim One) as it relates to its members' servicing of Commercial FFELP loans. The D.C. Law 21-214 and Final Rules may remain in place, and SLSA's members must comply with the D.C. Law 21-214 and Final Rules with respect to their servicing of Commercial FFELP loans. The Court suggests that the District of Columbia clarify for servicers operating in the District of Columbia how to comply with its licensing scheme with respect to servicing some, but not all, of their loans. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 11/21/18

70